# EXHIBIT 20

## Baumgarten, David

| | |
|---|---|
| **From:** | Baumgarten, David |
| **Sent:** | Thursday, July 14, 2016 7:28 PM |
| **To:** | Bandlow, Lincoln; Arnold, Margo J. |
| **Cc:** | Boyle, Nicholas; Hamilton, Eric |
| **Subject:** | RE: CoStar Realty Information, Inc. et al. v. Apartment Hunters, Inc., et al. (Case No.: 8:15-cv-0211-JLS-KES) |

Lincoln and Margo,

I write in response to your July 14, 2016 letter. We are in the final stages of collecting and processing Plaintiffs' website captures documenting Defendants' publication of CoStar photographs and listing information.  As requested, we will produce those captures as soon as possible — we are aiming for next week.

We will also agree to extend AHI's deadline to respond to Plaintiffs' Interrogatories No. 1 and No. 3 from July 18 until **one week** following Plaintiffs' production of website captures.  For the avoidance of doubt, Plaintiffs still expect to receive Apartment Hunters' responses to the remainder of Plaintiffs' First Set of Interrogatories on or before July 18, 2016.

Additionally, for the avoidance of doubt, we note that Plaintiffs' First Set of Interrogatories (and Requests for Production) define the terms "CoStar Photographs" and "CoStar Listings" as those photographs and listings that either (a) CoStar has specifically claimed Defendants infringed or misappropriated or (b) Defendants know, or have or had reason to believe, were infringed, misappropriated, or otherwise directly or indirectly sourced from CoStar (whether by Defendants or any other persons).  *See, e.g.*, Plaintiffs' Interrogatories, Definitions 4, 5; May 9, 2016 Letter from D. Baumgarten to L. Bandlow.  Thus, the set of photographs and listings regarding which AHI is required to provide information in response to Interrogatories No. 1 and No. 3 (and provide documents in response to Plaintiffs' Requests for Production) is potentially much broader than the set of CoStar photographs and listings that Plaintiffs have to date specifically identified as having been published by AHI.  Merely searching for information and documents relating to the website captures Plaintiffs will produce shortly does not satisfy AHI's discovery obligations.  Accordingly, Plaintiffs reiterate the suggestion that AHI provide third party vendor PicScout with access to (a) its full set of seed files from the period in question and (b) to its photo database, for the purposes of running an automated comparison to CoStar's databases.  *See* May 23, 2016 e-mail from D. Baumgarten to M. Arnold.

Sincerely,

**David Baumgarten**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5929 | (F) 202-434-5029
dbaumgarten@wc.com | www.wc.com/dbaumgarten

---

**From:** Liu, Cindy [mailto:CLiu@foxrothschild.com]
**Sent:** Thursday, July 14, 2016 1:00 PM
**To:** perigoe@caldwell-leslie.com; Boyle, Nicholas <NBoyle@wc.com>; Baumgarten, David <DBaumgarten@wc.com>; Hamilton, Eric <EHamilton@wc.com>
**Cc:** Bandlow, Lincoln <lbandlow@foxrothschild.com>; Arnold, Margo J. <marnold@foxrothschild.com>
**Subject:** CoStar Realty Information, Inc. et al. v. Apartment Hunters, Inc., et al. (Case No.: 8:15-cv-0211-JLS-KES)

Dear Counsel,

Please see attached correspondence for your review and records.

Thank you.

Sincerely,

**Cindy Liu**
Legal Administrative Assistant to
David Aronoff
Lincoln Bandlow
Patrick J. Hagan
Margo Arnold
**Fox Rothschild LLP**
1800 Century Park East
Suite 300
Los Angeles, CA 90067
(310) 228-3077 - direct
(310) 556-9828 - fax
CLiu@foxrothschild.com
www.foxrothschild.com

This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (215)-299-2167 or notify us by e-mail at helpdesk@foxrothschild.com. Also, please mail a hardcopy of the e-mail to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3222 via the U.S. Postal Service. We will reimburse you for all expenses incurred. Thank you.

# EXHIBIT 21

1   Lincoln D. Bandlow (SBN 170449)
    lbandlow@foxrothschild.com
2   Margo J. Arnold (SBN 27288)
    marnold@foxrothschild.com
3   **FOX ROTHSCHILD LLP**
    1800 Century Park East, Suite 300
4   Los Angeles, CA 90067-1506
    Telephone:  310.598.4150
5   Facsimile:   310.556.9828

6   Attorneys for Defendants
    Apartment Hunters, Inc.,
7   Kevin Shayan, and
    Steven Shayan

8

9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12  COSTAR REALTY INFORMATION,          Case No.: 8:15-cv-02111- JLS-KES
    INC., and APARTMENTS, LLC
13                                       **HON. JOSEPHINE L. STATON**
              Plaintiffs,
14
        vs.                              **DEFENDANT APARTMENT**
15                                       **HUNTERS, INC.'S OBJECTIONS**
                                         **AND RESPONSES TO**
16  APARTMENT HUNTERS, INC.,             **PLAINTIFFS' FIRST SET OF**
    KEVIN SHAYAN, and STEVEN             **INTERROGATORIES**
17  SHAYAN
18
              Defendants.
19

20

21

22

23

24

25

26

27

28

---

| | |
|---|---|
| PROPOUNDING PARTY: | Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC |
| RESPONDING PARTY: | Defendant Apartment Hunters, Inc. |
| SET NO: | ONE (1) |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Apartment Hunters, Inc. ("AHI") hereby objects and responds to Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC's, (collectively as "Plaintiffs") First Set of Interrogatories as follows:

## **GENERAL OBJECTIONS**

The following general objections to Plaintiffs' Interrogatories are incorporated into each and every response to each individual Interrogatory as though fully set forth therein:

1.    AHI objects to the Interrogatories to the extent that they seek to impose obligations on it greater than or more extensive than those required by the Federal Rules of Civil Procedure.

2.    AHI objects to the Interrogatories to the extent that they seek information equally or more available to, or already in the possession, custody or control of Plaintiffs.

3.    Discovery is continuing in this action, and AHI has not completed its factual investigation.  These responses are made in good faith and after diligent inquiry into the facts and information now known to AHI.  However, information that may be responsive to the Interrogatory may not have been discovered.  Accordingly, without asserting an obligation to do so, and without waiving the objections asserted herein, AHI reserves the right to amend/supplement its responses as and when additional information and/or documents are discovered.  Additionally, because AHI's responses are based upon information which it has identified to date, it does not preclude AHI from relying on facts or documents discovered or generated pursuant to subsequent investigation and discovery.

4.     In providing responses and objections to the Interrogatories, AHI expressly reserves all of its objections to the use of the responses herein, including but not limited to, objections as to the competency, relevance, materiality, and admissibility thereof.

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:**

Identify the source from and/or means by which You obtained each CoStar Photograph and each CoStar Listing, including, but not limited to, the names of any websites involved; the names, roles and contact information of any other Person involved; the method, including software or other technical means, used to capture the photograph or listing; and the title of any contract relating to such conduct.

**RESPONSE TO INTERROGATORY NO. 1:**

AHI objects to this interrogatory as burdensome and harassing because of its compound nature. AHI further objects to this interrogatory because it is presently pursuing its investigation of the facts and law relating to this case, and has not completed its discovery or preparation for trial. Therefore, this response is being provided without prejudice to AHI's right to add, modify or otherwise change or amend these responses and is subject to AHI's right to produce evidence of any subsequently-discovered fact or document.

Notwithstanding the foregoing objections, AHI has not yet been able to locate the photographs identified on CoStar's Exhibit A within its stored website data and, without such information, it is unable to identify the source and/or means, if any, upon which those photographs were obtained.

**INTERROGATORY NO. 2:**

Identify each third party, including without limitation internet services providers (ISPs), hosting services, and server providers, you have utilized to obtain listings, photographs, and information for Your websites and database(s).

**RESPONSE TO INTERROGATORY NO. 2:**

1   AHI objects to this interrogatory as burdensome and harassing because of its

2   scope.  AHI obtains listings, photographs, and information from thousands of

3   landlords, management companies, and third party property owners, employees, or

4   agents and up to 100 of partner feeds, including but not limited to:

5       - RentPath (Apartmentguide.com, Rentals.com, MyNewPlace.com);

6       - Dominion Enterprises (ForRent.com, Homes.com);

7       - ListHub (Move.com, Nationwide MLS data);

8       - On-site.com;

9       - Rentalutions.com;

10      - ShowMojo.com; and

11      - IT49.com.

12  **INTERROGATORY NO.  3:**

13      For each CoStar Photograph and each CoStar Listing, identify any Person who

14  You assert gave permission to You to copy such photograph or listing, and the form of

15  the permission.

16  **RESPONSE TO INTERROGATORY NO.  3:**

17      AHI objects to this interrogatory because it is burdensome and harassing

18  because of its compound nature. AHI further objects to this interrogatory because it is

19  presently pursuing its investigation of the facts and law relating to this case, and has

20  not completed its discovery or preparation for trial.  Therefore, this response is being

21  provided without prejudice to AHI's right to add, modify or otherwise change or

22  amend these responses and is subject to AHI's right to produce evidence of any

23  subsequently-discovered fact or document.

24      Notwithstanding the foregoing objections, AHI has not been able to locate any

25  CoStar Photographs or Listings within its website data.  Without such information, it

26  is unable to identify the Persons who gave it permission to copy and display such

27  Photographs and Listings.

28  **INTERROGATORY NO.  4:**

1  Identify each Person to whom or which You have sold, licensed, or provided
2  real estate information or listings for commercial use. For the avoidance of doubt, this
3  Interrogatory does <u>not</u> call for the identification of individual customers who
4  purchased monthly "memberships" to your website in order to view listings for their
5  own personal, non-commercial use.

6  **RESPONSE TO INTERROGATORY NO.  4:**

7  AHI does not sell, license, or provide real estate information or listings for
8  commercial use.

9  **INTERROGATORY NO.  5:**

10  Identify all instances in which You (which, for the avoidance of doubt, is
11  defined to include agents and employees) have accessed any database or website
12  (including without limitation www.apartments.com, www.apartmenthomeliving.com,
13  and www.apartmentfinder.com) made available or hosts by CoStar or any of its
14  affiliates, including, but not limited to, the date of that access, and any efforts taken
15  (including but not limited to using rotating IP addresses) to try to ensure that CoStar
16  and/or its affiliates did not discover that You (which, for the avoidance of doubt, is
17  defined to include agents and employees) were accessing such database or website.

18  **RESPONSE TO INTERROGATORY NO.  5:**

19  No such instances have occurred.

20  **INTERROGATORY NO.  6:**

21  Identify each individual IP address You (which, for the avoidance of doubt, is
22  defined to include agents and employees) used to access, view, or otherwise use
23  www.apartments.com, www.apartmenthomeliving.com, and
24  www.apartmentfinder.com.

25  **RESPONSE TO INTERROGATORY NO.  6:**

26  No such IP addresses exist.

27  **INTERROGATORY NO.  7:**

28

1    Identify the servers on which the photographs displayed on Your websites are
2 stored, and any Person who own and/or license use of such servers to You.

3 **RESPONSE TO INTERROGATORY NO.  7:**

4    AHI objects to this interrogatory because it seeks information that is not related
5 to a matter that is relevant to any party's claim or defense and proportional to the
6 needs of the case.

7    Notwithstanding the foregoing objection, the photographs displayed on AHI's
8 websites are stored on Amazon Cloud Drive which is licensed to AHI by Amazon.

9 **INTERROGATORY NO.  8:**

10    Describe any relationship between You (which, for the avoidance of doubt, is
11 defined to include any affiliates or subsidiaries, whether domestic or foreign) and
12 Delta Centric, LLC, Host1Plus, and/or Digital Energy Technologies (an/or with their
13 respective affiliates), including without limitation identifying the names and dates of
14 any contracts for services with such entities.

15 **RESPONSE TO INTERROGATORY NO.  8:**

16    No such relationships exist.

17 **INTERROGATORY NO.  9:**

18    Describe the methods You use to verify the availability of apartment listings
19 displayed on Your websites, including the frequency with which You use those
20 methods and the basis for statements on Your websites (appearing, for instance, on
21 search result pages) that specific listings were "Updated," "Modified," "Posted,"
22 "Refreshed," "Vacant," or "Price Reduced" at a specific date and time.

23 **RESPONSE TO INTERROGATORY NO.  9:**

24    AHI objects to this interrogatory because it seeks information that is not related
25 to a matter that is relevant to any party's claim or defense and proportional to the
26 needs of the case. AHI further objects to this interrogatory as burdensome and
27 harassing because it previously stipulated that rental listings are time-sensitive and
28 discovery into this subject is no longer necessary.

**INTERROGATORY NO. 10:**

Describe the methods You use to process the photographs and listing information You acquire or post on Your websites, including without limitation any processes for editing, altering, or cropping of photographs or for editing, altering, reorganizing, or rewriting listing information.

**RESPONSE TO INTERROGATORY NO. 10:**

AHI does not modify feeder information.  Information received by third parties, including management companies, landlords, and third-party feeders, is reviewed for inappropriate or unwanted content and then is published as initially provided on the websites.

**INTERROGATORY NO. 11:**

Identify every instance in which You (which, for the avoidance of doubt, is defined to include agents and employees) have had any involvement (for example, without limitation, as a plaintiff, employee of a plaintiff, defendant, employee of a defendant, third party, employee of a third party, consultant, or actual or potential witness) in any claim, dispute or proceeding involving copyright or other intellectual property issues, or involving apartment listings or photographs, including without limitation any claims or disputes that were resolved without litigation.

**RESPONSE TO INTERROGATORY NO. 11:**

AHI objects to this interrogatory because it is burdensome and harassing as to its scope.  AHI objects to this interrogatory because it is compound.  AHI further objects to this interrogatory because it seeks information that is not related to a matter that is relevant to any party's claim or defense and proportional to the needs of the case.

Notwithstanding the foregoing objections, AHI states that in 2014 the California Bureau of Real Estate filed a complaint against it for allegedly using pictures and information about certain rental properties without permission. The Bureau Commissioner found AHI liable for such conduct on July 1, 2015.  AHI,

1   however, is in the process of appealing that decision.

2   **INTERROGATORY NO.  12:**

3   Identify every action You have taken to protect intellectual property owned or

4   claimed by You, including, without limitation, using copyright or trademark notices,

5   symbols or other indicators of intellectual property status; using terms of use, terms of

6   access, terms of service, or licenses; filing for copyright, trademark or patent

7   protection; engaging in litigation involving copyrights, trademarks or patents; and

8   engaging in non-litigation communications relating to copyright, trademarks or

9   patents.

10  **RESPONSE TO INTERROGATORY NO.  12:**

11  AHI objects to this interrogatory because it is burdensome and harassing as to

12  its scope.  AHI objects to this interrogatory because it is compound.  AHI further

13  objects to this interrogatory because it is presently pursuing its investigation of the

14  facts and law relating to this case, and has not completed its discovery or preparation

15  for trial.  Therefore, this response is being provided without prejudice to AHI'S right

16  to add, modify or otherwise change or amend these responses and is subject to AHI'S

17  right to produce evidence of any subsequently-discovered fact or document.

18  Notwithstanding the foregoing objections, AHI states that it has taken action to

19  protect its intellectual property through the use of (i) a Terms and Conditions

20  agreement that anyone accessing their websites agrees to be bound to by accessing the

21  website and (ii) copyright notices on each of their webpages.

22  **INTERROGATORY NO.  13:**

23  Identify all Persons You believe to have discoverable information concerning

24  this action and identify the subject matter of that knowledge.

25  **RESPONSE TO INTERROGATORY NO.  13:**

26  AHI objects to this interrogatory because it is burdensome and duplicative

27  given that it seeks the same information provided in Defendants' Initial Disclosures.

28  AHI objects to this interrogatory because it is compound.  AHI further objects to this

interrogatory because it is presently pursuing its investigation of the facts and law relating to this case, and has not completed its discovery or preparation for trial. Therefore, this response is being provided without prejudice to AHI's right to add, modify or otherwise change or amend these responses and is subject to AHI's right to produce evidence of any subsequently-discovered fact or document.

Notwithstanding the foregoing objections, the persons AHI currently believes have discoverable information concerning this action are as follows:

| Person | Subject Matter of Knowledge |
|---|---|
| Kevin Shayan, employee, Apartment Hunters, Inc.  Mr. Shayan can be contacted through his counsel, Lincoln D. Bandlow, at Fox Rothschild LLP, 1800 Century Park East, Suite 300 Los Angeles, CA 90067. | Apartment Hunters, Inc.'s policies, procedures, and activities; and Mr. Shayan's personal conduct. |
| Steven Shayan, Chief Executive Officer, Apartment Hunters, Inc.  Mr. Shayan can be contacted through his counsel, Lincoln D. Bandlow, at Fox Rothschild LLP, 1800 Century Park East, Suite 300 Los Angeles, CA 90067. | Apartment Hunters, Inc.'s policies, procedures, and activities; and Mr. Shayan's personal conduct. |
| Vidmantas Mačys, Manager of UAB Apartment Hunters LT, Savanorių pr. 349, LT-51480 Kaunas | Apartment Hunters, Inc.'s systems and operations. |
| Denis Portnov, employee, Apartment Hunters, Inc.  Mr. Portnov can be contacted through Lincoln D. Bandlow, at | Apartment Hunters, Inc.'s systems and operations. |

| | |
|---|---|
| Fox Rothschild LLP, 1800 Century Park East, Suite 300 Los Angeles, CA 90067. | |
| The corporate designee(s) of CoStar. CoStar's designee(s) may be contacted through CoStar's counsel, Kelly L. Perigoe, Caldwell, Leslie & Proctor, PC, 725 South Figueroa Street, 31st Floor, Los Angeles, California 90017-5525, 213-629-9040, perigee@caldwell-leslie.com | Plaintiffs believe the designee(s) will have knowledge of CoStar's policies, procedures, and activities, including copyright procedures, agreements for sharing of data and information provided by CoStar to third-party licensees, CoStar's copyright infringement protocol, and what information and photographs Defendants' allegedly have copied. |
| The corporate designee(s) of Apartments. Apartments' designee(s) may be contacted through Apartments' counsel, Kelly L. Perigoe, Caldwell, Leslie & Proctor, PC, 725 South Figueroa Street, 31st Floor, Los Angeles, California 90017-5525, 213-629-9040, perigee@caldwell-leslie.com | Plaintiffs believe the designee(s) will have knowledge of CoStar's policies, procedures, and activities, including copyright procedures, agreements for sharing of data and information provided by CoStar to third-party licensees, CoStar's copyright infringement protocol, and what information and photographs Defendants' allegedly have copied. |

Dated:  July 28, 2016                    FOX ROTHSCHILD LLP

By _____
Lincoln D. Bandlow
Margo J. Arnold
Attorneys for Defendants
Apartment Hunters, Inc.,
Kevin Shayan, and
Steven Shayan

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

**VERIFICATION**

I, Steven Shayan, declare:

I have read the foregoing DEFENDANT APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES and know its contents.

I am a principal for Apartment Hunters, Inc. and I am authorized to make this verification for and on its behalf, and I make this verification for that reason. These responses were assembled by our counsel of record and I am informed and believe that the responses are true and complete.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 27th day of July, 2016, at DANA POINT CA 11:40 AM.

_____
Steven Shayan

**<u>PROOF OF SERVICE</u>**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California.  My business address is 1800 Century Park East, Suite 300, Los Angeles, CA 90067-1506.

On July 28, 2016, I served the following document(s) described as **DEFENDANT APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Fox Rothschild LLP practice for collecting and processing correspondence for mailing.  On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☐ **BY OVERNIGHT MAIL (FEDEX):**  I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

☐ **BY PERSONAL SERVICE:**  I personally delivered the document(s) to the person being at the addresses listed in the Service List.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.  (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

☑ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address marnold@foxrothschild.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of July, 2016 at Los Angeles, California.

_____
Cindy Liu

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

1

**SERVICE LIST**

2

3   Nicholas J. Boyle
    David K. Baumgarten
4   Eric J. Hamilton
5   Williams and Connolly LLP
    725 Twelfth Street NW
6   Washington, DC 20005-5901
7   202-434-5000
    Fax: 202-434-5029
8   Email: nboyle@wc.com
9   Email: dbaumgarten@wc.com
    Email: ehamilton@wc.com
10

11  Kelly L. Perigoe
    Caldwell Leslie and Proctor PC
12  725 South Figueroa Street 31st Floor
13  Los Angeles, CA 90017-5524
    213-629-9022
14  Fax: 213-629-9022
15  Email: perigoe@caldwell-leslie.com

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET
OF INTERROGATORIES

# EXHIBIT 22

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DAVID BAUMGARTEN
(202) 434-5929
dbaumgarten@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

September 9, 2016

<u>Via Email</u>

Lincoln D. Bandlow
Margo J. Arnold
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506

      Re:    *CoStar Realty Information, Inc., et al. v. Apartment Hunters, Inc., et al.*, No. 8:15-<u>cv-02111-JLS-KES</u>

Dear Counsel:

      I write on behalf of Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar") regarding (a) Apartment Hunters, Inc.'s ("AHI") Response to Plaintiffs' Request for Production ("RFP") No. 34 and (b) the portion of the Joint Stipulation Regarding Plaintiffs' Motion to Compel (the "Stipulation") submitted on behalf of AHI on Thursday, September 1, 2016, and the Declarations provided therewith.

## **Defendants' Response to Plaintiffs' RFP No. 34**

      AHI states that it will "make available in advance of September 29" non-privileged documents responsive to RFP No. 34. ***Please produce all such documents to CoStar by Friday, September 16.***

## **Defendants' Portion of the Stipulation**

      As you have doubtless realized, after receiving and reviewing AHI's proposed portion of the Stipulation, CoStar elected not to immediately file its Motion to Compel and the accompanying Stipulation with the Court.  This decision was based both on AHI's failure to comply with the Local Rules governing the Stipulation, as well as a number of troubling substantive inaccuracies contained within AHI's proposed portion of the Stipulation. For the avoidance of doubt, depending on AHI's response to the issues raised in this letter, CoStar

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 2

reserves all rights to either file the present combined draft of the Stipulation or to submit a revised portion of the Stipulation to AHI (in which case AHI would, of course, have seven days to submit a revised response, consistent with Local Rule 37-2).  Thus, while this letter does not endeavor to respond to every argument set forth by AHI in its portion of the Stipulation, we write to highlight a few issues as to which we believe the parties may yet make progress—and to correct the record as to a certain inaccuracies:

 *First*, AHI's portion of the Stipulation does not comply with Local Rule 37-2.1, which limits each party's introductory statement to three pages in length.  AHI's introductory statement is seven and a half pages.  ***In the event that the parties submit revised portions of the Stipulation, please comply with Local Rule 37-2.1.***

 *Second*, citing the accompanying Declaration of Ms. Arnold, AHI asserts that "CoStar's counsel admitted to Defendants' counsel that its general practice is to send cease and desist letters prior to filing a lawsuit and that it strategically opted to not following [sic] this practice with Apartment Hunters."  *See* Stipulation at 22; *see also* Arnold Decl. at ¶ 2.  AHI does not state who made this representation, but neither Nick Boyle, I, nor anyone else at Williams & Connolly made this statement.[1]  ***In the event that the parties submit revised portions of the Stipulation, please remove this inaccurate assertion (and also submit a revised declaration that removes this inaccurate assertion).***  If AHI insists on filing a Stipulation and/or Declaration containing this assertion following this warning, CoStar will bring the inaccuracy of the statement to the Court's attention and seek appropriate relief.

 *Third*, AHI's primary excuse for its failure to produce documents responsive to RFP Nos. 2, 3, and 4 rests on its assertion—never before raised in the meet-and-confer process—that CoStar has failed to identify the specific locations on AHI's network of websites at which Defendants published CoStar's photographs and information.  AHI's assertion is false.  As the below examples illustrate, CoStar has, in multiple ways, already identified its photographs and information that Defendants copied and published:

  *AHI assertion*: "Exhibit A, however, does not identify where on Apartment Hunter's [sic] website the photos allegedly were seen."  *See* Stipulation at 4-5.

   *Reality*: The first column in Exhibit A to CoStar's Complaint is titled **"Location (URL) of Listing Displaying Infringing Photos,"** and provides the URL for each of the 26 listings in which the 93 photos identified in Exhibit A were included.  *See* Exhibit A (attached as Ex. A).  Moreover, because Defendants use a standard format for creating URLs for the website www.apartmenthunterz.com, **each of those URLs contains a unique nine-digit "Listing ID"**—*i.e.*, a unique

---

[1] On a meet-and-confer call, in response to a question from Mr. Bandlow, Mr. Boyle stated that while CoStar's practice was to send cease-and-desist letters where infringement appears to be inadvertent or innocent, it does not do so where infringement appears to be deliberate and systematic.  If you wish to bring that statement to the Court's attention, we have no objection.

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 3

number created by AHI and presumably used to identify and track listings—providing AHI with another means of identifying the sample of infringing photographs identified in the Complaint.  In addition, the second column in Exhibit A provides the full address of each of the 26 properties featured in the 93 sample infringing photographs.  And the final column in Exhibit A, titled "CoStar-Copyrighted Photos As Displayed on ApartmentHunterz.com," contains thumbnail copies of each of the 93 infringing photographs.

Thus, Exhibit A not only "identif[ies] where on [AHI's] website the photos allegedly were seen," but **provides AHI with four separate data points**—the listing URL, the unique listing ID, the property address, and the thumbnail photos—to identify the sample photographs and listings identified in the Complaint.[2]

**_AHI assertion_**: "CoStar has failed to tell Apartment Hunters in discovery (or the Court in its Complaint) _what_ information was misappropriated.  In fact, CoStar has not produced a single page of 'evidence' or discovery documents to identify what type of sensitive information was allegedly misappropriated, or where it allegedly resided."  _See_ Stipulation at 4.

**_Reality_**: Defendants' Interrogatory No. 2 asked CoStar to identify "each and every listing you claim Defendants copied, reproduced, published, or used without your permission"—_i.e._, to identify the information Plaintiffs claim that Defendants misappropriated.  In response, CoStar provided a list of 31 specific property names and addresses for which CoStar is presently aware of Defendants' having copied and published listings.  _See_ CoStar Resp. and Obj. to AHI's 1st Interrogatories, June 3, 2016 (Ex. B).

CoStar further stated that pursuant to Fed. R. Civ. P. 33(d), the "written content used in each listing" could be derived from documents that Defendants intended to produce.  _See id._  On July 21, 2016, CoStar produced screen captures of each of those 31 listings—displaying the misappropriated written information—as they appeared on Defendants' websites.[3]  And in the cover letter accompanying that production, CoStar supplemented its Response to Interrogatory No. 2 to explicitly identify these documents to AHI, stating:

---

[2] The foregoing is _more_ information than AHI's own terms of service require of a copyright owner submitting a takedown notice to AHI pursuant to Section 512(c) of the Digital Millennium Copyright Act. _See_ AHI_000249 at 4.

[3] _See_ CoStar_0000156, _000157, _000161, _000165, _000169, _000173, _000177, _000182, _000187, _000192, _000197, _000201, _000205, _000209, _000213, _000219, _000224, _000227, _000231, _000235, _000242, _000246, _000250, _000255, _000259, _000263, _000267, _000272, _000277, _000281, _000396, and _000397.

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 4

The "written content used" in each listing referenced in CoStar Realty Information, Inc.'s and Apartments, LLC's respective Responses to Interrogatory No. 2 may be derived or ascertained from the documents bearing Bates numbers COSTAR_0000157 through COSTAR_0000282 and COSTAR_0000396 through COSTAR_0000397.

*See* Baumgarten Lttr to Bandlow and Arnold, July 21, 2016 (Ex. C).

**Each of these 31 screen captures produced by CoStar displays a "Listing ID"—*i.e.*, the unique number *Defendants* use to identify each of their listings—on the top navigation bar.** *See, e.g.*, CoStar_0000169 (Shelley Court listing, displaying "Listing ID: 143839739") (Ex. D). As noted above, because Defendants' websites employ a standard URL format, the Listing IDs also functionally provided AHI with the URL at which each of the 31 listings containing misappropriated information was published.

In sum, CoStar has served written discovery responses identifying the 31 listings (of which it is presently aware) published by AHI that contain misappropriated information; produced screenshots of each of those 31 listings displaying the misappropriated information and a unique Listing ID (and containing the information required for AHI to determine the URL at which each listing was published); and identified the Bates ranges at which those screenshots were produced.

In addition, AHI's portion of the Joint Stipulation focuses entirely on the sample photographs and listings identified in Exhibit A, *see, e.g.*, Stipulation at 4-5, 23—even though CoStar has subsequently identified additional examples of Defendants' infringement and misappropriation beyond those identified in Exhibit A.

- As discussed above, in response to AHI's Interrogatory No. 2, CoStar set forth 31 listings for which CoStar presently believes Defendants have misappropriated listing information (the majority identified in Exhibit A, as well as some additional newly-identified listings). *See* Ex. B.

- Similarly, in response to AHI's Interrogatory Nos. 1 and 3, CoStar identified the 39 listings (of which it is presently aware) that contain photographs Defendants copied, reproduced, published, or used without CoStar's permission (again, the majority were identified in Exhibit A, as well as some additional newly-identified photographs). *See* Appx. A to CoStar Resp. and Obj. to AHI's 1st Interrogatories, June 3, 2016 (Ex. E).

In total, CoStar has identified 40 listings on Defendants' websites containing a total of 124 infringing photographs and/or misappropriated listing information. Through its Complaint, discovery responses, and productions, provided AHI with full addresses for ***all 40*** listings,

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 5

thumbnail or full-size versions of *all 124* copyrighted photographs, and URL and/or unique Listing IDs for 37 of the 40 listings at issue.[4]  AHI should be searching for documents relating to all of those listings and photographs, as well.

Frankly, we are uncertain why AHI would make the above-described baseless assertions (along with numerous other similar claims as to CoStar's purported failures to identify the misappropriated photos and information at issue) and ignore CoStar's detailed written discovery requests which identify and describe additional instances of misappropriation and infringement. The most likely explanation is that AHI is again engaging in the pattern of gamesmanship—described in CoStar's portion of the joint stipulation—that has characterized AHI's prior litigations.  In any event, though not obligated to do so, CoStar will provide AHI with yet another chance to produce documents responsive to RFP Nos. 2, 3, and 4, now that CoStar has highlighted the above identifying information that has long been in AHI's possession and provided the limited items of additional information set forth in note 4 *supra*.  ***Please produce documents responsive to RFP Nos. 2, 3, and 4 by Friday, September 16; if AHI fails to do so, CoStar will submit a revised Stipulation.***

***Fourth***, AHI's portion of the Stipulation contains a handful of additional representations that demonstrably misstate or mischaracterize the factual record.  ***In the event that the parties submit revised portions of the Stipulation, please revise the following representations***.  If AHI insists on submitting to the Court a Stipulation including these disingenuous assertions following this warning, CoStar will bring the inaccuracy of these assertions (and CoStar's request that they be corrected) to the court's attention and seek appropriate relief.

- AHI asserts that CoStar has not met-and-conferred with AHI about its review status and is making an "end-run around any informal resolution methods."  *See* Stipulation at 7; *see also id.* 27-28.  In reality, in addition to participating in lengthy meet-and-confer calls on May 4, 2016 and June 7, 2016, counsel for CoStar sent no fewer than *nine* emails and letters in the past few months regarding AHI's disclosure failures and discovery responses (all cited as exhibits to the Stipulation) prior to sending AHI its portion of the Stipulation.  In contrast, AHI spends much of its portion of the Stipulation complaining about CoStar's production shortcomings—despite never before raising any complaints (let alone asking for a meet-and-confer) regarding CoStar's productions to date.[5]

---

[4] The three listings for which CoStar has not previously provided a URL or Listing ID were identified in CoStar's Response to Interrogatory Nos. 1 and 3.  *See* Ex. E.  The addresses and Listing IDs of these listings are:
  - Mariner's Point, 319 Caspian Way, Imperial Beach, CA 91932: Listing ID – 146283335
  - Park Heights, 2011 Arden Ave, Highland, CA 92346: Listing ID – 147674141
  - Serra Bella Apartments, 2707 Mission Village Dr, San Diego, CA 92123: Listing ID – 137157408
Full size captures of the copyrighted photographs displayed without authorization in these listings were produced in July. *See* CoStar_0000115 to _0000122; CoStar_0000148 to _0000149; CoStar_0000124 to _0000127.

[5] On July 14, 2016, Defendants suggested that if CoStar provided screenshots of its photos and listings as they appeared on Defendants' websites, such screenshots would help Defendants locate such responsive documents.

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 6

- AHI asserts that, "[c]ontrary to CoStar's conclusory allegations," AHI has produced agreements with third parties For Rent Media Solutions and Move Sales, Inc. *See* Stipulation at 7. In reality, CoStar explicitly references AHI's production of those two agreements—and explains (not for the first time) why they are not plausibly relevant to the issues at bar: In short, neither third party provided CoStar content to Defendants. *See* Stipulation at 30; *see also* Baumgarten Lttr to Bandlow, July 15, 2016. Meanwhile, AHI still has not responded to CoStar's repeated explanation as to the irrelevance of these two feed agreements.

- AHI asserts that it has "produced in excess of 5000 pages of documents to date" including "copies of the [listing] feeds from . . . third parties." *See* Stipulation at 5. But AHI admitted more than two months ago that 107 of the 121 (now 122) documents it had produced were listing feeds from April and May 2016—and that it had yet to produce any listing feeds from January 1, 2014 to the day of the filing of the lawsuit. *See* Arnold Letter to Baumgarten, June 22, 2016. Moreover, as CoStar explained, those 107 files were effectively unreadable without AHI's proprietary software. Yet when Costar asked for access to such software, AHI ignored the request. *See* Baumgarten Letter to Arnold, June 13, 2016. Removing those 107 unreadable files that AHI admits are unrelated to the sample listings and photographs CoStar initially identified in Exhibit A, AHI has produced just 148 pages of documents, not "in excess of 5,000."

- AHI repeatedly suggests that CoStar is only seeking to hold Defendants liable for photographs and listings that appeared on Defendants' websites in October and November 2015. *See* Stipulation at 8, 22, 23. In reality, CoStar's Complaint alleges, on information and belief, that Defendants' infringement and misappropriation was ongoing. *See* Complaint ¶ 14, 133, 142. Moreover, the listings CoStar identified in its Responses to AHI Interrogatory Nos. 1, 2, and 3—each containing both infringing copyrighted photographs and misappropriated listing information—include listings discovered by CoStar in ***March 2016***, long after the Complaint was filed.[6]

*__Fifth__*, as you should be aware, at the time CoStar served the Complaint on Defendants, it also hand-delivered letters reminding Defendants of their preservation obligations, including

---

CoStar promptly produced the requested screenshots just a week later, on July 21, 2016. In the ensuing five months, AHI was entirely silent regarding this production and never suggested that there were any flaws with the screenshots, including in Ms. Arnold's recent letter asking CoStar to table the motion. *See* Arnold Letter to Boyle, August 26, 2016. Nonetheless, AHI now complains in its portion of the Stipulation, for the first time, that shortcomings with the format of CoStar's screenshots are somehow to blame for its own lack of productions.

[6] AHI's ongoing misconduct, months after the Complaint was filed gives the lie to its already paper-thin protestations of innocence, as well as undercutting AHI's assertion that its failure to identify misappropriated conduct is somehow attributable to CoStar's decision to file suit only after concluding its investigation of AHI's widespread infringement. Moreover, AHI's failure to produce misappropriated listings that it published well after the Complaint was filed strongly supports CoStar's suspicion, discussed in further detail below, that AHI has engaged in spoliation.

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 7

without limitation that AHI both "suspend any routine document-destruction policies and switch off any function that could result in the automatic deletion of relevant documents, *including without limitation the automatic deletion of* email or *website content*" and "immediately take affirmative actions to *preserve the entire content of the Apartment Hunters Websites as they exist today, to preserve any currently existing prior content, and to ensure that, going forward, all website content is preserved*." *See* Boyle Lttr to AHI, December 18, 2016 (Ex. F) (emphases added). AHI's portion of the stipulation suggests that it has ignored these obligations and requests:

- AHI states that it "periodically purges content," that it "only stores the most recent listing information for a property… [and] removed content is not backed up." *See* Stipulation at 23-24. *Did AHI disable the automatic purging function on its websites, as instructed, upon receipt of the Complaint and above-referenced letter?*

- AHI states that it "preserved a copy of the property listings identified by CoStar" and "'froze' the listings at issue." *See* Stipulation at 24-25. *Why did AHI decline to preserve the entirety of its websites, as instructed by CoStar, and as AHI was obligated to do, given CoStar's allegations that the identified infringing photographs and misappropriated listings were only illustrative samples of what CoStar had reason to believe was broad, systematic unauthorized copying and publishing by Defendants?*

CoStar reserves all rights regarding any spoliation in which AHI has engaged, and will interpret AHI's failure to respond to these queries as an admission that spoliation has occurred.

*Sixth*, as you are aware, CoStar's Complaint alleged that at least *nine* websites owned or operated by Defendants had infringed CoStar's copyrighted photographs and misappropriated CoStar's listing information. *See* Complaint ¶¶ 13-14. The above-referenced preservation letter sent to Defendants therefore instructed them to take the above-described preservation steps as to all nine of those "Apartment Hunters Websites." *See* Ex. F. Defendants admitted in their Answer that AHI "owns and operates" seven of those websites (ApartmentHunterz.com, 4rentinla.com, wetakesection8.com, ifindrentals.com, featuredrentals.com, leaseinsandiego.com and rentsinsanfrancisco.com). *See* Defendants' Answer at ¶ 13.

Accordingly, CoStar's RFPs sought documents relating to the broad set of websites CoStar believes Defendants to own or operate, using "website" as a defined term that encompassed the entire collection of Defendants' websites. *See* CoStar's First Set of Requests For Production to AHI, March 21, 2016 at Definition 13. AHI initially objected to this definition, *see* AHI's Response and Objections to Plaintiffs' First Set of [sic] Production of Documents, April 20, 2016, at General Objection 16. During the ensuing meet-and-confer, counsel for AHI explained that this objection was made because the individual Defendants, not AHI, owned and operated the referenced collection of websites—an assertion that contradicted Defendants' Answer. *See* Baumgarten Lttr to Bandlow, May 9, 2016. In any event, CoStar explained that this objection would cause CoStar to simply serve identical RFPs on the

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
September 9, 2016
Page 8

individual defendants, and AHI stated that it would reconsider its objection. *See id.* AHI then removed its objection to the defined term "website" from its Supplemental Responses and Objections to Plaintiffs' First Set of [sic] Production of Documents, served on May 19, 2016. Thus, AHI already agreed to search for and produce responsive documents relating to the entire collection of websites owned or operated by Defendants (whether by the individuals or AHI).

Moreover, CoStar has identified four listings in its Responses to Interrogatory Nos. 1, 2, and 3—each containing both infringing copyrighted photographs and misappropriated listing information—that appeared on websites other than www.apartmenthunterz.com. *See* Exs. B and E.[7] Defendants admitted to owning and operating all three of the sites on which these listings appear, *see* Answer at ¶ 13, and have no basis to exclude them from the scope of discovery.

Nonetheless, in its portion of the Stipulation, when discussing the limited preservation steps it has taken, AHI repeatedly refers to "Apartment Hunters' website," *see e.g.*, Stipulation at 23, suggesting that it has only attempted to preserve portions of www.apartmenthunterz.com, but not the other websites referenced in CoStar's Complaint, December 18, 2016 preservation letter, and RFPs. ***Please clarify whether Defendants have (1) preserved portions of any website other than www.apartmenthunterz.com or (2) searched for responsive documents relating to any website other than www.apartmenthunterz.com.***

### 

In summary, CoStar asks that AHI do the following by September 16, 2016, which CoStar remains hopeful will help it narrow the scope of the discovery dispute requiring the Court's intervention.  CoStar reserves all rights in connection herewith.

- Produce all documents responsive to RFP No. 34.

- Produce all documents responsive to RFP Nos. 2, 3, and 4.

- Answer the questions posed by CoStar as to the fifth and sixth issues above (pp. 6-8).

Sincerely,

*David K. Baumgarten*

David K. Baumgarten

---

[7] The four listings are (1) Bayside Apartments, 530 Sunnyview Dr., Pinole, CA 94564 (4rentinla.com, Listing ID 149466050), *see* CoStar_0000177; (2) New Hampshire Commons, 90 Corbin Ct., Lakewood, NJ 08701 (4rentinnewyork.com, Listing ID 136265918), *see* CoStar_0000213; (3) Canyon Crest, 5200 Chicago Ave., Riverside, CA 92507 (www.ifindrentals.com, Listing ID c51ynp91), *see* CoStar_0000156; CoStar_0000396; and (4) Mission Garden Apartments, 3850 Skofstad St., Riverside, CA 92505 (www.ifindrentals.com, Listing ID c515pdip), *see* CoStar_0000397.

# EXHIBIT 23



**Fox Rothschild LLP**
ATTORNEYS AT LAW

1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Tel 310.598.4150  Fax 310.556.9828
www.foxrothschild.com

LINCOLN D. BANDLOW
Direct Dial: 310-228-2913
Email Address: LBandlow@FoxRothschild.com

September 16, 2016

**VIA E-MAIL**

Nicholas J. Boyle
David K. Baumgarten
Eric J. Hamilton
Williams and Connolly LLP
725 Twelfth Street NW
Washington, DC 20005-5901

Kelly L. Perigoe
Caldwell Leslie and Proctor PC
725 South Figueroa Street 31st Floor
Los Angeles, CA 90017-5524

**Re:    Costar Realty Information, Inc. et al. vs. Apartment Hunters, Inc. et al. - Case No. 8:15-cv-02111-JLS-KES**

Dear Counsel:

This letter is in response to your September 9, 2016, letter regarding Apartment Hunters, Inc.'s Response to Plaintiffs' Request for Production No. 34 and the draft Joint Stipulation Regarding Plaintiffs' Motion to Compel.

First, with regard to Defendants' Response to Plaintiffs' RFP No. 34, Defendants are not currently aware of any responsive documents within their possession custody and control. As the Rule 30(b)(6) designee will explain when you undoubtedly ask during the upcoming deposition, many internal policies and procedures are conveyed orally and not documented.

Second, with respect to Defendants' Portion of the Stipulation, your accusation that Defendants' assertions are false is unfounded. Plaintiffs may not like the reality that based on the information provided Defendants cannot locate the infringing content in their files, but that's what it is. Due to changes in Defendants' website that altered how information is categorized, having the "Listing ID" or the general webpage for a listing is not enough to pull up anything specific from that listing, such as one of the thousands of photographs that may be linked to it.

A Pennsylvania Limited Liability Partnership

California   Colorado   Connecticut   Delaware   District of Columbia   Florida
Illinois   Minnesota   Nevada   New Jersey   New York   Pennsylvania   Texas



Page 2

Partial information such as the website address, Listing ID, or copies of the allegedly infringing photo that don't show the image on apartmenthunterz.com, do not provide Defendants with a clue to begin searching the files for the specific images and information at issue. Similarly, identifying a property as allegedly having misappropriated information without identifying what the misappropriated information is, gives Defendants no information about how to locate the source of such alleged misappropriation.

Presumably, you've provided all the documents you have about the allegedly infringing photographs and misappropriated information. With a handful of exceptions, these documents consist of portions of screenshots and do not give Defendants complete information as to where this information was on apartmenthunterz.com. Defendants do not contend that they have abandoned searching for this information; to the contrary, they are diligently endeavoring to locate the listings at issue. But because this is a needle in a haystack search, given the plethora of data that flows through an apartment rental website, this process is extremely time consuming.

Third, you indicate that there are allegedly infringing images appearing on apartmenthunterz.com as recently as March 2016. I am baffled that you chose to mention this for the first time in a footnote instead of immediately bringing this to counsel's attention. If Defendants had been made aware of this information as it existed on their website, they would have immediately been able to ascertain its source. Plaintiffs, however, chose to sit on this information, putting my clients at a tremendous disadvantage. Given that this is not the first time that Defendants have chosen to tactically withhold information instead of notifying Defendants about immediate infringement, it appears the only gamesmanship is coming from your end.

Fourth, as I have previously stated, counsel is not answering your litigation preservation questions. You will have the opportunity to ask those questions to Apartment Hunters' designee on September 29.

Fifth, if Plaintiffs choose to resubmit their motion, Defendants request that a pre-filing conference of counsel pursuant to Local Rule 37-1 first occur. Since counsel will all be in the same location on September 29 for the Rule 30(b)(6) deposition of Apartment Hunters, Inc., I would suggest the conference occur after the deposition, should it still prove to be necessary.

Very truly yours,

Lincoln D. Bandlow

# EXHIBIT 24

## Baumgarten, David

| | |
|---|---|
| **From:** | Baumgarten, David |
| **Sent:** | Wednesday, September 21, 2016 6:06 PM |
| **To:** | Bandlow, Lincoln; Arnold, Margo J. |
| **Cc:** | Boyle, Nicholas; Hamilton, Eric; Kelly Perigoe |
| **Subject:** | CoStar v. Apartment Hunters |
| **Attachments:** | 2016.09.21 - Photograph URLs.pdf |

Lincoln and Margo,

Thank you again for this morning's productive meet-and-confer call.  While CoStar still believes that the issues we discussed are ripe for the Court's resolution (and have been for some time), we will agree to your request to not re-serve a Joint Stipulation regarding CoStar's Motion to Compel prior to the 30(b)(6) deposition of Apartment Hunters, Inc. ("AHI") next week, in case that deposition is able to further narrow the issues in dispute.

I also want to quickly follow up on our discussion of Defendants' explanation of their inability to locate documents relating to CoStar's photographs and listing information.  You told us that while there is no additional information that CoStar can provide to help Defendants identify the source of the CoStar listing information, Defendants believe that CoStar's identification of the underlying URLs for each specific infringing photograph would help Defendants locate CoStar's photographs in their system.  This clarification was very helpful, as Defendants had never previously explained that each photograph was published at a unique URL, in addition to on the main listing page.  While we do not have a complete record of URLs for each individual photograph (as we had no reason to believe that such information would be necessary), we have located URLs for 34 of the 126 infringing photographs identified to date by CoStar (which were published in 16 different listings).  *See* Appx. A to CoStar's Response & Objections to AHI's Interrogatories.  A chart setting forth that information is attached.

We ask that Defendants endeavor to produce any documents located based on the information in the attached chart by next Wednesday, September 28, 2016.  If Defendants are still unable to produce any documents related to the CoStar content that appeared on their websites, we ask that AHI's corporate representative be prepared to explain during the 30(b)(6) deposition on Sept. 29 *why* the information in the attached chart did not allow Defendants to locate any relevant documents.

Thank you,

**David Baumgarten**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5929 | (F) 202-434-5029
dbaumgarten@wc.com | www.wc.com/dbaumgarten

# EXHIBIT 25

LAW OFFICES

## WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DAVID K. BAUMGARTEN
(202) 434-5929
dbaumgarten@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 15, 2016

<u>Via E-mail</u>

Lincoln D. Bandlow
Margo J. Arnold
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506

      Re:    CoStar Realty Information, Inc., *et al.* v. Apartment Hunters, Inc., *et al.*, No. 8:15-cv-02111-JLS-KES

Dear Lincoln and Margo,

      I write in response to your June 22, 2016, letter regarding the adequacy of the production made by Defendant Apartment Hunters, Inc. ("AHI") in the above-captioned matter.

      As set forth in more detail below, in more than three months since Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar") served discovery requests on AHI, AHI has produced just seven responsive documents from its files, from a single custodian.  This deficient production contains neither "valid third party agreements" authorizing AHI's use of CoStar listings and photographs (which AHI has repeatedly promised to produce) nor a single e-mail (which you represent not to exist based on a demonstrably untrue assertion).  Combined with AHI's past history of failing to produce key documents in litigation, AHI's limited and insufficient production strongly suggests that AHI has failed to preserve documents and/or failed to undertake a reasonable search for documents.

      As you know, civil litigation, and the discovery process in particular, works only if there is a good faith effort to comply with obligations—and counsel are obligated to ensure their clients participate in good faith. Accordingly, CoStar sets forth several questions at the close of this letter regarding AHI's compliance with its discovery obligations, and asks that AHI provide a detailed written response to those questions by Friday, July 22, 2016.  *CoStar also requests that you preserve all documents and communications in <u>your or your clients'</u> possession, custody, or control relating to your client's preservation and production responsibilities, and the steps <u>both you and your clients</u> have taken to comply with those obligations.*  CoStar reserves all rights to seek Court intervention and/or sanctions, including without limitation seeking formal discovery from counsel concerning its role in AHI's response to CoStar's discovery requests.

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 2

## I.      Plaintiff's Requests, AHI's Reponses, and AHI's Production to Date

On March 21, 2016, CoStar propounded thirty-three document requests to AHI (the "Requests").  AHI submitted its initial Response and Objections to the Requests on April 20, 2016.  Following a telephonic meet and confer on May 4, 2016, AHI withdrew many of its initial objections and agreed to produce documents responsive to all but two of the Requests.  *See* Defendant Apartment Hunters, Inc., Supplemental Responses and Objections to Plaintiffs' First Set of [Requests For] Production of Documents (May 19, 2016) ("AHI's Supplemental Responses").

On May 27, 2016, AHI produced 121 documents—its first and only production to date.  The contents of that production are as follows:

- One hundred and seven (107) of these documents were unreadable native files, which also lacked basic metadata, including custodian and date information.  Upon our inquiry, you informally represented to be "seed files" for AHI's listings.  We raised numerous questions regarding these files during a second telephonic meet and confer (on June 7, 2016) and in a follow-up letter (dated June 13, 2016).  On June 22, you informed us that these files were created between four and five months *after* CoStar brought this lawsuit—*effectively conceding that the files are irrelevant and non-responsive* (in addition to being unreadable).

- Of the other fourteen documents produced, six were publically available domain registry records (which appear to have been created for the purpose of this litigation by entering website names into the website <https:whois.icann.org/en>). And one additional document was a duplicate.

Accordingly, AHI has produced *just seven responsive documents from its files, from a single custodian*.  And none of those documents directly concern AHI's copying of CoStar's content.[1]

## II.     AHI Has Not Produced Any "Valid Third Party Agreements," Despite Counsel's Repeated References to These Purportedly Exculpatory Agreements

Over the last four months, Defendants have repeatedly represented to CoStar—and to the Court—that it possesses "valid third party agreements" authorizing AHI to publish CoStar's listings and photographs. *See, e.g.*, Joint Report of the Parties' Rule 26 Planning Meeting, Part 1(b) (Defendants' Statement) (March 18, 2016).  And Defendants have repeatedly assured CoStar, both informally and through AHI's discovery responses, that they will produce these purported agreements in short order.

---

[1] These seven documents consist of: (a) four agreements with AHI's back-end service providers (Amazon Web Services, Google AdWords, and LiveChat); (b) one document pertaining to AHI's 2014 application to renew its (suspended) Prepaid Rental Listing Service license with the California Bureau of Real Estate; and (c) two content-sourcing agreements which are unrelated to CoStar.

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 3

Yet, AHI has not produced a single document substantiating its claim that it was authorized to publish CoStar's listings and photographs.  As we have explained, the two content-sourcing agreements AHI has produced to date have no bearing on this case.[2]

We ask that you confirm whether or not AHI possesses any additional content-sourcing agreements that it believes authorize it to publish CoStar's listings and photographs, and if so, to produce such documents immediately.[3]

### III. AHI Has Not Produced a Single E-mail, and the Recent Purported Explanation for the Lack of E-mails is Demonstrably False.

CoStar's Requests call for the production of e-mails.  *See* Requests, Definitions 5, 8. There is no doubt that internal AHI e-mails, AHI e-mails with third party service providers (including content providers), and AHI e-mails with customers are all responsive to numerous of CoStar's Requests.  *See, e.g.*, Request Nos. 3, 4, 6, 8, 9, 20.  And AHI has agreed to produce documents responsive to such requests.  *See* AHI's Supplemental Responses.[4]  Thus, during our second telephonic meet and confer (on June 7, 2016) and in a follow-up letter (dated June 13, 2016), we expressed surprise and concern that AHI had not produced a single e-mail.

During the meet and confer, you represented that you would speak with AHI regarding its efforts to locate responsive e-mails. In your most recent letter, you then represented that "there are no e-mails responsive to CoStar's document requests" because AHI "is a three-person company that primarily interacts through oral communications."  Arnold Lttr to Baumgarten (June 22, 2016) at 2.  This facially implausible explanation for AHI's failure to produce a single e-mail is, moreover, refuted by representations made, and documents submitted, by AHI and its principals in prior litigation.

As an initial matter, AHI is not a three-person company—but rather a *three-office* company with, it appears, *at least two dozen employees*.  In his recent (2015) testimony before the California Bureau of Real Estate (the "CalBRE"), Kevin Shayan disclosed that in addition to

---

[2] ForRent is a CoStar competitor to which CoStar does not provide its listings.  The content sources in the Move/ListHub license (Exhibit C-1) do not include CoStar or any entity to which CoStar has licensed its content, and CoStar had no relationship with Move at the time of the infringement at issue.

[3] To be clear, CoStar does not believe that any such agreements exist, which would explain AHI's failure to produce them, and underscore AHI's lack of a liability defense in this case.

[4] CoStar requested documents and communications relating to the source of the CoStar-owned listings and photographs published on AHI's website, permission received to make those publications, and software used to copy and publish those listings.  Request Nos. 3, 4, 6.  CoStar requested documents and communications relating to the methods AHI uses to populate its websites with listings and photographs.  Request No. 8.  CoStar requested documents and communications relating to the individuals and entities that AHI has engaged to collect apartment listings and photographs.  Request No. 9.  CoStar requested AHI's communications with customers relating to CoStar.  Request No. 20.  CoStar requested communications relating to complaints, including from customers, regarding AHI's unauthorized copying of apartment listings and photographs (AHI has objected to producing customer complaints).  Request No. 27.

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 4

AHI's Orange County home office (where the Shayan brothers work), AHI has offices in Lithuania and Russia.  *See* Ex. A (Hr'g Tr., Case No. H-39404, Feb. 25, 2015) at 222.  Kevin Shayan further testified that:

- AHI owns and controls Apartment Hunters LT, a subsidiary run in Kaunas, Lithuania by Vidmantas Macys, which has "16 or 17 Lithuanian employees," *id.* at 246, including "a bunch of young men who sit down and program [AHI's website]," *id.* at 247.

- AHI has at least one employee in its Russian office, Dennis Portnov.  *Id.* at 223.

- AHI employs "six support ladies" to answer incoming customer calls; Shayan did not specific those employees' location.  *Id.* at 214.

It strains credulity to believe that any 21st Century technology-driven company with two dozen employees in three different offices would conduct its business primarily via oral communications. The fact that ten time zones separate Messrs. Shayan and Shayan in Los Angeles from AHI's Lithuanian and Russian offices only magnifies the impracticality, if not impossibility, of such an arrangement, particularly given that Kevin Shayan testified that he and his brother supervise their overseas employees "on a daily basis." Ex. A at 225.  Indeed, Kevin Shayan repeatedly emphasized that AHI is an "internet-based company," *id.* at 241-43, further underscoring the implausibility that AHI's employees do not communicate by e-mail.  *See also* Ex. B (Proposed Decision, Case No. H-39404, May 27, 2015) at ¶ 24.  In sum, the representation that AHI's employees do not use e-mail for internal AHI communications is not credible.

Moreover, Kevin Shayan's testimony in the CalBRE matter, along with various documents submitted as in the same proceeding, directly establishes that ***AHI regularly uses e-mail to communicate with both customers and the sources of its listings***:

- Kevin Shayan authenticated, and AHI entered into evidence, an e-mail chain in which he (using the e-mail address kevin@apartmenthunterz.com) and Macys (using the e-mail address affiliate@apartmenthunterz.com) corresponded with employees of the real estate listing website Trulia regarding entering into a referral agreement.  Ex. A at 198-199 & Ex. C.  This e-mail is directly responsive to Request No. 8, but has not been produced in this matter.

- Shayan also testified that each website owned and operated by AHI and/or the Shayans has its own e-mail address (for the purpose of receiving customer e-mails).  Ex. A at 189.

- Shayan testified that AHI regularly send e-mails to landlords and management companies to ask permission to republish their listings and photographs.  *Id*. at 201-202, 216-218.  An affidavit executed by Macys further explained that AHI uses "a sophisticated automated system" to send e-mails to management companies when it collects apartment listings and track those companies' responses to its e-mails.  Ex. D at 4-5.  Though a sample e-mail submitted by AHI did not display an e-mail address, a spreadsheet prepared and submitted by

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 5

> AHI purported to show that these e-mails are sent from the address landlord@apartmenthunterz.com. Ex. D at 1-2. E-mails with the sources of AHI's listings would be responsive to Request No. 8 (as well as Request Nos. 3 and 4, to the extent the e-mails concern CoStar Listings or CoStar Photographs, as those terms are defined in the Requests), but none have been produced in this matter. Shayan also testified that AHI maintains spreadsheets that log authorizations to publish listings. *See* Ex. A at 219-220. Such spreadsheets similarly would be responsive to Request No. 8 (and potentially Request Nos. 3 and 4), but none have been produced in this matter.

- According to Shayan's testimony, AHI also has an e-mail system integrated into its customer support capabilities. *Id.* at 214 ("The calls are recorded where we can listen to the audio file, as well they're transcribed in a text and into a ticketing system. So we have a ticketing system, audio recording system, ***and then we also have an e-mail system***, and we have a very accurate tracking system that shows us from the time of customers calling in or making a ticket request, to the time that we reply to their request." (emphasis added)).[5] Customers' e-mails to AHI are potentially responsive to Request Nos. 20 and 27, but none have been produced in this matter.

- Shayan testified further that the employees in AHI's Lithuanian office "sit down and program the website. They data entry, type, validate, and ***check the listings***. ***They make sure the e-mails have gone out. The e-mails have been replied to.***" *Id.* at 247-48 (emphasis added). Yet not one such e-mail from AHI's Lithuanian team relating to listings (Request Nos. 2, 3, 6, and 8) or customers (Request Nos. 20 and 27) has been produced in this matter.

In sum, the foregoing testimony and documents (which are necessarily limited, in that they relate to another case) by themselves confirm that (a) AHI conducts its business, both internally across its multiple offices and employees, and externally with listing sources and customers, via e-mail, and (b) in particular, AHI sends and receives e-mails responsive to many of CoStar's discovery requests. As noted above, AHI has stated that it will produce documents responsive to the vast majority of CoStar's Requests. AHI cannot now avoid producing responsive documents by falsely claiming to be a three-person company that communicates "primarily" orally.

## IV. AHI's History of Failing to Produce Key Documents in Litigation

AHI's prior document production shortcomings in connection with the 2015 CalBRE proceeding cast further doubt upon the adequacy of its production, and the reliability of its representations, in this litigation. In that matter, AHI did not produce the purported e-mail at the core of its defense, instead representing that it had been deleted as part of a routine document purge. The presiding administrative law judge found Kevin Shayan's testimony that the e-mail

---

[5] Shayan specifically testified that AHI accepts customer requests for payment refunds by e-mail, *id.* at 232, and sends e-mails to customers confirming refunds when processed, *id.* at 215. *See also id.* at 253 (testifying regarding e-mails relating to refunds). No such refund requests or confirmations have been produced in this matter, nor have any audio recordings, nor have any documents from or relating to AHI's "ticketing system."

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 6

could not be produced because "such messages had been purged from its system three or four months after being sent" was "not convincing," since Shayan produced other e-mails from the same time period in those proceedings. *See* Ex. B (Proposed Decision, Case No. H-39404, May 27, 2015) at ¶ 17.

## V.   Counsel Are Required to Ensure Client's Good Faith Discovery Participation

As you know, the Federal Rules of Civil Procedure and the Rules of Professional Conduct of the State Bar of California require cooperation in the discovery process by both litigants and lawyers. Where a party and/or its counsel fail to meet this duty, sanctions are warranted.

As an initial matter, both parties and their lawyers are obligated to take steps to preserve documents, including through the issuance of—and monitoring by counsel of compliance with—a litigation hold. "[I]t is generally recognized that when a company or organization has a document retention policy, it 'is obligated to suspend' that policy and 'implement a litigation hold to ensure the preservation of relevant documents' after the preservation duty has been triggered." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1137 (N.D. Cal. 2012) (adopting preservation requirements set forth in *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)). But "[a] party's discovery obligations do not end with the implementation of a 'litigation hold'—to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); *see also* Cal. Bar Comm. on Prof. Resp. & Conduct, Formal Op. 2015-193, at 3-4 n.6 ("[T]he duty to [issue a litigation hold] falls on both the party and outside counsel working on the matter."). A party's failure to monitor its employees' preservation efforts warrants sanctions. *Apple*, 881 F.Supp.2d at 1150-51 (imposing adverse jury instruction sanction) (imposition of adverse jury instruction sanction upheld, with modification, by *Apple, Inc. v. Samsung Electronics*, 888 F.Supp. 976 (N.D. Cal. 2012)).

Counsel are also required to ensure that a client's collection of, search for, and production of responsive documents are conducted in good faith. Counsel may not simply accept a client's uncorroborated assertions or look the other way when a client's discovery efforts appear lacking. *See* Cal. Bar Comm. on Prof. Resp. & Conduct, Formal Op. 2015-193, at 5. Indeed, a District Court in California sanctioned both a party and its attorneys where the attorneys "chose not to look in the correct locations for the correct documents, to accept the unsubstantiated assurances of an important client that its search was sufficient, to ignore the warning signs that the document search and production were inadequate, [and] not to press [the client's] employees for the truth . . ." *Qualcomm Inc. v. Broadcom Corp.*, No. 05-v-1958, 2008 WL 66932, at *13, *18 (S.D. Cal. Jan. 7, 2008) (imposing monetary sanctions against party and referring the involved attorneys to the State Bar of California for investigation); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010) (cited approvingly by Cal. Bar Comm. on Prof. Resp. & Conduct, Formal Op. 2015-193) (finding party's "conduct was negligent" where "[k]ey players searched their own files without

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 7

supervision from management or counsel, and accordingly issuing both monetary and adverse jury instruction sanctions).

## VI.   Questions for AHI

Based on the issues set forth above, CoStar has significant cause for concern that AHI has failed to preserve documents and/or failed to undertake a reasonable search for documents.  In hopes of assuaging these concerns, CoStar asks that AHI provide detailed written responses to the following questions by the close of business on Friday, July 22, 2016:

1.  When, if ever, and to whom, if anyone, did AHI issue a litigation hold in connection with this suit?

2.  What steps has AHI taken to ensure that its employees, as well its subsidiaries and agents and their employees, implemented the litigation hold?   Please specify the role of outside counsel, if any, in these steps.

3.  How did AHI determine which individual custodians and/or other sources of documents should be collected and reviewed for potentially responsive documents?  Please specify the role of outside counsel, if any, in this determination.

4.  From which individual custodians and/or other sources of documents has AHI (and its counsel) collected documents to be reviewed?  For each custodian from whom documents were collected, please specify whether the collection was made by AHI principals or employees, or by outside counsel.

5.  What sources of documents, if any, has AHI searched electronically (*i.e.*, drives, servers, networks, databases) in order to identify documents for collection or production?  If any electronic searches were conducted, please specify whether they were conducted by AHI principals or employees, or by outside counsel.

6.  Please list each individual with whom outside counsel has <u>directly</u> spoken regarding AHI's document preservation, collection, and/or review processes.

7.  How did AHI determine which documents and e-mails were responsive to CoStar's Requests?  To what extent did outside counsel rely upon AHI principals or employees to determine the responsiveness of particular documents?

8.  Does AHI intend to rely upon any e-mails for its defense at trial in this litigation, as it did in its defense before the California Bureau of Real Estate?

9.  When, if ever, did AHI suspend the e-mail "purges" that allegedly resulted in the deletion of the key e-mail at issue in the California Bureau of Real Estate proceedings?

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 8

10. Will AHI produce the "valid third party agreements" that it has represented to the Court and Costar authorize its copying and display of CoStar's copyrighted photographs and other listing information, and any e-mails regarding such agreements?

As noted at the outset of this letter, CoStar reserves all rights to seek Court intervention and/or sanctions, including without limitation seeking formal discovery from counsel concerning its role in AHI's response to CoStar's discovery requests, in the event AHI refuses to answer the foregoing questions or if its responses establish a failure to meet its duties to participate in discovery in good faith.

We appreciate your prompt attention to this matter.

Sincerely,

David K. Baumgarten

# EXHIBIT A

BEFORE THE BUREAU OF REAL ESTATE

STATE OF CALIFORNIA

ERIC C. SAWYER, ADMINISTRATIVE LAW JUDGE

COPY

In the Matter of the Accusation of:     )
                                        )
APARTMENT HUNTERS, INC. and             )     No. 2014050485
STEVEN K. SHAYAN,                       )     2014060980
                                        )
             Respondent.                )
_____)

RECEIVED
Bureau of Real Estate

AUG 03 2015

L.A.D.O. Legal

TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, February 25, 2015

Reported by:

BRITTANY GUTIERREZ
Hearing Reporter

Job No.:
44590AH



*Kennedy*
COURT REPORTERS, INC.
920 WEST 17TH STREET
SECOND FLOOR
SANTA ANA, CALIFORNIA
92706

2

1              BEFORE THE BUREAU OF REAL ESTATE

2                    STATE OF CALIFORNIA

3          ERIC C. SAWYER, ADMINISTRATIVE LAW JUDGE

4

5

6   In the Matter of the Accusation of:    )
                                           )
7   APARTMENT HUNTERS, INC. and            )   No. 2014050485
    STEVEN K. SHAYAN,                      )   2014060980
8                                          )
                  Respondent.              )
9   _____)

10

11

12

13                                          •

14

15

16          TRANSCRIPT OF PROCEEDINGS, taken at

17       320 West Fourth Street, Suite 630, Los Angeles,

18       California, commencing at 9:00 a.m.

19       on Wednesday, February 25, 2015, heard before

20       ERIC C. SAWYER, Administrative Law Judge,

21       reported by BRITTANY GUTIERREZ, Hearing Reporter.

22

23

24

25

3

```
 1    APPEARANCES:

 2          For the COMPLAINANT:   STATE OF CALIFORNIA
                                   BUREAU OF REAL ESTATE
 3                                 LISSETE GARCIA, ESQ.
                                   320 West Fourth Street
 4                                 Suite 350
                                   Los Angeles, California
 5                                                  90013

 6
            For the RESPONDENT:    LAW OFFICES OF
 7                                 JILBERT TAHMAZIAN
                                   JILBERT TAHMAZIAN, ESQ.
 8                                 1518 West Glenoaks Boulevard
                                   Glendale, California
 9                                                  91201

10

11

12

13                                                .

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                          I N D E X

2    COMPLAINANT'S
     Witnesses:         Direct   Cross   Redirect   Recross
3
     Yo Wakita            22       42       79        88
4
     David Huang         107      122      167       175
5
     RESPONDENT'S
6    Witness:

7    Kevin Shayan        187      221

8

9

10                       E X H I B I T S

11                                    Marked for      Received
     COMPLAINANT'S:               Identification    In Evidence
12
     1A   Hearing file for Case Number      13          13
13        H-39404 LA

14   1B   Hearing file for Case Number      13          13
          H-36458 LA
15
     2    License history certification     14          14
16        for Apartment Hunters dated
          May 1, 2014
17
     3    License certification showing     14          14
18        no record of license for
          Steven K. Shayan
19
     4    Certified copy of records for     16          16
20        CAL BRE Case Number H-36485 LA

21   5    Complaint from Yo Wakita with     17          41
          attachments
22
     6    Declaration of David Huang        17         185
23        dated August 27, 2013

24   7    E-mail from Yo Wakita to David    18         106
          Huang
25

Kennedy Court Reporters, Inc.
(800) 231-2682

5

E X H I B I T S (Continued)

| COMPLAINANT'S: | | Marked for Identification | Received In Evidence |
|---|---|---|---|
| 8 | Apartment Hunters documents | 19 | 19 |
| 9 | Declaration regarding recovery of investigation costs | 19 | 21 |
| 10 | Declaration regarding recovery of enforcement costs | 21 | 21 |
| | | | |
| RESPONDENT'S: | | | |
| A | License printout of Apartment Hunters, Inc. | 148 | 264 |
| B | Apartmentguide.com data feed | 195 | 265 |
| C | Document entitled "Los Angles Great Locations" | 197 | 265 |
| D | eight-page e-mail document from Trulia | 199 | 266 |
| E | Screen shot entitled "Contract and Receipt" | 212 | 266 |

187

1                        KEVIN SHAYAN,

2    called as a witness, and having been first duly sworn by

3    the Hearing Reporter, was examined and testified as follows:

4        THE WITNESS:  Yes, I do.

5        THE COURT:  Good afternoon.

6        THE WITNESS:  Good afternoon, your Honor.  How are you?

7        THE COURT:  Good.  For the record please state and spell

8    your name.

9        THE WITNESS:  Kevin, K-e-v-i-n.  Last name Shayan,

10   S-h-a-y-a-n.

11       THE COURT:  Okay.  Thank you.  Mr. Tahmazian?

12       MR. TAHMAZIAN:  Thank you, your Honor.

13

14                    DIRECT EXAMINATION

15   BY MR. TAHMAZIAN:

16       Q    Mr. Shayan, what is your relation to Apartment

17   Hunters?

18       A    I've been there since 1999.  And I'm mostly in

19   charge of designing the website, the website structure,

20   technical stuff.  As well as some graphic design oversight,

21   not personally doing it, but I pretty much design and dream

22   it up.

23       Q    And what is your relation to Steven Shayan?

24       A    I'm his brother.

25       Q    You said you've been there since 1998?

· 188

1      A     1999.

2      Q     '99.  And with no breaks?

3      A     No breaks, no vacations.

4      Q     Were you --

5      MS. GARCIA:  Your Honor, if I may, the witness has a

6   mobile phone, cellphone, and it's out of view -- my view.

7   So I can't tell if he's referring to it or not.

8      THE COURT:  Okay.

9      MR. TAHMAZIAN:  Just like the record to reflect it's a

10  covered iPhone, but that's okay.

11  BY MR. TAHMAZIAN:

12     Q     Are you familiar with the procedure that Apartment

13  Hunters follows to follow with the rules and regulations of

14  the Department as far as a PRLS license is concerned?

15     A     Can you ask me again, please?

16     Q     Sure.  Are you familiar with the procedures and

17  policies of Apartment Hunters, and how they follow the rules

18  of the Department with respect to being compliant with the

19  PRLS licensees?

20     A     Yes, sir.

21     Q     Do you deal with the Department yourself also?

22     A     I've been involved in the previous proceedings.  I

23  know what the rules are, but Steve is the licensee.

24     Q     I understand.  Now, I want to direct your attention

25  back to May of 2013, April 2013, around that area.

189

1          Approximately how many different contracts did you

2    have approved by the Department and uploaded on your

3    website?

4        A     DRE contracts?

5        Q     Yes?

6        A     Six.

7        Q     Why six contracts?

8        A     Because the Department requires you to have one

9    contract for each website, or as you called it, "DBA," or as

10   we call it, "domain name," or "address."  So we own

11   Apartment Hunters, with a "Z" .com.  The For Rent in LA,

12   which is a Los Angeles-based domain.  Lease in San Diego,

13   which is a San Diego regional domain.  Rent in San

14   Francisco, which is a San Francisco-based domain.  And

15   Section Eight, which is a low income government housing

16   domain.

17          Each one had to have it's own contract with it's

18   own phone number.  Each one has his own phone number for

19   guests, landlords, and members, each one.  And it's own

20   e-mail address and it's own contract.

21       Q     Okay.  Now, this is something that was required by

22   the Department; correct?

23       A     Correct, sir.

24       Q     In fact, did you go through a process with the

25   Department; them demanding this from you?

1      A      Yes, sir.

2      Q      And when you say domain, what does that mean?

3      A      URL address, business address.

4      Q      What is that address?  Is that where you conduct

5  business?

6      A      Yes.

7      Q      And you were saying the Department -- in your

8  opinion, in your conversation with the Department

9  previously, they considered a domain an address of the

10  business?

11      A      Yes.

12      Q      Okay.  Now, going back to 2013 when you had these

13  domain names, these were -- the contracts themselves were

14  all the same.  The only difference was the domain address

15  and the information related to that domain; is that correct?

16      A      No, sir.  The contracts were slightly different in

17  price and in refund amount.  So some were at 49, some were

18  at 59; therefore, their refund commitments were different.

19             But, yes, basically they were all the same.  I

20  think only one had a different pricing by $10.  But they

21  were all the same except the address, yes.

22      Q      And did you go through a process to have the

23  Department approve these contracts?

24      A      Several processes, and they were kicked back and

25  forth several times.

1    Q    And then finally approved?

2    A    Yes.

3    Q    And to your knowledge, does the Department have a

4    copy of those contracts on file?

5    A    Yes.  We had to put up a security bond, a $10,000

6    bond.  All kinds of papers to get this.

7    Q    And to your knowledge, did this contract appear on

8    your Apartment Hunters website?

9    A    It was always up.  For us to get going we had to

10   have it first visible on the website at the time we

11   submitted for approval to Sacramento.  So we had to have a

12   printed copy.  A copy that opens up on the website matching,

13   and then wait for them to stamp it.  So Steve would go

14   downtown here to the counter, submit it.  They would stamp

15   it, send the copy to Sacramento.

16        At all times during the business we had a contract

17   printable -- viewable -- to the consumer with today's date

18   and his signature always, from inception.

19   Q    By "his," you mean Steve's signature?

20   A    Yes, sir.

21   Q    Now, tell us a little about how your business is

22   conducted, in a sense that how do you service your

23   customers?

24   A    Via the internet.

25   Q    Tell me how that happens?

192

1    A    What happens is we're an apartment rental and

2   listing service.  We don't make any money from the landlord.

3         So what happens is the landlords come and list

4   their properties with us for free.  It comes from landlords,

5   smaller landlords, mom and pop, two-unit, ten-unit

6   landlords, management companies.  We're authorized by the

7   MLS to have our MLS data.  As well as real estate investment

8   trust.  So they come and list the properties with us.

9         When a tenant comes to the website, they enter

10  their search criteria.  For example, two bedroom, two

11  bathroom in West Los Angeles for $1,500.

12   Q    Before you go there, how does a tenant get the

13  rights to enter the website?

14   A    They come to the website as a guest.  Initially as

15  a guest, you don't have to have anything, they're just

16  coming.

17   Q    Okay.

18   A    In the guest search they will type the criteria

19  what they are looking for.  All the listings appear,

20  complete description, photos, interior, exterior, virtual

21  tour, if there is any.  You can see everything.

22         We have demographics, what's nearby, ATMs.  Every

23  possible thing about that particular property, zip code,

24  down to longitude, latitude, street view, everything.  The

25  only thing we don't show is the landlord's phone number and

1  the address.

2          Once you pay the subscription fee, instantaneously

3  the address and the phone number of the landlord appears.

4      Q    What is the usual subscription fee?

5      A    $49.

6      Q    For how long of a period?

7      A    30 days.

8      Q    Is that the only money you really make?

9      A    Only money we really make.  And sometimes a lot

10 less because we offer coupons or specials.

11     Q    And now, your database you testified comes from

12 other sources; correct?

13     A    Yes, it comes directly from landlords, management

14 companies, as well as other sources.

15     Q    Now, do you get the information from other

16 syndicates like Craigslist, Trulia, Zillow, and those kind

17 of places?

18     A    Large companies, yes.

19     Q    How does that workout?

20     A    What happens is we have a partnership with, for

21 example, Apartment Guide.  Apartment Guide is a publicly

22 traded Fortune 500 company.  So what happens on a daily

23 basis they send us a XML Feed, which I brought a sample.

24          It's a raw feed where it contains a ton of data,

25 right, that comes every 24 hours.  It either comes or we go

194

1   to pick it up.  So when we say pick it up, it sits in a bin.

2   So they either leave it on the Apartment Guide server for us

3   to go pick up, or they drop it off in a bin on our server.

4          So every night we pick up hundreds or thousands of

5   fresh listings that Apartment Guide is providing to us that

6   has been verified by them.  So that's called the XML Feed.

7   Once we take that raw feed and throw it inside the database,

8   it becomes a visible listing where the pictures come, the

9   raw data converted to bedrooms, bathrooms, pets, all the

10  text, and all of that.  Kind of like a excel sheet that's

11  exploding into reality-type text.

12     Q    When you say partners with Trulia or Zillow, how

13  does that work?

14     A    It's a feed partnership.  So, for example, we have

15  a contract there stating actually, you know, that Trulia had

16  asked us to be their data provider.

17         So what happens with a lot of the smaller or larger

18  companies is that they don't have enough sufficient data in

19  certain areas or certain regions.  In this case Trulia came

20  to us and asked us for data for the Los Angeles County

21  region, San Fernando, Los Angeles, San Diego County region

22  it's specified in the contract.  And they ask us for a

23  two-year run for us to be the data provider, specifically

24  because of our relationships with a smaller management

25  companies.

195

1      MR. TAHMAZIAN:  Let me stop you there.  You testified

2  earlier about some raw data you received.

3          Your Honor, if you look in your package, there's a

4  package that starts like this.  It should be number six.

5  Right there.

6      THE COURT:  This one?

7      MR. TAHMAZIAN:  Yes.

8      THE WITNESS:  That's the raw data, yes, sir.

9          That's how it arrives in a chunk.

10      MR. TAHMAZIAN:  I mark that as Respondent's "B".

11      THE COURT:  Okay.  On the top of the first page is says,

12  "Apartmentguide.com data feed."

13          We'll mark it for identification as Exhibit "B".

14          (Respondent's Exhibit B was marked for

15      identification by the Court.)

16      THE COURT:  Okay.  Go ahead.

17  BY MR. TAHMAZIAN:

18      Q    Now, you testified that you receive feed; is that

19  what you are talking about?

20      A    Yes, sir.

21      Q    This is information received from who?

22      A    Apartment Guide in a raw format prior to it being

23  converted into a visible format.

24      Q    We'll talk about that.

25          You get this because you're partners with them?

```
 1      A     Correct.

 2      MS. GARCIA:  I'm going to object to this line of

 3  questioning.  We've been here for a while now today.

 4          Can Counsel try to at least get to the properties

 5  at issue here?  Because he's asking a lot of general

 6  questions about contracts with other websites and if he can

 7  just focus his questioning to the issues that are here

 8  today, the three or four properties alleged that were

 9  advertised without the authorization, and on those specific

10  websites that they were advertised on.

11          There is no mention in the Accusation about

12  apartmentguide.com.

13      THE COURT:  All right.  Look, I'm sure we'll get there,

14  but I think it has some probative value of explaining what

15  the business is, and that might help explain how the four

16  properties became involved in this.

17      MS. GARCIA:  Okay.

18      THE COURT:  I'm sure we won't spend to much time on

19  this, but go ahead.

20  BY MR. TAHMAZIAN:

21      Q     And then you testified that once with you get this

22  documentation, it transforms into data for your users; is

23  that correct?

24      A     Yes.

25      MR. TAHMAZIAN:  And if I can ask the Court to look at
```

197

1    the next document, it's a package, on top it says "Los

2    Angeles Great Locations."

3         THE WITNESS:  That's what it turns out to look like,

4    sir.

5         MR. TAHMAZIAN:  Right there.

6         THE COURT:  This one?

7         MR. TAHMAZIAN:  And I'm marking it as Respondent's "C".

8         THE WITNESS:  That's what that raw data will look as

9    when it's converted.

10        THE COURT:  Okay.  Give me one moment.  Hold off a

11   second.

12             (Respondent's Exhibit C was marked for

13        identification by the Court.)

14        THE COURT:  Okay.  So "C" this is what's visible on your

15   website?

16        THE WITNESS:  Yes, sir.  This is how it arrives and this

17   is what this will get converted to when it gets displayed.

18        MR. TAHMAZIAN:  By this he means Exhibit "B."

19        THE WITNESS:  Exhibit "B" is how it arrives in raw

20   format and then finished format it gets displayed as that.

21             So in here there's a link that says images, if you

22   see HTTP, and the image would then be that.

23        THE COURT:  Okay.  So "C" is a sample of what is on the

24   Apartment Hunters website?

25        THE WITNESS:  Website.  And sent by this partner.

1       THE COURT:  Okay.  Thank you.

2               Go ahead, Mr. Tahmazian.

3  BY MR. TAHMAZIAN:

4       Q    You also testified about an invitation by Trulia to

5  become the --

6       A    Data provider.

7       Q    -- data provider.

8               And you were working with Trulia as of when?

9       A    I don't recall the exact date, but we're working

10  with over 15 other websites right now that we provide data

11  to.

12      Q    Do you pay anything to Trulia to become a partner

13  with them?

14      A    Yes.

15      Q    What do you pay them?

16      A    The relationship at that time was -- in one month I

17  think it was $5,200.  But we were also -- based on that we

18  were also making sales from the relationship.  So they were

19  displaying our listings, we were paying for our listings to

20  be displayed and also receiving subscription via the traffic

21  they were sending.

22      Q    I see.  And you indicated about an e-mail

23  conversation with them that had you previously back in 2013;

24  correct?

25      A    Correct.  There's a five-page back and forth, a

199

1    little bit of actual push from them for us to sign the

2    agreement.  They wanted to move forward faster than we could

3    actually sign the contract.  It's all provided to you.

4        MR. TAHMAZIAN:  In your package, your Honor, there is a

5    document, 8 pages on the left-hand corner it says Zimbra

6    (phonetic).

7        THE WITNESS:  That's the e-mail from Trulia.  "Are you

8    guys ready to move forward?"

9        MR. TAHMAZIAN:  Next one.  I'm going to mark that as

10   Respondent's "D", your Honor.

11       THE COURT:  Okay.  Give me a moment.

12           Okay.  That item is the marked as requested.

13           (Respondent's Exhibit D was marked for

14       identification by the Court.)

15   BY MR. TAHMAZIAN:

16       Q    Now, tell me within that e-mail, when did you

17   receive the proposal initially from Trulia to get

18   information fed from them into your website for the proposed

19   listings?

20       A    It started as early back as -- I want to tell you

21   February or March.

22       Q    Of what year?

23       A    Of 2013.

24       Q    And from that time you're receiving feed from

25   Trulia; is that correct?

200

```
1       A    We were receiving feed from several companies and
2    giving feeds.
3       Q    I see.
4       A    So two sides to all of this.  We're providing and
5    receiving.
6       Q    I understand that, but I'm talking about the
7    company Trulia.
8       A    Yes.
9       Q    From February you started working with them?
10      A    Yes.
11      Q    Which means at that time you were feeding them with
12   the listing you had and receiving listings they had?
13      A    Yes, sir.
14      Q    Is that correct?
15      A    Yes.
16      Q    To your knowledge was there a limitation of what
17   kind of feedings they would send to you?
18      A    Well, not for sale.  For rent only.
19      Q    For rent, I'm sorry.
20      A    And not the ones that were duplicate that we
21   already had.
22      Q    So what was the limitation about what kind of feed
23   they would send you?
24      A    Rental listings that were unique data that we
25   already did not have, via filter we created, within the
```

1    geographic area of California that we covered, and vice

2    versa.  We would send them listings that was not multiple

3    listing services, because they already had that and was not

4    from the larger management companies because they already

5    had that.  Yet, from smaller management companies.

6              There's a detailed discussion of what they needed

7    and what we were in need of.

8        Q    There was also a different method by which you

9    received listings from various landlords and management

10   companies; correct?

11       A    Correct.

12       Q    How was that's done?

13       A    A feed.

14       Q    Okay.  Procedurally what would you do?  Was there

15   something automated within your system?

16       A    Landlords, once you call for a permission to get

17   permission to list their properties, they would actually

18   give you a blanket permission, because once you call a

19   management company and say, "May I get permission to list

20   your listings?"  And two days later they have another

21   vacancy and you say, "May I get permission?"  Pretty much

22   they're going say, "Look, I told you 48 hours ago.  The

23   answer is yes.  Stop calling.  Go ahead and get my listing."

24             So we switched to this system where we take the

25   listing that we find on their website, or anywhere else, we

1    include it in an e-mail and we go, "Dear landlord, we have

2    the following listings and we would like to get your

3    permission to list it.  If it's okay with you click here for

4    yes.  If it's not, click here for no."  And, you know, "If

5    you'd like us to update the price or change the price, type

6    a few sentences," whatever it is.  And we also let them know

7    that we multiply the advertising efforts of theirs by

8    putting it other Trulia, Zillow, Rental Source, Rentix, a

9    lot of other websites; however, we don't benefit.

10       MS. GARCIA:  Move to strike as nonresponsive.  I think

11   the witness (unintelligible).

12       THE COURT:  I'm sorry?

13       THE REPORTER:  I'm sorry?

14       MS. GARCIA:  I'm sorry.  Move to strike as

15   nonresponsive.  Everything that's been said about what the

16   landlords.  I guess the last sentence of the witness's

17   statement.

18       THE COURT:  That they also tell the landlords they'll

19   send the info to the other sites, or --

20       MS. GARCIA:  No.  I'll withdraw my objection.

21       THE COURT:  Okay.

22       MS. GARCIA:  I thought he said something else.

23       THE COURT:  Okay.  Go ahead.

24   BY MR. TAHMAZIAN:

25       Q    Now, when you receive this feed from other sources,

203

1    you obviously know that these are listings that are on

2    Trulia or any other company that you receive from; correct?

3        A    Yes.

4        Q    And when you receive that and put them up on your

5    website or on Trulia, feed them back with the same listing,

6    and if a prospective tenant likes that particular unit and

7    wants to look at it or rent it, and try to contact them

8    through your website, who would they contact?

9        A    The actual owner or the realtor of that property.

10   In the cases of the -- if I may?

11       Q    Yes.

12       A    If in the cases of this four listings in question,

13   they would contact that gentleman right there, Mr. --

14       Q    The HomeTeam Property Management?

15       A    Yes, sir.  We don't have anything to do with it.

16   Once they pay us our subscription fee, we don't make a

17   penny.  We don't have an intermediate phone number.  It goes

18   straight to him.

19       Q    So, in fact, by the fee that you get from Trulia

20   and other engines --

21       A    And/or putting up listings on other engines.

22       Q    You are actually expanding the audience --

23       A    Yes.

24       Q    -- of HomeTeam Property Management; is that

25   correct?

1     A     By 300 times.

2     Q     By them contracting through your website, you get

3     no monetary benefit; is that correct?

4     A     None whatsoever.

5     Q     The tenant doesn't pay you a penny more --

6     A     No.

7     Q     -- to get those listings; is that correct?

8     A     No, sir.  Just the amount of calls to HomeTeam

9     would quadruple verses sitting vacant.

10    Q     In May 2013, how many phone numbers did Apartment

11    Hunters have?

12    A     Apartment Hunters company?

13    Q     Yes?

14    A     At any given time, I want to tell you about 30, 35

15    phone numbers.

16    Q     And how many of those phone numbers appeared on the

17    database of BRE, approximately?

18    A     On each domain name has to be at least three.

19    Q     What are those three?

20    A     Guests, billing and credit card, and landlords.

21    Q     And had you six domain numbers; correct?

22    A     Six times at the minimum should be three.  Worse

23    case scenario should be two, which would be tenant and the

24    landlord.

25    Q     So at least minimum of ten numbers listed --

```
 1      A    12.  Six times two.

 2      MS. GARCIA:  Objection.

 3      MR. TAHMAZIAN:  Let me finish the question.

 4  BY MR. TAHMAZIAN:

 5      Q    To your knowledge you have provided to the

 6  Department with at least more than 10 telephone numbers

 7  related to the Apartment Hunters; correct?

 8      A    Yes, sir.

 9      Q    Those phone numbers were working?

10      A    And published on the website.

11      Q    And still working today?

12      A    Yes, sir.

13      Q    And was working back in 2013?

14      A    And on the contract, on the Department contract.

15      Q    There was a phone number that appeared on the

16  worksheet.

17      MR. TAHMAZIAN:  Is that what it's called, the worksheet?

18  I apologize.

19      MS. GARCIA:  I don't know what you are talking about?

20      THE COURT:  The Case Analysis.

21      MS. GARCIA:  Oh.

22      MR. TAHMAZIAN:  The Case Analysis.  810 --

23      THE WITNESS:  575, sir.

24  BY MR. TAHMAZIAN:

25      Q    Yes.  Is that phone number Apartment Hunters's
```

1    phone number?

2        A    I just got ahold of all of our program owners, if I

3    may?

4        Q    Well, no.  Don't touch anything.

5             Is that phone number Apartment Hunters's telephone

6    number?

7        A    No, sir.

8        Q    How do you know that?

9        A    It goes to an address on Federal Avenue in West Los

10   Angeles, which we never had anything to do with that

11   location.  We never had an office there.  We never went

12   there.  It's a Google search that brings up this phone

13   number.

14            This phone number was never -- it's disconnected

15   first of all.  And we have never had a disconnected phone

16   number in our life.  So this phone number was never

17   registered to us from 1999 to now.

18       MR. TAHMAZIAN:  If I may ask, your Honor, can he show

19   you on his phone when he Googled, how he came up with that

20   number, so you can see where that number comes from?

21       THE COURT:  All right.  Ms. Garcia, what do you think of

22   that?

23       MS. GARCIA:  I'm going to object, your Honor.  I don't

24   see what the point of that is.  I don't have any objection

25   to Counsel submitting something on a printed form, showing a

 1    Google search for that phone number, but I don't think it's

 2    appropriate to --

 3        THE WITNESS:  I can send it.

 4        MS. GARCIA:  -- testimony from a cellphone number that

 5    we don't have any copy of for the record.

 6        THE COURT:  Well, I think the request that he does a

 7    Google search on his smartphone and that this number that's

 8    on the Case Analysis will come up as one of the search

 9    results.  If I'm understanding --

10        MR. TAHMAZIAN:  That's correct.

11        THE WITNESS:  Correct.

12        MS. GARCIA:  Okay.  That's fine then.

13        THE COURT:  All right.  Why don't you come up,

14    Ms. Garcia.

15        MS. GARCIA:  Sure.

16        THE COURT:  Do you want to watch him do it?

17        THE WITNESS:  It's right here.

18        THE COURT:  Show her -- do the search, show her the

19    process.

20        THE WITNESS:  It's right here.  It says 1507 Federal

21    Avenue --

22        MS. GARCIA:  What's the phone number --

23        THE WITNESS:  I'm going to show you.  Right here,

24    575-4098.

25        MS. GARCIA:  And what's the website listed on that?

1    THE WITNESS:  Apartmenthunterz.com.  And we were never

2  on Federal Avenue ever, never, ever, ever.

3    MS. GARCIA:  So when you search that number it shows up

4  apartmenthunterz.com?

5    THE WITNESS:  No.  It shows up Federal Avenue.  We were

6  never on Federal Avenue.

7    THE COURT:  Okay.

8    MR. STEVEN SHAYAN:  It says California Apartments.

9    THE WITNESS:  It says California Apartments, Federal

10 Avenue West L.A.  We were never on Federal Avenue in West

11 L.A., and that's the phone number it shows.

12   MS. GARCIA:  Your Honor, when he scrolled down I saw

13 Apartment Hunters --

14   THE WITNESS:  Yeah.  It does say the domain name.

15   THE COURT:  All right.  I see that under the website

16 just above the hours.  Apartment Hunters with a "Z" .com.

17   THE WITNESS:  Correct.

18   THE COURT:  Is that what you wanted me to see?

19   MR. TAHMAZIAN:  Yes, your Honor.

20   THE WITNESS:  But that number and address has never been

21 ours.

22   THE COURT:  Okay.  Thank you.

23 BY MR. TAHMAZIAN:

24   Q    And that number was never your number?

25   A    Ever, never.

209

1    Q    What was the number that's listed with the

2  Department?  The very first number?

3    A    (310) 276-4663.

4    Q    And to your knowledge is that number still with the

5  Department as of today?

6    A    Always been.

7    Q    And is it there as of today?

8    A    Yes, sir.

9    Q    Has it ever been disconnected?

10    A    No, sir.

11    Q    Has that ever been removed from the Department's

12  database?

13    A    No.

14    Q    Do you recall having a conversation with the

15  Department about submitting different applications with the

16  various domain names about three years ago -- four years

17  ago?

18    A    Yes.

19    Q    At that time you were operating out of the

20  Robertson address; correct?

21    A    Yes.

22    Q    And you had prepared the contracts with that single

23  address; is that correct?

24    A    Yes.

25    Q    At one point; is that correct?

210

1     A     Yes.

2     Q     Do you recall if the Department objected to that?

3     A     No.

4     Q     Do you recall if the Department requested that you

5     submit a contract for every separate address you've got?

6     A     Every separate domain address.

7     Q     Well --

8     A     Yes.

9     Q     Yes?

10    A     Yes.

11    Q     Right.  Do you recall that conversation with the

12    Department?

13    A     Yeah.  Unlike the previous testimony, I couldn't

14    have one contract with six websites on it.  So had I to

15    have -- each address had to have it's own contract, and as a

16    matter of fact, it's own phone number.

17    Q     And, in fact, none of those contracts had the

18    Robertson address; correct?

19    A     No.  They had the domain address.

20    Q     At that time did you have any contracts on file

21    with the Robert address?

22    A     The Apartment Hunters.

23    Q     Now, when you moved from the Robertson address, did

24    you send some notification to the Department about page?

25    A     I believe by mail we did.

211

1      Q      You believe or you know you did?

2      A      I know we did.  And I know we did through your

3   office.

4      Q      Well, I want to know what you did.

5             Back in 2013, what did you send to the Department?

6      A      That we are moving from that address to the Golden

7   Lantern address in Dana Point.

8      Q      Now, you also -- strike that.

9             You had a restricted license until March of 2014;

10  correct?

11     A      Yes, sir.

12     Q      Now, in March of 2014, did you do anything to try

13  to remove yourself?

14     A      Yeah.  We applied for a brand-new unrestricted

15  license.

16     Q      And on that application, did you put your new

17  address?

18     A      Yes.

19     Q      What was the address?

20     A      The Golden Lantern address.

21     Q      Now, is that the address that appears on your

22  contract -- one of your contacts -- on the website at this

23  time?

24     A      Yes, sir.

25     MR. TAHMAZIAN:  I'm going to ask the Court for one more

212

1   document, your Honor.  If you can mark it has Respondent's

2   "E" please.  And I can show you what it is, it's a screen

3   shot, one single page right there.

4       THE COURT:  This one?

5       THE WITNESS:  That contract, yes.

6       MR. TAHMAZIAN:  Please.

7       THE COURT:  Okay.  It says, "Contract and receipt," on

8   the top of the image depicted in the middle of the screen

9   shot.

10        And I'll mark it as Exhibit "E".

11        (Respondent's Exhibit E was marked for

12      identification by the Court.)

13       THE COURT:  Okay.  Go ahead.

14  BY MR. TAHMAZIAN:

15    Q   Mr. Shayan, tell me about this exhibit.

16        First of all, who wrote the red letters on the

17   bottom?  If you look at the document, the red lettering and

18   all that, who wrote that at the bottom?

19    A   This is our program owner.  This is us.

20    Q   And the screen shot of Apartment Hunters?

21    A   Was done by us to demonstrate here today that we

22   had this up on the site.

23    Q   Have you, yourself, gone online and checked if this

24   contract is up on your website?

25    A   Of course.

213

1    Q   Have you yourself verified that this contract is in

2  possession of the Department?

3    A   Yes, sir.

4    Q   Now, tell me at the bottom what information you

5  provided to the Department?

6    A   That the domain name is listed under the DBA

7  section.

8    Q   And the address for Apartment Hunters?

9    A   Which is right here, yes.  And the license number

10  is present on both the member registration page and contract

11  page.

12    Q   What about the address for Apartment Hunters?

13    A   It's there, sir.

14    Q   And when did you provide this particular contract

15  to the Department?

16    A   Way back when we went to -- first of all, this was

17  there when we moved from Robertson.

18    Q   Okay.  I understand.

19    A   And then one more time when we went to remove the

20  restriction.

21    Q   And you have a few more contracts online?

22    A   For each address.

23    Q   Each address.

24        And you are familiar with this document; correct?

25    A   Of course.

214

1    Q    And you've seen it on the website; is that correct?

2    A    It's there everyday.

3    Q    What is the -- as far as Apartment Hunters business

4    is concerned, do you have any walk-in customers?

5    A    None.

6    Q    Are your customers 100 percent internet based?

7    A    Yes, sir.

8    Q    And how do you communicate with the your customers?

9    A    We have six support ladies that attempt to do a

10   24-hour shift where we chat with the customers.  We have 18

11   to 22 incoming lines that people call into.  The calls are

12   recorded where we can listen to the audio file, as well

13   they're transcribed in a text and into a ticketing system.

14        So we have a ticketing system, audio recording

15   system, and then we also have an e-mail system, and we have

16   a very accurate tracking system that shows us from the time

17   of customers calling in or making a ticket request, to the

18   time that we reply to their request.  They have an 18.22

19   second average total response time.

20        Whether it be a subscription, a refund, a customer

21   satisfaction, or even helping the customer do something on

22   the web, 18.22 seconds.

23   Q    Now, obviously in your business, do you get

24   customers complaining and wanting refunds?

25   A    Yes.

215

1    Q    And how do you handle that?

2    A    With the ticketing system so it's documented.  With

3    the recorded audio of their request, and we push a button.

4    We refund the money to the same last four digits of the

5    credit card they use to pay.

6         However, instantaneously a text goes to their

7    cellphone that we refund to.  An e-mail goes to the e-mail

8    address with a transaction ID of their refund, and a robotic

9    phone call that the robot calls the phone and goes, "This is

10   a call to confirm a refund has been made to your credit

11   card."  Three ways we reach to the customer outbound to

12   confirm their refund.

13   Q    Now, did you look at your -- strike that.

14        Do you document this data on your website?

15   A    Hundred percent.

16   Q    Did you look at your data back in January of this

17   year?

18   A    Which data?

19   Q    The data about your sales and refund?

20   A    Yes, sir.

21   Q    And out of your entire sales in 2013, January, how

22   many percent was your refund, approximately?

23   A    Out of 2,000 sales we had a 3.47 percent refund,

24   but that didn't necessarily mean that is data related.  Some

25   people are looking for unreasonable price points.  Like if

216

1   you are looking for six-bedroom, six-bathroom by the ocean

2   for $600 you get your money back.

3        Q    But you refund the customers to keep them happy?

4        A    Hundred percent because the laws of the Department

5   of Real Estate says if within five days you don't find them

6   exactly what they are looking for, you have to give them

7   their money back.

8        Q    Have had you any complaints in the last two years

9   from any customers that were unable to communicate with your

10  company or get a refund?

11       A    Not at all.

12       Q    The information received from the landlords, as

13  well as from these companies like Trulia, Zillow, and MLS,

14  and all that, how do you make sure that they are updated?

15       A    The feeds that come are every night.  The landlords

16  that come and list their properties, we have a system that

17  we know when they last lodged in.  So with the market of Los

18  Angeles usually with these properties that we have here,

19  usually they're gone within 72 hours, right.

20            So, for example, a one-bedroom, one-bathroom in

21  West L.A., it's not going to sit on the market for more than

22  one, two, or three days.  So if the landlord doesn't come to

23  login check within 72 hours, an e-mail goes out.  That goes,

24  "Dear Landlord, we show you have not come and logged into

25  the website.  Click here to extend the life of the vacancy

217

```
 1    for seven days."
 2            That will actually allow the vacancy to be
 3    refreshed and stay seven more days or expire.  If the
 4    landlord doesn't open that e-mail, or if that e-mail lands
 5    in his junk box, we kill the vacancy automatically.  That's
 6    his job to come back.  We deactivate it, we don't kill it so
 7    he doesn't have to type it all over again.  So he just comes
 8    back and reactivates it.
 9        Q    What about Trulia and Zillow?
10        A    Those are fresh feeds.  They come every night
11    fresh, fresh.  We pick up the feed or they put it in our
12    bin.  It's a server to server discussion.
13        Q    If you look at the exhibit package, Exhibit 8,
14    please?
15        A    Where is it?
16        Q    The exhibit package right there.  Exhibit Number 8.
17        A    Okay.
18        Q    Page one, right there.
19            Can you explain to the Court what this page
20    depicts?
21        A    This one says that we would send this listing to a
22    landlord that owns the website called DMinvestments.com,
23    that we noticed they have available vacancies.  We introduce
24    ourselves and a family of our websites, and exactly what we
25    do.  And we'd like to refer prospective tenants to them on a
```

```
 1    daily basis to maximize their marketing efforts, as well as
 2    to syndicate the listings to our partner websites.
 3         Q    What's the purpose of this e-mail?
 4         A    To get their permission to list their vacancies.
 5         Q    This is stuff that you send on a daily basis?
 6         A    On an hourly basis as we located their vacancy.
 7    But mostly daily basis, yes, sir.
 8         Q    Now, would you have sent similar e-mails to a
 9    company called HomeTeam Property Management?
10         A    Yes, sir.
11         Q    Now, what did you learn about the Complaint from
12    HomeTeam?
13         A    When the DRE sent us the Complaint --
14         Q    Which was in?
15         A    I don't know.
16         Q    April of last year?
17         A    Yes.
18         Q    Is that about right?
19         A    Yes.
20         Q    And from reading the Complaint, you do recall that
21    the Complaint was made back in May of 2013; correct?
22         A    Correct.
23         Q    Now, do you maintain this data of contacting the
24    landlords in your website in that ten months?
25         A    This far back, no.  But we maintain it for some
```

219

1   time, but we purge them eventually.

2       Q    How often?

3       A    I think every three or four months after we get the

4   permission, because the listing is gone.  We get the

5   permission, we put the listing, then the listing expires and

6   the permission has to be reset.

7       Q    Is page one of Exhibit 8 the document you prepared

8   and gave to me?

9       A    Yes.

10      Q    Go to page two?

11      A    Yes, sir.

12      Q    Is that something you prepared?

13      A    Yes, sir.

14      Q    And why did you prepare this document?

15      A    Because when you click on this yes, there is a

16  unique session ID on the server, this is sitting on the

17  server.  That unique ID is what's behind that yes or no

18  button.

19          Then the second column, that's column "B".  So that

20  column "A" is the date the e-mail was sent.  Column "B" is

21  the unique session ID, the cookie as you would call it.  And

22  unit "C" is who the e-mail was sent to, and column "D" is

23  the sender, which is landlord@apartmenthunterz.com, which is

24  the sender, us.

25      Q    What is the --

1    A    "E" is the authorization.  They decided to say yes

2    or no.  Some said no, some said yes.

3    Q    Okay.  And you are trying to -- with this

4    spreadsheet or excel, you are trying to show the

5    communication within HomeTeam and Apartment Hunters back in

6    May 2013?

7    A    Yeah.  And several other landlords, not just

8    HomeTeam.

9    Q    Okay.  Go to the next page.

10   A    Yes, sir.

11   Q    Is this something you prepared?

12   A    Yes, sir.

13   Q    What are you trying to show?

14   A    First of all the listing status was deactivated in

15   column "B".

16   Q    As of when?

17   A    As of the date this thing -- as of 05-05-2013.  The

18   listing status was deactivated.  It shows the street, the

19   city, the state, the zip code, and then it shows that the

20   listing -- the date it was listed, sir, it shows the date it

21   was expired and the date it was authorized.

22        So the date authorized goes back to this other page

23   that you just -- previous page you mentioned.  And the day

24   it was expired was the date we expired the listing.  The

25   05-05 was authorized, 05-07 it was listed.  It took us some

1    time to make it live.

2        Q    Are you familiar with Vidmantas Macys?

3        A    Vidmantas Macys is one of our lead IT programmers,

4    sir.

5        Q    Were you familiar with the Declaration you

6    prepared?

7        A    Yes, sir.

8        Q    Were you involved in preparing this Declaration?

9        A    Yes, sir.

10       Q    Have you read this Declaration before?

11       A    Yes, sir.

12       Q    Would you agree with what he says in the

13   Declaration?

14       A    100 percent, yes.

15       MR. TAHMAZIAN:  No further questions, your Honor.

16       THE COURT:  All right.  Thank you.  Give me one moment.

17           Okay.  When you are ready, Ms. Garcia.

18

19                       CROSS-EXAMINATION

20   BY MS. GARCIA:

21       Q    Looking at Exhibit 8, since you have that in front

22   of you.

23       A    Exhibit --

24       Q    Eight, first page.

25           Are you claiming that Apartment Hunters sent a

1    similar e-mail to the e-mail address for

2    leasing@hometeampm.com on May 5th of 2013, and that --

3    that's my questions.

4        A    Yes.

5        Q    And are you claiming that somehow this e-mail was

6    purged from your system, and you don't have proof of that

7    e-mail; is that correct?

8        A    I have the session ID.  That the unique session ID

9    was there and the date that it was sent there.  But I don't

10   keep records going back to 2013.  That's two years ago.

11       Q    For the record, the witness is referring to page

12   two of Exhibit 8, and he's reading from the excel

13   spreadsheet that he claimed he prepared; is that correct?

14       A    Right.  Correct.

15       Q    So other than this excel spreadsheet, you don't

16   have any proof of that e-mail that was allegedly sent to

17   Apartment Hunters; isn't that correct?

18       A    Other than the session ID, no.

19       Q    And can you explain to me why this excel

20   spreadsheet is in a different language other than in

21   English?

22       A    Because we have offices overseas.

23       Q    And where did you prepare this?

24       A    In our office overseas.  We have offices in

25   Lithuania and in Russia.

223

1    Q    And where were you when you prepared this?

2    A    In the United States.

3    Q    And so what language is this excel sheet?

4    A    In Russian.

5    Q    Okay.  And can you explain why you would prepare an

6    excel spreadsheet in the U.S. using the Russian language?

7    A    This documentation -- we work on Skype and on

8    screen-sharing systems like half of the United States.

9    MS. GARCIA:  Move to strike as nonresponsive.

10   BY MS. GARCIA:

11   Q    Why did you prepare this --

12   THE COURT:  Granted.

13   MS. GARCIA:  -- excel spreadsheet in Russian?

14   THE WITNESS:  It was on a screen share.

15        I didn't prepare this, my programmers prepared this

16   with me there.

17   BY MS. GARCIA:

18   Q    Okay.  You testified earlier that you prepared

19   this.  Now who are you claiming prepared this?

20   A    This is with our programmers with Vidmantas Macys

21   and Dennis Portnof (phonetic) in our offices overseas.

22   Q    What office was this excel spreadsheet prepared in?

23   A    In our Russian office with Dennis Portnof, and

24   Vidmantas Macys.

25   Q    Have you ever notified the Bureau of Real Estate

1    that you have offices overseas?

2        A    I don't have to.

3        Q    Okay.  Has Apartment Hunters ever notified the

4    Bureau of Real Estate that they maintain offices overseas?

5        A    These are programing offices, not location offices

6    that has anything to the with customers or landlord --

7        MS. GARCIA:  Move to strike as nonresponsive.

8        THE COURT:  Granted.  I think it's just yes or no.

9        THE WITNESS:  No.

10   BY MS. GARCIA:

11       Q    Okay.  Now, taking a look at page three of

12   Exhibit 8, this also appears to be in a different language.

13            What language is this in?

14       A    Page?

15       Q    Three.

16       A    Same as the other one.

17       Q    Is that Russian?

18       A    Yes.  The headings are Russian, the rest is

19   English.

20       Q    And is it your testimony still that you prepared

21   this, or did someone else prepare this?

22       A    It was prepared by Dennis and Vidmantas, my

23   employees overseas.

24       Q    And who supervises these employees overseas?

25       A    I do.

225

```
1       Q    Are you license by the Bureau in any capacity?
2       A    No.
3       Q    Okay.  And does Mr. Steven Shayan supervise those
4   employees?
5       A    On a daily basis.
6       Q    How does he do that?
7       A    We're both together there while all of this is
8   working.  We work 16 hours a day with these gentlemen.
9       Q    And when were these excel sheets prepared?
10      A    After the Complaint was filed.
11      Q    Okay.  Do you recall exactly when or what month --
12      A    I don't.
13      Q    -- or what year?
14      A    I don't remember.
15      Q    Were they prepared this year?
16      A    No.  They were prepared prior to this year.
17      Q    So just to sort of help you along, the Accusation
18  was filed in April of 2014, does that help you?
19      A    It was done after April of 2014.
20      Q    Do you know approximately what part of the year?
21      A    No, ma'am, I don't.
22      Q    Okay.  Now, you stated when looking at page three
23  that these listings were deactivated on May 5th, 2013.  And
24  then you went on to testify that the properties were listed
25  as is noted on column "K".
```

226

1        Why would you deactivate listings before they were

2   listed?

3        A     Which one again?  Say again.

4        Q     Your testimony earlier as to page three, the four

5   properties listed there, you stated that the listings were

6   deactivated on May 5th of 2013.

7        I'm asking why you would deactivate the listings

8   prior to them being listed according to this spreadsheet?

9        A     At the time this report was prepared, the listings

10  were deactivated.  This column says authorized, listed, and

11  expired.

12       Q     Okay.  And --

13       A     Those are three columns are different than the

14  status.

15       Q     Now, your testimony is that they were deactivated

16  at the time of this spreadsheet?

17       MR. TAHMAZIAN:  I'm going to object to that question.

18  He never testified to that, your Honor.

19       THE COURT:  Sustained.  Why don't you rephrase?

20       MS. GARCIA:  Okay.

21  BY MS. GARCIA:

22       Q     So when were these properties deactivated?

23       A     I'm not sure.  It just shows that at the time this

24  report was printed the status was deactivated.  I could tell

25  you when they were expired, it says it there in the column,

227

1  column "F".

2       Q    And these excel spreadsheets were prepared by --

3       A    Staff.

4       Q    -- Russian employees?

5       A    They are first of all, the word "Russian employees"

6  is disrespect.  They are our staff.  So what country they're

7  from is very disrespectful and racial.

8       Q    I wasn't -- I apologize.

9       A    Right.  Apologize to them, not me.

10      Q    Where were these employees located?

11      A    In Russia, correct.

12      Q    So they were prepared by your employees in Russia?

13      A    Correct.

14      Q    Where were they getting -- and this information

15  reflects what, the Apartment Hunters listings for these

16  properties?

17      A    Correct.

18      Q    And they claim that these properties were listed or

19  authorized by whom on May 5th of 2013?

20      A    I don't understand the question.  "They claim," who

21  is "they claim"?

22      Q    Well, Apartment Hunters.

23           You have the date authorized under column "M" as

24  May 5th, 2013; who authorized these?

25      A    That's the day that they were -- this e-mail was

228

1    clicked on.

2        Q    So you are claiming that the -- are you referring

3    to page two?

4        A    Yes, ma'am.

5        Q    Okay.  So --

6        A    Page one actually.  When this e-mail was clicked

7    on.

8        Q    Okay.  But that e-mail is to Doug Wetton?

9        A    Right.  It's similar like this.

10       Q    Okay.  So you are claiming that --

11       A    We don't keep the actual graphic e-mail.

12       Q    Okay.  But you are claiming that HomeTeam

13   authorized those listings on May 5th, 2013?

14       A    Correct.

15       Q    And how did they authorize that?

16       A    By clicking on that box.

17       Q    And where was that e-mail sent?  To what e-mail

18   address?

19       A    To HomeTeam Leasing at

20   hometeampropertymanagement.com (sic).

21       Q    So you've been present while Mr. Yo Wakita

22   testified earlier today.  And his claim that he searched

23   through his e-mails at leasing@hometeampm.com, and he spoke

24   to his brother who is the broker for HomeTeam, and that he

25   denies ever having authorized Apartment Hunters to use those

1    listings.  So --

2        A    That's his testimony.

3        Q    -- are you saying that's not true?

4        A    I'm saying we did send this e-mail out.  We have a

5    valid unique session ID that we prepared, sent this.

6        Q    So other than these excel spreadsheets that you've

7    had your employees prepare, does Apartment Hunters have any

8    written or oral -- any proof of any written or oral

9    permission to list these properties?

10       A    No.

11       Q    Okay.  And how many properties, or how many

12   listings for properties did Apartment Hunters have in May of

13   2013?

14       A    At any given time, Apartment Hunters has about 65

15   to 75,000 active listings.

16       Q    Okay.  And how do you know -- how are you able to

17   update within a five-day period whether those 65,000 or so

18   listings are still vacant and available for rent?

19       A    We have a staff updater, entry people that do it on

20   a daily basis, and a lot are via feeds, and automated data

21   input via the management companies website themselves.

22       Q    Do you have any proof of any contact to HomeTeam

23   Property Management to inquire whether the four listings

24   that are at issue here today were still available on the

25   dates that you claim were listed for those properties?

230

```
 1      A    I don't have that, no.  We just have proof that we

 2   sent and got permission for them, and that they were

 3   activated and expired in a proper date format.

 4      Q    Okay.  Are you aware that PRLS licensees have to

 5   keep copies of any contracts for PRLS services that they use

 6   for a period of three years?

 7      A    Which contracts?

 8      Q    The PRLS license contract.  PRLS service contract

 9   that they use?

10      A    With the customer or with the landlord?

11      Q    With the customers.

12      A    Sure.

13      Q    You are aware of that?

14      A    Right.

15      Q    And is it your company policy to purge -- is it

16   still your testimony that it's your company policy to purge

17   information for listings after only three months?

18      A    This is PRLS contract with the customer, I have it

19   goes back as far as you need, which is the contract we enter

20   into with a tenant to provide them with prepaid rental

21   listing services, which means the last four digits of credit

22   card.  When they signed up.  When they have came.  How many

23   living they look at --

24      MS. GARCIA:  Objection.  Move to strike as

25   nonresponsive.
```

231

1       THE WITNESS:  Yeah, well, I'm responding.

2       THE COURT:  Granted.

3       THE WITNESS:  It's not that.

4       THE COURT:  Hold on.  I'm going to grant it.

5           Do you remember what she asked you?

6       THE WITNESS:  She asked me if I understand that PRLS

7   license requires you to keep documents for three years.  Not

8   on the side of landlords.  On the side of tenants I keep

9   them longer than three years.

10      THE COURT:  Go ahead.

11  BY MS. GARCIA:

12      Q    And if there's a dispute by a prospective tenant

13  over a property, wouldn't it make sense to keep copies of

14  the records related to that listing.  If you have to answer

15  a request for a refund.

16      A    We've refunded everything going back right away.

17      MS. GARCIA:  Move to strike as nonresponsive.  That's

18  not my question.

19      THE COURT:  Granted.

20  BY MS. GARCIA:

21      Q    How long of a period do you keep records relating

22  to the authorizations that you receive from property

23  managers or property owners for your listings?

24      A    Approximately six months I would say.

25      Q    Okay.  And how are you able to respond to requests

232

1    for refunds that relate to PRLS services that go beyond the

2    six months?

3        A    Our refunds have nothing to do with the properties.

4    As a policy, we refund anybody who asks for a refund,

5    period.

6        Q    What if the request for a refund has to do with a

7    listing of a property that wasn't authorized?

8             How are you able to determine --

9        A    We haven't had that.

10       Q    Okay.  You are claiming that every listing that

11   Apartment Hunters has used has been authorized by the

12   property owner or manager?

13       A    I'm claiming every refund we've had has not been

14   property related.

15       Q    And you reviewed every request for a fund?

16       A    I am the one who issues a refund.

17       Q    Okay.  And how did you receive those requests for

18   refunds?

19       A    By e-mail, by ticketing system, by a recording

20   telephonic request for a refund, or via credit card company

21   request.

22       Q    Have you ever actually received a mailing of a

23   request for a refund from a customer?

24       A    Never.

25       Q    I'm sorry?

233

1        A     Never.

2        Q     Is that because the addresses listed for Apartment

3    Hunters are no longer valid?

4        A     No, ma'am, that's not because.

5        Q     Okay.  Are you aware that the refund requirement --

6    the refund wording requirements for PRLS listings also

7    require that the request for refund be mailed by certified

8    mail or by regular mail by the client asking for a refund?

9        A     Correct.

10       MR. TAHMAZIAN:  Objection.  This is beyond the scope of

11   the Accusation, your Honor.

12       THE COURT:  How is this relevant?

13       MS. GARCIA:  Well, there's been testimony about their

14   procedure for refunding requests for a refund.  And there's

15   been testimony about his knowledge of the PRLS requirements.

16           I just want to know whether he is aware of the fact

17   that in order to request a refund, the customer has to show

18   proof of mailing.

19       THE COURT:  Okay.  It's probative.  Let's not spend too

20   much time on it.

21       MS. GARCIA:  Okay.

22       THE COURT:  Do you remember what she asked?

23       THE WITNESS:  Yes, your Honor.

24       THE COURT:  Okay.

25       THE WITNESS:  But we refund without even waiting for a

234

1   refund request.

2       MR. TAHMAZIAN:   I think the question --

3   BY MS. GARCIA:

4       Q    What are the business addresses that Apartment

5   Hunters operates out of?

6       A    What are the current business addresses?

7       Q    Yes.

8       A    32565 Golden Lantern, Dana Point, 92629.

9       Q    And is that a business address, or is that a

10  residence?

11      A    That's a business address.

12      Q    And how long has Apartment Hunters been at that

13  address?

14      A    Since -- it's been approximately three and a half

15  years, almost four years.

16      Q    So since 2012?

17      A    I would say so, yeah.  I don't know the exact date.

18  It's been over three years.

19      Q    And are you claiming that you notified the Bureau

20  of this change of address?

21      A    Yes, ma'am, I did.

22      Q    And where was Apartment Hunters before that?

23      A    201 North Robertson Boulevard in Beverly Hills.

24      THE COURT:   Okay.  Make sure that you let Ms. Garcia

25  finish.

235

1        THE WITNESS:  I apologize.

2        THE COURT:  Okay.  Go ahead.

3        MS. GARCIA:  Sorry, your Honor.

4   BY MS. GARCIA:

5        Q    When did Apartment Hunters vacate that location on

6   Robertson?

7        A    Approximately three years ago, around the same time

8   that the new location was announced.

9             I don't know the exact vacate and new date to give

10  you an exact date.

11       Q    So this year is 2015.  Three years ago would have

12  been 2012; is that correct?

13       A    Correct.

14       Q    So it's fair to say that by August of 2013, the

15  address at Robertson avenue had been vacated --

16       A    Correct.

17       Q    -- by Apartment Hunters.

18            And do you have proof of any of the applications or

19  notices of change of addresses or new versions of contract

20  with the new address for Apartment Hunters that were

21  submitted to the Bureau of Real Estate?

22            Do you have any of those with you?

23       A    Yes.  With us, yes, we submitted it -- it's right

24  here.  Each website, right now live has it.  They're here.

25  ///

236

1    BY MS. GARCIA:

2        Q    For the record the witness is referring to R's

3    Exhibit "E"; is that correct?

4        A    Correct, ma'am.

5        MR. TAHMAZIAN:  Yes.

6        THE COURT:  Yes.

7    BY MS. GARCIA:

8        Q    Who obtained this screen shot?

9        A    I did.

10       Q    And when did you get the screen shot?

11       A    It is three days old.

12       Q    Okay.  And where did you -- what website did you

13   pull this screen shot from?

14       A    It is, I believe, Apartment Hunters.

15       Q    So this was from Apartment Hunters's website?

16       A    Yes, ma'am.

17       Q    Okay.  So other than the screen shot that you

18   allegedly took from Apartment Hunters's website, do you have

19   any other copies of any contracts or license applications or

20   change of address notices that were submitted to the Bureau?

21       A    They were all submitted the Department.

22       Q    When were they submitted?

23       A    When we asked for the restriction to be removed.

24       Q    When was that?

25       A    I don't recall the date.

237

```
 1      Q     Was it this year?

 2      A     No, ma'am, it was last year.

 3      Q     2014?

 4      A     Right.

 5      Q     Okay.  But you claim that you've been at the

 6   address at Golden Lantern since 2012; is that correct?

 7      A     That is correct.

 8      Q     Okay.  Now, Apartment Hunters restricted real

 9   estate license was suspended as of May 8th, 2014; isn't that

10   correct?

11      A     Yes.

12      Q     And so why is Apartment Hunters, as of at least

13   three days ago, according to your testimony, is still having

14   a website up for PRLS services even though their license has

15   been suspended?

16      A     We were not about to cease operations of the

17   company for a suspension that has not been fought yet.

18      Q     Okay.  So you've continued to engage in PRLS

19   services, even after you received the order suspending the

20   restricted real estate license from the Bureau; is that

21   correct?

22      A     Correct.

23      Q     And you were with the company at the time of the

24   previous disciplinary action that was filed against

25   Apartment Hunters back in 2010; isn't that correct?
```

238

1     A    Correct.

2     Q    And you actually testified at the hearing for that

3  previous action; is that correct?

4     A    Correct.

5     Q    So it is fair to say that you were familiar with

6  the allegation against Apartment Hunters in that previous

7  action; isn't that correct?

8     A    Correct.

9     Q    And is it fair to say that you were familiar with

10  the final decision on that matter that granted the

11  restricted license to Apartment Hunters; isn't that correct?

12     A    Correct.

13     Q    Okay.  And isn't it true that the allegations with

14  respect to the use of various domain names, as your attorney

15  has referred to them as, isn't it true that those

16  allegations had to do with an unlicensed use of a fictitious

17  business name?

18     MR. TAHMAZIAN:  Objection.  Relevance, your Honor.  It's

19  got no baring on this Accusation.  The last case was heard

20  and dealt with, and as a result a restricted license was

21  issued.  And now we're talking about a new Accusation.  That

22  has no relevance in this case, your Honor.

23     THE COURT:  Overruled.  It's probative.  The prior

24  disciplinary history of the licensee is always relevant.

25         You can answer.

239

1      THE WITNESS:  Ask your question again, please.

2  BY MS. GARCIA:

3      Q    Well, let me see if I can just clarify the issue

4  here, because you were asked earlier about the steps that

5  Apartment Hunters took to address the previous allegations

6  by the Bureau of Real Estate.  And Counsel kept referring to

7  them as domain names and trying to tie them into property

8  addresses?

9           But isn't it a fact that what the Bureau actually

10  alleged against Apartment Hunters for those use of the

11  website names such as forrentinla.com, or

12  wetakesection8.com, et cetera, the DBAs that were

13  subsequently licenses under Apartment Hunters.

14           Isn't it true is that the allegations had to do

15  with an unlicensed use of a fictitious business name, and

16  not the failure -- or use of other actual physical

17  addresses?  Do you understand my question?

18      A    No.  No, I don't.  I'm sorry.

19      Q    Why did Apartment Hunters add all of those DBAs

20  after the previous disciplinary action?

21      A    They're hyper regional, specifically targeted

22  towards business -- different business models.

23      Q    Isn't it true that the Bureau alleged against

24  Apartment Hunters in the previous action, that Apartment

25  Hunters was using unlicensed fictitious business names

240

1  including For Rent in L.A. and For Rent in San Francisco?

2      A    They were all licensed and they all had the PRLS

3  contract on their website.

4      Q    And that was after the previous Accusation was

5  filed against Apartment Hunters; isn't that correct?

6      A    I don't recall that.

7      Q    Okay.  But the use of a fictitious business name

8  such a website that isn't exactly apartmenthunterz.com,

9  isn't it required that Apartment Hunters file and obtain

10  authority from the Bureau of Real Estate to use that

11  fictitious business name?

12      A    And it did.

13      Q    Okay.  The use of a website is not the same thing

14  as a business -- a physical business location; is that

15  correct?

16      MR. TAHMAZIAN:  Objection.  Calls for argumentation and

17  it's a legal conclusion, your Honor.

18      THE COURT:  Sustained.

19  BY MS. GARCIA:

20      Q    Okay.  Is it your understanding in order to operate

21  out of any location that's not the main principle address

22  that's listed on Apartment Hunters records with the Bureau,

23  that Apartment Hunters has to obtain a license or authority

24  from the bureau to use that additional location?

25      A    I don't believe so.  I believe that the location is

1   the domain.

2       MS. GARCIA:  Move to strike as nonresponsive.

3       THE WITNESS:  Since it's an internet-based company,

4   there is no location.  A location is the internet.

5       THE COURT:  Overruled.  I think he's trying to answer

6   your question.

7   BY MS. GARCIA:

8       Q    I'm referring to physical office addresses, such as

9   the address Golden Lantern, or the Robertson address.

10          Assuming that you have one physical main office

11  address listed with the Bureau, in order for Apartment

12  Hunters to operate out of any other address besides that

13  address; isn't that correct that Apartment Hunters has to

14  obtain a bond for that location and get approval from the

15  Bureau to operate out of that location?

16      MR. TAHMAZIAN:  Objection.  That calls for legal

17  conclusion.  Vague and ambiguous.  Counsel talks about a

18  physical address and then a location, which is very

19  confusing.

20      THE COURT:  All right.  I'll overrule it, but you can

21  just tell us if you have an understanding on that issue one

22  way or the other what it is.

23      THE WITNESS:  I mean, if I may, the Department of Real

24  Estate has given a PRLS license to a website that

25  Ms. Lissete is mentioning.  That's a 50-state website, We

242

```
 1   Take Section 8, and I'm not sure if we're suppose to have 50

 2   offices.  For that matter, Rent for San France if I'm

 3   suppose to have a location in San Francisco for customers to

 4   come pick up their money or send mail to.

 5        The entire thing is just a completely confusing set

 6   up to shut this operation down.

 7   BY MS. GARCIA:

 8   Q    Do you understand the difference between a website

 9   and a physical office location?

10   A    Ms. Garcia, if you are going to disrespect me,

11   please go ahead and do it in a different manner.

12        I fully understand the difference between a website

13   and a physical location.  We're in a physical location, not

14   on the court's website.  Yes, I do.

15   Q    Okay.  And how many physical locations is Apartment

16   Hunters currently operating out of?

17   A    There is no physical location, it's an internet

18   company.

19   Q    So what's actually at the location on Golden

20   Lantern?  What is there?

21   A    It's an office, an office address.  It's a location

22   address.  It's an address to receive mail.

23   Q    Is it a P.O. box?

24   A    It's an office address.

25   Q    How many desks are at that location?
```

243

```
 1      A     There is none.  We don't need a desk.  We don't
 2  need an office.  It's an internet company.
 3      Q     Okay.  So where do you and Mr. Shayan regularly
 4  work out of on a day-to-day basis?
 5      A     Out of a location.
 6      Q     What location?
 7      A     Out of our home office.
 8      Q     And what location is that?  What address is that?
 9      A     I don't think it's relevant.
10      Q     Okay.
11      A     Out of a hotel room.  It doesn't really have
12  anything to do with where we work out of.
13      Q     How is the Bureau suppose to serve any documents
14  related to Apartment Hunters PRLS license if they don't have
15  a valid address as to where --
16      A     On Golden Lantern there is someone there to receive
17  service live.
18      Q     You just stated that there's no person there and no
19  desk there.
20      A     There's person there to receive service.
21      Q     Who is there?
22      A     There is a service to receive live lawsuits.
23            Is that what you want to ask?  There is a person to
24  receive service from you.
25      Q     What is the name of that person?
```

```
 1      A    There's always -- I don't know a full first name,
 2  last name, but you are welcome to serve us there.
 3      Q    Who employs that person?
 4      A    The location owner.  I'm not sure, ma'am.
 5      Q    So who owns that location?
 6      A    I'm not sure.  There is someone there between 9:00
 7  to 5:00 standing to sign a certified letter or a sheriff can
 8  come and serve anything there under our name, 9:00 a.m. to
 9  5:00 p.m.
10      Q    But you don't know the name of this person who
11  supposedly is there to receive service on behalf of
12  Apartment Hunters?
13      A    No.
14      Q    And you don't know the name of the owner who
15  allegedly owns Golden Lantern; is that correct?
16      A    No.  I know there is a person.  I believe his name
17  is Mike Lee, as Steve just mentioned.  But it could be Mike
18  Lee, it could be somebody else.  There is a human being
19  there 9:00 to 5:00.  Feel free to serve.
20      Q    Who employs Mike Lee?
21      A    I have no idea, ma'am.
22      Q    So how is he authorized to accept service on behalf
23  of the Apartment Hunters?
24      A    Well, your process server would come up and go,
25  "I'd like to serve Steve Shayan and Kevin Shayan of
```

245

```
 1    Apartment Hunters," and the guy would sign and we would go
 2    and pick up the package.
 3        Q    But Mike Lee is not an employee of the Apartment
 4    Hunters; is that correct?
 5        A    No.
 6        Q    Okay.  And who owns Apartment Hunters?
 7        A    Steven Shayan.
 8        Q    Anyone else?
 9        A    No.
10        Q    So Steven Shayan owns 100 percent of Apartment
11    Hunters?
12        A    Correct.
13        Q    Is Apartment Hunters a corporation incorporated in
14    California?
15        A    You'd have to ask Steve.  Yes, it is.
16        Q    And does the corporation have any officers?
17        A    Are you asking me?
18        Q    Yes?
19        A    Yes, Steve is the officer.
20        Q    What's his title?
21        A    CEO and President.
22        Q    He's President?
23        A    Right.
24        Q    How long has he been President?
25        A    You would have to ask these questions from Steve.
```

```
 1   I'm not privy to that information.

 2       Q    What's your title with Apartment Hunters?

 3       A    I'm just running, as I mentioned earlier, the

 4   company's design and supporting my brother who has some

 5   health issues, with the website's design, back and listing

 6   quality, and the employees overseas.

 7       Q    And how long have you held that position?

 8       A    Since 1999.

 9       Q    Has your brother been President of Apartment

10   Hunters for the last year?

11       A    He's been from inception.

12       Q    Do you know why the Declaration that was submitted

13   to the Bureau from Vidmantas Macys, and if you want to refer

14   to it, I'm looking at page four of Exhibit 8.

15            Do you know why Mr. Macys would claim that he's

16   President of Apartment Hunters LT?

17       A    Absolutely.  That's a Lithuanian corporation we

18   own, and we pay Lithuanian taxes to the Lithuanian

19   Government.  So it's Apartment Hunters LT.  Lithuanian

20   corporation with 16 or 17 Lithuanian employees that pays

21   Lithuanian taxes.

22       Q    Okay.  And has the Bureau of Real Estate -- well,

23   let me move back.

24            Is Apartment Hunters LT engaging in PRLS services?

25       A    No, ma'am.
```

1    Q    So what is Mr. Macys's relation to, or involvement

2    with the PRLS services that are alleged in this Accusation?

3    A    He's one of the programmers who was handling data

4    listings and listing quality on our behalf.

5    Q    Who's behalf?

6    A    On mine and Steve's behalf that -- he's being

7    supervised by Steve, the licensee, and me assisting Steve.

8    Q    For Apartment Hunters?

9    A    Correct.

10    Q    Using the license that was issued by the California

11    Bureau of Real Estate to Apartment Hunters?

12    A    No, ma'am.  He is a programmer.  So if I'm getting

13    your question right, next week I have to bring my girlfriend

14    and my wife in under the license in here to tell you what's

15    going on in the bedroom or -- he's a programmer, that's all.

16    Q    I'm trying to understand what Apartment Hunters LT

17    is.

18    A    It's a corporation.

19    Q    Is that --

20    A    In Lithuania with a bunch of young men who sit down

21    and program.

22    Q    And what do they do?

23    A    They sit down and program the website.  They data

24    entry, type, validate, and check the listings.  They make

25    sure the e-mails have gone out.  The e-mails have been

248

1    replied to.  The customers have been answered to.  And the

2    photographs are of good quality, watermarked, et cetera.

3        Q    And for what company are they doing this for?

4        A    For Apartment Hunters Lithuania corporation.

5        Q    And these listings are located where?

6        A    In California.

7        Q    Is Apartment Hunters Lithuania licensed by the

8    Bureau of Real Estate in California?

9        A    Apartment Hunters Lithuania is not a PRLS, it's

10   programmers.  There are not the ones soliciting or entering

11   into a any negotiations with the user, the customer.

12       Q    So who is?

13       A    We are.

14       Q    Meaning?

15       A    In the United States.

16       Q    Meaning Apartment Hunters, Inc.?

17       A    Right.  So the customers are not negotiating with

18   Vidmantas Macys.

19       Q    Okay.  So does Apartment Hunters have an office in

20   Lithuania?

21       A    I just said that.

22       MR. TAHMAZIAN:  Apartment Hunters who?  Lithuania or the

23   one here?

24   BY MS. GARCIA:

25       Q    Does Apartment Hunters, Inc. control Apartment

249

1   Hunters LT?

2       A    Of course.

3       Q    Okay.  And is there an office for Apartment Hunters

4   LT in Lithuania?

5       A    Yes.

6       Q    Okay.  And has the Bureau been notified of the

7   address for that office address in Lithuania?

8       A    Ma'am, I don't have to notify --

9       MR. TAHMAZIAN:  Just yes or no.

10      THE WITNESS:  No.

11  BY MS. GARCIA:

12      Q    Now, looking at the Complaint for Mr. Wakita in

13  Exhibit 5, can you please turn to page eight of Exhibit 5.

14      A    Page.

15      Q    Eight.

16      A    Exhibit 5.

17           I want to take a quick break.

18           Is that okay to use the restroom?

19      THE COURT:  Yes.  Let's go off the record.

20           (Off the record)

21      THE COURT:  Back on the record.

22  BY MS. GARCIA:

23      Q    Looking the page eight of Exhibit 5.

24      A    Exhibit 5, page eight.

25      Q    It should say CAL BRE page eight.

1       A       Yes, sir -- yes, ma'am.

2       Q       Did Apartment Hunters ever use a phone number

3    (310) 982-2536?

4       A       Yes.

5       Q       Okay.  And you testified earlier that the listings

6    that Apartment Hunters used for other property managers,

7    that they would list the numbers to direct the property

8    managers directly.

9            So according to this listing, why would Apartment

10   Hunters list their own phone number, and not HomeTeam's

11   number?

12      A       We're a Prepaid Rental Listing Service, and our

13   only source of revenue is the subscription.  So what I

14   stated earlier is that once the customer pays our

15   subscription fee, we're out of the system, and they get to

16   the contract that gentleman direct.

17           So when you contact that (310) 982-2536, you would

18   get us, at which point you would become a subscriber, and

19   then directly contact the property, which would be HomeTeam.

20   We don't interfere between the point -- after the point that

21   the customer pays us, they can contact HomeTeam directly 200

22   sometimes a day.

23      Q       Did you get permission from HomeTeam to list this

24   property?

25      A       I believe I already said that earlier, yes.

251

1    Q    And do you have proof other than the excel

2  spreadsheets that were prepared by Apartment Hunters

3  employees?

4    A    Yes.

5    MR. TAHMAZIAN:  Objection.  Asked and answered, your

6  Honor.

7    THE COURT:  We've covered that before, didn't we?

8    MS. GARCIA:  Yeah.  I think so.  Sorry.

9  BY MS. GARCIA:

10    Q    This phone number, (310) 982-2536, is that a

11  landline number?  Is that a cellphone number?

12    A    It's our company number.

13    Q    And what address does that number belong to?

14    A    We have over 30-someodd numbers that are actually

15  belonging to the company and dedicated to separate,

16  different websites.  And what address are you thinking

17  about?  Is it a Pacific Bell phone number with a specific

18  address?

19    Q    Correct?

20    A    It's not -- their phones are not set up like that.

21  These are like Cisco Phones, so they're IP based phones.

22    Q    Okay.  So is there a physical address as to who

23  answers the calls that are made to this phone number?

24    A    Yes.  These calls are answered via intelligent

25  voice response system, an IVR that automatically recognizes

252

1    who you are, and knows that if you are a tenant or a

2    landlord.  It talks to you, you can talk to it.  You'll hear

3    everything you have to have say similar to the same way you

4    called Chase Bank or Direct TV, and it would read you a

5    listing.  It would call you back with a listing.  You can

6    enter your phone number.  It would do everything a human

7    does and more, including recorded and/or transfer you to

8    any -- including a payment system if you'd like to pay.

9        Q    So a physical human person does not answer these

10   calls that are made to this number?  It's an automated

11   machine?

12       A    It's not a machine.  It's an interactive voice

13   response system.  It's intelligent interactive voice

14   response system.  It's 21st century, very intelligent stuff.

15       Q    Okay.  Who runs the system for Apartment Hunters?

16       A    It's two billion dollar company called Ifbyphone,

17   I-F-B-Y phone.

18       Q    Where are the offices located for Ifbyphone?

19       A    They're in Chicago.

20       Q    Okay.  And so this is -- is Ifbyphone owned by

21   Apartment Hunters?

22       A    No, ma'am.  I wish.

23       Q    So how does Apartment Hunters control or supervise

24   what information is going out calling the phone number

25   listed here on the listing?

1    A    It's all a huge sophisticated server connected into

2 our back end. I could demonstrate if we had time,

3 unfortunately I can't right now. But you would call in and

4 if you are a member of our service what would happen if you

5 call in, it right away knows you are Lissete Garcia, you are

6 a member of our service. At the tone, please tell me what I

7 can do for you.

8         If you even say the word "ref" without the word

9 "und" it says you want a refund, I'll do it. Goes there,

10 makes a ticket. Comes in front of one of our six ladies

11 that are there. Shows up as text, they push a button. A

12 text goes, an e-mail goes, an automatic callback goes. If

13 you are a landlord you can even activate, deactivated

14 listings if you have the right criteria inside our system.

15         You can talk to this thing as if it's human. It

16 recognizes every single word you say. Once is does it, it

17 gets transcribed with an audio file where we can listen to

18 what you say. Again, within an 18-minute highest response

19 time.

20    Q    And somebody calling in for a refund to Apartment

21 Hunters, they are going to get an automated machine, and not

22 speak to a physical person?

23    A    They get a refund within 18 minutes, whether they

24 do one or not --

25    Q    Move to strike as nonresponsive.

1        Do they talk to a person, or do they get a machine?

2     A     It's not a machine.  It's an interactive voice

3   response that interacts with you back and forth.  So you'd

4   say, "I'd like a refund."  It says, "Please tell me the last

5   four digits of your credit card."  You say it, you get your

6   money back.

7        It's better than a person.  It doesn't argue with

8   you.

9     Q     And where would clients of Apartment Hunters go to

10  if they are not satisfied with the response they get with

11  this IVR system?

12    A     Where would they go to?

13    Q     Yeah.

14    A     It would escalate their complaint to a supervisor

15  and would make all kinds of red flags and come directly into

16  a huge box where it would be flashing to me, Steve, and one

17  of our senior supervisors -- which that box is usually empty

18  because we have a punishment system for our staff not doing

19  a good job, but we don't have that.

20    Q     And if a client wanted to sue Apartment Hunters in

21  a small claim suit, where would they serve the small claims

22  action?

23    A     Right here.  To this address on the contract.

24    Q     You are referring to the Golden Lantern address?

25    A     Correct.  Exactly where you would serve us.

1    Q    And according to as of February 24th -- I'm looking

2    at R's Exhibit "A" -- the address listed for Apartment

3    Hunters, according to the Bureau's website is still

4    Apartment Hunters, Inc.; is that correct?

5        MR. TAHMAZIAN:  I'm going to object to that question

6    based on the fact that what the Bureau has done in the past

7    year and a half is not before the Court.  You've heard

8    testimony about the fact that they've supplied information,

9    filed the applications with the new address.

10        If the Bureau does not take the proper precaution

11   to update their records, that's not the clients fault their

12   records still show the old one.

13        The document shows what it shows, your Honor.

14       THE COURT:  Overruled.  You can explain that.          •

15        Do you remember what the question was?

16   BY MS. GARCIA:

17   Q    So if a member of the public is looking up

18   Apartment Hunters, Inc. on the Bureau's website, they are

19   going find the invalid address that's on Robertson

20   Boulevard; isn't that correct?

21   A    Correct.

22   Q    And you are claiming that if someone tries to serve

23   a lawsuit on Apartment Hunters, Inc. at the Golden Lantern

24   address that they would have to serve it on someone who's

25   not an employee of Apartment Hunters, a person that you've

 1    names as Mike Lee; isn't that correct?

 2        A    Someone is there to accept any kind of lawsuit,

 3    small claims, regular, any kind of suit.

 4        Q    Okay.  When did you start working with Trulia.com?

 5        A    I don't recall the exact date.  I believe it's back

 6    in -- we started the negotiating February, I think of -- the

 7    e-mail is here.  I don't have the dates right in front of me

 8    right now.

 9        THE COURT:  Do you remember the year?

10        THE WITNESS:  Yeah.  February of 2013, sir.

11    BY MS. GARCIA:

12        Q    February of 2013 is when you claim that you started

13    working with Trulia?

14        A    The communications started back in that time, yes.

15        Q    When did you actually have permission to list

16    Apartment Hunters listings on Trulia's website?

17        A    The negotiations started in February and were on

18    paper, I want to say in March of 2013, and finalized in that

19    time.  The exhibits are here.

20        Q    Are you referring to Exhibit "D"?

21        A    Yes, ma'am.  It's "D", yes.

22        Q    And so I'm looking at the first page of

23    Exhibit "D", and the top e-mail.

24             Did Apartment Hunters have a contract in place with

25    Trulia as of June 5th of 2013?

257

1      A      It had it before.  This is an older e-mail.  If you

2  go further down, you'll see March 29, 2013.  This is put in

3  reverse order, ma'am.

4      Q      Okay.  Now, the --

5      A      March 11, 2013 if you look.

6      Q      What page?

7      A      There's e-mail dates, ma'am.  March 29, 2013 you'll

8  see.  And look here it says right here, I'll show it to you.

9  Right there, ma'am, March 11th.

10     Q      On the bottom left corner there's the page --

11     A      No, no.  On the e-mail from Trulia to us starting

12  portion of the negotiation, your Honor.

13         THE COURT:  Second to the last page.

14         THE WITNESS:  Right here.

15         THE COURT:  Do you see it, Ms. Garcia?

16         MS. GARCIA:  Yes.

17         THE COURT:  Okay.  She's got it.

18         THE WITNESS:  Sorry.

19  BY MS. GARCIA:

20     Q      Okay.  That e-mail purports to reflect a question

21  from a Trulia employee as to how they can work with

22  Apartment Hunters?

23     A      That's when they start the negotiations.

24     Q      Okay.  So when exactly did Apartment Hunters start

25  listing properties on Trulia.com is my question?

1     A     I believe it was in April, April or May.  I'm not

2   sure of the exact date.  I'd have to go look it up.  I've

3   provided every communication or most of them here.

4     Q     And what year?

5     A     2013.

6     Q     And the listings that Apartment Hunters was placing

7   on Trulia's website, were those properties owned by Trulia?

8     A     One more time, please?

9     Q     The listings that Apartment Hunters posted on

10  Trulia's website, were those properties owned by Trulia?

11    A     Your question is confusing.

12          Why would I be taking properties that are owned by

13  Trulia and put it up on Trulia?

14    Q     So you are claiming that the properties on Trulia's

15  website are owned by Trulia?

16    A     You just told me that.  I think we're -- either I'm

17  confused or we're all getting tired.

18          I would be putting up properties on Trulia that

19  Trulia doesn't have.  What you just asked me is:  Did I put

20  up properties owned by Trulia on Trulia.

21          Why would they come to me for properties that they

22  own?

23    Q     So Trulia didn't have authority to give you to list

24  properties that they do not own; is that correct?

25          MR. TAHMAZIAN:  That's a vague questions.  Objection.

1   Vague.

2        THE COURT:  Do you understand what she's asking?

3        THE WITNESS:  I fully do.  May I respond?

4        THE COURT:  Yes.

5        THE WITNESS:  Where you are going is that and once

6   Trulia gets permission from the landlord to list the

7   property on Trulia, they give it to me via a feed, and I

8   don't have to call again to get permission from that

9   landlord.

10        We've been going through this with your company,

11   with your office for 15 years now.

12        MS. GARCIA:  So --

13        THE WITNESS:  One, Trulia calls the landlord, gets

14   permission.  Two, gets that vacancy.  Overnight they can

15   transfer that vacancy to us without us having to call again

16   to get permission.  Same goes with the MLS.  I have a

17   license to get and display MLS data, which means I don't

18   have to call each MLS broker and get permission for that

19   rental listing, because the MLS gave it to me.  So we can go

20   again and again for 15 more years.

21   BY MS. GARCIA:

22        Q    Okay.  So you are claiming that the four properties

23   that HomeTeam is complaining about, that you had permission

24   to list those properties because HomeTeam may have listed

25   those onto Trulia?

1      MR. TAHMAZIAN:  Objection.  Misstates his testimony.  He

2   testified about the exhibits very clearly and about the

3   e-mail that he got from HomeTeam.  That wasn't his

4   testimony.

5      THE COURT:  Okay.  He can agree or disagree.  Is what --

6      THE WITNESS:  It can be both.

7   BY MS. GARCIA:

8      Q    So do you actually contact the property manager or

9   the owner for every single listing that you are pulling from

10  Trulia or any other website that you are using to list

11  Apartment Hunters information on?

12     A    No.

13     Q    You do not contact the property manager?

14     A    No, because once the data comes from Trulia, Trulia

15  has already contacted those properties and then they send it

16  to us.

17     Q    Those properties have allowed Trulia to list their

18  listing or properties.  They have not given --

19     A    And once Trulia sends it to us, the permission has

20  already been given over.  That's a legal thing.  That's your

21  fight with them, not mine.

22     THE COURT:  All right.  You cut off Ms. Garcia there.

23     THE WITNESS:  Sorry.

24     THE COURT:  Let her --

25     THE WITNESS:  I'm very passionate about this permission

261

```
 1   thing.  They've been trying to shut down our company for

 2   15 years.

 3       THE COURT:  I see that.  But if you both speak at the

 4   same time and the reporter doesn't get it, your passion just

 5   kind of evaporates --

 6       THE WITNESS:  Sorry.

 7       THE COURT:  -- and is it doesn't get on the record,

 8   which is not what you want to do.

 9       THE WITNESS:  No.  I appreciate that, your Honor.

10       THE COURT:  Go ahead.

11   BY MS. GARCIA:

12       Q    Do you understand that a PRLS licensee has to

13   obtain information from the property management or manager

14   in order to list that property on their listings that they

15   sell to prospective tenants?

16       A    I do.

17       Q    Okay.  And you didn't obtain -- never mind --

18   strike that.

19            Why did Apartment Hunters vacate the office at the

20   Beverly Hills address?

21       A    We wanted to be by the ocean in Orange County.

22       Q    Okay.  Now, looking at your set of exhibits, please

23   look at Exhibit "B".

24       A    Yes, ma'am.

25       Q    Who prepared this document?
```

```
1      A    I did.

2      Q    When did you prepare it?

3      A    I believe two nights ago -- three nights ago.

4      Q    Okay.  And looking at Exhibit "C", how did you

5    obtain these documents?

6      A    This is a feed that is a sample of how data arrives

7    from a data feed partner.  And this is a sample of what it

8    looks like, which I went through all of this, I believe,

9    earlier.  Comes raw, looks like this when it gets displayed.

10     Q    I'm referring to Exhibit "C" specifically?

11     A    You go to our website, you do a screen shot, you

12   print it, it comes like this.

13     Q    So this is from Apartment Hunters website?

14     A    Correct, ma'am.  That's what is says.

15     Q    And when did you print these documents out?

16     A    Same time I did these.  Couple of nights ago.

17     Q    Okay.  And just from my brief review of these

18   documents, it doesn't look like the property addresses match

19   up from the ones --

20     A    These are samples.  These are just samples for the

21   Court to understand raw data, transformed data.  They're not

22   exactly from these.

23     Q    They are not the same properties?

24     A    They're not.  Just an example.

25     Q    And how did you get the information for these
```

1  properties on Exhibit's "B" and "C"?

2      A    How did I get?

3      Q    Are these properties owned by Apartment Hunters?

4      A    Ma'am, these came to us.  On top, Apartment Guide,

5  it's a partner who sends the listings to us every night.  So

6  I obtained these properties from a feed partner.

7      Q    Okay.

8      A    And these I obtained by printing them on our own

9  website, which is a direct transformation of raw data to

10 regular pages.

11     Q    Okay.  And does Apartmentguide.com -- are they the

12 owners or property managers --

13     A    Absolutely not.  They are the legal advertiser and

14 they have been -- they get paid by the property manager to

15 promote, advertise, and syndicate these listings.

16     Q    Did Apartment Hunters obtain permission for every

17 one of these properties from the property owner or property

18 manager to list them?

19     A    No.  And we don't have to.

20     THE COURT:  All right.  Ms. Garcia, it's 4:30 I think

21 we're going to have to stop at this time.

22          Let's have a chat off the record.

23          Off the record now.

24          (Discussion off the record)

25     THE COURT:  My understanding from Ms. Garcia is that she

# EXHIBIT B

BEFORE THE
BUREAU OF REAL ESTATE
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Accusation (Order Suspending Restricted License) Against:<br><br>APARTMENT HUNTERS, INC.,<br>a Prepaid Rental Listing Service (PRLS) corporation,<br><br>Respondent. | Case No. H-36458 LA<br><br>OAH No. 2014060980 |
| In the Matter of the First Amended Accusation Against:<br><br>APARTMENT HUNTERS, INC., and STEVEN K. SHAYAN, as designated officer for Apartment Hunters, Inc.,<br><br>Respondents. | Case No. H-39404 LA<br><br>OAH No. 2014050485 |

## PROPOSED DECISION

These consolidated matters were heard by Eric Sawyer, Administrative Law Judge (ALJ), Office of Administrative Hearings, State of California, on February 25, 2015, in Los Angeles.[1]

Lissete Garcia, Real Estate Counsel, represented Complainants.

Jilbert Tahmazian, Esq., represented Respondents Apartment Hunters, Inc. and Steven K. Shayan.

The record was held open after the hearing concluded so the parties could submit closing argument briefs, which were timely received and marked for identification as described in orders the ALJ issued describing the events that transpired while the record remained open. The record was closed and the matter submitted on April 30, 2015.

---

[1] These two matters were consolidated for hearing on February 13, 2015, by order of Presiding Administrative Law Judge Susan Formaker, without objection.

# FACTUAL FINDINGS

*Parties and Jurisdiction in Case No. H-39404 LA*

1.     Complainant Maria Suarez brought the Accusation in Bureau of Real Estate (Bureau) case number H-39404 LA (OAH No. 2014050485) in her official capacity as a Deputy Real Estate Commissioner. Respondents timely submitted a request for a hearing to contest the allegations of the Accusation.

2.     While the record remained open after the hearing concluded, Complainant was given leave to file a First Amended Accusation and Respondents were allowed to file an opposition to any such amended pleading. (See ALJ's order, Ex. 13.) On April 17, 2015, Complainant filed the First Amended Accusation. On April 27, 2015, Respondents filed an opposition to the First Amended Accusation. The record was thereafter closed. (See ALJ's order, Ex. 14.) Respondents filed another opposition to the First Amended Accusation and requested another day of hearing to respond. The ALJ denied Respondents' request and the record remained closed.[2] (See ALJ order, Ex. 15.)

3.     In 2007, Respondent Apartment Hunters, Inc. (AHI) was issued a prepaid rental listing service (or PRLS) license, as a corporation. As a result of the prior disciplinary action described in more detail below, Respondent AHI was issued, upon its application, a restricted PRLS license pursuant to, and subject to, the provisions of Business and Professions Code section 10156.7. However, Respondent AHI's license expired on March 12, 2014, and was not subsequently renewed.[3]

4.     Respondent Steven K. Shayan (Respondent Shayan) is the president of and designated officer for Respondent AHI. Respondent Shayan has never been licensed by the Bureau in any capacity.

*Parties and Jurisdiction in Case No. H-36458 LA*

5.     Respondent AHI's PRLS license was restricted as a result of discipline issued after an accusation filed against it in Bureau case number H-36458 LA. The order restricting AHI's PRLS license in that matter became effective on February 23, 2012, and included a condition whereby the restricted license could be suspended prior to a hearing by order of the Real Estate Commissioner (Commissioner). As a result of the above-described Accusation filed in Bureau case number H-39404 LA, the Commissioner issued an Order Suspending Restricted Real Estate License (Suspension Order) against Respondent AHI, also bearing Bureau case number H-36458 LA (OAH No. 2014050485), on May 8, 2014.

---

[2] The events that transpired after the hearing, and the documents filed by the parties during that time, are described in more detail in exhibits 13-15.

[3] The Bureau retains jurisdiction to seek disciplinary action against this expired license pursuant to Business and Professions Code section 10103.

6.      Respondent AHI requested a stay of the Suspension Order. The Bureau denied that request. Respondent AHI thereafter timely requested a hearing to contest the Suspension Order. Respondent AHI's restricted PRLS license has been suspended since May 8, 2014.

*Prior Discipline*

7.      Respondent AHI supplied prospective tenants with listings of residential real properties for rent pursuant to an arrangement under which the prospective tenants were required to pay a fee in advance of, or contemporaneously with, supplying listings.

8.      On February 11, 2010, the Bureau filed the aforementioned accusation against Respondent AHI in Bureau case number H-36458 LA. The matter was heard by an administrative law judge on October 20, 2010, and a Proposed Decision was issued on December 29, 2010, in which it was recommended that Respondent AHI's license be suspended for six months. The Proposed Decision was not adopted.

9.      On September 30, 2011, a Decision After Rejection in said case became effective. In that Decision, the Acting Commissioner concluded that Respondent AHI's license should be revoked because it had violated the following provisions of the Business and Professions Code:

a. sections 10167.2, 10167.3 and 10167.12, by engaging in the business of a prepaid rental listing service under two fictitious business names without having a valid license to operate under those names;

b. sections 10167.9 and 10167.12, by using PRLS contracts not previously approved by the Commissioner;

c. section 10167.12, by continuing to operate as a PRLS business under two unlicensed fictitious business names after the Department had issued a Desist and Refrain Order demanding that it stop doing so;

d. sections 10167.11 and 10167.12, by not confirming the availability of property for tenancy during the four-day period immediately preceding the dissemination of the listing information; and

e. sections 10167.10 and 10167.12, by failing to timely provide refunds of fees paid by prospective tenants for PRLS rental lists that did not meet contracted specifications.

10.      On February 3, 2012, the Acting Commissioner issued a Decision After Reconsideration, in which she maintained the same findings and conclusions made in the Decision After Rejection. However, the Acting Commissioner set aside the revocation and granted Respondent AHI a restricted PRLS license, which included a condition that it may be suspended prior to a hearing by order of the Commissioner on satisfactory evidence that

3

Respondent AHI violated provisions of the Real Estate Law, the Subdivided Lands Law, Regulations of the Commissioner or conditions attaching to the restricted license.

11.     According to the terms of the restricted license, Respondent AHI was not eligible to apply for the issuance of an unrestricted license or for removal of any of the terms or conditions of said restricted license until two years had elapsed from the effective date. It was not established that Respondent AHI had submitted such a request at any time.

*Respondents' Use of Information from Hometeam Property Management*

12.     On June 7, 2013, the Bureau received a complaint from Mr. Yo Wakita, a leasing manager and co-owner of Hometeam Property Management (Hometeam). Hometeam is a licensed real estate corporation that performs property management services for property owners in Southern California, particularly the San Diego area. Hometeam lists available rental properties on the Multiple Listing Service (MLS), on Hometeam's own website, and on various syndicated real estate marketing websites, such as Craigslist, Trulia, and Zillow.

13.     Mr. Wakita submitted his complaint to the Bureau after he discovered that Respondents had, without Hometeam's authorization, used copyrighted pictures and information about four separate rental properties listed on Hometeam's website; and, without written or oral permission, posted said pictures and information about the properties on different websites including, but not limited to, Trulia and Zillow. Specifically, Respondents took photographs of the four properties displayed on Hometeam's website, eliminated the "Hometeam" watermark inserted on the photographs by cropping and shrinking the borders of the photographs, and placed an "ApartmentHunterZ" watermark on the photographs. The photographs and information from Hometeam's website concerning the four properties, as well as AHI's website address, were placed on promotions for the properties found on the other websites.

14.     Hometeam had an exclusive listing with the landlords of the four properties in question, which were located in Chula Vista as follows: one on Thompson Avenue; one of Reisling Terrance; and two on Stanislaus Drive. Respondents listed an incorrect rental amount for one of the properties, although the rest of the information was generally the same as that on Hometeam's website for the four properties.

15.     A person viewing Respondents' advertisements for the four properties on the Trulia and Zillow websites would initially believe Respondents were authorized to solicit prospective tenants for those properties on behalf of the property owners, managers, or any authorized agent. However, as established by the testimony of AHI employee Kevin Shayan, the brother of Steven Shayan, somebody viewing these four listings on either another website or AHI's would receive access to the property address and landlord contact information only when they paid a fee to AHI. Once that was done, the prospective tenant would be referred only to Hometeam, not AHI. Respondents only receive compensation on such listings by customers who pay Respondents a subscription fee. Respondents do not participate in renting out the properties and receive no compensation when the properties are leased.

4

16.    A. Mr. Wakita was convincing in his testimony that at no time did Hometeam provide consent to Respondents to list the four properties in question on any website. Mr. Wakita never gave any such verbal consent. He checked his company's e-mail system and could find no e-mails from Respondents during the relevant time. His testimony was corroborated by a screenshot of his company's received e-mail file during the relevant time that shows nothing received from Respondents.

B. Mr. Wakita was also convincing in his testimony that his only partner, his brother, did not have access to the e-mail system at the time and that his brother did not give any consent to Respondents.

17.    Respondents' evidence supporting their contention that they had obtained consent from Hometeam to list the four properties was not convincing. Kevin Shayan testified that AHI would have sent Hometeam an e-mail in May 2013 advising that it could promote the properties in question and that AHI would have done so only if someone from Hometeam clicked on a consent link on that e-mail. However, Mr. Shayan testified that Respondents could not produce that e-mail because such messages had been purged from its system three or four months after being sent. Since the Accusation in Bureau case number H-39404 LA was filed and served well after that time, Mr. Shayan testified there was no reason for Respondents to save the e-mail in question. However, Mr. Shayan's testimony was undercut by several e-mails he presented during the hearing between he and Trulia which were generated from March through June 2013, well before the time he testified AHI's e-mails had been purged. No explanation was presented why those e-mails would be available, but not an e-mail sent to Hometeam in May 2013. The only tangible evidence presented by Respondents concerning an e-mail received from Hometeam was a copy of an Excel spreadsheet in which such an e-mail was described, along with a "Unique ID" number for said e-mail. However, that document does not purport to be a screenshot of information contained in an e-mail system, but rather information inputted into the spreadsheet by another person. The document is not convincing.

18.    At no time did Respondents contact and obtain consent from the landlords owning the four properties in question to promote them on the other websites. Kevin Shayan conceded in his testimony that no such efforts were taken. Instead, he testified that the way in which consent would have been obtained from Hometeam should be deemed as consent from the actual landlords as well. For that reason, it was established that Respondents did not confirm the availability of the four properties for tenancy during a four-day period immediately preceding their dissemination of the listing information.

19.    Respondents contend but failed to establish that either Trulia or Zillow served as a constructive or authorized agent on behalf of Hometeam or the four property owners. It is true that Mr. Wakita admitted on cross-examination that he has used Trulia to upload property listings, and that he has not read Trulia's terms and conditions of doing so. However, Mr. Wakita did not testify that he uploaded the four properties in question onto Trulia, nor did he testify that he agreed to allow Trulia to be an authorized agent for purposes of the four properties in question. In fact, after seeing Respondents' promotions of the four

5

properties in question, Mr. Wakita complained to both Trulia and Zillow. Both websites removed Respondents' promotions of the four properties in question. Those events indicate that Mr. Wakita had not authorized Respondents or Trulia to list the four properties in question. In any event, Respondents agree that they never contacted any of the property owners, and they presented no documentation showing that Trulia or Zillow were appointed to act as an authorized agent with regard to the four properties in question.

20. Mr. Wakita conceded that all of the four properties were rented out by Hometeam. No evidence indicates that Respondents had interfered with Hometeam's efforts in that regard. Mr. Wakita expressed concern that Respondents' promotions duplicating what Hometeam had placed on its website would cause confusion in the market that could interfere with Hometeam's business. Based on the evidence presented in this case, that concern at this time is speculative.

*Respondents' Vacant Office*

21. Bureau Special Investigator David Huang was assigned to investigate Mr. Wakita's complaint. While doing so, Special Investigator Huang tried to contact Respondents. He could not reach them by telephone, so he decided to visit their office.

22. On August 12, 2013, Special Investigator Huang went to the address listed by Respondents with the Bureau as their main office and mailing address: 201 N. Robertson Blvd., Suite 202, in Beverly Hills. Special Investigator Huang discovered that the office suite there previously used by Respondents had been vacant for some time.

23. According to Kevin Shayan, Respondents moved from their designated address to an office in Orange County about three years ago. However, Respondents failed to notify the Commissioner of a new main office or mailing address. Kevin Shayan testified that Respondents had mailed such a notification to the Bureau, but he failed to corroborate that testimony, such as by presenting a copy of a notification kept in a business file. The Bureau's official license history record shows no such notification was received. Kevin Shayan also testified that Respondents submitted new PRLS contracts to the Commissioner for approval which contained the new address in Orange County. However, his testimony was self-serving, uncorroborated and for those reasons not persuasive.

24. Mr. Shayan conceded in his testimony that AHI is a virtual office, in that AHI employees work mainly from their homes over the internet. Some of the AHI employees are located overseas in Lithuania and Russia. The new office address in Orange County is simply a place to receive mail and service of process. There are no desks or offices or employees there. Thus, if Respondents' PRLS consumers tried to visit the office to complain or seek other information, there would be no AHI employee there to help them.

25. Respondents' essentially conduct all of their business over the internet and telephone lines. Kevin Shayan testified that if a consumer complains and asks for a refund, they receive it, "no questions asked." Thus, he testified there is no need for an employee to

be located at Respondents' physical address. He also testified that personnel at the office in Orange County can accept service of process or official Bureau requests, if need be.

*Unlicensed Activity*

26.    Other than unsuccessfully requesting a stay, Respondents have ignored the Suspension Order. Kevin Shayan was clear in his testimony that Respondents have continued to engage in PRLS activity after receiving the Suspension Order on or about May 8, 2014, and have continued doing so to the present time. Respondent Shayan was not licensed in any capacity by the Bureau during this period.

27.    Respondents contend, but did not establish, that the Bureau knew at all times relevant that they were continuing to engage in PRLS activities after the restricted license was suspended and/or expired. If anything, the record created in this case tends to indicate the Bureau was not aware of such activity until Kevin Shayan testified as described above during the hearing.

28.    Kevin Shayan testified that Respondents continued to engage in PRLS activity after AHI's restricted license was suspended because they had not yet had an opportunity to challenge the Suspension Order, presumably referring to the hearing. Respondents thereafter contended in their opposition to the First Amended Accusation that they continued to engage in PRLS activity after the Suspension Order was issued because they "would be cut off at the knees if they stopped their fifteen year business and left with no livelihood." (Ex. G, at p. 5.) They also intimated that their continued engagement in licensed activity after the restricted license was suspended and/or expired was justified because the Bureau has engaged in "relentless and ruthless efforts to shut Respondent's business down." (*Id.*)

29.    Respondents did not address the fact that AHI's restricted license expired on March 12, 2014. They did not explain why the restricted license was not subsequently renewed.

*Costs*

30.    The Bureau incurred reasonable costs in the investigation and prosecution of this matter in the amount of $2,859.90.

31.    The Bureau submitted a copy of the documents evidencing its costs to Respondents before the hearing. Respondents' counsel sent to the Bureau legal objections to said costs before the hearing. Respondents' objections have been considered and are overruled. Those objections did not include that the pleadings involved in this case do not contain a prayer for costs.

///

///

## LEGAL CONCLUSIONS

*Cause for Discipline Generally*

1.      Pursuant to Business and Professions Code section 10167.12,[4] subdivision (a)(1), the Commissioner has authority to discipline a PRLS licensee for violating Article 2.3 of the Real Estate Law, which pertains to PRLS activity. Pursuant to section 10177, subdivision (k), the Commissioner has authority to discipline any licensee under the Real Estate Law for violating the terms of an order granting a restricted license. Pursuant to section 10177, subdivision (d), the Commissioner also has authority to discipline any licensee for willfully disregarding or violating the Real Estate Law or the regulations promulgated to enforce it.

*Cause for Discipline for False, Misleading or Deceptive Advertisements*

2.      Section 10167.11, which pertains to PRLS activity, states in relevant part:

"[I]t shall be a violation of this article for any licensee or any employee or agent of a licensee to do the following:

[¶] . . . [¶]

(b) Refer a property to a prospective tenant knowing or having reason to know that:

(1) The property does not exist or is unavailable for tenancy.

(2) The property has been described or advertised by or on behalf of the licensee in a false, misleading, or deceptive manner.

(3) The licensee has not confirmed the availability of the property for tenancy during the four-day period immediately preceding dissemination of the listing information.

(4) The licensee has not obtained written or oral permission to list the property from the property owner, manager, or other authorized agent."

3.      A. In this case, it was established that Respondents violated section 10167.11, subdivision (b)(2), by promoting and advertising the four properties in question in a false, misleading or deceptive way. By taking information about the four properties from Hometeam's website, changing it, and placing it on AHI's website, Respondents misled the viewing public into believing that Respondents were authorized to solicit prospective tenants for those properties. It was only after a prospective tenant paid a subscription fee to Respondents that they would learn otherwise. In addition, Respondents violated section

---

[4] All further statutory references are to the Business and Professions Code.

10167.11, subdivision (b)(4), in that they had not obtained written or oral permission to list the four properties in question on their website by the owner, manager or other authorized agent of the properties.

B. Respondents' argument that they directly obtained authorization from Hometeam to use the information was not credible. So too was their argument that somehow Trulia became a "constructive authorized agent" of either Hometeam or the property owners simply because Hometeam had used Trulia in the past to upload information about other properties and Respondents used Trulia to upload information about the four properties in question. That argument is further undercut by the fact that Respondents did not verify at any time the availability of Hometeam's properties for rent, which they would have been required to do four days before they placed information about the four properties on the Trulia and Zillow websites, pursuant to section 10167.11, subdivision (b)(3).

4.   Cause exists for discipline of Respondents' real estate license and/or license rights pursuant to sections 10167.12, subdivision (a)(1), and 10177, subdivision (k), in that it was established that Respondents violated section 10167.11, subdivision (b), which is contained in Article 2.3 of the Real Estate Law. By violating the Real Estate Law, Respondents violated a term and condition of AHI's restricted PRLS license. (Factual Findings 1-20.)

*Cause for Discipline for Office Abandonment*

5.   A. Pursuant to section 10167.5, which is part of Article 2.3 that specifically applies to PRLS licensees, "a license issued for a particular location shall automatically expire 60 days after the time the business conducted at such location ceases for any reason to be under the charge of and managed by the designated agent of record with the department, unless within such 60-day period the licensee submits written notice of the new designated agent to the department." Section 10167, subdivision (c), defines "location" as "the place, other than main or branch office of a real estate broker, where a prepaid rental listing service business is conducted."

B. Section 10162 provides, "Every licensed real estate broker shall have and maintain a definite place of business in the State of California which shall serve as his office for the transaction of business. This office shall be the place where his license is displayed and where personal consultations with clients are held. *No real estate license authorizes the licensee to do business except from the location stipulated in the real estate license as issued or as altered pursuant to Section 10161.8.*" (Emphasis added.) Section 10162 is part of Article 2 of Chapter 3 of the Real Estate Law.

C. California Code of Regulations, title 10, section (Regulation) 2715 states that whenever there is a change in the location or address of the principal place of business or of a branch office of a broker, the broker must notify the Commissioner thereof no later than the next business day following the change.

9

D. Regulation 2710, subdivision (c), provides that notices of changes in license information or status are to be submitted to the Bureau on prescribed forms not later than five days after the effective date of the change unless otherwise provided in the applicable statute or regulation. Regulations 2710 and 2715 are part of Article 3 of Chapter 6 of the California Code of Regulations that pertain to the Real Estate Law.

6.    It was established that Respondents violated sections 10167.5 and 10162, as well as Regulations 2710 and 2715, when they vacated their designated address of record with the Bureau and failed to notify the Commissioner in writing of that change over the course of three years. (Factual Findings 1-25.)

7.    Respondents contend but failed to establish that they had in fact submitted written notification of their change of address to the Commissioner.

8.    A. Respondents' argument that section 10162 and Regulation 2715 only apply to a licensed real estate broker or salesperson, but not to PRLS licensees, was not persuasive. The statutes and regulations contained Article 2 of Chapter 3 of the Real Estate Law generally apply to those engaged in PRLS activities, either those who have a PRLS license or licensed real estate brokers engaged in PRLS activity.

B. Respondents cite to section 10167.16, which provides that a person or corporation who has a PRLS license but is not engaged in acts for which a real estate license is required under Article 1 (brokers, salespersons, etc.) shall be subject to the provisions of Chapters 1 and 2, and sections 10450, 10452, 10453 and 10454. Since Respondents only have a PRLS license, but not a license issued under Article 1, they argue they are not subject to any of the provisions of Chapter 3, which includes section 10162. Respondents also argue that because Regulation 2715 only refers to brokers, it only applies to brokers.

C. While at face value Respondents' argument has some traction, a deeper review indicates that Respondents' interpretation of section 10167.16 is wrong and that the statute was not intended to exclude application of the provisions of Chapter 3 to PRLS licensees. First, section 10167.16 does not specifically exclude the provisions of Chapter 3 from application to PRLS licensees. Next, the argument that section 10162 does not apply to PRLS licensees (as opposed to real estate brokers engaged in PRLS activity) would lead to the absurd result that a PRLS licensee would not be required to provide the Commissioner with written notice of a change to their address of record. Moreover, Respondent AHI was issued a restricted PRLS license pursuant to section 10156.7 and able to obtain such a license as a corporate entity pursuant to section 10158. While those provisions are contained in Chapter 3, there are no such provisions in Chapters 1 or 2 allowing for a restricted license or for a corporate licensee. It is hard to conclude that the general provisions of Chapter 3 do not apply to Respondents when the very license they applied for and received was issued under Chapter 3. Ironically, Article 2.3, which contains the provisions specifically applying to PRLS activity, is contained within Chapter 3. Finally, the last sentence of section 10162 provides that "[n]o real estate license authorizes the licensee to do business except from the

10

location stipulated in the real estate license as issued or as altered pursuant to Section 10161.8." That excerpt demonstrates an intention for that statute to apply to all licensees.

D. In any event, Respondents do not argue that section 10167.5 or Regulation 2710 do not apply to them. Thus, even assuming arguendo that Regulation 2715 does not apply to Respondents, they apparently agree that Regulation 2710 does. Regulation 2710 requires prompt written notification of a change in license status or information. As section 10167.5 specifically references both the identity of the designated agent of record and the location where the PRLS activity managed by that agent is to occur, a change in the designated address of record by the designated agent (here Respondent Shayan) can reasonably be construed as the sort of change of information contemplated by Regulation 2710. Thus, section 10167.5 and Regulation 2710 required Respondents to advise the Commissioner in writing promptly after they changed their physical office location from Los Angeles to Orange County.

9.     Respondents' above-described violation of the Real Estate Law constitutes cause for discipline of their real estate license and/or license rights pursuant to sections 10167.12, subdivision (a)(1), and 10177, subdivision (k). (Factual Findings 1-25.)

*Cause for Unlicensed Activity*

10.     Section 10167.2 prohibits any person from engaging in the business of prepaid rental listing service unless licensed in that capacity or licensed as a real estate broker. Section 10130 makes it unlawful for any person to act as a real estate broker or real estate salesperson without first obtaining the requisite license. A reasonable interpretation of the interplay between sections 10130 and 10167.2 is that a person or corporate entity may only be engaged in PRLS activity if a PRLS license pursuant to Article 2.3 of Chapter 3 of the Real Estate Law is first obtained or, if not, a real estate broker's license is first obtained pursuant to Article 1 of Chapter 3.

11.     It was established that Respondents' refused to abide by the Suspension Order issued on May 8, 2014, and that they willfully continued to engage in the business of prepaid rental listing service while Respondent AHI's restricted PRLS license was suspended, had expired, and Respondent Shayan was not licensed in any capacity. That unlicensed activity violated sections 10167.2 and 10130, because at the relevant times Respondents did not have a valid PRLS license or real estate broker's license.

12.     The violation of sections 10167.2 and 10130 were willful and deliberate violations of the Real Estate Law and the terms and conditions of Respondent AHI's restricted PRLS license and thereby constitute cause for discipline of Respondents' real estate license or licensing rights under sections 10167.12, subdivision (a)(1), and 10177, subdivisions (d) and (k). (Factual Findings 1-29.)

13.     Respondents do not dispute that they engaged in unlicensed activity. They only provided excuses for doing so. However, none of their excuses are valid justification for breaking the law. As the holder of a restricted license pursuant to section 10156.7, subdivision (b), Respondents were subject to an immediate suspension before a hearing could be convened. After unsuccessfully seeking a stay of the Suspension Order from the Commissioner, Respondents could have sought relief in Superior Court or requested an expedited hearing date of this matter. They did neither. Instead, they decided to willfully violate a legal order from the Commissioner. Moreover, Respondents allowed their restricted license to expire and failed to renew it. They have not explained how they could legally operate with an expired license. Whether or not the Bureau knew that Respondents continued to operate after the Suspension Order was issued is beside the point. In any event, it was not established that the Bureau knew Respondents were violating the Suspension Order before the hearing commenced.

*Disposition*

14.     <u>First Amended Accusation</u>. Since cause for discipline has been established in this case, a determination must be made on the level of discipline warranted. Respondents received their PRLS license in 2007. Just a few years later, they were subject to serious discipline for violating the Real Estate Law, which resulted in a restricted PRLS license being issued in 2012. Slightly over one year later, Respondents engaged in the deceptive advertising of the properties listed by Hometeam. Unbeknownst to the Bureau, Respondents had abandoned their designated office of record even before they received their restricted PRLS license and failed to advise the Commissioner of their new location. Respondents essentially ignored the Commissioner's Suspension Order, allowed their restricted PRLS license to expire, and thereafter engaged in unlicensed activity. Respondents have been unapologetic for any of this misconduct. Instead, Respondents present a picture of a licensee with little regard for the Commissioner and no desire to comply with the rules and regulations established by the Commissioner. Respondents have presented no evidence indicating such misconduct will not occur again soon. Under these circumstances, an order revoking the restricted PRLS license is warranted for the protection of the public. (Factual Findings 1-29; Legal Conclusions 1-13.)

15.     <u>Suspension Order</u>. The Suspension Order was premised only on the allegations concerning Respondents' use of the information taken from the Hometeam website. Since cause for discipline based on those allegations was established, there is cause to sustain the Suspension Order. Since Respondents' restricted PRLS license will be revoked, no further action on the Suspension Order is necessary. (Factual Findings 1-20; Legal Conclusions 1-4.)

*Costs*

16.     A. Section 10106 authorizes the Commissioner to request an order in resolution of any disciplinary proceeding directing a licensee found to have committed a violation of the Real Estate Law to pay the reasonable costs of the investigation and enforcement of the case. In an action against a licensed corporate entity, a costs order can be

against the corporation. (*Id.*) Here, it was established that Respondents violated the Real Estate Law, and that the Bureau incurred reasonable costs in the investigation and prosecution of this matter in the amount of $2,859.90. (Factual Finding 30.)

B. Curiously, the Accusation, First Amended Accusation and Suspension Order do not contain a prayer for costs. Nonetheless, prior to the hearing, the Bureau submitted copies of documentation evidencing its costs to Respondents. With notice that the Bureau would be seeking such costs at the hearing, Respondents objected to the costs on grounds other than the absence of a prayer for such relief in the operative pleadings. Respondents' substantive objections to the costs have been overruled. It can be construed from these events that the Bureau has made a request for costs, that Respondents were provided with notice of said request as well as the amount of the costs sought, and that they did not object on procedural grounds. Under these unusual circumstances, an order for costs is warranted. (Factual Findings 30-31.)

C. While a costs order can be made against Respondent AHI, as a licensed corporate entity, section 10106 does not appear to support a cost order against a non-licensed designated officer such as Respondent Shayan. The Bureau has not provided any authority supporting the same. Therefore, Respondent Shayan will not be subject to a costs order.

## ORDERS

The Order Suspending Restricted Real Estate License issued on May 8, 2014, to Respondent Apartment Hunters, Inc. is sustained.

All licenses and licensing rights of Respondents Apartment Hunters, Inc. and Steven K. Shayan under the Real Estate Law are revoked.

Respondent Apartment Hunters, Inc. shall pay costs of the investigation and prosecution of this matter in the amount of $2,859.90 to the Bureau of Real Estate within 30 days of the effective date of this decision.

DATED: May 27, 2015

ERIC SAWYER,
Administrative Law Judge
Office of Administrative Hearings

13

# EXHIBIT C

http://mail.apartmenthunterz.com/zimbra/h/printmessage?id=712513&t...

**Zimbra**

**info@apartmenthunterz.com**

## RE: Trulia Feed

**From :** Devu Gandhi <dgandhi@trulia.com>

**Subject :** RE: Trulia Feed

**To :** ApartmentHunterZ.com Affiliate Partner
  <affiliate@apartmenthunterz.com>, Kevin Shayan
  (kevin@apartmenthunterz.com)
  <kevin@apartmenthunterz.com>

**Cc :** Pierre Calzadilla <pierre@trulia.com>

Wed, Jun 05, 2013 04:54 AM

✏ important   ♦ red

📎 1 attachment

Hi Kevin,
Have you had a chance to review the proposal I sent over last week?  We're ready to turn your feed on and begin sending you referrals, but I wanted to get your feedback on some of the linking ideas I included.  Can we hop on a quick call to discuss tomorrow?
Thanks,
Devu

**From:** Devu Gandhi
**Sent:** Thursday, May 30, 2013 4:47 PM
**To:** 'ApartmentHunterZ.com Affiliate Partner'
**Cc:** Kevin Shayan (kevin@apartmenthunterz.com); Pierre Calzadilla
**Subject:** RE: Trulia Feed

Hi Vidmantas,
I've put together a few slides to reflect the conversations both Pierre and I have had with Kevin, plus a few additional ideas we discussed the last time we spoke.  To summarize:

- We'll display your listings for LA and SD
- You'll pay us $0.20 per user referral, which will come from a PDP "contact" action
- You can respond to those referrals, and offer a $10 discount off a subscription to Trulia's users
- We can hide the exact address in the listings information that we show consumers

I also included a few slides of integration ideas for you to consider:

- Providing access to Trulia's local information
- Integrating some our widgets onto your pages

Finally, Pierre mentioned that he had spoken to Kevin about including a few complete listings in front of the subscription wall.  Is this still an option and how would we accomplish this?

As for next steps –
1. We finalize the pieces of the relationship, i.e. listings, links, widgets, etc.
2. I'll send over a draft agreement that reflects the deal
3. We'll simultaneously begin working to integrate your feed into our site



2015-02-24 14:22

We're in high season, so we're excited about getting this done quickly!
Let me know if you have any questions; I'd be happy to jump on a call tomorrow or next week.
Thanks,
Devu


**From:** ApartmentHunterZ.com Affiliate Partner [mailto:affiliate@apartmenthunterz.com]
**Sent:** Wednesday, May 22, 2013 1:49 AM
**To:** Devu Gandhi
**Subject:** Re: Trulia Feed

Hello,

My name is Vidmantas, i am Senior Affiliate Manager at ApartmentHunterZ.com my goal is
to work with you to expedite our partnership.

Per your conversation with Kevin, Kevin had promised to send you our last email to Pierre
which mentions our affiliate offer, I attach the original email bellow.



Please let me know if you have more questions and when we can start sending our data to
your website.

Thank you


Vidmantas Ma
Senior Affiliate Manager

www.ApartmentHunterZ.com/Affiliate
Your Affiliate Partner
310-982-2536 / affiliate@apartmenthunterz.com

**Affiliate Links:**
**About Affiliate Program**
Sign Up (become Partner)

Sign In (existing account)


-------- Original Message --------
Subject: Fwd: Trulia Feed
From: Kevin Shayan <kevin@apartmenthunterz.com>
To: Pierre Calzadilla <pierre@trulia.com>
CC:

## Kevin Shayan
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

Hi Pierre,

I tried to answering your questions as short as possible.
· Expected listing volume in LA County and SD:
Our  Expected listing volume in Los Angeles County and San Diego county are as follows
LA County - over 10k, SD around 8k

This number could vary depending on the season, but I can assure you that we have
the largest most up to date volume listings for all of California.

Please see excel sheet attached for our total coverage. It's broken by county and zip code.

I had also suggested since we are including a ONE TIME feed with address & phone
numbers that you have your team do a check to see that we do have unique data in other
areas should you choose to include them.
· Conversion rate from past experience?
Conversion rate changes from 0.3% to 1.5% at hot season. ( Slow times are Oct, Nov, Dec
) during slow times because of the Holidays not too many relocate.
And also it depends on traffic source. Web search tend to have lowest rate, while relevant
websites like Trulia - highest.
· What would rev share look like?
In general we pay $0.15-0.2 per referral, and $5-10 per sale, it depends on the volume.

As far as I understand in terms of referrals the main thing for Trulia is the email inquiry
form,
because I see link to the site email inquiry  is at the very bottom of details page and not
very accessible.

For email inquiries we pay $0.2. We used to pay more but it didn't work very well for us.
There is a big chance to loose a customer over a long email conversation while converting
from click is sometimes a matter of minutes.
But it's all negotiable, so I'm sure we can work this out.

You had indicated that you were not particularly interested in a per subscription revenue
share.
So in this case we can discount for all Trulia visitors and have special coupon with a
$10.00 discount.

feed urls are:

http://www.apartmenthunterz.com/bulkupload/trulia/ah_feed_la_sd.xml - LA & SD

http://www.apartmenthunterz.com/bulkupload/trulia/ah_feed_full.xml - full

I have also attached data for our National Government housing Section 8 data. Please comment. The site is www.wetakesection8.com

http://www.apartmenthunterz.com/bulkupload/trulia/s8_feed.xml

If there is anything else you need let me know I will make it happen.

Kevin

## Kevin Shayan
### President

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

---

**From:** "Pierre Calzadilla" <pierre@trulia.com>
**To:** "Kevin Shayan" <kevin@apartmenthunterz.com>
**Sent:** Friday, March 29, 2013 10:31:42 PM
**Subject:** Re: Trulia Feed

Fantastic Kevin, looking forward to it.

Best,
Pierre A. Calzadilla
Trulia.com - 116 New Montgomery St, Suite 300
San Francisco, CA 94105
(415) 400-7260

Twitter: https://twitter.com/NYPierre
LinkedIn: http://www.linkedin.com/in/pierrecalzadilla
Trulia: http://www.trulia.com/profile/NYPierre/
Check out Trulia Rentals and our Mobile Tools.



**About Trulia, Inc.**

Trulia (NYSE: TRLA) gives home buyers, sellers, owners and renters the inside scoop on properties, places and real estate professionals. Trulia has unique info on the areas people want to live that can't be found anywhere else: users can learn about agents, neighborhoods, schools, crime, commute times and even ask the local community questions. Real estate professionals use Trulia to connect with millions of transaction-ready buyers and sellers each month via our hyper local advertising services, social recommendations and top-rated mobile real estate apps. Trulia is headquartered in downtown San Francisco. Trulia is a registered trademark of Trulia, Inc.

**From:** Kevin Shayan <kevin@apartmenthunterz.com>
**Reply-To:** Kevin Shayan <kevin@apartmenthunterz.com>
**Date:** Friday, March 29, 2013 1:30 AM
**To:** Pierre Calzadilla <pierre@trulia.com>
**Subject:** Re: Trulia Feed

Pierre,

I am working with my team to actually not only send you the data regarding traffic & conversions but to also give you the number of smaller properties  per zip code etc. Eventually we can even prepare a full feed & send it to you including full address & phone number , this way you guys can run a quick query to see how many unique listings per area we can provide & you can choose areas based on your needs.

I will put together a couple of quick scenarios  & send you an email by next Tuesday.

We can make this happen for sure.

Thanks
Kevin

### Kevin Shayan
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

---

**From:** "Pierre Calzadilla" <pierre@trulia.com>

**To:** "Kevin Shayan" <kevin@apartmenthunterz.com>
**Sent:** Thursday, March 28, 2013 3:52:47 PM
**Subject:** Re: Trulia Feed

Kevin,

A few questions for clarity:

- Expected listing volume in LA County and SD:
- Conversion rate from past experience?
- What would rev share look like?

Best,
Pierre A. Calzadilla
Trulia.com - 116 New Montgomery St, Suite 300
San Francisco, CA 94105
(415) 400-7260

Twitter: https://twitter.com/NYPierre
LinkedIn: http://www.linkedin.com/in/pierrecalzadilla
Trulia: http://www.trulia.com/profile/NYPierre/
Check out Trulia Rentals and our Mobile Tools.



**About Trulia, Inc.**
Trulia (NYSE: TRLA) gives home buyers, sellers, owners and renters the inside scoop on properties, places and real estate professionals. Trulia has unique info on the areas people want to live that can't be found anywhere else: users can learn about agents, neighborhoods, schools, crime, commute times and even ask the local community questions. Real estate professionals use Trulia to connect with millions of transaction-ready buyers and sellers each month via our hyper local advertising services, social recommendations and top-rated mobile real estate apps. Trulia is headquartered in downtown San Francisco. Trulia is a registered trademark of Trulia, Inc.

**From:** Kevin Shayan <kevin@apartmenthunterz.com>
**Reply-To:** Kevin Shayan <kevin@apartmenthunterz.com>
**Date:** Monday, March 25, 2013 3:06 AM
**To:** Pierre Calzadilla <pierre@trulia.com>
**Subject:** Re: Trulia Feed

Hi Pierre,

Thank you for the call. I have discussed the feed & partnership with both my partner as

http://mail.apartmenthunterz.com/zimbra/h/printmessage?id=712513&t...

Zimbra

well as my senior developers.  We are excited to move forward, & put everything needed in
motion rather fast.

After our call it is clear that you are mainly interested in all of Los Angeles County & that
we should remove the larger communities. You also showed interest in San Diego both of
which we can drill down & provide smaller private management company data as well as
individual landlords.

We will provide this data as frequently as daily & no less than 3 times a week as the
listings do change much faster than the bigger communities.

I wanted to ask you to outline in detail how you see the partnership working in terms of
revenue on both sides. As you are aware our only source of revenue is the subscription
fee . For every guest as well as every member we invest a lot of money in 24 hour live
customer support as well online chat , text messages & listings via email.

We did have a long term partnership with Yahoo real estate , were we did provide the
visitor with one or 2 listings displaying the full address & phone number.

You had indicated that you were not particularly interested in a pay per subscription
revenue share. In this case we can even discount our subscription by for example $10.00
dollars . This way all memberships via your site are offered at a discount etc.

Please email me a few options & we can move forward from there. I can get this set up in
less than a week once we can agree on the terms you have in mind. If you need a member
access to the site please let me know.

I look forward to your response.


Kevin
Kevin@apartmenthunterz.com



**Kevin Shayan**
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

2015-02-24 14:22

**From:** "Pierre Calzadilla" <pierre@trulia.com>
**To:** development@apartmenthunterz.com
**Sent:** Monday, March 11, 2013 3:31:34 PM
**Subject:** Trulia Feed

Good afternoon,

Someone on your team submitted a feed to Trulia on approximately 2/1/2013. I would like to connect with your business development, or leadership, to discuss how we can work together.

Best,

Pierre A. Calzadilla
Trulia.com - 116 New Montgomery St, Suite 300
San Francisco, CA 94105
(415) 400-7260

Twitter: https://twitter.com/NYPierre
LinkedIn: http://www.linkedin.com/in/pierrecalzadilla
Trulia: http://www.trulia.com/profile/NYPierre/
Check out Trulia Rentals and our Mobile Tools.



**About Trulia, Inc.**
Trulia (NYSE: TRLA) gives home buyers, sellers, owners and renters the inside scoop on properties, places and real estate professionals. Trulia has unique info on the areas people want to live that can't be found anywhere else: users can learn about agents, neighborhoods, schools, crime, commute times and even ask the local community questions. Real estate professionals use Trulia to connect with millions of transaction-ready buyers and sellers each month via our hyper local advertising services, social recommendations and top-rated mobile real estate apps. Trulia is headquartered in downtown San Francisco. Trulia is a registered trademark of Trulia, Inc.



**image001.png**
23 KB

# EXHIBIT D

Can not see images? Open email in browser

 Apartment**Hunterz**
IF IT'S VACANT, IT'S LISTED WITH US

 Dont let rentals sit vacant
## Find a Tenant
in less than 3 days!

**Dear doug wetton,**

Recently we noticed by visiting your website http://www.dwinvestments.com/ that you have available vacancies.

Apartmenthunterz.com & it's family of websites is one of the largest rental listing services in California with over 70,000 listings of apartments, houses and condos for rent. We have 5,000+ registered tenants and 40,000+ prospective tenants visiting daily. Landlords can post their listings 100% free of charge.

We would like to refer prospective tenants to you on a daily basis, and maximize your marketing efforts as well as syndicating and advertising your properties on our partner websites.

If you wish us to list all vacancies available on your website http://www.dwinvestments.com/ plese click this button



By clicking this button you grant Apartment Hunters Inc and its affiliates websites permission to list your vacancies on Apartment Hunters websites, including available vacancies on www.dwinvestments.com, syndicate and advertise those on Apartment Hunters partner websites.

**Our partner network.** List with us and we will advertise your listings on 30+ of our partner websites.

  Walk Score*

  

  

**How we obtained your contact information?** We have built relationships with property owners and mangers as well as multiple listing services since 1999, and have 30,000+ management companies and private landlords registered with us. There is a possibility that a member of your management company or a previous manager has signed up as landlord on one of our websites and granted us permission to list your available vacancies. Please contact our support service to obtain your login or register a new landlord account with us.

**Don't wish to list?** Please click this link to unsubscribe. You will not get emails from us regarding your listings in the future.

---

**The Apartment Hunters Network**
Powerful apartment search websites, innovative search tools, unmatched service:

  

 Lease In **San Diego**

Find a Tenant in 3 days at

STATE'S
EXHIBIT
8

PENGAD 800-631-6989

CALPERS PAGE 1

| DATE_SENT | UNIQUE_ID | EMAIL_TO | EMAIL_FROM | AUTH_CLICK |
|---|---|---|---|---|
| 2013-05-05 | c4dce2d9030b20d39c1841d6a243b60f6f7ae9 | davegilmore@me.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 2a6807907839474t0a741dda69d87d57ee6f7518eb | jmacteo@gmail.com | landlord@apartmenthunterz.com | N |
| 2013-05-05 | 01ef9aad8581509011 9beb6ab282a63759d0e36 | yvonne.miller@att.net | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 5af3d27ce124b8cb0136a5016f65a801a4cfa923 | qq955166@hotmail.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 307z6z947c7611f40e2866c49d0a9b0e5ea34fb | dolphinmarina@gkind.com | landlord@apartmenthunterz.com | N |
| 2013-05-05 | 8589a41078f2e3659a3ddfbbb9857649e638902a27 | maria_t.murillo@gmail.com | landlord@apartmenthunterz.com | N |
| 2013-05-05 | fb86b62449897940dc68e9afef6c2901560c2f1c | nltbln.s@gmail.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 81a2cef9ee93a96cfd66c70f23f1a8f52f1b7604 | angienava292006@yahoo.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | dee39dd79386d3727201df47808425501ea8765ffb | ang.nune21@gmail.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 50a8b7c4060087aa8627d3b1e67a9ea86b09ded | edfonezcomoeste@gmail.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 902ba3cda18838015940b6e1b452790cc53948fda | keathul@goqulasearem.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 1cac23a1ceb3b0b1ce13568d8a1580523587e3eb | johnnieanderson@sbcglobal.net | landlord@apartmenthunterz.com | N |
| 2013-05-05 | 87d991220b669b0b6d093fe7cb25ed1dfb86549f22 | elvlapena@cox.net | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 9a7789578933bf44ca4f615866734d69a0faff77 | rvillagra@rapidnyc.com | landlord@apartmenthunterz.com | Y |
| 2013-05-05 | 7f8fc0271ea874add822aecd374f6d659424fdd | jebrantky@hotmail.com | landlord@apartmenthunterz.com | Y |

| ID | STATUS | STREET | CITY | STATE | ZIP | BD | BA | RENT | AREA | DATE_LISTED | DATE_EXPIRED | DATE_AUTHORIZED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 135912332 | deact | 1660 Thompson Ave | Chula Vista | CA | 91913 | 5 | 4.5 | 2995 | 2987 | 2013-08-06 | 2013-08-22 | 2013-05-05 |
| 135767261 | deact | 1437 Stanislaus Dr | Chula Vista | CA | 91913 | 4 | 3.5 | 3000 | 3280 | 2013-06-18 | 2013-06-24 | 2013-05-05 |
| 135767255 | deact | 1448 Stanislaus | Chula Vista | CA | 91913 | 5 | 3.5 | 3650 | 3649 | 2013-05-17 | 2013-06-10 | 2013-05-05 |
| 135826653 | deact | 524 Reesling Ter | Chula Vista | CA | 91913 | 4 | 3 | 3995 | 3831 | 2013-05-07 | 2013-06-10 | 2013-05-05 |

## DECLARATION OF VIDMANTAS MACYS

I, Vidmantas Macys, declare as follows:

1.   I am over the age of 18 and I am employed by Apartment Hunters, Inc. I have personal knowledge of the facts set forth herein. If called upon as a witness, I could and would competently testify as to these facts.

2.   I am an employee of Apartment Hunters, Inc. Specifically, I am the President for UAB "Apartment Hunters LT" based in Lithuania.

3.   I am knowledgeable about the process Apartment Hunters, Inc. utilizes in collecting information for management companies, such as Hometeam Property Management. As part of its business, Apartment Hunters, Inc. collects contact information of management companies from publicly available sources. Then, Apartment Hunters, Inc. has a sophisticated automated system that sends automatically generated emails that ask the recipients whether or not they wish for Apartment Hunters, Inc or its partner websites to list the recipients' available vacancies. Furthermore, Apartment Hunters, Inc. has a separate system which maintains the registering of the "clicks" which shows whether the recipients agree or disagree to list their vacancies in both a server log and a database record. The server log reveals information regarding the "clicks" in more depth as it tracks very specific data, including, but not limited to, second timestamp and IP address. These server logs are maintained for five to six months.

4.   I have reviewed Apartment Hunters, Inc.'s database record in connection to the following four properties: 1660 Thompson Ave., Chula Vista, CA; 524 Reisling Terrace, Chula Vista, CA; 1448 Stanislaus Dr., Chula Vista, CA; and 1437

CALIBRE PAGE 4

Stanislaus Dr., Chula Vista, CA.  Based on Apartment Hunters, Inc.'s database record that I personally reviewed, there were automated emails sent to Hometeam Property Management, and an agent, employee, or other member of their management team agreed to permit Apartment Hunters, Inc. to list their vacancies by agreeing to the option provided in said email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on this 28th day of May, 2014 in Kaunas, Lithuania.

_____

Vidmantas Macys,
Declarant

# EXHIBIT 26



**Fox Rothschild LLP**
ATTORNEYS AT LAW

1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Tel 310.598.4150  Fax 310.556.9828
www.foxrothschild.com

LINCOLN D. BANDLOW
Direct Dial: 310-228-2913
Email Address: LBandlow@FoxRothschild.com

July 21, 2016

**VIA E-MAIL**

Nicholas J. Boyle
David K. Baumgarten
Eric J. Hamilton
Williams and Connolly LLP
725 Twelfth Street NW
Washington, DC 20005-5901

Kelly L. Perigoe
Caldwell Leslie and Proctor PC
725 South Figueroa Street 31st Floor
Los Angeles, CA 90017-5524

**Re:   Costar Realty Information, Inc. et al. vs. Apartment Hunters, Inc. et al. - Case No. 8:15-cv-02111-JLS-KES**

Dear David:

I am in receipt of your July 15, letter and this serves as my response.

I am well aware of how the discovery process works and of my obligations as counsel. While your demands that I provide written responses regarding conversations I have had with my clients are not well received, and will not be responded to, I can assure you that I have taken the necessary steps to ensure my clients' good faith discovery participation.

Defendants' production to-date includes the information it presently has been able to locate which was in response to Plaintiffs' requests. Investigation efforts to locate additional documents, as we have informed you numerous times, are continuing and will conceivably be more fruitful once Defendants have the requested screenshots of the allegedly infringing activity.

Emails responsive to the requests, as I have also conveyed to you, do not exist; first, because Defendants generally do not internally communicate via email and, second, because Defendants did not engage in the willful conduct that your requests seek to uncover.

A Pennsylvania Limited Liability Partnership

California   Colorado   Connecticut   Delaware   District of Columbia   Florida
Illinois   Minnesota   Nevada   New Jersey   New York   Pennsylvania   Texas



Nicholas J. Boyle
David K. Baumgarten
Eric J. Hamilton
Kelly L. Perigoe
July 21, 2016
Page 2


You are welcome to ask Defendants about their collection efforts through interrogatories or depositions; there is no reason for me to respond to your questions and accusations here.



Kindest Regards,

Lincoln D. Bandlow

# EXHIBIT 27

WILLIAMS & CONNOLLY LLP
Nicholas J. Boyle (admitted *pro hac vice*)
David K. Baumgarten (admitted *pro hac vice*)
Eric J. Hamilton (Cal. Bar No. 296283)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
nboyle@wc.com

CALDWELL LESLIE & PROCTOR, PC
Kelly L. Perigoe (Cal. Bar No. 268872)
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5525
Telephone: (213) 629-9040
Facsimile: (213) 629-9022
perigoe@caldwell-leslie.com

*Attorneys for Plaintiffs CoStar Realty*
*Information, Inc., and Apartments, LLC*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| COSTAR REALTY INFORMATION, INC., and APARTMENTS, LLC,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>APARTMENT HUNTERS, INC., KEVIN SHAYAN, and STEVEN SHAYAN,<br><br>                    Defendants. | Case No. 8:15-cv-02111-JLS-KES<br><br>**PLAINTIFFS' NOTICE OF RULE 30(b)(6) DEPOSITION OF APARTMENT HUNTERS, INC.** |

Please take notice that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiffs CoStar Realty Information, Inc., and Apartments, LLC, (collectively, "CoStar") will take the deposition of Apartment Hunters, Inc., through its officers, directors, managing agents, or other persons designated to testify on its behalf on the topics set forth below.

The deposition will take place on Friday, September 16, 2016, commencing at 9:00 a.m. at Williams & Connolly LLP, 725 Twelfth Street, NW, Washington, DC 20005.  The deposition will be taken upon oral examination, by stenographic and/or videographic means, before a deposition officer duly authorized to administer oaths, and will continue from day-to-day, Saturdays, Sundays, and holidays excluded, until completed or adjourned pursuant to stipulation of counsel.

**Definitions**

The following terms shall be defined as set forth below for the purposes of this Notice:

1. <u>You</u> or <u>Your</u>: Apartment Hunters, Inc., and any affiliates or subsidiaries, including without limitation UAB Apartment Hunters LT.

2. <u>Action</u>: The currently pending suit, *CoStar Realty Information, Inc. et al. v. Apartment Hunters, Inc., et al.*, Case No. 8:15-0211-JLS-KES (C.D. Cal.).

3. <u>Requests</u>: Plaintiffs' First Set of Requests for Production of Documents to Apartment Hunters, Inc. (March 21, 2016).

4. <u>Interrogatories</u>: Plaintiffs' First Set of Interrogatories to Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan (May 26, 2016).

5. <u>AHI Websites</u>: apartmenthunterz.com, 4rentinla.com, wetakesection8.com, ifindrentals.com, featuredrentals.com, leaseinsandiego.com, and rentinsanfrancisco.com (individual or collectively).

6. <u>Website Data</u>: Data reflecting the apartment listings and photographs

displayed on any AHI Website from March 1, 2015 to December 18, 2015.

7.    Domains: The internet and/or electronical mail domains associated with apartmenthunterz.com; 4rentinla.com; wetakesection8.com; ifindrentals.com; featuredrentals.com; leaseinsandiego.com; rentinsanfrancisco.com; and any other domain owned, operated, or controlled by You or Your affiliates or subsidiaries.

**Instructions and Topics**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), You are hereby commanded to designate one or more of Your officers, directors, agents, or other individuals who can testify on Your behalf with respect to the following matters (as they relate to the period 2013 through present, unless otherwise specified) for examination:

1.    Your issuance of a litigation hold in connection with this Action.

2.    The identify and location of each employee, agent, contractor or representative that performed any work for You from March 1, 2015 to December 18, 2015, and a brief description of their responsibilities.

3.    The steps that have been taken to ensure that Your employees, as well as Your affiliates, contractors, agents and their respective employees, implemented the litigation hold.

4.    The method(s) by which sources of documents for collection and review, whether such sources are individual custodians or locations (electronic or otherwise), were identified in connection with Your responses to the Requests, and the individuals involved in such identification and any subsequent collection and review of documents.

5.    The method(s) by which sources of information, whether individuals or locations (electronic or otherwise), were identified in connection with Your responses to the Interrogatories, and the individuals involved in such identification

and any subsequent collection of information.

6.     The identity of the individuals, whether employed by or associated with You or otherwise, with whom Your outside counsel has <u>directly</u> spoken prior to July 29, 2016 regarding document preservation, collection, and/or review in connection with Your responses to the Requests.

7.     The identity of the individuals, whether employed by or associated with You or otherwise, with whom Your outside counsel has <u>directly</u> spoken prior to July 29, 2016 regarding Your responses to the Interrogatories.

8.     The identity of the individuals, whether employed by or associated with You or otherwise, with whom Your outside counsel has <u>directly</u> spoken on or after July 29, 2016 regarding document preservation, collection, and/or review in connection with Your responses to the Requests.

9.     The identity of the individuals, whether employed by or associated with You or otherwise, with whom Your outside counsel has <u>directly</u> spoken on or after July 29, 2016 regarding Your responses to the Interrogatories.

10.     The individual custodians and/or other sources of documents from which documents were actually collected for review in connection with Your responses to the Requests.

11.     The sources of documents, if any, that have been searched electronically (*e.g.*, drives, servers, networks, databases) in order to locate documents for collection or production in this Action, and, if any electronic searches were conducted, who conducted such searches.

12.     The means by which it was determined which documents were responsive to the Requests, and the identity of each of the individuals involved in such determination.

13.     Whether searches have been performed to locate the "valid third party

1   agreements" that You have represented to the Court authorized Your copying of

2   CoStar's copyrighted photographs and other listing information, and any e-mails

3   regarding such agreements, and whether such agreements and e-mails will be

4   produced in this case.

5         14.    The location(s), both electronic or physical, of the Website Data; the

6   steps taken, if any, to ensure that the Website Data was preserved after this lawsuit

7   was filed; and the steps taken, if any, to search the Website Data in connection

8   with Your responses to the Requests and to the Interrogatories (including searches

9   for listings generated by, and photographs owned by, CoStar).

10        15.    The steps taken, if any, to collect documents and information

11  responsive to the Requests or the Interrogatories from the software and/or systems

12  that You used to collect, gather or copy the Website Data.

13        16.    Your policies and practices regarding the deletion, preservation,

14  and/or archiving (whether automated or manual) of the data feeds from which You

15  received Website Data, and the steps taken, if any, to preserve such data feeds

16  and/or the information contained therein in connection with this Action.

17        17.    Your ability to monitor the IP addresses accessed by your employees,

18  independent contractors, and/or automated systems in the course of their work, and

19  the steps taken, if any, to preserve such access data in connection with this Action.

20        18.    Your policies and practices regarding the deletion, preservation,

21  and/or archiving of e-mails, including without limitation (a) when, if ever, You

22  suspended the e-mail "purges" that allegedly resulted in the deletion of the key e-

23  mails at issue in *Matter of Apartment Hunters, Inc., and Steven Shayan*, Nos. H-

24  36458 LA, H-39404 LA, Proposed Decision, at ¶¶ 12-20 (Cal. Bureau of Real

25  Estate May 27, 2015), and (b) whether any historical full system backups exist of

26  Your e-mails.

27

28

19. The number and identity of all persons who have an e-mail address at any of the Domains.

20. The number and identity of the e-mail servers that host e-mail for the Domains.

21. The approximate volume of e-mail sent and received on each of the Domains each month from March 2015 through December 2015, inclusive.

22. Whether You intend to rely upon any e-mails for Your defense at trial in this Action.

23. The internet server providers or hosting services used by You from March 1, 2015 to December 18, 2015, and the steps taken, if any, to collect from such internet server providers or hosting services documents and information responsive to the Requests.

24. Your policies and practices regarding the deletion, preservation, and/or archiving of files (whether electronic or hard copy) relating to past judicial, administrative, or regulatory proceedings in which You have been involved or complaints received from customers (whether directly or through a third party such as the Better Business Bureau), and the steps taken, if any, to preserve such files and/or the information contained therein in connection with this Action.

25. Any documents, whether by category or otherwise, that You know or have reason to believe are or were responsive to the Requests, and that have been deleted or otherwise made unavailable, or that have not been produced to, CoStar in this case.

Dated:  July 29, 2016          By:   *David L. Baumgarten*
                                     _____
                                     Nicholas J. Boyle (*pro hac vice*)
                                     David K. Baumgarten (*pro hac vice*)
                                     Eric J. Hamilton (Cal. Bar No. 296283)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000 (phone)
(202) 434-5029 (facsimile)

Kelly L. Perigoe (Cal. Bar No. 268872)
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5525
Telephone: (213) 629-9040
Facsimile: (213) 629-9022
perigoe@caldwell-leslie.com

*Attorneys for CoStar Realty*
*Information, Inc., and Apartments, LLC*

**PROOF OF SERVICE**

**WASHINGTON, D.C.**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in Washington, D.C. by Williams & Connolly LLP.  My business address is 725 12th Street N.W., Washington, D.C. 20005.

On July 29, 2016, I served true copies of the following document(s) described as **PLAINTIFFS' NOTICE OF RULE 30(b)(6) DEPOSITION OF APARTMENT HUNTERS, INC.,** on the interested parties in this action as follows:

*CoStar Realty Information Inc., et al v. Apartment Hunters, Inc., et al.*
**Case No. 8:15-cv-02111 JLS (KES)**

Lincoln D. Bandlow
Margo J. Arnold
FOX ROTHSCHILD LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
lbandlow@foxrothschild.com
marnold@foxrothschild.com
Telephone: 310.598.4150
Facsimile: 310.556.9828

*Counsel for Defendants*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dbaumgarten@wc.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of Washington, D.C. that the foregoing is true and correct.

Executed on July 29, 2016, at Washington, D.C.

_David L. Baumgarten_
David K. Baumgarten

# EXHIBIT 28

**SPECIFIC RESPONSES AND OBJECTIONS**

**TO REQUEST FOR PRODUCTION OF DOCUMENTS:**

The foregoing General Objections are expressly incorporated into the following Specific Responses and Objections.

**REQUEST FOR PRODUCTION NO. 34:**

Documents sufficient to provide the information sought by the Apartment Hunters Deposition Notice. For the avoidance of doubt, if only a subset of that information is available in documentary form, the subset of documents should be produced.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

This request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the fact that Responding Party has agreed to sit for deposition on September 29 and will orally provide the information sought by the Apartment Hunters Deposition Notice.  Further, this Request is objectionable to the extent that is seeks the production of documents which are subject to the attorney-client privilege.

To the extent that non-privileged documents regarding Apartment Hunters' preservation and collection efforts exist, Apartment Hunters will make them available in advance of September 29.

Dated: September 1, 2016               FOX ROTHSCHILD LLP


By _____
Lincoln D. Bandlow
Margo J. Arnold
Attorneys for Defendants
Apartment Hunters, Inc.,
Kevin Shayan, and
Steven Shayan

# EXHIBIT 29

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

COSTAR REALTY INFORMATION, INC., and APARTMENTS, LLC,
                    Plaintiffs,

            vs.                                    Case No. 8:15-cv-02111-JLS-KES

APARTMENT HUNTERS, INC., KEVIN SHAYAN, and STEVEN SHAYAN,
                    Defendants.

## **DECLARATION OF DAVID K. BAUMGARTEN**

I, David K. Baumgarten, declare the following:

1.      I am an associate at the law firm of Williams & Connolly LLP in Washington, D.C.

2.      I am counsel of record for Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC, in the above-captioned matter.

3.      The following facts are within my personal knowledge and, if sworn as a witness, I would testify thereto under oath.

4.      On October 7, 2015, I spoke by phone with Margo Arnold, counsel for Defendants in the above-captioned matter, regarding various discovery issues.

5.      During our conversation, I asked Ms. Arnold whether Defendants would produce the email purportedly sent by Kevin Shayan in December 2015 with the subject line, "Our new 2016 legal challenge," as described by Mr. Shayan in his deposition testimony as the corporate representative of Apartment Hunters, Inc.

6.      Ms. Arnold confirmed her agreement that the email should be produced, and stated that Defendants would "look into" locating it. Ms. Arnold

further stated that the deposition testimony was the "first time I've heard" of the purported email sent by Mr. Shayan.

7.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED:  November 11, 2016                    _/s/ David K. Baumgarten_____

David K. Baumgarten

DECLARATION OF DAVID K. BAUMGARTEN
Case No. 8:15-cv-0211-JLS-KES

# EXHIBIT 30

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

DAVID BAUMGARTEN
(202) 434-5929
dbaumgarten@wc.com

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

October 5, 2016

<u>Via Email</u>

Lincoln D. Bandlow
Margo J. Arnold
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506

      Re:    *CoStar Realty Information, Inc., et al. v. Apartment Hunters, Inc., et al.*, No. 8:15-cv-02111-JLS-KES

Dear Counsel:

      I write on behalf of Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar") regarding discovery that Apartment Hunters, Inc. ("AHI") has agreed to provide but has not yet produced to CoStar.

      *First*, AHI still has not produced any documents responsive to CoStar's Requests for Production ("RFPs") No. 2 and 3.  During last week's 30(b)(6) deposition of AHI, Mr. Shayan testified that, "in the last two or three weeks," AHI located photographs similar to all but two of the photographs that CoStar identified in the Complaint.  *See* Dep. Tr. at 73:22-74:3; 110:1-6.  Mr. Shayan stated that these photographs had been provided to your firm before the deposition, which you confirmed.  *Id.* at 74:4-7.  And you stated that, "[w]e have to put the information together for you to produce it to you.  We're in the process of doing that."  *Id.* 74:24-75:1.

      There is no basis for AHI to continue delaying the production of the above-referenced documents, which AHI evidently believes are responsive to CoStar's RFPs, were identified as such by AHI three to four weeks ago, and have been in your possession for at least a week.  Moreover, as you know, CoStar agreed to postpone the filing of its Motion to Compel based on your representations that the deposition testimony of AHI's corporate representative would resolve many of CoStar's discovery questions—only to learn, *during the deposition*, that (a) AHI had located potentially responsive documents it had claimed for many months to be unable to locate and (b) AHI's corporate representative would not answer substantive questions about

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow
October 5, 2016
Page 2

those documents during the deposition.  In short, AHI appears to be using every tactic possible to continue delaying its obligation to provide CoStar with documents and information responsive to CoStar's discovery requests (and, in turn, to continue delaying CoStar's ability to seek relief, if necessary, from the court).

*Second*, AHI still has not produced any documents responsive to CoStar RFP No. 27.  In AHI's portion of the Draft Stipulation, submitted Sept. 1, AHI conceded that relevance and responsiveness of documents relating to complaints "made in an administrative or judicial setting," including "documents related to the California Bureau of Real Estate proceedings." Draft Stip. at 10.  And during last week's deposition, Mr. Shayan testified that all of AHI's records relating to the California Bureau of Real Estate proceedings had been forwarded by AHI to your firm before the deposition.  *See* Dep. Tr. at 204:21-205:13.[1]  You stated that those records are being "processed" and their production is "probably just getting arranged."  *Id.* Again, there is no basis for continued delay.

*Third*, AHI has not yet produced the insurance policy it disclosed in its Initial Disclosures, which were served on March 29, 2016.  AHI's First and Second Amended Initial Disclosures stated that the production of this policy would be made after the entry of a protective order.  A protective order was entered more than four months ago, on May 16, 2016.  *See* Dkt. No. 43.  Yet again, there is no basis for continued delay.

Please promptly produce the above-discussed outstanding documents.  CoStar reserves all rights in connection herewith.

Sincerely,

*David K. Baumgarten*

David K. Baumgarten

---

[1] For the avoidance of doubt, CoStar expects that AHI will produce documents relating to *all* copyright- or misappropriation-related complaints made in an administrative or judicial setting—of which Mr. Shayan confirmed there are many, *see* Dep. at Tr. 16:1-17:6—and not just those relating to the Bureau of Real Estate proceedings.

# EXHIBIT 31

## Baumgarten, David

| | |
|---|---|
| **From:** | Baumgarten, David |
| **Sent:** | Friday, October 07, 2016 9:42 AM |
| **To:** | 'Arnold, Margo J.' |
| **Subject:** | RE: CoStar v. Apartment Hunters |

Margo,

Hope you are well. I'm writing to quickly touch base on a few discovery items.

First, as you know, AHI agreed to produce documents responsive to CoStar's RFP No. 34 (documents relating to topics of the 30(b)(6) deposition).  Lincoln's letter (dated Sept. 16) indicated that you were not aware at the time of any responsive documents in AHI's possession, custody, or control.  During the 30(b)(6) deposition, however, Mr. Shayan repeatedly referenced a "Legal Challenge" email that he sent in Dec. 2015 (regarding document preservation).  Based on Mr. Shayan's description, that email is probative as to many of the deposition topics, including without limitation Nos. 1 and 3, and is thus responsive to RFP No. 34.  Could you please check with your clients and ask them to provide you that "Legal Challenge" email as soon as possible so that you can produce it to us?

Second, I'd appreciate if you can begin checking on dates in January for depositions of the following AHI employees: Steven Shayan; Kevin Shayan; Vidmantas Macys; Dennis Portnov.  We're happy to hold the depositions in LA, Washington, Lithuania, or wherever Mr. Portnov is currently, so please let us know your preference on location(s) as well.

Third, since Mr. Shayan could not provide this information during the 30(b)(6) deposition, I'd appreciate if you could work with your clients to compile a list of the names and titles of the 15 AHI employees other than Mr. Macys based on Lithuania (i.e., the two teams of four programming employees and the team of seven customer support representatives Mr. Shayan referenced during the deposition).  As I'm sure you can guess, we also intend to notice the depositions of the majority of those employees – so, again, if you could start checking dates of availability for those folks, too, and letting us know your preference on locations, I'd appreciate it.

Please let me know if you'd like to discuss any of the above.

Thanks,


**David Baumgarten**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5929 | (F) 202-434-5029
dbaumgarten@wc.com | www.wc.com/dbaumgarten

---

**From:** Arnold, Margo J. [mailto:marnold@foxrothschild.com]
**Sent:** Friday, September 23, 2016 1:00 PM
**To:** Baumgarten, David <DBaumgarten@wc.com>
**Subject:** RE: CoStar v. Apartment Hunters


David,

Yes, Kevin will be prepared to testify about those subjects as well.

I'll let you know if anyone else will be in attendance, I don't believe there is at the moment.

Thanks,

Margo

**Margo Arnold**
Associate
**Fox Rothschild LLP**
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
(424) 249-1757 - direct
marnold@foxrothschild.com

---

**From:** Baumgarten, David [mailto:DBaumgarten@wc.com]
**Sent:** Friday, September 23, 2016 7:10 AM
**To:** Arnold, Margo J.
**Subject:** RE: CoStar v. Apartment Hunters

Margo,

Thank you for passing along the photo IDs. We look forward to seeing the results of AHI's search and/or discussing the issue with Mr. Shayan on Thursday. To that end, for the avoidance of doubt, we assume that Mr. Shayan will be prepared to testify regarding the issues we have been discussing in connection with the draft Motion to Compel, even if they were not explicitly included on the list of topics attached to the deposition notice we sent in August (as you know, we've only learned of some of the issues subsequent to issuing the notice). And we also assume that Mr. Shayan will be prepared to testify generally regarding AHI's corporate structure, affiliates, employees, and ownership of websites.

On a related note regarding deposition logistics, Kelly Perigoe from Caldwell Leslie has put you, Lincoln, and Mr. Shayan on the security list for Thursday. Please let us know if anyone else will be attending on AHI's behalf. I believe Kelly is arranging for break out rooms, as well as lunch for everyone; let me know if you have any other needs.

Thanks,

**David Baumgarten**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5929 | (F) 202-434-5029
dbaumgarten@wc.com | www.wc.com/dbaumgarten

---

**From:** Arnold, Margo J. [mailto:marnold@foxrothschild.com]
**Sent:** Thursday, September 22, 2016 2:58 PM
**To:** Baumgarten, David <DBaumgarten@wc.com>
**Subject:** RE: CoStar v. Apartment Hunters


David,

AHI appreciates CoStar agreeing to not re-serve a Joint Stipulation regarding CoStar's Motion to Compel prior to the 30(b)(6) deposition of Apartment Hunters, Inc. next week. I am hopeful that Kevin's testimony will resolve many of the issues in dispute.  As we mentioned, he is the best person to talk about AHI's data, preservation efforts, and review efforts and will be able to answer your questions much better than we can.

You are correct that we are not presently aware of additional information that CoStar can provide to help Defendants identify the source of the CoStar listing information and that we believe that the identification of the unique IDs for each photograph would help Defendants identify the source of the CoStar photographs. Thank you for providing the unique photo IDs that you did record. We will immediately furnish the list to our clients.

Should the information not be fruitful, we will have the 30(b)(6) designee prepared to discuss the subject of why the information in the attached chart did not allow Defendants to locate any relevant documents.

Thanks,

Margo


**Margo Arnold**
Associate
**Fox Rothschild LLP**
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
(424) 249-1757 - direct
marnold@foxrothschild.com

Sent from my iPhone.

---

**From:** Baumgarten, David [mailto:DBaumgarten@wc.com]
**Sent:** Wednesday, September 21, 2016 3:06 PM
**To:** Bandlow, Lincoln; Arnold, Margo J.
**Cc:** Boyle, Nicholas; Hamilton, Eric; Kelly Perigoe
**Subject:** CoStar v. Apartment Hunters

Lincoln and Margo,

Thank you again for this morning's productive meet-and-confer call.  While CoStar still believes that the issues we discussed are ripe for the Court's resolution (and have been for some time), we will agree to your request to not re-serve a Joint Stipulation regarding CoStar's Motion to Compel prior to the 30(b)(6) deposition of Apartment Hunters, Inc. ("AHI") next week, in case that deposition is able to further narrow the issues in dispute.

I also want to quickly follow up on our discussion of Defendants' explanation of their inability to locate documents relating to CoStar's photographs and listing information.  You told us that while there is no additional information that CoStar can provide to help Defendants identify the source of the CoStar listing information, Defendants believe that CoStar's identification of the underlying URLs for each specific infringing photograph would help Defendants locate CoStar's photographs in their system.  This clarification was very helpful, as Defendants had never previously explained that each photograph was published at a unique URL, in addition to on the main listing page.  While we do not have a complete record of URLs for each individual photograph (as we had no reason to believe that such information would be necessary), we have located URLs for 34 of the 126 infringing photographs identified to date by CoStar (which were published in 16 different listings).  *See* Appx. A to CoStar's Response & Objections to AHI's Interrogatories.  A chart setting forth that information is attached.

3

We ask that Defendants endeavor to produce any documents located based on the information in the attached chart by next Wednesday, September 28, 2016.  If Defendants are still unable to produce any documents related to the CoStar content that appeared on their websites, we ask that AHI's corporate representative be prepared to explain during the 30(b)(6) deposition on Sept. 29 *why* the information in the attached chart did not allow Defendants to locate any relevant documents.

Thank you,

**David Baumgarten**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5929 | (F) 202-434-5029
dbaumgarten@wc.com | www.wc.com/dbaumgarten

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (215)-299-2167 or notify us by e-mail at helpdesk@foxrothschild.com. Also, please mail a hardcopy of the e-mail to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3222 via the U.S. Postal Service. We will reimburse you for all expenses incurred. Thank you.

This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (215)-299-2167 or notify us by e-mail at helpdesk@foxrothschild.com. Also, please mail a hardcopy of the e-mail to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3222 via the U.S. Postal Service. We will reimburse you for all expenses incurred. Thank you.

# EXHIBIT 32



$10 OFF
ANY PENNZOIL
OIL CHANGE
CLICK HERE

## Call Kurtis Investigates: Rental Website Offers Homes Not for Rent

September 21, 2015 11:13 PM   By Kurtis Ming

Filed Under: Call Kurtis, Call Kurtis Investigates



LISTEN LIVE

FOLLOW US ON

Sign Up for Newsletters



SACRAMENTO (CSB13) —  Needing a larger place to live, Faith Hayes found a listing of a home with a swimming pool for $1,800 a month on ApartmentHunterz.com.

"It said this is available for immediate occupancy," she recalls seeing.

The site promises 97,000 plus exclusive listings including many not found on free sites or in newspapers. In order to get the landlord's contact information, Faith had to pay $29.95. When she called, she says she was surprised at what she heard.

"That house was sold 2 years ago," she said she was told. "We're not renting any properties whatsoever."

According to the California Bureau of Real Estate, it's not the first time they've heard of this company.

"They've been operating knowingly without a license for quite some time," said Spokesperson Tom Pool.

He says the state revoked ApartmentHunterz license in July after his department went after the owner for a variety of violations. Some violations dated back eight years.

same would pay the money and show up to the property with no land available," he said.

He says ApartmentHunterz also took ads from other places and posted them on their site without permission, which the state says is illegal. CBS13 found more than a month after the company's license was revoked, the website is still up. We reached out to the company repeatedly, but never heard back.

"Clearly at this point we can work with law enforcement in order to pursue a criminal investigation and lead to some sort of criminal penalties," Pool said.

After Faith told ApartmentHunterz she planned to call us, she says they refunded her $29.95.

**Kurtis Ming**

👍 Like    Follow

Eight-time Emmy Award winner Kurtis Ming is CBS13's consumer investigative reporter. Since joining CBS13 in 2003, he's held the position of general assignment reporter and weekend anchor, before starting the "Call Kurtis" consumer advocacy program,....

**More from Kurtis Ming**



**More From CBS Sacramento**





## CBS Sacramento

Follow Us  f  t  ▶  ◎

| NEWS | SPORTS | SCORES & STATS | BEST OF | OTHER | CORPORATE |
|---|---|---|---|---|---|
| Local | Kings | MLB | Events | CBS Careers | About Us |
| Call Kurtis | A's | NBA | Local Pages | Weather | Advertise |
| Politics | Raiders | NFL | Travel | Traffic | Business Development |
| Entertainment | Shows | NHL | | Links & Numbers | |
| Business | Podcasts | NCAA Football | | Contests | |

| Consumer | Interviews | NCAA Basketball | Only CBS |
| Health | | PGA | Contact CBS13 |
| | | | Contact KHTK |