# EXHIBIT 1



$10 OFF ANY PENNZOIL OIL CHANGE
CLICK HERE

Sacramento ▾   SIGN UP FOR NEWSLETTERS

CBS Sacramento

Follow Us

Home   News   Sports   Audio   Video   Best Of   Events   Health   Traffic   Weather   Directory   Travel   Deals   Autos   Contests

Latest News   Local   Drought   Call Kurtis   Politics   Entertainment   Offbeat   Business   Tech   Galleries

WATCH: Live news and more on CW31 | Latest forecast | Real-time traffic conditions

## Call Kurtis Investigates: Rental Website Offers Homes Not for Rent

September 21, 2015 11:13 PM   By Kurtis Ming

Filed Under: Call Kurtis, Call Kurtis Investigates

LISTEN LIVE

FOLLOW US ON

Sign Up for Newsletters





SACRAMENTO (CSB13) —  Needing a larger place to live, Faith Hayes found a listing of a home with a swimming pool for $1,800 a month on ApartmentHunterz.com.

"It said this is available for immediate occupancy," she recalls seeing.

The site promises 97,000 plus exclusive listings including many not found on free sites or in newspapers. In order to get the landlord's contact information, Faith had to pay $29.95. When she called, she says she was surprised at what she heard.

"That house was sold 2 years ago," she said she was told. "We're not renting any properties whatsoever."

According to the California Bureau of Real Estate, it's not the first time they've heard of this company.

"They've been operating knowingly without a license for quite some time," said Spokesperson Tom Pool.

He says the state revoked ApartmentHunterz license in July after his department went after the owner for a variety of violations. Some violations dated back eight years.

Call Kurtis Investigates: Rental Website Offers Homes Not for Rent » CBS Sacramento

dollars would any homeowner send out if the property was never
available," he said.

He says ApartmentHunterz also took ads from other places and posted
them on their site without permission, which the state says is illegal.
CBS13 found more than a month after the company's license was
revoked, the website is still up. We reached out to the company
repeatedly, but never heard back.

"Clearly at this point we can work with law enforcement in order to
pursue a criminal investigation and lead to some sort of criminal
penalties," Pool said.

After Faith told ApartmentHunterz she planned to call us, she says they
refunded her $29.95.

**Kurtis Ming**

👍 Like    Follow

Eight-time Emmy Award winner Kurtis Ming is CBS13's consumer investigative
reporter. Since joining CBS13 in 2003, he's held the position of general assignment
reporter and weekend anchor, before starting the "Call Kurtis" consumer advocacy
program,...

**More from Kurtis Ming**



### More From CBS Sacramento





Call Kurtis Investigates: Rental Website Offers Homes Not for Rent « CBS Sacramento

| Consumer | Interviews | NCAA Basketball | Only CBS |
| Health | | PGA | Contact CBS13 |
| | | | Contact KHTK |

http://sacramento.cbslocal.com/2015/09/21/call-kurtis-investigates-rental-website-offers-homes-not-for-rent/[4/28/2016 10:57:06 AM]

# EXHIBIT 2

CERTIFIED COPY

1          IN THE UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               SOUTHERN DIVISION

4

5    COSTAR REALTY INFORMATION,    )
     INC., and APARTMENTS, LLC,    )
6                                  )
                   Plaintiffs,     )
7                                  )
         vs.                       ) No. 8:15-cv-02111-JLS-KES
8                                  )
     APARTMENT HUNTERS, INC.,      )
9    KEVIN SHAYAN and STEVEN       )
     SHAYAN,                       )
10                                 )
                   Defendants.     ) (Pages 1 - 216)
11   _____)

12

13

14

15

16

17          Videotaped deposition of KEVIN SHAYAN

18     (pursuant to Rule 309(b)(6)), taken on behalf

19     of the Plaintiffs, at 725 South Figueroa Street,

20     31st Floor, Los Angeles, California, commencing

21     at 8:58 a.m., on Thursday, September 29, 2016,

22     before Kathleen Mary O'Neill, CSR 5023, RPR.

23

24

25

1

1    APPEARANCES:

2
     For Plaintiffs:
3
         WILLIAMS & CONNOLLY LLP
4        BY:   DAVID K. BAUMGARTEN, ESQ.
               NICHOLAS J. BOYLE, ESQ.
5        725 Twelfth Street N.W.
         Washington, D.C. 20005
6        202/434-5343

7

8    For Defendants:

9        FOX ROTHSCHILD LLP
         BY:   LINCOLN BANDLOW, ESQ.
10       1800 Century Park East
         Suite 300
11       Los Angeles, California  90067
         310/228-2913

12

13
     Videographer:
14
         JEANNIE SCHWARZE
15       Dean Jones Videos
         213/385-9756
16

17

18

19

20

21

22

23

24

25

                                                              2

```
                        I N D E X

DEPONENT                EXAMINED BY              PAGE

Kevin Shayan            Mr. Baumgarten             6

                        (P.M. Session)           113



        Videotape No. 1 . . . . . . Page    5

        Videotape No. 2 . . . . . . Page   52

        Videotape No. 3 . . . . . . Page  113

        Videotape No. 4 . . . . . . Page  181



                 UNANSWERED QUESTIONS

                  Page    Line

                   26      11
                   45       1
                  105      22



EXHIBITS FOR IDENTIFICATION:                     PAGE


  1  8/23/16 Plaintiffs' Updated Notice            9
     of Rule 30(b)(6) Deposition of Apartment
     Hunters, Inc.

  2  BBB Business Review                          29

  3  12/18/15 letter from Nicholas J. Boyle       35
     to Legal Department Apartment Hunters,
     Inc.

  4  3/21/16 Plaintiffs' First Set of             43
     Requests for Production of Documents
     to Apartment Hunters, Inc.
```

**Abrams, Mah & Kahn**

EXHIBITS FOR IDENTIFICATION:   (Continued)        PAGE

5   ICANN WHOIS Contact Information                54

6   ICANN WHOIS Contact Information                55

7   Viewdns.info Reverse Whois Lookup              58

8   Screen shot of apartmenthunterz.info           60

9   9/1/16 Declaration of Kevin Shayan             71
    in Support of Defendants' Opposition
    to Plaintiffs' Motion to Compel
    Production of Documents

10  Exhibit A: Sample of Infringing                77
    Photographs Found on
    apartmenthunterz.com?

11  2/25/15 Transcript of Proceedings             126

12  9/21/16 email from David Baumgarten           156
    to Lincoln Bandlow and Margo Arnold

13  MxToolbox look-up of                          164
    mail.apartmenthunterz.com

14  Exhibit 8 in the California Board             190
    of Real Estate Hearing

4

CERTIFIED COPY

| | | |
|---|---|---|
| 1 | LOS ANGELES, CALIFORNIA | |
| 2 | THURSDAY, SEPTEMBER 29, 2016 | |
| 3 | 8:58 A.M. | |
| 4 | -oOo- | |

1        LOS ANGELES, CALIFORNIA

2      THURSDAY, SEPTEMBER 29, 2016

3            8:58 A.M.

4              -oOo-

5        THE VIDEOGRAPHER:  Good morning.                    08:57:20

6      This is the videotaped deposition of Kevin

7    Shayan, taken at 725 South Figueroa Street, 31st floor,

8    Los Angeles, California, on Thursday, September 29,

9    2016, in the matter of CoStar Realtor -- Realty

10    Information, Inc. and Apartments, LLC vs. Apartment      08:57:39

11    Hunters, Inc., et al., Case No. CV-02111-JLS-KES,

12    U.S. District Court, Central District of California,

13    Southern Division.

14        This deposition is on behalf of the plaintiffs.

15        My name is Jeannie Schwarze with Dean Jones       08:58:02

16    Attorney Video Services of Los Angeles and Santa Ana.

17        This deposition is commencing at 8:58 a.m.

18        Would all present please identify themselves

19    beginning with the deponent.

20        THE WITNESS:  I'm Kevin Shayan with Apartment      08:58:16

21    Hunters, Incorporated.

22        MR. BANDLOW:  Lincoln Bandlow of Fox Rothshild

23    on behalf of Defendants.

24        MR. BAUMGARTEN:  David Baumgarten of Williams &

25    Connolly on behalf of plaintiffs.

5

CERTIFIED COPY

1          MR. BOYLE:  Nick Boyle from Williams &

2   Connolly.

3          THE REPORTER:  Sir, would you please raise your

4   right hand.

5          You do solemnly state that the testimony you

6   are about to give shall be the truth, the whole truth,

7   and nothing but the truth, so help you God?

8          THE WITNESS:  I do.

9          THE REPORTER:  Thank you.

10

11                    KEVIN SHAYAN,

12          having been first duly placed under

13          oath, was examined and testified

14          as follows:

15

16                    EXAMINATION

17   BY MR. BAUMGARTEN:

18     Q.   Good morning, Mr. Shayan.

19     A.   Good morning, sir.  How are you?

20     Q.   Good.  Thank you.

21          Could you please state your full name and

22   address for the record?

23     A.   Yes.  It's Kevin Shayan.  It's S-h-a-y-a-n.

24   And the address is 32565 Golden Lantern, Dana Point,

25   California.                                      08:59:03

CERTIFIED COPY

```
 1        Q.    Thank you.
 2              Have you ever given a deposition before?
 3        A.    Yes, sir.
 4        Q.    And in connection with what matter was that?
 5        A.    With the Department of Real Estate.          08:59:12
 6        Q.    So you're referring to your testimony before
 7   the Department of Real Estate?
 8        A.    Yes.
 9        Q.    Okay.
10              And so that was not a deposition; correct?    08:59:20
11              That was a hearing that you gave testimony;
12   correct?
13        A.    Right.
14        Q.    Okay.  All right.
15        A.    And previously in a previous matter with      08:59:26
16   another company, I was also deposed.
17        Q.    And what matter was that?
18        A.    Westside Rentals vs. Apartment Hunters.
19        Q.    So let me then just give you a few quick sort
20   of reminder guidelines about the process.              08:59:45
21              First of all, it's important that you answer
22   with words instead of nodding, so that the court
23   reporter can get everything down.
24        A.    Understood.
25        Q.    Please let me try to always finish asking a   08:59:53
```

7

```
 1    question before you begin your answer.  It's a lot
 2    better if we don't talk over each other, again for the
 3    court reporter.
 4           If you don't understand a question, just let me
 5    know, and I'll try to clarify it.                        09:00:05
 6           From time to time your lawyer, Mr. Bandlow, may
 7    object.  He will get his objection on the record.  But
 8    unless he instructs you not to answer, you still need to
 9    go ahead and answer the question despite his objection.
10           And finally, if you want to take a break at any   09:00:23
11    time, just let me know.  I just ask that if a question
12    is pending, you answer that question before we take a
13    break.
14           Is there any reason you can't testify fully and
15    accurately here today?                                   09:00:34
16       A.   No.
17       Q.   Okay.
18           Can you briefly take me through your
19    educational background?
20       A.   I finished high school at University High in    09:00:39
21    West Los Angeles, and I did a year of junior college.
22       Q.   Okay.
23           And can you -- since that year of junior
24    college, can you take me through your employment
25    history?                                                 09:00:56
```

8

CERTIFIED COPY

1    A.    Employment history, I was in the car stereo

2  sales business on Westwood Boulevard.

3          After that I was a 33-1/3 owner at Contact

4  Stereo on Wilshire Boulevard in Beverly Hills.

5          After that my brother and I started the company    09:01:19

6  named Wholesale Tronics where we were distributing

7  electronics to retailers.

8          Later on Wholesale Connection.

9          And thereafter, in 1999, we started this

10 company.                                                    09:01:50

11    Q.    Apartment Hunters, Incorporated?

12    A.    Yes, sir.

13          MR. BAUMGARTEN:   Let's mark this as Exhibit 1,

14 I guess.

15          (Discussion held off the record.)                 09:02:19

16          (Exhibit 1 was marked for identification.)

17    Q.    BY MR. BAUMGARTEN:   Have you seen this document

18 before, Mr. Shayan?

19    A.    One moment, please.

20          (The witness reviews a document.)                  09:02:51

21          Yes, I have.

22    Q.    Okay.

23          And you understand that you are testifying

24 today as the designated representative of Apartment

25 Hunters, Incorporated?                                      09:03:09

9

**Abrams, Mah & Kahn**

```
 1        A.    Yes, I am.
 2        Q.    And I may from time to time refer to Apartment
 3   Hunters as "AHI" just for brevity.
 4              Is that okay?
 5        A.    Yes.                                              09:03:20
 6        Q.    And all of my questions will be directed to
 7   your knowledge as a representative of Apartment Hunters
 8   and not limited to your personal knowledge.
 9              Do you understand that?
10        A.    Yeah.  So we're not going to mix them up.  So    09:03:27
11   it's all me as a representative of the company.
12        Q.    Correct.
13              If I'm asking a question or I'm asking for your
14   personal knowledge, I'll make that clear.
15        A.    Thank you very much.                             09:03:40
16        Q.    If you could flip to the -- I guess what's
17   numbered as page 2 here, really the third page of this
18   document.  It's a list of topics.
19        A.    Page 2?
20        Q.    Yes.                                             09:03:54
21        A.    No. 1.
22        Q.    Page 3, numbered 2.
23        A.    Uh-huh.
24        Q.    Do you understand that you have been designated
25   to provide testimony on these specific topics?            09:04:03
```

10

**Abrams, Mah & Kahn**

```
 1        A.    Yes.

 2        Q.    And did you review this list of topics prior to

 3   today?

 4        A.    Yes.

 5        Q.    Have you taken any steps to prepare to testify          09:04:10

 6   about these topics?

 7        A.    I've read them.

 8        Q.    Any other steps?

 9        A.    Yeah.

10              I've done every single thing that's been               09:04:19

11   mentioned here.

12        Q.    Okay.

13              Did you review documents, for instance, to --

14        A.    Yes, of course.

15        Q.    Did any documents refresh your recollection?           09:04:31

16        A.    Refresh my . . .

17        Q.    Recollection.

18        A.    When these were given to me and prior to these

19   when I received the lawsuit, I did exactly all of these

20   steps and had done them before.  So refresh my              09:04:50

21   recollection, as far as -- these were already in place.

22   So if you're asking me if I did a refresher last night,

23   I didn't have to.  But these were in place and done.  I

24   could answer them without reading this.

25        Q.    Okay.                                                   09:05:19
```

11

CERTIFIED COPY

1          So specifically in preparation for this

2    deposition, not in connection with when you first

3    received the complaint, did you review any documents to

4    prepare for --

5        A.   No.                                          09:05:30

6        Q.   -- today?

7          And did you -- putting aside Mr. Bandlow for a

8    moment, did you speak to anyone in preparation for this

9    deposition?

10       A.   No, sir.                                     09:05:40

11       Q.   And just yes or no, have you met with

12   Mr. Bandlow or spoken with Mr. Bandlow to prepare

13   for these -- to discuss these topics?

14       A.   No.

15       Q.   Who owns Apartment Hunters, Incorporated?    09:05:52

16       A.   Steve Shayan.

17       Q.   100 percent?

18       A.   100 percent.

19       Q.   Does Apartment Hunters, Incorporated have any

20   relationship to Rental Home Listings, Incorporated?   09:06:09

21       A.   Rental Home Listings, Incorporated is also

22   owned by Steve Shayan.

23       Q.   And Real Estate Data Solutions, Incorporated?

24       A.   It's also owned by Steve Shayan.

25       Q.   Does Apartment Hunters, Incorporated have any 09:06:27

12

CERTIFIED COPY

```
 1   corporate officers?
 2        A.   The corporate officers are Steve Shayan.
 3        Q.   And what is his position?
 4        A.   He's the CEO.
 5        Q.   And are you a corporate officer?          09:06:41
 6        A.   None of the companies.
 7        Q.   Are there -- and no other corporate officers
 8   other than Steve at Apartment Hunters?
 9        A.   Correct.
10        Q.   Does Apartment Hunters have an in-house     09:06:49
11   counsel?
12        A.   We did up to a while ago.  At this point we
13   don't.  But we are in touch with our in-house counsel.
14   But as far as having one full time, no.
15        Q.   Okay.                                       09:07:15
16             And is your in-house counsel -- just a
17   yes-or-no question -- providing you legal advice in
18   connection with this lawsuit?
19        A.   No.
20        Q.   Could you -- and who is that individual?    09:07:26
21        A.   Jilbert Tahmazian, which was originally
22   handling the case prior to the insurance company.
23        Q.   You mentioned an insurance company.
24             Could you clarify what that means?
25        A.   Access, which is handling the case with     09:07:49
```

13

CERTIFIED COPY

1    Lincoln.

2       Q.   And is Access paying for your defense?

3       A.   Yes.

4       Q.   Could you briefly describe AHI's business.

5       A.   We are a prepaid rental listing service, so we          09:08:13

6    are an apartment listing company.  Unlike the other

7    websites, we charge a fee to the person that's looking.

8    So we get the listings from the landlords, property

9    management companies, and we are a member of the

10   multiple listing service.                                        09:08:36

11         So the data comes directly from the MLS,

12   property management companies to our website, and we

13   don't display the address and the phone number until we

14   charge the subscription fee.  And once you pay, you see

15   the address and a phone number.                                  09:09:02

16         So we're just ALS, Apartment Listing Service.

17      Q.   And is the MLS feed, is that the only source of

18   the listings?

19      A.   I had mentioned before, individual landlords a

20   portion.  Then we get feeds from huge companies.                 09:09:21

21   That's -- for example, Apartment Guide, ForRent.com,

22   other huge companies, and then also the MLS.  So we have

23   agreements, partnerships with the REITs, the real estate

24   investment trusts.  And on a daily and some hourly basis

25   we get photos and property descriptions and prices from          09:09:53

14

CERTIFIED COPY

1   partners, as well as inputed by hand from landlords, as

2   well as faxes.

3       Q.   So your testimony is essentially, if I'm

4   correct, that your Apartment Hunters is also sort of

5   receiving listings passively through other people rather          09:10:20

6   than affirmatively copying listings from other websites?

7       A.   There is no copying.  It's all coming in the

8   traditional way.

9       Q.   Are you aware that a number of different

10  property owners and renters have accused AHI of copying         09:10:36

11  listings from other sites?

12      A.   Accused, yes.

13      Q.   You're aware of the complaints made to the

14  Better Business Bureau?

15      A.   I haven't read them recently, but I'm sure            09:10:47

16  they're there.

17      Q.   Are you aware of complaints that have been

18  posted on Trulia.com?

19      A.   We were partners with them.  And the

20  complaints, I believe, are not for the listings.  They         09:11:03

21  are for the fact that we charge a fee.  But I haven't

22  read the Trulia complaints.

23      Q.   Are you aware of the allegations that have been

24  made by the California Bureau of Real Estate?

25      A.   Yes.                                                   09:11:21

15

**Abrams, Mah & Kahn**

CERTIFIED COPY

1      Q.   Are you aware that there are allegations of

2  copying information off documents made by Property Three

3  Technology Group?

4      A.   Property Three?

5      Q.   Property Three Technology Group, yes.                    09:11:34

6      A.   I don't recall the name.

7      Q.   Okay.

8           They filed a lawsuit in Federal Court in

9  Indiana.

10     A.   A Property Three case was filed and was -- we            09:11:44

11  actually won that case because the Nigerian gentleman

12  who sued us did not have a water -- a -- sorry about

13  that, did not have a trademark on any of those.

14  So we were actually in a lawsuit for a bunch of blank

15  forms.                                                           09:12:20

16          So intent to terminate vacancy, parking spot

17  forms, blank leases, right, notice to pay rent or quit,

18  we had a receipt that we had paid in 2002 to purchase

19  these blank forms, and we had put them on our website

20  for convenience of the landlords.  So they were a bunch         09:12:48

21  of forms that, you know, landlords would print and -- to

22  provide to the tenants.

23          And this gentleman claimed that he has -- he

24  had copyrights to them.  And once we went to the court

25  in Indiana, the copyright was not filed, and he did not         09:13:08

16

**Abrams, Mah & Kahn**

```
1    have one.  And at the end we ended up getting a judgment
2    against that gentleman, and he filed bankruptcy.
3        Q.   Okay.
4             Are you aware of the allegations made by
5    Westside Rentals and Mark Verge?                              09:13:27
6        A.   Yes.
7        Q.   And so I don't need you to go through the
8    substance of all of them, but all of those allegations
9    Apartment Hunters denies, yes?
10       A.   All those --                                         09:13:40
11       Q.   All the different allegations of --
12       A.   Yes.  Yes.
13       Q.   Are you familiar with the term "scraping"?
14       A.   Yes.
15       Q.   What does that mean to you?                          09:13:50
16       A.   To me it means grabbing a spatula or taking
17   something off.  It would mean screen scraping.  It would
18   mean -- yeah.
19       Q.   What is "screen scraping"?
20       A.   Screen scraping is when you would write a           09:14:04
21   program that would pretty much -- you would order the
22   program to go inside a website, grab the data and bring
23   it back.
24       Q.   And does Apartment Hunters ever do screen
25   scraping?                                                     09:14:22
```

17

CERTIFIED COPY

```
 1        A.   No, sir.
 2        Q.   How do you -- how do you know that none of the
 3   Apartment Hunters employees ever engage in screen
 4   scraping?
 5        A.   Because I'm in charge of that, and I would know      09:14:32
 6   if anybody did that kind of conduct.  And we don't have
 7   the ability or the knowledge to write that kind of code.
 8        Q.   And how would you know?
 9             You said you're in charge, how would you know?
10        A.   Because our employees don't engage in that kind     09:14:50
11   of behavior, and the company's foundation was not built
12   on scraping, which is actually illegal.
13        Q.   Are any Apartment Hunters employees compensated
14   based on the number of listings they upload to the
15   website?                                                       09:15:13
16        A.   Absolutely not.
17        Q.   Where is Apartment Hunters located?
18        A.   In Dana Point.
19             Apartment Hunters is actually an Internet
20   company, so it has no location.  So it's web based.           09:15:26
21        Q.   And where do you work on a daily basis?
22        A.   From Dana Point.
23        Q.   And where does your brother work on a daily
24   basis?
25        A.   From Dana Point.  We both work there from Dana      09:15:42
```

18

```
 1   Point.

 2        Q.   Does anyone else work at that location with

 3   you?

 4        A.   No.

 5        Q.   Are there any other physical locations in the      09:15:52

 6   United States where Apartment Hunters employees work?

 7        A.   Absolutely not.

 8        Q.   Can you identify each employee that performed

 9   work for Apartment Hunters in 2015?

10        A.   No.                                                 09:16:08

11        Q.   Can you --

12        A.   I can identify two of our I.T. guys, which is

13   Dennis Portnov, who is some of the time in Russia, and

14   he's the one who is -- owns his own company and helps us

15   with our servers and also helps us with programming the     09:16:41

16   website because I do not code.  I have no knowledge of

17   programming and coding.  I dream it up, tell them, and

18   they program it.

19        So Vidmantas Macys is the second guy who is

20   running the Apartment Hunters LT, the small Lithuanian       09:17:06

21   office and corporation, which is also Steve is the

22   president.

23        And those two people at the moment I know their

24   name, and I could identify them.  The other employees,

25   to tell you first name, last name, I would not know.        09:17:26
```

19

CERTIFIED COPY

```
 1        Q.    Let me ask a couple of follow-ups.

 2              You said Mr. Portnov is in Russia some of the

 3    time?

 4        A.    Yes.

 5        Q.    Where in Russia is he?                          09:17:43

 6        A.    Where he is . . . the city, honestly, I don't

 7    recall, because I haven't been there.

 8        Q.    And you said "some of the time."  Where is

 9    he --

10        A.    He travels.  So he goes to Italy.  He went to   09:18:02

11    Spain for three months.  So he's just a private

12    contractor.  We consider him as an employee because he

13    works for us full time, but he travels all the time.  So

14    he goes to Spain.  He went to Milan for three months, so

15    he goes around.  But he -- he has changed his hours to    09:18:26

16    U.S. hours, and he works for us on mostly a full-time

17    basis.

18        Q.    And you said he owns his own company?

19        A.    He has a -- I guess the company there, so a

20    name.                                                     09:18:48

21        Q.    And do you know what the name of that company

22    is?

23        A.    I don't, sir.

24        Q.    Does he have people working for him?

25        A.    No.  I'm not sure.  To my knowledge, no.        09:18:58
```

20

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1        Q.   Have you ever asked him whether he subcontracts
 2   any work for Apartment Hunters out to other people?
 3        A.   No.
 4        Q.   You never asked?
 5        A.   No.                                              09:19:11
 6        Q.   Switching to Lithuania and Mr. Macys.
 7             How many other employees are there in Lithuania
 8   other than Mr. Macys?
 9        A.   We have about, and this changes all the time,
10   six or seven customer support ladies that are in charge    09:19:38
11   of answering the phones and answering the ticketing
12   systems.  "Ticketing systems" meaning the incoming
13   customer support questions, and the chats online, and
14   issuing refunds, and also helping the customers with
15   their search.  Also, all of our calls that come in are     09:20:08
16   automatically instantaneously converted into a ticket.
17   So we take a real call, as we're speaking right now, and
18   transcribe it to text.  So the seven ladies are there.
19             Then we have two groups of four people who are
20   in charge of data and making sure that the data feeds       09:20:35
21   that are coming from the partners are proper, and
22   they -- they put them up.  That's one group.  The other
23   group is in charge of removing the rented listings,
24   making sure that the old ones are gone.
25        Q.   Okay.  So --                                     09:21:01
```

21

1      A.   But again, I don't know first name, last names.

2   I don't want to guess.

3      Q.   Sure.

4           THE REPORTER:  Excuse me.  Could we go off the

5   record for just a moment?

6           MR. BOYLE:  Sure.

7           THE REPORTER:  Counsel?

8           MR. BANDLOW:  Yes.

9           THE VIDEOGRAPHER:  Off record, 9:21 a.m.

10          (Recess taken from 9:21 a.m. to 9:27 a.m.)          09:27:35

11     Q.   BY MR. BAUMGARTEN:  Mr. Shayan, when we took

12  the break, we were talking about some of your employees

13  and subsidiaries.

14          Going back to the Lithuanian office, Apartment

15  Hunters wholly owns that subsidiary; correct?          09:27:48

16     A.   Yes.

17     Q.   And Apartment Hunters fully controls that

18  subsidiary as well?

19     A.   Yes.

20     Q.   Do you and your brother supervise Mr. Macys?          09:27:56

21     A.   My brother not.  I do most.

22     Q.   And how do you supervise him?

23     A.   I work from about 9:00 p.m. till 4:00 a.m., and

24  we are on the phone and usually do some sort of a screen

25  share, if needed, but mostly on the phone.  And I          09:28:27

22

CERTIFIED COPY

1    handwrite or draw some of my stuff, and, if need be,

2    send it over to them.  If not, I just tell them what I

3    need because the website was designed a long time ago.

4    So we're not building stuff.  We're just making

5    modifications.  They --                                    09:28:56

6        Q.    How -- I'm sorry.  I didn't mean to cut you

7    off.

8        A.    And they just do their job.

9        Q.    How do you send things over to him?

10       A.    Just a quick scan and send over and that's it.   09:29:08

11       Q.    By email?

12       A.    No.

13             I just -- yeah.  By -- I scan it and send it

14   and that's it.  But I do some drawings and send it to

15   them.                                                       09:29:26

16       Q.    When you speak to them, are you speaking in

17   English?

18       A.    Yes.

19       Q.    And do you ever speak to any of -- you

20   mentioned a bunch of employees who work --                 09:29:37

21       A.    I've never spoken to any of the staff members

22   at all except Dennis and Vidmantas.

23       Q.    And so I think you said that there were

24   essentially three groups.  There are seven customer

25   support representatives; and then there are two groups     09:30:05

23

CERTIFIED COPY

```
 1    of four programmers, one who uploads and sort of checks

 2    the incoming things, and the other four remove listings;

 3    correct?

 4         A.   Correct, sir.

 5         Q.   So that is 15 employees total?              09:30:19

 6         A.   Yes.

 7         Q.   Okay.

 8         A.   But it varies.  Some of them quit, and some of

 9    them come and go.  Because those customer support

10    people, they have a real day job.  So you have to       09:30:32

11    understand they're working graveyard shift based on the

12    hours that they're working.  So they're working our

13    daytime which is their evening time.

14         Q.   And do you supervise them, or is it Mr. Macys?

15         A.   It's mostly Mr. Macys.                        09:30:54

16         Q.   And so, again, let's focus on the -- let's

17    focus on the eight programmers.

18              That's also more Mr. Macys' --

19         A.   I don't do any supervision.  It's all there.

20         Q.   And so how do you know what they're doing?    09:31:07

21         A.   Through Mr. Macys and a report in our admin

22    panel.

23              In our administrative panel there are little

24    squares, and the only person that doesn't have to report

25    is Mr. Macys, because I do speak to him on a daily basis  09:31:27
```

24

CERTIFIED COPY

1   via telephone.

2          In the admin panel, the other boys type exactly

3   what they've accomplished.  And we have a task manager,

4   a project management system and a progress system.  So I

5   do sit there and actually go one by one through what                    09:31:52

6   they've done, which is hours of work, and check it and

7   make sure that things are in order.

8      Q.   Sitting here today, though, you cannot identify

9   their names; correct?

10     A.   No.                                                             09:32:09

11          I just -- you know, they have Roman names in

12  Lithuanian.  So it's Kaskus, if you want, Danius,

13  Nergius.  But I don't really want to be put on record by

14  just saying -- I don't have the full list of them.  So

15  it's -- and most of them are the same name.  They use                   09:32:33

16  the old Roman names.

17     Q.   You mentioned the admin panel.

18          Is that a software?

19          What is that?

20     A.   Admin panel is the administrative panel where                   09:32:44

21  we have built -- where I go in as the owner of the

22  company.  It's our back end.

23     Q.   Okay.

24          And is there a specific piece of software --

25     A.   No.                                                             09:33:01

25

CERTIFIED COPY

```
 1      Q.    -- in this --

 2      A.    This is one page, HTML page, and it's built for

 3   me to go in.  And all -- I had a dream to have one page

 4   where everything is and all of the information is and

 5   that's where I get my reports.  It's -- call it my home       09:33:16

 6   page.

 7      Q.    Sure.

 8            How do you access that page?

 9            Is it a website?

10      A.    Through the web.                                     09:33:24

11    * Q.    What is the -- what is the address that you

12   open to get there?

13      A.    That's not going to be given.

14            MR. BANDLOW:  Yes.  That's proprietary and not

15   relevant.  So if you can explain to me what the              09:33:35

16   relevance is, I'll listen.

17            THE WITNESS:  That would be funny for you to

18   get into the back end of the company.

19            MR. BAUMGARTEN:  You're instructing him not to

20   answer?                                                      09:33:45

21            MR. BANDLOW:  Yes, I am on that.

22            MR. BAUMGARTEN:  Okay.

23            THE WITNESS:  What is the --

24            MR. BANDLOW:  That's his whole company.  That's

25   everything he has and possibly --
```

26

```
 1              THE WITNESS:  That was funny.
 2       Q.   BY MR. BAUMGARTEN:  The admin panel, are there
 3   sort of daily reports?
 4              What is the -- how often is data inputted?
 5       A.   I'm not going to answer that either.          09:34:13
 6       Q.   Okay.
 7              Is this information backed up?
 8       A.   I'm not going to answer anything regarding my
 9   company's information.
10       Q.   Let me ask you another question about          09:34:29
11   Lithuania.  I apologize if I mispronounce this.
12              Have you heard of the law firm of Glimstedt,
13   G-l-i-m-s-t-e-d-t?
14       A.   No.
15              We do have a law firm in Lithuania.  I do not 09:34:45
16   know the name.  I'm not sure if that is it or not.  But
17   we do have a law firm that formed a corporation and is
18   still employed by us, but I do not know the name.
19       Q.   Have you directly spoken to them?
20       A.   Never.                                         09:35:13
21       Q.   How do you communicate -- sorry.  Switching to
22   Russia and Mr. Portnov.
23              How do you communicate with him?
24       A.   I had said before, by phone.
25       Q.   By phone.                                      09:35:31
```

27

 1          And is he -- with the time differential, you're
 2   also talking to him in the -- at night in the U.S. while
 3   it's the day in Europe --
 4      A.   Just -- just earlier I mentioned that he
 5   switched his hours to U.S. hours.  So, yeah, I mean --          09:35:40
 6   I -- I work with the Lithuania people.  I work from 9:00
 7   to 4:00 a.m., and then I sleep till about 11:00, 11:30
 8   in the morning, and then I do the Dennis shift, which is
 9   daytime.
10      Q.   I see.  Thank you.  That makes sense.                   09:36:05
11          Do you ever email with Mr. Portnov?
12      A.   Do I ever email?  Not necessary.  We're just
13   all the time on the phone.
14      Q.   Do you ever send him drawings or sketches like
15   you send to --                                                  09:36:28
16      A.   No.
17          The website is always finished.  I mean, there
18   is no changes needed for me to do drawings or sketches.
19   It's just fixing stuff.
20      Q.   Does Apartment Hunters have a fraud prevention         09:36:41
21   team?
22      A.   Fraud prevention team, as far as -- can you
23   clarify what you mean by "fraud"?
24          MR. BAUMGARTEN:  Sure.  Well, why don't I show
25   you an exhibit.  I think that will be easier.  This             09:37:01

                                                              28

```
1    is -- and we'll mark this as Exhibit 2.
2           (Exhibit 2 was marked for identification.)
3       Q.   BY MR. BAUMGARTEN:  This is a printout of the
4    Better Business Bureau website.  And if you look at the
5    second page, there's a complaint that -- it starts at        09:37:39
6    the bottom of the second page and continues on the third
7    page, and on the third page in bold it says "Business
8    Response."
9       A.   Hold on.  Allow me -- because you guys have
10   printed on both sides.                                       09:37:53
11          MR. BANDLOW:  You're talking --
12      Q.   BY MR. BAUMGARTEN:  Right.  That complaint that
13   starts there at the bottom of that page.
14          MR. BANDLOW:  The plaintiff -- it starts "I am
15   a property owner in Southern California"?                    09:37:59
16          MR. BAUMGARTEN:  Correct.
17          MR. BANDLOW:  Okay.  Here (indicating).
18      Q.   BY MR. BAUMGARTEN:  If you -- I'm sorry, we
19   don't -- we're not going to talk about the substance of
20   the complaint, but if you continue on to the next page,     09:38:08
21   you'll see in bold sort of a third of the way from the
22   top, it says "Business Response."
23          And if you go down to the third big paragraph,
24   it says "We do have a fraud prevention team."
25          So it would seem that someone from your company      09:38:28
```

29

Abrams, Mah & Kahn

CERTIFIED COPY

```
 1   has posted this.
 2          Do you post responses to --
 3      A.   Allow me to read the response.
 4      Q.   Sure.
 5      A.   (The witness reviews a document.)          09:38:41
 6          100 percent yes.  100 percent yes.
 7      Q.   I'm sorry, 100 percent yes what?
 8      A.   We do have actually a live human.  One would be
 9   me and the other Steve.  To a certain extent on this
10   particular case, yes, there is human being intervention   09:39:22
11   on fraud.
12      Q.   Okay.
13          And did you post this?
14      A.   No.
15      Q.   Do you know who did?                        09:39:31
16      A.   Steve or one of our previous secretaries.
17          What is the date on this?
18      Q.   The date seems to be June 16th, 2016.  It's a
19   few months ago.
20      A.   That would be Steve.                        09:39:48
21      Q.   You mentioned previous secretaries.
22      A.   That would be going back a few years when we
23   were in a physical office in Beverly Hills.
24      Q.   Have you -- in 2015 or '16, you've had no
25   secretaries?                                        09:40:04
```

30

CERTIFIED COPY

```
 1        A.   No.
 2        Q.   Let me just make sure that I've asked this.
 3             Other than the folks that we've spoken about
 4   before, which is yourself, your brother Steve,
 5   Mr. Macys, Mr. Portnov, the seven customer support        09:40:15
 6   representatives, and the eight programmers, are there
 7   any other individuals who have worked as employees in
 8   2015 or 2016?
 9        A.   No, sir.
10        Q.   And are there any other individuals who you     09:40:27
11   hired to provide services as independent contractors
12   that you would not consider employees?
13        A.   No, sir.
14        Q.   Is there someone who has the title of senior
15   account manager at Apartment Hunters?                     09:40:41
16        A.   No.
17        Q.   So if someone was signing responses to the
18   Better Business Bureau with that title, you're not sure
19   who it would be?
20        A.   No.  Senior account manager?  No.               09:40:53
21        Q.   Do you know if Apartment Hunters has a
22   development manager?
23        A.   Development manager would be Vidmantas.
24        Q.   And you said that Mr. Macys does sometimes post
25   responses on the internet?                                09:41:13
```

31

```
 1        A.    Yes.
 2              And he does also reply to these, because the
 3   data department is under his supervision.
 4        Q.    Let me ask you about a new topic.
 5              Prior to this lawsuit, did Apartment Hunters          09:41:38
 6   have a formal policy regarding the routine retention or
 7   destruction of documents and data?
 8        A.    One more time, please.
 9        Q.    Yes.  Sure.
10              Prior to this lawsuit, did Apartment Hunters          09:41:52
11   have any sort of formal policy regarding how documents
12   were dealt with in terms of preserving them or deleting
13   them on sort of a routine basis?
14        A.    We preserve everything, including paper, phone
15   bills of AT&T going back to 1999.  So we have always          09:42:12
16   preserved and have even paper copies of everything.  We
17   don't do any deleting or shredding system in our
18   company.
19        Q.    Okay.  Let me follow up.
20              First of all, is there a written policy             09:42:41
21   explaining this --
22        A.    No.
23        Q.    -- or that's just --
24        A.    Internal policy.
25        Q.    Okay.
```

32

CERTIFIED COPY

1      A.   But keeping data, we don't past a certain

2  point.  And I can't tell you which data and specifically

3  what because I don't manage the servers.  But as far as

4  shredding or getting rid of stuff, it is not our policy

5  to get rid of stuff.                                    09:43:06

6      Q.   So your testimony, if I understand it, is that

7  you preserve all hard copy documents?

8      A.   Hard copy documents, yeah.  Yes.  Correct.

9      Q.   Okay.

10          And data, however, is not necessarily always   09:43:18

11  preserved?

12     A.   Data is preserved to a point, because if you're

13  talking about pictures and listings going back to 1999,

14  then we need the entire 31st floor to be servers.  But

15  that would be impossible.                               09:43:40

16     Q.   Sure.

17     A.   But going back to a backup point and preserving

18  it, yes, we do.

19     Q.   And I certainly understand the reasoning for

20  what you're saying with the data.                       09:43:57

21          Is there a formal written policy about when

22  data goes away, or is it sort of done on a more ad hoc

23  basis?

24     A.   There is no written policy is the answer.  And

25  the period of it is not known to me at the moment.  I    09:44:14

33

**Abrams, Mah & Kahn**

CERTIFIED COPY

 1   don't recall.

 2        But there is a complete conservative system put

 3   in place by Dennis, who's been with us for 12 years, and

 4   we do preserve going back quite a while.  I would say

 5   about a month or so.  And that is a guess. So more than      09:44:48

 6   a month or so we don't.

 7        Q.   So you think website data is kept roughly a

 8   month, and then it's --

 9        A.   Or less.

10        Q.   A month or less and then it's purged.             09:45:07

11        And what about emails, do you purge emails on a

12   regular basis?

13        A.   Yes.

14        Q.   And who is in charge of purging emails?

15        A.   The staff.  Dennis, I guess.  Vid and Dennis.      09:45:28

16   This is all technical or automated.  I'm not sure.

17   I don't do any computer-related stuff.

18        Q.   So you're not sure of Apartment Hunters'

19   policies and practices regarding the deletion of emails?

20        A.   Well, this is a small company -- so small to       09:45:52

21   medium-size company, so we don't have the corporate

22   structure or the government structure, if you're going

23   into the Hillary side, no.  We don't have written

24   complete books and policies, because there's just less

25   than 30 people there, so . . .                              09:46:15

                                                          34

```
 1        Q.   But your understanding is that Mr. Macys,
 2   Mr. Portnov and --
 3        A.   Which email deletions are you exactly speaking
 4   about?
 5        Q.   Well, let's focus on the general policy of the        09:46:29
 6   company.
 7        A.   There's no book of laws and records that if one
 8   employee leaves, we hand another employee's handbook to
 9   the new one coming.
10        Q.   Understood.                                           09:46:44
11             And so what you're saying is that Mr. Macys and
12   Mr. Portnov and the other employees are sort of free to
13   use their judgment on deletion?
14        A.   Correct, because there's no reason to go back
15   to the emails.                                                  09:46:57
16        Q.   Other than emails and website data, are there
17   any other categories of information that are also
18   deleted or purged because of space reasons or any other
19   constraints?
20        A.   Listings.                                             09:47:17
21             MR. BAUMGARTEN:   Let me show you a document
22   we'll mark as Exhibit 3.
23             This is a letter that was sent by my colleague,
24   Mr. Boyle, to Apartment Hunters on December 18th.
25             (Exhibit 3 was marked for identification.)           09:47:45
```

35

CERTIFIED COPY

1     Q.   BY MR. BAUMGARTEN:  And my question will be:

2   Have you ever seen this before?

3     A.   (The witness reviews a document.)

4          Cease and desist . . .

5          MR. BANDLOW:  Did you ever get this letter?          09:47:49

6          THE WITNESS:  No.  Because -- No.  This was --

7   this is not the one that came with the lawsuit.  We

8   never ever got this.

9          MR. BANDLOW:  Okay.

10          THE WITNESS:  This I have never received          09:48:31

11   whatsoever.  We never ever received this.  Had we gotten

12   a cease and desist I would have known.

13     Q.   BY MR. BAUMGARTEN:  So --

14     A.   This and the apartments.com terms in this

15   manner or the words "cease and desist" has never ever          09:48:55

16   been sent to us.

17     Q.   So this was sent to you on December 18th, which

18   was the same day that the complaint was served.  This

19   was delivered by hand.

20     A.   Oh, yes.  Yes.          09:49:10

21          If this was in the same box as the lawsuit,

22   I did receive it.

23     Q.   Okay.

24     A.   It was on top of the lawsuit in a box

25   eight-and-a-half-eleven.

36

CERTIFIED COPY

```
 1        Q.   That sounds right, yes.

 2        A.   Yes.

 3             And they gave me two boxes:  One for Steve, and

 4   one for me.  Yes.  Correct.

 5             I was -- I was engulfed in the lawsuit.              09:49:36

 6   Apparently I didn't look over the cease and desist.  So,

 7   yes, it was there.

 8        Q.   And so let me direct you to the second page, or

 9   the back of the first page, the paragraph that starts

10   "Third" in bold:                                               09:50:01

11             "Third, in connection with the

12             above-referenced lawsuit, we are sending

13             this letter to remind Apartment Hunters

14             and its affiliates," et cetera, "of their

15             legal obligation to take immediate steps

16             to preserve relevant documents and

17             evidence in their possession, custody,

18             or control."

19        A.   Uh-huh.

20        Q.   I'm going to skip the next big paragraph.           09:50:21

21             "The steps Apartment Hunters and

22             its affiliates, directors, officers,

23             employees, and agents should take to

24             preserve and maintain relevant documents

25             should include without limitation                   09:50:30
```

37

CERTIFIED COPY

1          the following."

2          And then moving on to the next page there are

3     four bullet points.  These are the steps, and I'll

4     direct you to the second one, which reads:

5               "Suspend any routine document

6          destruction policies and switch off

7          any function that could result in the

8          automatic deletion of relevant

9          documents, including, without any

10          limitation, the automatic deletion

11          of email or website content."

12     A.    This was done.  And I have an email that was

13     sent out to the employees with the subject line saying,

14     "Our new 2016 legal challenge."  And the email went

15     out -- okay, when I was served this, I made a phone call

16     to Jilbert Tahmazian, which --

17          MR. BANDLOW:  Don't -- don't tell the contents

18     of that phone conversation.

19          THE WITNESS:  Thank you.

20          MR. BANDLOW:  That's your attorney.

21          THE WITNESS:  I did send this email to my

22     employees with the subject line that "Our New Legal

23     Challenge."  After that I followed up with a phone call.

24     I spoke on a conference call with Dennis and Vidmantas

25     about preservation of documents, about taking all the

09:50:42

09:50:54

09:51:20

09:51:34

09:51:56

38

1    listings off, however, preserving them.  And also I used

2    the words, "I want you guys to find out how the hell

3    they got there."

4          And furthermore, I asked them to talk to each

5    and every employee, including even the ladies in          09:52:22

6    customer support, and let them know that this

7    preservation is in place so that nobody touches

8    anything.

9          And that email was sent to Lincoln.

10   Q.   BY MR. BAUMGARTEN:  Following that phone call       09:52:51

11   with Mr. Macys and Mr. Portnov where you gave them

12   instructions about preservation, did anyone monitor the

13   steps they took to implement your directions about

14   preservation?

15   A.   I don't get into the servers.  Okay?  But when     09:53:10

16   I give orders, historically, it's done.

17   Q.   So the answer is that you were relying on

18   Mr. Macys and Mr. Portnov to --

19   A.   100 percent I can assure you that it's done.

20   Q.   But you did not personally monitor what they        09:53:23

21   were doing?

22   A.   I cannot get into the servers.  I have zero

23   knowledge of how to even log into a server.

24   Q.   And did anyone else monitor what Mr. Macys or

25   Mr. Portnov were doing?                                  09:53:38

CERTIFIED COPY

1      A.    Neither myself nor Steve can even make a single
2   web page that says "You're invited to a birthday party."
3      Q.    And just to be clear, did this preservation
4   instruction include -- extend to emails?
5      A.    We didn't exchange any emails.  We don't                09:54:08
6   exchange emails.  We do everything by telephone.
7      Q.    Okay.
8      A.    Are you talking customer emails, because we
9   send the customer a receipt, "Thank you for signing up,"
10  and then we send the customer daily emails of the new        09:54:24
11  listings, landlord emails.  Because among the employees,
12  we just do -- we have a sophisticated phone system, a
13  VPN.  So we don't dial each other.  We push a button.
14  It's an extension to Lithuania.  So we don't really use
15  emails.                                                       09:54:46
16     Q.    I understand that, but my question is sort of
17  narrow.
18          Were there any directions given about
19  preservation of emails, whether it was internal or with
20  customers or anything?  There were no instructions given
21  regarding emails --
22     A.    It was all -- it was by email that I sent
23  these, and then I immediately pushed a button and spoke
24  to them live.
25     Q.    I understand.                                        09:55:08

40

CERTIFIED COPY

```
 1        A.   There was no emails.

 2        Q.   There was no instruction regarding emails?

 3        A.   Yes, because there was no emails to preserve.

 4        Q.   That letter that you sent or the email

 5   regarding, I think, "the legal challenge" you called it,    09:55:31

 6   who drafted that?

 7        A.   I did.

 8        Q.   And just a yes-or-no question here, did an

 9   attorney monitor or oversee your drafting of that

10   email?                                                      09:55:44

11        A.   No.

12        Q.   So you've testified that this email went out,

13   and you previously had testified that your sort of basic

14   policy was that website data, as you understand it, is

15   only kept for about the course of about a month in          09:56:29

16   general?

17        A.   Yes.  About a month, yes.

18        Q.   And so has that policy changed since you sent

19   out this legal challenge letter?

20        A.   The policy has not changed, but the data that     09:56:41

21   was required here was preserved on the day this was

22   served to us.

23        Q.   Okay.

24             So you took steps as to specific data, but the

25   overall policy has not changed?                             09:57:03
```

41

CERTIFIED COPY

```
 1        A.    Correct.

 2        Q.    Okay.  So --

 3        A.    There's no reason for us to change the policy

 4   the second we get a lawsuit.

 5             When we received this lawsuit, we did preserve      09:57:13

 6   what was requested of us.

 7        Q.    Okay.  Thank you.

 8             Do the -- and excuse my ignorance.  I don't

 9   actually know what the official language of Lithuania

10   is.                                                           09:57:50

11        A.    It's Lithuanian.

12        Q.    Lithuanian.  I thought so.  I didn't want to

13   assume.

14             Do the employees under Mr. Macys in Lithuania,

15   do they speak English or Lithuanian?                         09:58:00

16        A.    They do both, because they have to code in

17   English, I guess.  So, yes.  But they speak horrible

18   English, but they code in perfect English.

19        Q.    Do they understand English?

20        A.    Yeah.                                              09:58:18

21        Q.    Are you aware that on March 21st of this year

22   CoStar served requests for production of documents to

23   Apartment Hunters?

24        A.    I'm not sure.  It's pretty vague.  If they did,

25   which documents, which service, which one?                   09:58:48
```

42

CERTIFIED COPY

```
 1        Q.   Sure.  Let's show you a document.  That's fair.
 2             I'm going to mark Exhibit 4.  This is a
 3   document reading "Plaintiffs' First Set of Requests for
 4   Production of Documents to Apartment Hunters,
 5             (Exhibit 4 was marked for identification.)        09:59:13
 6             THE WITNESS:  (To Mr. Bandlow) We did this,
 7   right?
 8             MR. BANDLOW:  Uh-huh.  We did.
 9             THE WITNESS:  Yes, we did.
10        Q.   BY MR. BAUMGARTEN:  Has anyone at Apartment       09:59:38
11   Hunters, aside from your attorney Mr. Bandlow or any of
12   your other attorneys, reviewed these document requests?
13        A.   Of course.
14        Q.   And just yes or no, have you discussed these
15   document requests with either Mr. Bandlow or one of his    09:59:52
16   colleagues?
17        A.   Yes.
18        Q.   Has anyone at Apartment Hunters spoken to
19   employees about the retention of documents potentially
20   responsive to these requests?                              10:00:09
21        A.   Oh, a lot.
22        Q.   And when were those conversations?
23        A.   Immediately after it was served.
24        Q.   So are you referring to the email you sent in
25   December?                                                  10:00:24
```

43

CERTIFIED COPY

1      A.    Immediately after that email, and continuously

2  after that, and then in detail after this particular

3  paper and the requests within this.

4      Q.    Okay.

5            And did you directly speak -- who did you                10:00:41

6  directly speak to after this -- after this paper came in

7  March?

8      A.    There are only two people, so Dennis and Vid.

9      Q.    And --

10     A.    This actually gives more detailed information         10:00:58

11 after the preservation was ordered.  So after the

12 lawsuit, complete preservation was in place, and this

13 gives more instruction and more discussions where needed

14 to go inside the preservation.

15           (Discussion held off the record

16      between Mr. Bandlow and the witness.)

17     Q.    BY MR. BAUMGARTEN:  So did anyone other than

18 yourself talk to Mr. Macys and Mr. Portnov about the

19 preser- --

20     A.    Absolutely not.                                       10:01:49

21     Q.    Has Apartment Hunters hired an eDiscovery

22 vendor?

23     A.    A what?

24     Q.    An eDiscovery vendor?

25     A.    Never heard of that.                                  10:02:02

44

CERTIFIED COPY

```
 1      * Q.   And Apartment Hunters' outside counsel, in
 2  other words, Mr. Bandlow and his colleagues, have they
 3  spoken to anyone other than yourself about the
 4  collection of documents?
 5           MR. BANDLOW:  Objection.  Calls for                10:02:23
 6  attorney-client privilege.
 7           Instruct the witness not to answer.
 8           Stop getting into what we've instructed, what
 9  we've shown them, any of that stuff.  You know that's
10  privileged.  He's not going to answer it.                   10:02:32
11           MR. BAUMGARTEN:  Respectfully, I think the
12  names of who he's spoken to would not be privileged
13  given that's the sort of information --
14           MR. BANDLOW:  That's not the preface of your
15  question.  You can ask him who he has spoken to about      10:02:41
16  issues of document retention and preservation.  There's
17  no problem with that question.  But when you preface it
18  with his outside counsel, et cetera, you're getting into
19  privilege.
20           MR. BAUMGARTEN:  I'm asking who outside counsel    10:02:53
21  has spoken to.  I think it's fair to ask who outside
22  counsel has spoken to.  I'm not asking for the
23  substance.  I'm asking for --
24           MR. BANDLOW:  The only way he would know who
25  outside counsel has spoken to would be by outside          10:03:02
```

45

CERTIFIED COPY

1  counsel informing him, which would reveal

2  communications.  It is an improper question.

3        I'm instructing him not to answer.

4        MR. BAUMGARTEN:  I mean, it's also possible he

5  would have an independent basis for knowing without          10:03:21

6  having talked to you.  And if he only knows through you,

7  I'm fine with that objection, if that's what you're

8  instructing.  But I think it's fair to at least ask him

9  whether he has an independent basis to know.

10       MR. BANDLOW:  If what you want to do is depose      10:03:34

11  me and ask me who we've dealt with on document

12  preservation issues, knock yourself out.  Serve that

13  depo notice.  But until you do that, no.  He's not going

14  to answer that particular question.  If you want to

15  rephrase it better, you can.                               10:03:47

16   Q.   BY MR. BAUMGARTEN:  So, Mr. Macys [sic],

17  without revealing any --

18       MR. BOYLE:  It's Mr. Shayan.

19   Q.   BY MR. BAUMGARTEN:  I'm sorry.  Mr. Shayan, I

20  apologize.

21       Mr. Shayan, without revealing any information

22  that your attorneys have told you, do you have any

23  independent basis, apart from what your attorneys have

24  told you, to know whether or not your attorneys have

25  spoken to any employees about document preservation or    10:04:11

46

```
 1    document collection?

 2        A.    Completely confusing question.  So let's do it

 3    one more time.

 4        Q.    Sure.

 5              I want you to put aside anything you know          10:04:23

 6    through your attorneys.

 7              And the question is:  Do you have any knowledge

 8    of whether your attorneys have talked to any of your

 9    employees about the collection or preservation of

10    documents?                                                  10:04:34

11              And if you only know from your attorneys, don't

12    tell me.  But if you know on your own --

13        A.    I have no idea.

14              Actually, if the question clearly is has my

15    attorney spoken to my employees?  Is that your question?    10:04:50

16    The answer would be no.  Absolutely not.

17        Q.    Okay.  Thank you.  Let me ask a slightly

18    different question.

19              Can you -- are you aware that your attorneys

20    have produced some documents, in other words, turned        10:05:12

21    over some documents to us in this matter?

22        A.    Yes.

23        Q.    And those documents presumably came from

24    somewhere on your servers or systems, correct, or your

25    files?                                                      10:05:27
```

47

 1      A.   Uh-huh.

 2      Q.   Okay.

 3           Can you tell me all the locations that

 4   documents were collected from for review?

 5           Where did the documents come from?                    10:05:36

 6      A.   I couldn't tell you, because we -- our

 7   Lithuanian team produced them as we were asked, and I

 8   sent the requests that you guys gave us over to

 9   production.  Then when it came back, I reviewed them and

10   then sent them over.                                          10:06:04

11      Q.   So you're -- you're not personally sure of the

12   sources of the documents that have been --

13      A.   Sources meaning exactly what?

14      Q.   Well, let's -- sure.  Let's start.

15           Are you clear of the "sources," meaning           10:06:14

16   locations, of documents that have been searched in order

17   to locate --

18      A.   Locations as in physical or server locations?

19      Q.   So I understand you know that something in

20   Lithuania was searched and something in Russia perhaps.      10:06:27

21   I'm talking about server locations.

22           Are you aware of what server locations were

23   searched?

24      A.   Of course.

25      Q.   Okay.  What were those locations?                    10:06:38

                                                              48

**Abrams, Mah & Kahn**

CERTIFIED COPY

1      A.   Amazon.  We are on an Amazon Cloud, and there

2  is no physical machines for me to tell you anything.  So

3  we're on a huge Amazon Cloud sitting next to the Netflix

4  in Canada.

5      Q.   All right.                                          10:07:00

6      A.   So we went down when Netflix Canada went down

7  for three hours.

8      Q.   Okay.

9           And do you know whether the Amazon -- were

10 there any other locations other than this Amazon Cloud    10:07:13

11 that were searched?

12     A.   No.

13          For the last several years we've been on a

14 cloud.  Previous to that we were in Texas.  That's

15 pretty much it.                                            10:07:27

16     Q.   Okay.

17          Do you know how this Amazon Cloud, how this was

18 searched?

19          In other words, was it searched using search

20 terms electronically?                                      10:07:35

21          Was it searched manually by someone clicking

22 through documents?

23     A.   I have no idea how to get into a server, for

24 the fifth time.  I have no knowledge of servers.

25     Q.   So you have no knowledge of what your employees  10:07:48

49

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1    did to search the servers?
 2         A.    That is not what I said.
 3              You asked me, "Do you know how it was
 4    searched?"  My response was I don't have the knowledge
 5    to go into servers, nor how they are searched.          10:08:03
 6              I didn't say I have no knowledge of what my
 7    employees do.  I said I do not have the -- myself the
 8    information of how it's done.
 9              But I believe 100 percent in the capability of
10    my employees, and please do not put them down or        10:08:28
11    constantly think they're unsupervised, because . . .
12    done.
13         Q.    Okay.
14         A.    This company did $3 million plus in sales, and
15    you're constantly saying it's unsupervised.             10:08:47
16         Q.    Mr. Shayan, I certainly do not mean to offend
17    you or your employees --
18         A.    Got it.
19         Q.    -- but I do need to ask the question directly.
20         A.    I appreciate it.                             10:08:55
21         Q.    You know that your employees performed searches
22    of the Amazon server.  And what I'm asking is whether
23    you can tell me any more details about those searches
24    beyond that they were done.
25         A.    They performed it, produced it, handed it to  10:09:11
```

50

CERTIFIED COPY

```
 1   me.  I checked, make sure they're relevant to your

 2   questions, handed it over, you got them.

 3       Q.   But you do not know exactly what they did?

 4            You trust them, but you don't know exactly what

 5   they did; correct?                                    10:09:25

 6       A.   They did a search.

 7            But if you're asking me how they do a search on

 8   a server versus a normal computer, I don't know.

 9       Q.   I'm not asking for the technical details.  I'm

10   asking you what you know in terms of whether the        10:09:38

11   searches were electronic or manual, for instance.

12            Did they --

13       A.   You can't manually search a server.

14       Q.   Let me rephrase.

15            Whether they ran search terms or whether they,   10:09:48

16   for instance, just clicked through documents one by one.

17            Do you have any sense of --

18       A.   In the server there's no documents.  So

19   every -- everything is files.  Okay?  So I'm not -- is

20   this -- I'm not sure what your question is.             10:10:04

21            But whatever they did was there live preserved.

22   I'm not sure.  Is this a trick question?  I don't

23   understand the question.

24       Q.   I assure you it's not a trick question.

25       A.   Okay.  Can I take a break?                     10:10:22
```

51

CERTIFIED COPY

```
 1              MR. BAUMGARTEN:  Sure.
 2              THE WITNESS:  Thank you.
 3              THE VIDEOGRAPHER:  Off record, 10:10 a.m.
 4         This concludes tape No. 1.
 5              (Recess taken from 10:10 a.m. to 10:18 a.m.)      10:10:35
 6              THE VIDEOGRAPHER:  This begins tape No. 2 in
 7    the videotaped deposition of Kevin Shayan, taken at
 8    725 South Figueroa Street, 31st floor, Los Angeles,
 9    California on September 29th, 2016.
10              My name is Jeannie Schwarze with Dean Jones       10:18:53
11    Legal Videos, Inc. out of Santa Ana, California.
12              Returning to record, 10:19 a.m.
13         Q.   BY MR. BAUMGARTEN:  Mr. Shayan, let me move to
14    a new topic.
15              What websites does Apartment Hunters,            10:19:10
16    Incorporated own or operate?
17         A.   We own apartmenthunterz.com.
18              We own featuredrentals.com.
19              We own wetakesection8.com.
20              We own ifindrentals.com.                         10:19:34
21              We own foreclosureplaces.com.
22         Q.   What about 4rentinla.com?
23         A.   4rentinla.com is a website we owned, and we've
24    turned it off, but the domain is ours.
25         Q.   When did you turn it off?                        10:20:02
```

52

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
1      A.   A long time ago.  This is previous to the suit.

2      Q.   Do you know if it was prior to October of 2015?

3      A.   Yes.

4           It was prior to October of 2015.

5      Q.   4rentinnewyork.com?                                    10:20:41

6      A.   We owned that website, as well, and it was shut

7  down, and it was shut down prior to October of 2015.

8      Q.   What happens if someone goes to

9  4rentinnewyork.com right now?

10     A.   We decided to merge all the baby sites into       10:20:59

11 featuredrentals.com.

12     Q.   So if someone goes to that website, it

13 redirects them?

14     A.   Yes, sir.

15     Q.   leaseinsandiego.com?                               10:21:12

16     A.   The same.

17          We -- these were regional sites that we had

18 prior to going national.

19     Q.   rentinsanfrancisco.com?

20     A.   Again, that's the same one.  Redirects them to    10:21:25

21 featuredrentals.com.

22     Q.   ineedtomove.com?

23     A.   ineedtomove.com is a domain that we owned, and

24 that also just takes you to, I believe, apartmenthunterz

25 or featuredrentals.  I'm not sure.                         10:21:44
```

53

CERTIFIED COPY

```
 1        Q.   findforeclosuresnow.com?

 2        A.   findforeclosuresnow.com was a domain name that

 3   we started our foreclosure website with and later on I

 4   found a better name, which is foreclosureplaces.com.

 5   They both are going to the same web page.                    10:22:10

 6             MR. BAUMGARTEN:  Let me show you a document.

 7             I'm going to mark this as Exhibit 5.  And this

 8   is a document produced by your attorneys with Bates

 9   stamp AHI-000188.

10             (Exhibit 5 was marked for identification.)        10:23:01

11        Q.   BY MR. BAUMGARTEN:  This is -- have you seen

12   this document?

13        A.   It was produced by who?

14             MR. BANDLOW:  By us.

15             THE WITNESS:  By you?  Uh-huh.                     10:23:06

16             And what domain is it for?

17        Q.   BY MR. BAUMGARTEN:  If you skip to the second

18   page, you'll see it's the back of your first page.

19             See at the very top it reads "Domain Name:

20   apartmenthunterz.com"?                                      10:23:21

21        A.   Uh-huh.  Okay.

22        Q.   And I'll represent that your attorneys produced

23   this document to us on June 1st, 2016.

24             Have any changes been made to the registration

25   for this particular website since --                        10:23:36
```

54

CERTIFIED COPY

```
 1        A.    No, sir.

 2        Q.    So if I looked up the current registration

 3   info, it would look the same?

 4        A.    Correct.

 5             MR. BAUMGARTEN:   Okay.  Let me show you another     10:23:46

 6   document then.

 7             THE WITNESS:   Actually, this -- if any changes

 8   were made to this document, it would have been changed

 9   by Dennis, and I would not have any knowledge of it.

10             MR. BAUMGARTEN:   Okay.                              10:24:08

11             THE WITNESS:   So if the changes were made --

12   again, this is an area that I would not have changed.

13             MR. BAUMGARTEN:   Sure.  Let me show you another

14   document.  I'll mark this Exhibit 6.

15             THE WITNESS:   I stand corrected, because this       10:24:29

16   is not an area that I would also go in.

17             MR. BAUMGARTEN:   Sure.  And this is Exhibit 6.

18             (Exhibit 6 was marked for identification.)

19        Q.    BY MR. BAUMGARTEN:   I apologize that it looks

20   like the bottom of the document has not -- it looks like    10:24:41

21   only the first two pages printed, but I'm going to focus

22   my questions on the first two pages anyway.  I'm happy

23   to print a full copy at the break if you think there's

24   anything missing here that's relevant.

25             But I used the same ICANN Whois lookup tool          10:24:56
```

55

CERTIFIED COPY

```
 1    that your attorneys used to produce the document marked

 2    as Exhibit 5.  And I ran this, I believe, on

 3    September 23rd.

 4          If you compare the "Registrant Contact," the

 5    name is all different.  It's now changed from --          10:25:13

 6    A.    Oh, it just became private.

 7    Q.    Right.

 8    A.    We just -- we just -- we just decided that we

 9    want the Whois private.  That's all.  A lot of companies

10    do this.                                                   10:25:28

11    Q.    And when did you decide that?

12    A.    I have no idea.

13          But, you know, some people just start

14    soliciting us on these domains to buy it or to sell us

15    some products, and we were getting apparently solicited   10:25:41

16    for products or items or search engine optimization or

17    marketing or advertising, at which point we just decided

18    to do a protection and privacy thing.

19          This is so -- this is so common on the internet

20    that -- I mean, from this you could get                   10:26:07

21    Mark Zuckerberg's address and just drive by.  So

22    everybody has it protected.

23    Q.    Okay.

24          But you made the change between June 1st and

25    September 23rd; correct?                                  10:26:21
```

56

1    A.   I assume.  I didn't do the physical typing and

2  going into the domain place and changing it.

3    Q.   But you told Dennis to make the change?

4    A.   I didn't tell him.  I just corrected myself

5  that if changes were made, they weren't made by me.          10:26:32

6    Q.   Sorry, they were made by you?

7         MR. BANDLOW:  Were not.

8         THE WITNESS:  They were not made by me,

9  so . . .

10   Q.   BY MR. BAUMGARTEN:  So you don't -- you don't     10:26:41

11  know -- you don't know why -- I mean, do you know

12  specifically -- let me strike that.

13       Did you discuss this change with Dennis between

14  June 1st and September 23rd?

15   A.   No, sir.                                           10:26:56

16   Q.   Did you know if any other registrations have

17  changed for domains that Apartment Hunters, Incorporated

18  had --

19   A.   If I didn't discuss it on apartmenthunterz.com,

20  which is one of our main domains, I would not have       10:27:09

21  discussed it with him on any other ones.

22   Q.   We have talked about a lot of different domain

23  names.  I understand that a lot of them just redirect to

24  one of your main sites.

25       Do you have a sense of about how many domain       10:27:28

57

Abrams, Mah & Kahn

CERTIFIED COPY

1   names are registered to the company?

2       A.   I don't have an exact number.

3       Q.   Ballpark?

4       A.   I don't know.

5            MR. BANDLOW:  Don't speculate.  You know or you          10:27:40

6   don't know.

7            THE WITNESS:  I don't know.

8            MR. BAUMGARTEN:  Okay.  Let me show you another

9   exhibit.  I'll mark this as Exhibit 7.

10           This is from a website called Viewdns.info.com.        10:27:59

11   And this is Reverse Whois results for info at

12   apartmenthunterz.com.

13           (Exhibit 7 was marked for identification.)

14      Q.   BY MR. BAUMGARTEN:  So in other words, what

15   we've done is we've done a lookup for any website where        10:28:17

16   the email that it's registered to is

17   info@apartmenthunterz.com.

18      A.   Uh-huh.

19      Q.   So let me start by asking you,

20   info@apartmenthunterz.com, I assume that's an email           10:28:31

21   that your company controls?

22      A.   Uh-huh.

23      Q.   And so this has 95 domains registered to you.

24           Does that seem roughly -- I know you don't know

25   for sure, but roughly?                                        10:28:41

58

CERTIFIED COPY

1      A.   Uh-huh.

2      Q.   Okay.

3      A.   I recognize these names.  These are from the

4  1999, 2000 era that buying domain names was the thing to

5  do.                                                          10:28:56

6      Q.   Right.

7           And you see that the creation date was over a

8  number of years.  I see that.

9      A.   And a lot of them have dropped off and not

10 renewed.                                                     10:29:05

11     Q.   Okay.  Well, let me ask you a question here

12 about one of the names on here, one of the domains.

13          I don't know exactly what number it is, but

14 it's apartmenthunterz -- with a z -- .info.  So it's

15 right below apartmenthunterz -- sorry,

16 apartmenthuntersnewyork.com.

17          Do you see apartmenthunterz.info?

18     A.   Yeah.

19     Q.   And so that's a web -- that's a domain

20 registered to you?                                           10:29:33

21     A.   Yes.

22          MR. BAUMGARTEN:  Okay.  Let me show you another

23 document.  I'll mark this as No. 8.

24          This is a -- I'll represent that this is a

25 screen shot of what happened when I tried to go to that     10:29:55

59

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1    website because I was curious.
 2            (Exhibit 8 was marked for identification.)
 3       Q.   BY MR. BAUMGARTEN:  It looks like this is a --
 4       A.   Right.
 5       Q.   -- password-protected website; correct?          10:30:07
 6       A.   100 percent password protected.
 7       Q.   And is this a website that you have a user name
 8    and password to?
 9       A.   100 percent.
10            And this is a website you will never have the    10:30:18
11    user name and password to.
12       Q.   I'm not going to ask for your user name and
13    password.
14            I am going to ask, though, who has user names
15    and passwords to this website?                           10:30:26
16       A.   You will not get that either.  This is a
17    sandbox where we actually do development under, and this
18    is where we test our stuff, and this is where beta mode
19    happens, and this is where even Google crawlers don't go
20    to.                                                      10:30:54
21       Q.   Okay.
22       A.   So good luck.
23       Q.   Is the information at this website, is that
24    also stored on the Amazon --
25       A.   Yes.
```

CERTIFIED COPY

1      Q.    -- Cloud?

2      A.    Yes.

3      Q.    Have steps been taken to preserve the

4  information that one would access by going through this

5  website?                                                      10:31:14

6      A.    The stuff here is not related to anything here

7  (indicating).

8      Q.    Okay.  But --

9      A.    This is all new development, and it's not even

10  been made live.  It's just in beta format.                    10:31:23

11      Q.    I understand.

12      A.    And it's not been presented to the public.

13            Assume this as the futuristic drones that

14  Amazon claims is going to fly and bring your packages.

15  This is not related to this case.                             10:31:46

16      Q.    I understand that's your position, but --

17      A.    But it's on the Amazon Cloud, and since it's in

18  development, it was preserved, obviously, because it's

19  still being -- in its initial baby stages.  The answer

20  is yes.                                                       10:32:03

21      Q.    Are there -- so this Amazon Cloud drive, the

22  website data is stored there for --

23      A.    Everything is stored there.

24      Q.    Photographs?

25      A.    Everything.                                         10:32:24

61

1    Q.   Are there any other cloud drives that you use,

2    or it's just this Amazon Cloud?

3    A.   Amazon.  I mean -- yeah, Amazon.

4    Q.   Within this Amazon Cloud, do you know whether

5    the data for the different websites, so in other words,          10:32:46

6    apartmenthunterz.com versus featuredrentals.com, is the

7    data for both those websites and any other websites

8    stored all together or is it separated --

9    A.   I have --

10   Q.   -- in some way?

11   A.   -- zero server knowledge, ninth time.

12   Q.   Do you know, is Amazon Web Services the

13   corporate name of who you contract with for the Amazon

14   Cloud?

15   A.   I believe so.                                               10:33:21

16   Q.   And your website that states

17   apartmenthunterz.com, is that also hosted by the

18   Amazon Cloud or the Amazon Web Services or is there

19   another host for that?

20   A.   It's hosted by Amazon.                                      10:33:42

21   Q.   And I assume, then, that Amazon owns all of the

22   servers and IP addresses and everything else that are

23   used to make your websites function; right?

24        You're essentially renting space on those?

25   A.   Amazon owns their cloud obviously.  Right?                  10:33:59

62

CERTIFIED COPY

1      Q.   Upon receiving the complaint in this case in

2   December, did Apartment Hunters send a litigation hold

3   letter to Amazon or to the Amazon Web Services?

4      A.   No.

5      Q.   Have any steps been taken to inform Amazon to          10:34:24

6   preserve data?

7      A.   We took care of that ourselves, so, no.

8      Q.   Are you aware that in the discovery in this

9   case that we have asked Apartment Hunters to identify

10  the sources from which it obtains listings, photographs,      10:35:12

11  and all of its website information?

12     A.   Uh-huh.

13     Q.   And your attorneys on your behalf -- or on

14  Apartment Hunters' behalf provided the answer that --

15  and I'll read this quickly, that the company obtains          10:35:30

16  listings from up to a hundred different partner feeds,

17  but then listed seven entities in particular.

18          Does that sound correct?

19     A.   Seven, but constantly we are getting more and

20  more partners since we've attended other trade shows.         10:35:52

21  But, yes.

22     Q.   So let me ask about those that were listed.

23          RentPath, that's -- I think that's apparently,

24  I guess, the umbrella for apartmentguide.com,

25  rentals.com, and mynewplace.com?                              10:36:16

63

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1        A.    Right.

 2        Q.    And so when the company gets incoming feeds

 3   from RentPath, what is the -- the file format?

 4              How does that come in?

 5        A.    I believe it comes in an XML format, but each      10:36:24

 6   one of one -- again, this area, I cannot open the feed.

 7   I cannot see how many listings.  And when I open the

 8   XML, it's all garbled.  I have -- I don't know how to

 9   open a zip file pretty much.

10              So what happens is that comes directly to the     10:36:45

11   guys.  And the four people that I mentioned earlier are

12   in charge of checking it, making sure it's good, and all

13   of that.

14              But I believe it comes in an XML file.

15        Q.    And do you know whether the listing information   10:37:01

16   and data and photos come all together in one feed or if

17   it's separate?

18        A.    I don't know that.  I don't know if the photos

19   come separately.

20        Q.    Do you know how often the feeds will come in?     10:37:16

21        A.    Yes.

22              They come daily.  Twice a day sometimes.

23        Q.    And do you know whether the data is effectively

24   an entire new set of data each day or --

25        A.    It's new, completely brand-new data.             10:37:32
```

1      Q.   Okay.

2           And does that replace the old data, or is it

3    just additions and subtractions?

4      A.   No.  It replaces the old data.

5      Q.   Okay.                                           10:37:45

6           And those answers that you just gave as to

7    RentPath, would those also be true as to Dominion

8    Enterprises?

9      A.   Yes.

10     Q.   And also true as to ListHub?                    10:37:55

11     A.   Oh, ListHub, it comes four times a day, five

12   times a day, every hour, and that's very time sensitive.

13     Q.   And each of those, with ListHub again, it's

14   entirely new or replaces the old data, not just the --

15     A.   And photos get replaced and, yes, time stamps,   10:38:15

16   and all of that.

17     Q.   Okay.

18          One of the other websites that was listed on

19   the company's behalf is onsite.com.

20          What is onsite.com?                              10:38:31

21     A.   I believe that this company is a little

22   platform that goes to the management companies and helps

23   them make a feed for them.  Smaller companies that

24   cannot take their data and make a feed, this guy, this

25   corporation helps them, I believe.                      10:39:01

65

**Abrams, Mah & Kahn**

CERTIFIED COPY

1    Q.   So they actually do send you incoming data --

2    A.   Yes.

3    Q.   They'll send you, perhaps, XML feeds and --

4    A.   Oh, yes.   I believe, yes.

5    Q.   Have you -- has Apartment Hunters asked                    10:39:09

6    onsite.com to preserve any of the feeds that they sent

7    you?

8    A.   No.

9         Once they send us, it's our job to put it up.

10   Q.   Okay.                                                      10:39:22

11        Has Apartment Hunters asked RentPath to

12   preserve anything they've sent you?

13   A.   Why would they preserve what they've sent?

14   That's their internal system.   I don't -- I cannot order

15   anybody outside of our company to do anything.                 10:39:33

16   Q.   You can request that they do.

17   A.   The answer is no.

18   Q.   Is the answer also no as to Dominion

19   Enterprises?

20   A.   The answer is no on all of them.   I don't run            10:39:43

21   their companies.

22   Q.   And ListHub, as well, the answer is no?

23   A.   No.

24        MR. BANDLOW:   Asked and answered.   He said as

25   to all of them.   But you can ask again.                       10:39:54

66

CERTIFIED COPY

```
 1          MR. BAUMGARTEN:  I don't want to ask a compound

 2   question.  I'm just trying to make sure we're not losing

 3   anything.

 4      Q.   Let me ask about another company that was

 5   listed, rentalutions.com, r-e-n-t-a-l-u-t-i-o-n-s.com.        10:40:03

 6          Do you know what that website is?

 7      A.   I'm not familiar with that.  Vidmantas works

 8   with them.  So he is the manager of getting these

 9   relationships.  I know a few that I know, but the rest

10   of them, the relationships are with Vidmantas.              10:40:24

11      Q.   Do you know showmojo.com?

12      A.   I dealt with them for about a week initially

13   when they came on.  But again, we hired Vidmantas to be

14   in charge of affiliates, partners, negotiations.

15      Q.   What does showmojo.com do, do you know?           10:40:45

16      A.   ShowMojo does the same thing I explained

17   earlier.  It goes to the management companies.  And IT49

18   there is the same.  These are little corporations that

19   go to the management companies, charge them a small fee,

20   and help them to make XML files.                          10:41:03

21      Q.   And has Apartment Hunters asked either ShowMojo

22   or IT49 --

23      A.   No.

24      Q.   I need to finish the question.

25      A.   Got it.
```

67

**CERTIFIED COPY**

1      Q.   Has Apartment Hunters asked ShowMojo or IT49 to

2  preserve what they're sending you?

3      A.   No.

4      Q.   Okay.  Thank you.

5           So these feeds that come in, and why don't we          10:41:27

6  take RentPath as an example.  These feeds that come in

7  once a day, twice a day, are they preserved when they

8  come in?

9           So you've got one in, and then as soon as you

10  get the new one in, what happens to the prior one on      10:41:41

11  your system?

12      A.   It gets overwritten.

13      Q.   So there is -- at any time your systems only

14  have one feed per --

15      A.   Correct.                                          10:41:53

16      Q.   -- source?

17           And that's continued to be the policy even

18  after receiving the complaint in this litigation?

19      A.   Correct.

20           Let me clarify.  The company has backups.  So    10:42:07

21  I am not savvy if all the servers were to crash what

22  backup Dennis or Vid would put up and how that plays

23  into the feeds and which feed would be put up.  But

24  that's a tricky question.  And I don't have knowledge of

25  that.                                                       10:42:46

68

CERTIFIED COPY

```
 1          So asking me if we killed the feed of yesterday

 2    or today or we have one week of backup, because we

 3    usually do keep backups up to a week, if the server blew

 4    up and caught on fire.  But this is a technical question

 5    I couldn't really answer, and it's walking a fine line      10:43:08

 6    going too technical into the server base.

 7          So I just want to be clear that when you ask me

 8    what happens with the feeds, I can reply to you that in

 9    a normal arena it replaces yesterday's feed, but in the

10    back end, the answer is if there was a situation where      10:43:30

11    the servers just died, our system replicates and brings

12    back historic information up to, I guess, a few days,

13    so . . .

14       Q.   Okay.  So you --

15       A.   I just want to be clear that not everything       10:43:52

16    dies, because we do have backups.

17       Q.   Sure.  And I understand that you're not

18    100 percent sure.

19          But to the best of your knowledge, it sounds

20    like it's a few days or maybe a week that it is backed     10:44:06

21    up.

22       A.   Yeah.

23          I don't have that knowledge.  It's just left --

24    I interviewed these people 13 years ago, and they've

25    been there 13 years, and that's in their hands.            10:44:18
```

69

CERTIFIED COPY

```
 1              (To Mr. Bandlow) Are you okay?

 2              MR. BANDLOW:  Yes.  I'm fine.

 3              THE WITNESS:  (To Mr. Bandlow) I'm checking on

 4    you.

 5              MR. BANDLOW:  No worries.

 6         Q.   BY MR. BAUMGARTEN:  So let me ask you two

 7    questions about the backups.

 8              Where are the backups?

 9         A.   See --

10         Q.   You don't know where --                      10:44:40

11         A.   I have no idea, and I'm assuming that such a

12    thing exists.  So again, I don't even know if they're

13    backed up.  I don't know if they replicate themselves.

14    I don't know if they're cloning.  I've heard the word

15    "cloning" come from Dennis, that the second they die    10:45:03

16    they clone themselves.  But I cannot give you any of

17    this information because I don't know.

18         Q.   And I'm just asking for your knowledge as to

19    each of these things.

20              So a related question is:  Do you know whether 10:45:16

21    these backups have been -- to the extent they exist,

22    have been searched in connection with this litigation?

23         A.   Yes.  And -- yes.

24              We have -- we have opened up every single door

25    and preserved, and opened up every single door and      10:45:35
```

70

```
 1    searched.  We've actually scrubbed.
 2            MR. BAUMGARTEN:  Let me show you a document.
 3            This will be marked as Exhibit 9.  And this is
 4    the "Declaration of Kevin Shayan in Support of
 5    Defendants' Opposition to Plaintiffs' Motion to Compel         10:46:30
 6    Production of Documents."
 7            (Exhibit 9 was marked for identification.)
 8       Q.   BY MR. BAUMGARTEN:  So I believe if you look
 9    toward the end of this, you'll see your signature.
10       A.   (The witness reviews a document.)                      10:46:51
11       Q.   I assume you reviewed this document before
12    signing it?
13       A.   (Witness nods head up and down.)
14       Q.   Sorry.  I need a verbal response.
15       A.   Yes, sir.                                              10:47:01
16       Q.   Thank you.  So why don't we jump to
17    paragraph 6.  So you write:
18            "... I arranged for the immediate
19            preservation of a copy of the property
20            listings identified by CoStar as containing           10:47:15
21            appropriated material.  However, I do
22            not believe that any of the images
23            identified by CoStar in its complaint
24            were on Apartment Hunters' website in
25            December 2015 when Apartment Hunters was               10:47:25
```

71

1          notified of the allegations."

2      A.    Right.

3      Q.    So now, when you say "arranged for immediate

4  preservation," is that a reference to what we've talked

5  about today, your call to Mr. Macys and Mr. Portnov?          10:47:36

6      A.    Yes, sir, and a phone call thereafter.

7      Q.    Okay.

8            And when was the second phone call?

9      A.    No, the first phone call.

10     Q.    The first phone call.

11     A.    Immediately after the email, and the email I

12  don't have here.  Unfortunately, I also left my phone in

13  the car.  But we have an email with the date and all of

14  that.

15     Q.    I see.  So there's an email and a call?          10:48:00

16     A.    And a call immediately after, and I explained

17  that I even went down the chain of employees.

18     Q.    Okay.  I'm sorry, you went down the . . .

19     A.    The chain even to the seven ladies that don't

20  have anything to do with the listings, and I made sure          10:48:17

21  the whole company knows.

22     Q.    You emailed all of them; correct?

23     A.    No.

24            I emailed to Dennis and Vidmantas that subject

25  line, "Our New 2016 Legal Challenge," and I asked them          10:48:30

                                                                 72

CERTIFIED COPY

1    to even tell the team of four -- the other team of four,

2    down to the customer support.  Nobody touches anything.

3        Q.    So I want to just -- looking at this statement

4    here, I just want to understand it.

5            You say that you arranged for the immediate          10:48:51

6    preservation of the listings identified by CoStar, but

7    then you also say that you don't believe any of the

8    images identified by CoStar were on the website.

9            So I'm trying to understood what was preserved

10   in that case.  It seems like you're saying that you          10:49:11

11   tried to preserve a certain set of listings, but you

12   couldn't find them?

13       A.    No.  You're just trying to make this -- twist

14   this.

15           I looked at the photos, and by our demeanor,          10:49:23

16   okay, and your earlier question of what is scraping, it

17   is not a practice we do.  And the photos that were

18   there, in my eyes, there were exterior photos and normal

19   photos to me that could not be copyrighted, in my first

20   view, and that's what I said.  I don't think these were      10:49:51

21   on our site.

22           And I would put my life on it that we received

23   them from a feed and that proved to be.  When we went to

24   look for them, we have found them now in a feed.  And

25   that is my declaration.                                      10:50:14

73

CERTIFIED COPY

 1          So we did not scrape them, and my declaration

 2     is 100 percent correct.  We have the photos, all except

 3     two I couldn't locate any feed.

 4          Q.   So when did you find these photos?

 5          THE WITNESS:  Lincoln, you got them like a few            10:50:40

 6     days ago; right?

 7          MR. BANDLOW:  Yes.

 8          THE WITNESS:  We're done searching for them,

 9     and we have them, except two I couldn't locate, all from

10     a legitimate agreement with those companies.                  10:50:50

11          Q.   BY MR. BAUMGARTEN:  So let me start with,

12     which -- which company was it that had given you --

13          A.   I don't -- I'm not going to get into it in this

14     depo, but we're going to present it to you, that those

15     photos, whether exact or not, were found -- those          10:51:14

16     buildings were found with the photos and located.

17          Q.   So your testimony is that you know which feeds

18     the photographs that CoStar has identified came from,

19     you discovered that last week, but you're not --

20          A.   I'm not going --

21          Q.   -- going to tell me?

22          A.   -- to give testimony on something that hasn't

23     been presented yet.  So I'm not going there.

24          MR. BANDLOW:  We have to put the information

25     together for you to produce it to you.  We're in the         10:51:51

                                                                  74

CERTIFIED COPY

```
 1    process of doing that.
 2            MR. BAUMGARTEN:   Okay.
 3       Q.   Will you tell me whether it was from --
 4       A.   No.
 5       Q.   -- just one web source or multiple?          10:52:08
 6       A.   No.
 7       Q.   Let me just go back to paragraph 6.  I truly am
 8    just trying to understand.
 9            At the time in December 2015, am I correct that
10    you had not been able to find any listings initially in   10:52:29
11    December 2015?
12       A.   Uh-huh.
13       Q.   You did not find any listings; correct?
14       A.   Uh-huh.
15            MR. BANDLOW:   Yes or no.
16            THE WITNESS:   No, no, no, no.
17       Q.   BY MR. BAUMGARTEN:   You did not find any?
18       A.   Right.
19       Q.   Okay.
20            And so what was actually preserved in December   10:52:41
21    2015 if you couldn't find any of the listings?
22       A.   The lawsuit was originally served, I believe,
23    two months -- there's a two-month gap almost between
24    when it was served . . . I don't understand your
25    question exactly.                                          10:53:11
```

75

CERTIFIED COPY

```
 1        Q.   Sure.  Let me try to clarify.

 2             My understanding is that Apartment Hunters has

 3   only in the last week identified or found on its -- the

 4   cloud or on servers the listings that CoStar identified

 5   in its complaint; is that correct?                          10:53:30

 6        A.   Right.

 7        Q.   And you've also stated that certain things were

 8   preserved in December?

 9        A.   Right.

10        Q.   And so I'm trying to figure out, if you didn't   10:53:39

11   find the listings till last week, what specifically was

12   preserved --

13        A.   Everything that --

14        Q.   -- last December?

15        A.   Everything that was mentioned in the original    10:53:48

16   lawsuit, and the listings that later came.  Your later

17   filings is what we preserved, and other stuff that was

18   mentioned in the original suit, we have kept constantly

19   going on.

20             But specifically December 2015 was just the      10:54:10

21   general complaint.  After that you asked for more

22   detailed stuff that we started to preserve.  But as a

23   practice, we don't do any digital or physical

24   destruction.

25             MR. BAUMGARTEN:  Let me show you what we'll      10:54:34
```

76

CERTIFIED COPY

```
 1   mark as Exhibit 10.

 2            (Exhibit 10 was marked for identification.)

 3        Q.   BY MR. BAUMGARTEN:  This is Exhibit 8 to the

 4   complaint, it was filed along with the complaint.

 5        A.   Uh-huh.                                              10:54:52

 6        Q.   And this includes roughly 26 different

 7   listings, I believe, that encompass somewhere in the

 8   90s.  I don't know the exact number of photographs.

 9        A.   Uh-huh.

10        Q.   Did you see this in December when we first       10:55:09

11   served the complaint?

12        A.   Uh-huh.

13        Q.   I'm sorry, I need "yes."

14            MR. BANDLOW:  Say "yes" or "no."

15            THE WITNESS:  Yes, yes, yes.

16        Q.   BY MR. BAUMGARTEN:  Sorry about that, but I --

17        A.   No.  I was looking -- I apologize.

18        Q.   No.  That's fine.

19            So these listings that you got in December --

20        A.   Yes.                                              10:55:29

21        Q.   -- how were these preserved?

22            What was done to preserve these specifically?

23        A.   These listings, when we went to get them, these

24   photos were not there.  When we pulled up these URLs, we

25   had either floor plans there or a different photo there. 10:55:53
```

                                                            77

CERTIFIED COPY

1      So by the time that you had served us and you

2   had pulled up these URLs, first of all, the listing ID

3   numbers had changed, and we couldn't open these URLs.

4   Secondly of all, these photos were not on your site

5   anymore.  So we couldn't pull up these photos.          10:56:19

6      Q.   I understand that.

7           So my question is:  What was preserved, then,

8   in December?

9           I understand that you couldn't -- because you

10  couldn't pull up the photos, you couldn't preserve      10:56:28

11  them --

12     A.   Right.

13     Q.   -- but what was preserved?

14     A.   We had to go -- I'm not -- we started to

15  preserve our entire back end of listings, photos not to  10:56:37

16  be overwritten until we can go and look for what you're

17  asking for.  So if we had these photos in the past, they

18  would have been overwritten with new stuff.

19          So when you served us in December, all

20  processes were turned off.  That's preservation.  But   10:57:02

21  when I went in to look for these immediately after I got

22  the suit, these photos we didn't have.  They were

23  replaced already.

24     Q.   So you've also written, and this is at

25  paragraph 8 of the same -- of your statement, your      10:57:22

78

CERTIFIED COPY

```
 1    declaration, you wrote that you "froze the listings at
 2    issue."
 3        A.   Yes.
 4        Q.   Those were these issues -- these listings?
 5        A.   Yes.                                              10:57:31
 6             But at the time they had already changed.
 7        Q.   I understand that.
 8        A.   See, what happens, the second it becomes
 9    midnight, 12:01, these listing IDs change.  They get
10    refreshed.                                                 10:57:45
11        Q.   Every day?
12        A.   Yeah.  Of course.  There's a new session, a new
13    cookie.  It opened you up for error HTTP 404.
14             (To Mr. Bandlow) We did this, right, Lincoln?
15             MR. BANDLOW:  Uh-huh.                             10:58:07
16        Q.   BY MR. BAUMGARTEN:  And you did this -- you did
17    this once on -- in December after you took a snapshot of
18    the website on that day after we sent this to you;
19    correct?
20        A.   I didn't take a snapshot.  I went killing        10:58:12
21    myself to open these, and the ones I opened did not have
22    any of these images.  So we didn't have these photos.
23        Q.   Okay.
24             So if you didn't have the photos, which I
25    understand --                                             10:58:33
```

79

CERTIFIED COPY

```
 1        A.    Uh-huh.

 2        Q.    -- I'm trying to understand exactly what was

 3   done to preserve.

 4             You captured the website as it existed on that

 5   day?                                                        10:58:43

 6             What did you do exactly?

 7        A.    We didn't have to capture the website as it is

 8   that day.  We stopped any processes that would actually

 9   remove listings, remove photos, replace photos, or

10   feeds --                                                    10:59:01

11        Q.    So did --

12        A.    Allow me to finish.

13        Q.    Sure.

14        A.    -- replace feeds, remove photos, remove

15   listings, any automated process.                           10:59:06

16             So there was no destruction process.  It would

17   just be automated processes that would clean up space

18   for us.  Right?  That's what we stopped.  That's

19   preservation.

20        Q.    You stopped the automated processes that clean  10:59:27

21   up space?

22        A.    Right.

23             So this would be -- this would eventually --

24   this is what we were earlier talking about.  If we kept

25   photos going back to 1999, as you recall earlier, we       10:59:40
```

80

Abrams, Mah & Kahn

CERTIFIED COPY

1   would need 31 floors of servers.

2       Q.   Okay.

3       A.   And then this is what we started to preserve,

4   look for, and try to see where it came from.

5       Q.   So your testimony is that you -- I understand          10:59:54

6   that you don't have every photo since 1999.

7            But you're saying that you do have every piece

8   of information since on or about December 18th, 2015?

9       A.   We are going to present photos to you once they

10  are ready.                                                      11:00:14

11      Q.   I appreciate that, but that's not my question

12  here.

13           My question is:  Has every incoming feed

14  listing since December 18th or about then been

15  preserved?                                                      11:00:31

16      A.   That relates to the fact that the photos that

17  we received were in that feed and not taken from CoStar.

18      Q.   So you have -- you've only have been preserving

19  some of the incoming feeds since December of --

20      A.   We have found --                                       11:00:50

21      Q.   -- 2015?

22      A.   -- the same property addresses with these

23  pictures in our feeds.  We have the feeds, yes.

24      Q.   Okay.  That's not my question though.

25      A.   I don't understand your question.                      11:01:02

81

```
 1        Q.   Well, I'll rephrase for --
 2        A.   And also, your question is pretty much you're
 3   trying to get earlier information before we present you
 4   with the photos.  I pretty much can't answer that until
 5   you prepare the photos and present it.                      11:01:19
 6             MR. BANDLOW:  Well, he's asking you about
 7   processes that you went through over the course of time.
 8   Obviously, we are going to produce to him the
 9   information that we have just uncovered that shows where
10   all of these came from.                                     11:01:33
11             But to the extent that he's asking you what
12   process you went through to preserve documents --
13             THE WITNESS:  Right.  We preserve --
14             MR. BANDLOW:  -- do the best you can to answer
15   his question.                                               11:01:42
16             THE WITNESS:  We preserve everything actually.
17   So when I said we've turned off every automated process,
18   so we've kept the feeds.
19        Q.   BY MR. BAUMGARTEN:  Okay.  So let me make sure
20   I understand.                                               11:01:53
21        A.   Uh-huh.  Yes.
22        Q.   Your testimony was that normally RentPath sends
23   you a feed every day or twice a day?
24        A.   Uh-huh.
25        Q.   And that the new feed replaces the old feed?      11:02:05
```

82

Abrams, Mah & Kahn

CERTIFIED COPY

```
1        A.    Uh-huh.

2        Q.    That the old feed might be backed up for three

3   days to a week?

4        A.    Yes.

5        Q.    But generally the old feed is just written over    11:02:15

6   because of storage preservation issues?

7        A.    Correct.

8              MR. BOYLE:  You need to say "yes."

9              THE WITNESS:  Yes.  Sorry about that.  Yes.

10       Q.    BY MR. BAUMGARTEN:  Okay.  So if, for instance,    11:02:24

11   we went and said, "We want to see every feed that you

12   received on January 20th of 2016" --

13       A.    Correct.

14       Q.    -- you would have every feed that you have

15   received from --                                            11:02:39

16       A.    Correct, and we presented some feeds to you.

17       Q.    I'm sorry.  You presented -- I know you --

18       A.    We did send you the feeds.  We did deliver

19   feeds.  So if you asked me for the January 20th feed,

20   yes, we have it.                                            11:02:56

21             MR. BAUMGARTEN:  Okay.  Why don't we take a

22   short break.  We've been going for about 45 minutes.

23   Why don't we take a short break.

24             THE WITNESS:  We can go for a quick bite maybe?

25             MR. BANDLOW:  Yeah, when do you think we can
```

83

**Abrams, Mah & Kahn**

1  have lunch?

2          THE VIDEOGRAPHER:  Off record, 11:03 a.m.

3          (Recess from 11:03 a.m. to 11:13 a.m.)

4          THE VIDEOGRAPHER:  Returning to record,

5  11:13 a.m.                                           11:13:46

6     Q.   BY MR. BAUMGARTEN:  So, Mr. Shayan, before we

7  go back into questions, I just want to confirm that

8  you're aware that there is a protective order in this

9  case.

10         Are you aware of that?                       11:14:01

11    A.   Yes.

12    Q.   And that means that there are protections for

13 how information can be shared, and things can be marked

14 such that it wouldn't be shared beyond the attorneys of

15 my client.                                           11:14:16

16    A.   Right.

17    Q.   But your position is that you're going to

18 refuse to answer certain factual questions about, for

19 instance, the admin panel, about apartmenthunterz.com

20 info based on confidentiality concerns?              11:14:28

21    A.   Not confident- -- yes.  Some of it is confiden-

22 -- admin panel is completely proprietary stuff, so --

23         MR. BANDLOW:  And irrelevant to the lawsuit.

24 It contains no information remotely relevant to anything

25 in this lawsuit.                                     11:14:44

84

1          MR. BOYLE:  So are you representing on the

2    record that the daily reports from the coders in

3    Lithuania have been reviewed?

4          MR. BANDLOW:  What are you talking about?  The

5    daily reports that he sees on his admin?         11:14:55

6          MR. BOYLE:  Yes.  Have they been reviewed?

7          MR. BANDLOW:  What do you mean by "reviewed"?

8          MR. BOYLE:  Reviewed for responsiveness.

9          MR. BANDLOW:  That I don't know.

10          MR. BOYLE:  So you cannot make that         11:15:08

11    representation?

12          MR. BANDLOW:  I thought you were talking about

13    his back-end site.

14          THE WITNESS:  That's the back-end site.

15          MR. BOYLE:  We want to make it clear so that    11:15:15

16    there's no surprise when it happens, so we will be

17    seeking relief from the court because there's no basis

18    not to answer those questions.

19          MR. BANDLOW:  Well, I don't think he was -- I

20    don't think he was asked those questions.  I don't think  11:15:27

21    he was asked, "Did you review the -- your admin reports

22    to see if there were any communications with any of your

23    employees regarding facts relevant to this lawsuit?"

24          MR. BOYLE:  Well, he was asked preliminary

25    questions about those reports, and the record will show  11:15:43

1    that he refused to answer questions about those reports,

2    so the --

3              THE WITNESS:  That's not --

4              MR. BOYLE:  -- predicate questions you said you

5    would refuse to answer.  So we can't investigate that.          11:15:55

6    If you want to speak off the record about --

7              THE WITNESS:  There is no reporting there.

8    This is -- "I arrived at 8:00 a.m.  I worked here.

9    I worked on this."  They don't talk amongst themselves.

10             MR. BOYLE:  Would you like to speak off the           11:16:09

11   record and then we can ask those questions?

12             MR. BANDLOW:  If you want to ask him about if

13   he ever saw in his daily review of what his employees

14   were doing, anything that related to CoStar or this

15   lawsuit or anything of that nature, I'll evaluate that          11:16:21

16   question.  But just to simply say, you know, "Will you

17   produce all of the daily communications with your

18   employees" --

19             THE WITNESS:  No.  I delete it daily.  It gets

20   deleted daily.  It's like, "Boss, I came in at 8:00.            11:16:33

21   Tomorrow can I have the day off?"  It's just --

22             MR. BANDLOW:  Okay.

23             THE WITNESS:  It's just a little note page.

24             MR. BOYLE:  Okay.  So he was asked how many

25   reports were made, how often they were made, whether            11:16:44

86

1   they were backed up.  The record will reflect he refused

2   to answer.

3          If he's willing to answer those --

4          MR. BAUMGARTEN:  I can go back.

5          MR. BOYLE:  -- David can go back to those.  He          11:16:53

6   wouldn't answer whether they were backed up.  He said

7   that's confidential.

8          THE WITNESS:  No, no.  It's like a little

9   yellow sticky pad for four people.

10         MR. BOYLE:  That's nonresponsive.          11:17:05

11         We can go back to this and get an answer.  That

12  will avoid having to go to the court.

13         MR. BANDLOW:  You can ask him questions about

14  what he recalls seeing of his communications by his

15  employees --

16         THE WITNESS:  But that is --

17         MR. BANDLOW:  -- and he --

18         THE REPORTER:  Sir, you have to wait --

19         THE WITNESS:  That is the heart of the company

20  and access will never be given.

21         THE REPORTER:  I cannot report --

22         MR. BANDLOW:  We're not on the record.

23         THE REPORTER:  -- when you answer on top of the

24  other attorneys.

25         MR. BANDLOW:  We're not on the record.

87

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1              THE WITNESS:  We're not on the record.
 2              MR. BANDLOW:  We're not on the record.  We
 3    haven't been yet.
 4              MR. BOYLE:  We have been.
 5              THE REPORTER:  You are on the record.
 6              MR. BANDLOW:  When did we go on the record?
 7              You said "Before we go on the record, I wanted
 8    to clarify some things to you."
 9              THE REPORTER:  I have been on the record.  Are
10    you off the record now?
11              MR. BOYLE:  No, he didn't say, "Before we go on
12    the record."
13              MR. BANDLOW:  Okay.  That's all fine.  I don't
14    want -- so then let her be able to type again.
15              THE REPORTER:  I just want to say, sir, when
16    you interrupt them, I cannot report --
17              THE WITNESS:  We were off the record.
18              MR. BOYLE:  No, we were not off the record.
19              THE REPORTER:  I was reporting on the record.
20              MR. BAUMGARTEN:  I'm pretty sure I said,
21    "Before I ask some more questions."
22              MR. BANDLOW:  I never heard her announce that
23    we were back on the record, which happens every single
24    time a videotape recommences.
25              THE REPORTER:  She did say that.
```

88

CERTIFIED COPY

1          MR. BOYLE:  Everybody else in the room heard

2     it.

3          MR. BANDLOW:  That's fine.  Let's go off the

4     record for a moment right now, please.

5          THE REPORTER:  Sure.  Off the record?

6          MR. BAUMGARTEN:  Sure.

7          MR. BOYLE:  Sure.

8          THE VIDEOGRAPHER:  Off record, 11:18 a.m.

9          (Discussion held off the record.)

10         THE VIDEOGRAPHER:  Returning to record,          11:20:04

11    11:20 a.m.

12      Q.   BY MR. BAUMGARTEN:  Mr. Shayan, let's talk a

13    little bit about the admin panel.

14         I believe you've testified that you get reports

15    from the Lithuanian -- the employees based in Lithuania.   11:20:18

16      A.   I get notes, daily notes.

17      Q.   Daily notes, okay.

18         And you get notes from all the programmers?

19      A.   Not all.  I get notes -- I don't get notes from

20    the team leaders or the lead programmer Vidmantas.        11:20:30

21         Just every day in there, they write down a few

22    major achievements, questions, or vacation requests.  If

23    I have time to read them, I read them.  If I have to

24    leave it there, I say "@Kevin, do this."  If it's

25    something just informational, there's an X red button.    11:21:00

89

CERTIFIED COPY

```
 1    I hit it to clean it.  Because if I don't clean it, then
 2    they think I don't care, I haven't read it, and it's
 3    unmotivational, et cetera.
 4        Q.   Okay.
 5        A.   Sometimes when I'm not there, it adds up to be      11:21:16
 6    two days, three days.  I write "@Kevin, will read.  Do
 7    not move," and that's it.  It's like a square yellow
 8    sticky where they just type requests.
 9        Q.   And this is sort of the primary way that you
10    communicate with the coders; correct?                       11:21:38
11        A.   It's not a primary way.  It's just a little
12    sticky -- I keep telling you.  It's a sticky little
13    notepad.
14        Q.   I understand.
15             But you've said that you -- you never talk to       11:21:47
16    the coders on the phone; right?
17        A.   I've never spoken to them.  This is -- this is
18    just the little request page and a little "Boss, can I
19    take tomorrow off?  Can I be late, my wife is going
20    there?"  And instead of -- when Vidmantas is not            11:22:02
21    available, they write to me there, me being admin.
22        Q.   Sure.
23             So when they need to talk to you, they talk to
24    you about it through this admin panel; correct?
25        A.   Right.                                              11:22:16
```

90

CERTIFIED COPY

```
 1        Q.    Okay.
 2              And you said Vidmantas doesn't use it, and you
 3   said the team leader doesn't use it?
 4        A.    Yeah.
 5              Those guys are immune because they're pretty      11:22:23
 6   much supervisors.
 7        Q.    I'm sorry, who is the team leader, is that
 8   Vidmantas or --
 9        A.    Vidmantas, Dennis, Garmanus, the other guys
10   that are in charge of uploading.  There's a team leader     11:22:35
11   in charge of putting the listings up, feeds up, or
12   removing the listings.  There's team leaders.  So they
13   are immune.  They can pretty much come and go as they
14   wish.
15        Q.    And these notes that are left for you, you        11:22:52
16   effectively delete them as you deal with them?
17        A.    Yeah.
18              I just read them.  It's today's happenings, you
19   know, "We bought lunch for everybody," you know,
20   ta-ta-ta, and that's it.                                    11:23:07
21        Q.    And after receiving this complaint, did you
22   change your policy and start preserving these notes?
23        A.    No.
24        Q.    Is this sort of notepad the entirety of your
25   admin panel, or are there other parts to your admin         11:23:20
```

91

CERTIFIED COPY

```
 1    panel?
 2        A.   No.
 3             There's a lot more to the admin panel, but
 4    that's the proprietary workings for me of the company,
 5    and that is, again, proprietary and none of anybody's        11:23:36
 6    business.  That's like giving Samsung access to Apple's
 7    business.
 8        Q.   Okay.  I'll come back to that, but let me go
 9    back to the notepad part of it.
10             Do you ever confirm achievements that people        11:23:57
11    have made, or do you confirm the daily activities
12    they've done via that notepad?
13        A.   What do you mean confirm?  That's their job.
14    I don't have to say, "Wow, thank you," or "Good job."
15    There's no back and forth like that.                         11:24:13
16        Q.   Is there ever any discussion of job-related --
17    I understand that there's discussions of "Can I take
18    vacation?"
19             Are there ever any discussions of job-related
20    activities or operational issues through that panel?         11:24:27
21        A.   No.
22        Q.   Okay.
23        A.   They get it from the team leaders.
24        Q.   Okay.  Let me go back to, then, the
25    non-notepad.                                                 11:24:39
```

92

CERTIFIED COPY

1         There is data on this admin panel other than

2    the notepad part; correct?

3         A.   Yes.

4         Q.   Okay.

5              And are you willing to answer whether or not          11:24:53

6    that data has been preserved in connection with this

7    lawsuit?

8         A.   Yes.

9              That data has been preserved, of course.

10        Q.   All the data in the admin panel has been              11:25:03

11   preserved?

12        A.   Of course.

13        Q.   And who was it preserved by?

14        A.   This is the front panel.  This is the HTML

15   panel.  This is like opening the web page panel.  This          11:25:20

16   is not the code panel.  So when I said my dream was to

17   make a web page where I could see, because I can't code.

18   So this is the dummy version.

19             It was preserved by Dennis and Vid.  The

20   preservation cannot be on a HTML, if you understand.            11:25:41

21   HTML is opening www.google.com.  That's not where

22   preservation happens.  Preservation happens on a server.

23        Q.   Correct.

24        A.   Okay?  Preservation did not happen at admin

25   level on a single page.                                         11:26:03

93

CERTIFIED COPY

```
 1        Q.   It did not happen?

 2        A.   On this particular admin panel.

 3             This admin panel does not have the capability

 4   to talk to the Amazon server and start saying preserve

 5   this and that.  This is a much more basic page.  So when        11:26:23

 6   the email came out and telephone conversation came,

 7   preservation was done on the Amazon server.

 8             You keep trying to twist it that whether I did

 9   it or not.  I am not capable of getting into the server

10   nor is this page, admin.                                        11:26:39

11        Q.   The admin page --

12        A.   Is not capable of going into the Amazon server.

13   It is connected to the database.  However, it does not

14   have a button to preserve, or the button to get into the

15   database, put a date range in, and preserve.  It just          11:26:59

16   doesn't have it.  It's just informational.  It was made

17   for me because I can't get into the MySQL.  I can't get

18   into the database.  They made it so I don't screw

19   anything up.  That's pretty much it.

20        Q.   Mr. Shayan, this will go quicker if you just         11:27:21

21   let me ask the question --

22        A.   Go ahead.

23        Q.   -- and you just answer the question.

24        A.   Go ahead.

25        Q.   Yes or no, data comes in through the admin            11:27:28
```

94

CERTIFIED COPY

1   panel from -- there is information in there that you

2   read?

3         There's something in the admin panel; correct?

4   A.   I can clarify for you.

5   Q.   Okay.                                                11:27:38

6   A.   Data comes in there inputted by hand by the

7   landlords.  Okay?  And still after 15 years my brother

8   Steve and I sit there and we call it the small bid.

9   It's a small bid.  Where we actually read each and every

10  listing and go through all the photos before it goes     11:28:08

11  live.

12        Some of these landlords put in discriminatory

13  sentences, like "This property is perfect for adults, no

14  children," et cetera.

15  Q.   Sure.                                                11:28:25

16  A.   And we go through that even though we have

17  filters and clean it up, some negative pictures or

18  nudity, et cetera.

19        So every hour we go in there, there's 30, 40,

20  50 listings.  Some of them only want to allow it for two  11:28:42

21  days.  We extend it because you can't rent a place in

22  two days.  So that is in the admin panel.  Right?

23        So when it said in that BBB that, you know,

24  that we have measures, that is what it is talking about.

25  We verify the listings.  And also people, the Nigerians   11:29:04

95

```
 1   came to see our database, put in fake listings.  That's
 2   where the buck stops.
 3        So admin does have listings in it, not the
 4   feeds.  The feeds don't come to admin.  The feeds go to
 5   the server.                                             11:29:25
 6        Q.   Understood.  So let me ask a few follow-ups.
 7        A.   Number of sales comes to the admin.
 8        Q.   The listings that come through to the admin,
 9   are those preserved in some way?
10        A.   I approve them.  They go live to the website.  11:29:42
11   After that they are in the database, and they are
12   preserved, yeah, because the landlord can deactivate
13   them and activate them.
14        Q.   Okay.  So what --
15        A.   So they're back in the database.  So they're   11:30:03
16   back where the listings -- all the listings are.
17        Q.   And then whatever preservation is whatever
18   would be happening to the whole database?
19        A.   Right.
20        We don't see -- we didn't delete.  We activate      11:30:15
21   or deactivate.  If I may explain?  Our system doesn't
22   let you delete.  It lets you activate or deactivate.
23        Q.   And when something is deactivated, then it
24   disappears from the system; correct?
25        A.   No, sir.                                        11:30:28
```

96

```
 1              It sits there.  As a landlord, it sits there.
 2    You could also reactivate it.  We have a landlord system
 3    and then we have a feed system.  They operate
 4    separately.
 5         Q.   Okay.  That's helpful.                              11:30:44
 6              And your testimony is that when things come in
 7    from landlords, you or your brother quality-control
 8    every single one?
 9         A.   Every single one.
10         Q.   That's not true of the feed agreements;           11:30:57
11    correct?
12              Those come through and are automatically going
13    in?
14              Does that --
15         A.   No.                                                11:30:58
16              Feeds are also -- I mentioned earlier, feeds
17    are also checked by Dennis, and also the feed clean and
18    make sure that they are not duplicates.  They're
19    correct.  They're photos.  And I don't -- I had
20    mentioned, I don't know if the photos come separately     11:31:16
21    from the text.  I'm not savvy to that.
22         Q.   Okay.
23              Let me turn to the other topic that you had
24    initially refused to answer factual questions regarding,
25    and let me -- if you're not going to answer, that's        11:31:39
```

97

Abrams, Mah & Kahn

CERTIFIED COPY

```
 1    fine.  I just want to be clear on this.
 2          So that was the apartmenthunterz.info website.
 3          (Telephone interruption)
 4    A.    Sorry, I left my phone -- I'll turn it off.
 5    Sorry about that.  Sorry about that.  Go ahead.         11:31:57
 6    Q.    Your testimony previously on the
 7    apartmenthunterz.info website was that, for instance,
 8    you would not tell me who can access that site.
 9    A.    Me, Dennis, and Vid, and not even -- I don't
10    think Steve goes in there.  But me, Dennis, Steve, and   11:32:09
11    Vid.
12    Q.    And can you tell me at a general level what
13    sort of information is in that website?
14    A.    If we were to make the apartmenthunterz.com
15    pink, before we chose what shade of pink, we would throw 11:32:25
16    it in there until we decide.
17    Q.    And has the information within
18    apartmenthunterz.info been preserved in some way?
19    A.    Yes.
20          It's the same exact thing until we choose what    11:32:40
21    color.  It's a sandbox, as we call it in the internet
22    industry.  It's our playground for testing new stuff.
23    Q.    Let me go back to some prior testimony.
24          You've talked about the backups; correct?
25          That there's a lot of information, and            11:33:06
```

98

CERTIFIED COPY

```
 1   therefore, generally, the feed agreement -- I'm sorry,

 2   that feeds that come in, the data, is only backed up for

 3   about three days to a week?

 4       A.   I have very, very limited knowledge there,

 5   because that is also on a server.  And I just have          11:33:23

 6   confidence that a couple of times when the servers went

 7   down, we were able to bring them up from a previous

 8   backup.  So I cannot answer too many backup questions.

 9       Q.   That's fine.

10       A.   I can answer to the best of my knowledge.          11:33:45

11       Q.   All I'm asking is for you to answer my direct

12   questions to the extent you can.

13            You've also just testified, I think, that

14   following receiving this complaint, you changed

15   Apartment Hunters' policy so that every single feed that   11:34:03

16   comes in is preserved?

17       A.   Yes, sir.

18       Q.   So the one incoming feed that you said

19   refreshes four times a day, you have four feeds each day

20   for ten months.                                            11:34:18

21            That's all been saved?

22       A.   Yes, sir.

23       Q.   And where has that been saved?

24       A.   Obviously, on the server.

25       Q.   On the Amazon Cloud server?                       11:34:26
```

99

CERTIFIED COPY

```
 1        A.    Yes, sir.
 2        Q.    And so that's -- is that -- that must be much
 3   more data than you'd ever previously saved; correct?
 4        A.    I believe so, yes.  It's in a zip or a tar
 5   file.                                                          11:34:41
 6        Q.    Okay.
 7        A.    But you're talking -- see, this -- the one that
 8   you just mentioned has nothing to do with the listings.
 9   This is the multiple listing service.  I want to be
10   clear.  This is not normal apartments.  This is the          11:35:00
11   Realtor data.
12        Q.    I'm sorry, what . . .
13        A.    What you just mentioned, ListHub --
14        Q.    Yes.
15        A.    -- that's the Coldwell Banker.                    11:35:20
16        Q.    Yes.
17        A.    That's Re/Max.
18        Q.    Yes.
19        A.    So if we preserved it or not, which we have,
20   has got nothing to do with the CoStar matter.  CoStar        11:35:26
21   doesn't go to the MLS site.  CoStar is doing the
22   apartments.  But I just wanted to clarify that.
23        Q.    I would be happy to discuss just the feeds that
24   you believe the CoStar information came from if you
25   could tell me what those feeds are.                          11:35:47
```

100

1      A.   Minus the ListHubs, sir.

2      Q.   Okay.  So RentPath, for instance?

3      A.   Yes, yes, yes, yes, yes.

4      Q.   So the --

5      A.   Because we're licensed for the MLS, right, and        11:36:02

6  that's Realtors.

7      Q.   So taking RentPath, has every feed that's come

8  in from RentPath --

9      A.   Yes, sir.

10         MR. BANDLOW:  Let him finish -                          11:36:15

11         THE WITNESS:  Sorry.  It --

12     Q.   BY MR. BAUMGARTEN:  I also just want to state,

13 when no question is pending, it's -- you really can't

14 just start speaking, sir.  I have to ask -- wait for my

15 questions.  Okay?                                               11:36:24

16     A.   Sorry about that.

17     Q.   If you could only respond when I ask a

18 question, I'd appreciate it.

19     A.   I apologize.

20     Q.   Thank you.                                            11:36:30

21         Other than the cloud, does Apartment Hunters

22 have any other places where any sort of information is

23 stored?

24     A.   No.

25     Q.   So the folks in -- well, let's start with           11:36:44

                                                                      101

CERTIFIED COPY

```
 1    yourself.
 2         You work at a laptop?  A desktop?  What type of
 3    computer do you use?
 4    A.   I have a touchscreen and a huge computer.
 5    Q.   Okay.                                          11:36:58
 6         And on that huge computer, there's a hard
 7    drive; correct?
 8    A.   Yes, sir.
 9    Q.   Has that hard drive been preserved in
10    connection with this matter?                        11:37:06
11    A.   I don't store anything on it.  I don't usually
12    download.  I just get on the web, open a page, and
13    that's it.  I don't have any data on it.
14    Q.   Do your --
15    A.   I have music on it, and that's it.             11:37:23
16    Q.   Your employees in Lithuania, do they use
17    laptops?  Do they use desktops?
18    A.   Desktops.
19    Q.   And have those hard drives been preserved or
20    searched in connection with this matter?            11:37:39
21    A.   I have no idea what -- whether they store stuff
22    on it, or it's on the Amazon server.  I have not been to
23    Lithuania.
24    Q.   So you're not sure whether the hard drives have
25    been searched and they may store things?            11:37:58
```

102

Abrams, Mah & Kahn

1      A.    I have not been to Lithuania.

2      Q.    Everything that is done in -- let me strike

3    that.

4            Are there any other cloud servers that your

5    employees either in Lithuania or Russia use?                11:38:10

6      A.    No, sir.

7      Q.    Do you have hard copy files personally?

8      A.    No, sir.

9      Q.    Do you know if your employees in Lithuania or

10   Russia have hard copy files?                               11:38:24

11     A.    No, they don't.

12     Q.    They don't.  Okay.

13           Do you know whether there are any external hard

14   drives or thumb drives that are ever used?

15     A.    Absolutely not.                                    11:38:35

16     Q.    And how do you know not if you've never been to

17   Lithuania?

18     A.    We don't have a reason to do thumb drives or

19   external drives.  There's plenty of storage on our

20   cloud.                                                     11:38:50

21     Q.    So we've talked about the cloud a lot.

22           In addition to whatever steps were taken to

23   search the cloud, have any steps been taken to go to

24   individual employees and ask them, "Do you personally

25   have documents related to this matter"?                    11:39:10

CERTIFIED COPY

```
 1        A.    No.

 2              They -- they wouldn't normally have it.  It

 3    would all be Dennis and Vidmantas.

 4              (Discussion held off the record

 5         between Mr. Bandlow and the witness.)

 6              THE WITNESS:  The email we sent went down -- I

 7    said it several times -- even down to the girls in

 8    customer support.

 9        Q.    BY MR. BAUMGARTEN:  Understood.  Let me back up

10    a moment.                                                        11:40:02

11              You said that the MLS listings had been stored

12    in some sort of zip file or a tar file; correct?

13        A.    Right, but they're not related to this case.

14        Q.    So the listings that are related to this case,

15    how have they been stored?                                       11:40:17

16        A.    They've been stored on the server.

17        Q.    Are they also in zip files, or how are --

18        A.    I don't know --

19        Q.    -- they stored?

20        A.    -- the format, because if it's huge, they're          11:40:24

21    tarred.  That's what I've heard.  Tar.

22        Q.    T-a-r?

23        A.    That's the word that I've heard on -- while I

24    talk to them, because that's a format that can hold a

25    lot more information than zip.                                   11:40:41
```

104

**Abrams, Mah & Kahn**

```
 1        Q.   Okay.

 2        A.   That's all I know.

 3        Q.   Okay.

 4        A.   So they have tarred them, I believe, but when

 5   it gets technical, I wish I could help.                    11:40:53

 6        Q.   Your understanding, though, is that those tar

 7   files and zip files stay on the backup -- the tar and

 8   zip files stay on the cloud server?

 9        A.   Correct, sir.

10        Q.   And those tar and zip files have been searched,  11:41:02

11   that's why you didn't search them?

12        A.   And preserved.

13        Q.   Are you familiar with -- do you know what

14   interrogatories are?

15        A.   Yes.                                             11:41:24

16        Q.   And you're aware that CoStar served

17   interrogatories on Apartment Hunters?

18        A.   Yes.

19        Q.   And you're aware that Apartment Hunters served

20   some responses to CoStar?                                  11:41:31

21        A.   Yes, sir.

22      * Q.   Can you name the -- so I'll ask -- this is a

23   yes-or-no question.

24             Did you speak with Mr. Bandlow or any of his

25   colleagues about the answers to those?                     11:41:43
```

105

```
 1              MR. BANDLOW:  Objection.  Calls for
 2    attorney-client communications.
 3              I instruct him not to answer.
 4              MR. BAUMGARTEN:  Whether or not he spoke?
 5              MR. BANDLOW:  Well, you give a subject matter,
 6    so he's going to confirm a subject matter, and therefore
 7    that's going to reveal attorney-client privilege.
 8              So, yes, I object, and I instruct him not no
 9    answer.
10              "Did you talk to your client about the murder?      11:41:57
11    Just yes or no," that's asking for attorney-client
12    communication, and you know it is.
13              MR. BOYLE:  A privilege log contains the
14    subject matter of the communication.
15              MR. BANDLOW:  Okay.  You've asked him a broad       11:42:08
16    question about what he's discussed with his lawyers
17    about an interrogatory response.
18              MR. BOYLE:  No, he didn't.  He asked --
19              MR. BAUMGARTEN:  Has he -- yes or no, has he
20    spoken with his attorneys about the responses to          11:42:14
21    interrogatories.
22              MR. BOYLE:  It's perfectly proper.
23              MR. BANDLOW:  You're asking for the substance
24    of his communications with his counsel.
25              MR. BOYLE:  No, he's not.                         11:42:23
```

106

CERTIFIED COPY

1          MR. BAUMGARTEN:  Yes or no, has he spoken.

2   Have conversations occurred?  There's no substance.

3          MR. BANDLOW:  Well, I think there's actually a

4   case law for the even existence of a conversation being

5   a privileged communication.                                    11:42:34

6          But I'll let him answer this one question with

7   it not being a waiver of the privilege.

8          You can answer that one question.  Have you

9   spoken to your lawyers about the interrogatory

10  responses?                                                      11:42:44

11         THE WITNESS:  Yeah, because --

12         MR. BANDLOW:  That's it.  Yes.

13         MR. BAUMGARTEN:  That's all I'm asking for.

14  Okay.

15     Q.   And I'm going to ask the same question that I          11:42:50

16  think we decided was proper before.

17         Without telling me any information that you

18  know from your conversations with your attorney, do you

19  know, yes or no, whether any other employees of

20  Apartment Hunters have spoken with Mr. Bandlow or his          11:43:03

21  colleagues regarding the interrogatory responses?

22     A.   No.

23     Q.   You do not know?

24     A.   Nobody has spoken.  Nobody else have spoken

25  with Mr. Bandlow.                                               11:43:17

107

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1        Q.   All right.  That's all I need.  Thank you.
 2             Mr. Shayan, are you aware that to date your
 3   attorneys have produced two agreements relating to feeds
 4   and turned those over to us, produced two agreements?
 5        A.   I believe so, yes, sir.                          11:43:46
 6        Q.   Let me -- so one was with ForRent Media, and
 7   the other was with Move Sales, Incorporated?
 8        A.   Yes.  Yes.  That's ListHub, yes.
 9        Q.   That's ListHub.  Okay.
10             And are you aware that CoStar has represented   11:44:04
11   that ForRent is a competitor to which it does not
12   provide its listings?
13        A.   Pardon me?
14             MR. BANDLOW:  I'm sorry, yes.  Object.  Vague
15   and ambiguous.                                            11:44:16
16             Can you do that one again?
17             MR. BAUMGARTEN:  Sure.
18        Q.   CoStar has represented that ForRent is a
19   competitor of CoStar and therefore CoStar does not
20   provide its listings to ForRent.                          11:44:25
21        A.   Yes.
22        Q.   Are you aware of that fact?
23        A.   Yes, sir.
24        Q.   Can you -- and by "you" I mean, can Apartment
25   Hunters explain how Apartment Hunters' agreement with     11:44:35
```

108

Abrams, Mah & Kahn

CERTIFIED COPY

```
 1    ForRent could have authorized Apartment Hunters to use
 2    CoStar's listings?
 3        A.    I don't understand.
 4        Q.    Apartment Hunters produced the ForRent listing
 5    agreement because it believed that perhaps this                11:44:54
 6    agreement authorized it to publish content that CoStar
 7    had identified; correct?
 8        A.    No.
 9        Q.    Well, let me ask you then:  Why was -- without
10    revealing any attorney-client communications, why was          11:45:10
11    that agreement with ForRent Media produced?
12            Why did you turn that over to us?
13            Why is that relevant?
14            Again, not telling us what your attorney told
15    you.                                                            11:45:23
16        A.    The question was where do we get -- identify
17    every source from which you receive data, so we did.
18        Q.    Okay.
19            Do you have a reason to believe that the
20    listings that CoStar has identified as being CoStar's          11:45:33
21    came from ForRent Media?
22        A.    Yes.
23        Q.    And what is that reason?
24        A.    Similar photos with the same exact address of
25    the same exact building are in those feeds.                    11:45:51
```

109

**Abrams, Mah & Kahn**

CERTIFIED COPY

1    Q.   And when did you find those photos?

2    A.   After searching through all the feeds, in the

3    last two or three weeks recently we have been able to

4    put together most -- I would say 95 percent of the

5    listing photos in question that they did come through          11:46:32

6    the feeds.

7    Q.   And --

8    A.   Or were present previously on the site.  I

9    don't have the sheet, the Excel sheet in front of me.

10   Q.   So when this agreement with ForRent was           11:46:58

11   presented to CoStar, which I believe was in --

12   A.   It's not --

13   Q.   -- May or --

14   A.   -- all through ForRent.  It came from several

15   other sources, as well as directly posted through our          11:47:07

16   website, so . . .

17   Q.   I'm going to ask you again to not interrupt my

18   question --

19        MR. BANDLOW:  Wait for his question.

20        MR. BAUMGARTEN:  -- and let me finish my

21   question before you just talk.

22        THE WITNESS:  Okay.

23        MR. BAUMGARTEN:  Thank you.

24   Q.   CoStar -- excuse me.

25        Apartment Hunters produced this agreement with          11:47:24

110

CERTIFIED COPY

```
 1    ForRent to CoStar in May or June.

 2         A.   Uh-huh.

 3         Q.   In May or June, what was your basis for

 4    believing that this agreement was the source of the

 5    CoStar photos?                                        11:47:37

 6         MR. BANDLOW:  Objection.  Lacks foundation,

 7    that he had any basis at that time.

 8         You can answer.

 9         THE WITNESS:  In May or June?

10    Q.   BY MR. BAUMGARTEN:  In May or June, did you     11:47:46

11    believe that the CoStar photos had come from ForRent?

12         A.   The only reason we produced these was the

13    question you asked that identify all the sources from

14    which you received data.  That was the only basis that

15    we produced those documents.                          11:48:05

16         Q.   Why don't we look at the exhibit that we marked

17    as No. 9.

18         A.   If you guys --

19         Q.   There's no question.  Sorry.  If you need a

20    break, that's fine, but there's no question pending.  11:48:16

21         A.   No, no, no.  Grab a bite to eat, because I

22    usually -- I'm on a different schedule.  I work 10:00 at

23    night to 5:00 in the morning, and this is actually my

24    sleep time, so I'm starving.

25         MR. BANDLOW:  Okay.                              11:48:29
```

111

CERTIFIED COPY

1          MR. BAUMGARTEN:  We can go off record.  That's

2     fine.

3          MR. BANDLOW:  We have to go off the record and

4     find you some food.

5          THE VIDEOGRAPHER:  Off record, 11:48 a.m.          11:48:30

6          This concludes tape No. 2.

7          (Lunch recess from 11:48 a.m. to 12:29 p.m.)

8                         -o0o-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFIED COPY

```
 1                    LOS ANGELES, CALIFORNIA

 2                 THURSDAY, SEPTEMBER 29, 2016

 3                         12:29 P.M.

 4                          -o0o-

 5         THE VIDEOGRAPHER:  This begins tape No. 3 in        12:29:22

 6   the videotaped deposition of Kevin Shayan, taken at 725

 7   South Figueroa Street, 31st Floor, Los Angeles,

 8   California, on September 29th, 2016.

 9          My name is Jeannie Schwarze with Dean Jones

10   Legal Videos, Inc. out of Santa Ana, California.

11          Returning to record, 12:29 p.m.

12

13                    EXAMINATION (Resumed)

14   BY MR. BAUMGARTEN:

15         Q.   Mr. Shayan, could I ask you to look at Exhibit   12:29:46

16   No. 9 again.

17         A.   Yes, sir.

18         Q.   This is the declaration that you signed on

19   September 1st.

20         A.   Yes, sir.                                        12:29:58

21         Q.   And if I could refer you to paragraph 5.  I'm

22   going to read the last two sentences -- or the last

23   three sentences:

24              "To maintain the substantial amount

25               of data, Apartment Hunters only stores        12:30:13
```

113

CERTIFIED COPY

```
 1              the most recent listing information for
 2              a property.  As new photos are uploaded
 3              for a specific property, they are merged
 4              with existing photos and information and
 5              older, outdated material associated with          12:30:24
 6              the property is removed from the listing.
 7              Because of the sheer volume of this data,
 8              removed content is not backed up."
 9       A.    Correct.
10       Q.    This was an accurate statement on                  12:30:33
11   September 1st; correct?
12       A.    Yes.
13       Q.    And is this a statement of Apartment Hunters'
14   current policy?
15       A.    Yes.                                                12:30:43
16       Q.    So currently removed content is not backed up?
17       A.    It's merged in a marriage together.  So what
18   happens is that when a new listing comes with two photos
19   and then the same listing comes with other photos at the
20   same address, our system actually merges them together.      12:31:10
21   It's not a -- yes, it's a marriage, merged with the
22   existing information and the older -- it merges.  So
23   they get associated together, and one of them has to
24   leave.
25       Q.    Let me move on to a different topic.                12:31:36
```

114

CERTIFIED COPY

1          The -- let me show you or ask you.  So we've

2     been talking about ForRent Media.

3          A.   For . . .

4          Q.   ForRent Media, which was one of the two listing

5     agreements that your counsel produced.                          12:32:10

6          A.   Yes, sir.

7          Q.   And I just want to clarify.

8          Was this produced because you believe that we

9     asked for all listing agreements, and this is a listing

10    agreement that you have, or was it produced because you        12:32:22

11    think that that agreement specifically might have given

12    you the rights to produce -- to publish the CoStar

13    photos?

14         A.   No, sir.

15         It was produced because you asked, "Give us the          12:32:34

16    source of any and all sources you do business with or

17    receive data from."  You asked the broad question, and

18    we gave you everything.

19         Q.   And let me ask, then, the same question as to

20    the second agreement with Move Sales, Inc., which I           12:32:55

21    understand is ListHub.

22         That was also produced because that was an

23    agreement that you have for listing data and not because

24    you had a specific belief that Move Sales, Inc. was

25    providing the photos that CoStar had identified?              12:33:11

                                                              115

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1        A.    Correct.
 2              It was asked, yes, for us to name any place we
 3    get listings from.
 4        Q.    Okay.
 5              And you're aware that those are the only two          12:33:24
 6    feed agreements that Apartment Hunters produced;
 7    correct?
 8        A.    Well, there's several others; right?
 9    ApartmentGuide.
10        Q.    I'm talking about that there have only been two      12:33:37
11    physically.  I understand that you've named some other
12    sources.
13        A.    Right.
14        Q.    But there have only been two feed agreements
15    that have been produced in this matter --
16        A.    Right.
17        Q.    -- ForRent and Move Sales.
18        A.    Correct.
19        Q.    You're aware of that?
20        A.    Right.  Right.  Right.                               12:33:52
21              We could not locate the actual written for the
22    others.
23        Q.    And who conducted the search for the other feed
24    agreements?
25        A.    I and Steve did.  Apparently, the other written     12:34:03
```

116

Abrams, Mah & Kahn

CERTIFIED COPY

1    ones during our move was misplaced.

2         Q.   Let me direct you to the same exhibit and

3    paragraph 15.  If I could ask you to look at paragraph

4    15 of your declaration from September 1st.  I'm going to

5    read this.                                                    12:34:37

6              "Apartment Hunters has produced

7              the written agreements it believes serve

8              as the source of the CoStar photos that

9              allegedly existed on its website.  Aside

10             from the written agreements produced,

11             Apartment Hunters also has agreements

12             with specific property owners and/or

13             managers that were orally entered into.

14             Additional agreements have not been

15             produced because there are no others          12:34:54

16             in Apartment Hunters' possession that

17             reasonably relate to CoStar listing or

18             CoStar photographs."

19             So the first sentence there, you state that you

20    produced the written agreements that Apartment Hunters       12:35:09

21    believes serve as the source of the CoStar photos.

22             Is your testimony today that that wasn't the

23    case, that you just produced these because they were

24    listings in general?

25             MR. BANDLOW:  You've got two different time        12:35:22

117

```
 1   frames.  You've got a time frame for when we originally
 2   produced these agreements, and you've got a time frame
 3   for when he did this declaration.  So your question
 4   confuses those two together -- or is confusing as to
 5   what was his state of mind as to which of those periods      12:35:36
 6   of time that you're asking about.
 7            You've asked him what his state of mind was
 8   back in the summer when we produced documents.  This is
 9   a separate state of mind as of a few weeks ago.
10            MR. BAUMGARTEN:  Okay.
11            MR. BANDLOW:  So I think it's confusing.
12            MR. BAUMGARTEN:  Okay.  Let me -- let me do it
13   this way then.
14       Q.   Sitting here today, do you believe that the
15   agreement with ForRent Media has been the source of the     12:35:59
16   photographs and listings identified by CoStar?
17       A.   Not the exact same photos, but within that
18   address of the same building we have found photos that
19   are not the same photos that CoStar says, but they were
20   on our website.                                              12:36:27
21       Q.   Okay.
22            MR. BANDLOW:  You may have found that
23   particular property that is the subject of --
24            THE WITNESS:  That particular property that is
25   the subject of what we're talking about today, and the      12:36:37
```

118

CERTIFIED COPY

```
 1   photos were given to us via that feed.
 2       Q.   BY MR. BAUMGARTEN:  How are the photos -- you
 3   said there are similar photos.  How are they --
 4       A.   No.  They're not similar.
 5            It is not the same exact photo that CoStar has     12:36:48
 6   a copyright on.  It is a different photo of the same
 7   exact building.
 8       Q.   So it's not that it's -- strike that.
 9            For instance, the CoStar photo might be the
10   building from one side of the street, and the photo you   12:37:11
11   found is from the other side of the street?
12       A.   Correct, sir.
13       Q.   And for Move Sales, Inc., do you presently,
14   sitting here today, believe that that agreement has been
15   the source of CoStar photos and listings?                 12:37:34
16       A.   No, sir.
17       Q.   Are there any other agreements, other than
18   ForRent Media, that you believe are the source of the
19   CoStar photographs?
20       A.   Yes.                                              12:37:43
21            They are in the other feeds.  But right this
22   minute, without having the documents in front of me that
23   we're about to produce, I cannot pinpoint it for you.
24       Q.   Going back to paragraph 15 of your declaration,
25   you also mention oral agreements.                         12:38:03
```

119

1      Sitting here today, do you presently believe

2  that any of the CoStar photographs ended up on your

3  website as a result of oral agreements?

4      A.   Right.  And also property managers.  And

5  inputted directly manually by owners of the properties      12:38:23

6  and property managers.

7      Q.   So there are three categories of sources that

8  you have identified --

9      A.   Correct.

10     Q.   -- ForRent, oral agreements, and property       12:38:37

11  managers?

12     A.   There's actually five.

13     Q.   Could you tell me the other two?

14     A.   Yes.

15         So what happens is that we have over 30,000 --    12:38:44

16  28,900 or so registered landlords that come to our site,

17  enter their data manually on a daily basis, and put in

18  their photos on a daily basis.  Okay.

19         Then we have what's called a speed post where a

20  landlord can come in quickly without registering as a      12:39:16

21  landlord, throw in their listings.

22         And orally is where we call the management

23  company, ask for permission to enter their listings, and

24  the answer would be, "I already gave you permission.

25  You go ahead and put it from my website."                  12:39:38

120

Abrams, Mah & Kahn

CERTIFIED COPY

1           And also we receive faxes on a daily basis from

2     these landlords to enter them.

3           And we receive emails.  And I have the emails.

4           (To Mr. Bandlow) As I've given you.  All the

5     emails we've given.                                    12:40:03

6     Q.   I just want for the record to reflect by "you"

7     you mean Mr. Bandlow and not me.

8     A.   Yes, sir.

9           I've given the emails from the landlords.  I've

10    given the faxes from the landlords to Mr. Bandlow.     12:40:10

11          (To Mr. Bandlow)  Right, sir?

12          MR. BANDLOW:  I think we have those.

13          THE WITNESS:  But I have them.  If you haven't

14    received them, I have emails, I have faxes I got on

15    different dates going back a long time that we receive  12:40:23

16    from the management companies.  And I have . . .

17          MR. BANDLOW:  You can keep talking.

18          THE WITNESS:  And I have the 28,000 landlords.

19    Q.   BY MR. BAUMGARTEN:  Okay.  So all those emails

20    you're talking about contain permissions; correct?     12:40:51

21    A.   No.

22          All those emails contain permissions -- okay.

23    Let's start from scratch.

24          All those emails are with letterhead of the

25    management company --                                  12:41:04

121

CERTIFIED COPY

```
 1        Q.    Yes.

 2        A.    -- below with their properties and their

 3   prices.

 4        Q.    Yes.

 5              Those are emails to you from landlords;            12:41:09

 6   correct?

 7        A.    Management companies.

 8        Q.    From management companies.

 9        A.    And all the smaller landlords, and it says,

10   "Please put these in.  Update these."                        12:41:16

11        Q.    Understood.

12        A.    And those are emails and then faxes.

13        Q.    And are you saying -- I understand that you're

14   talking about that these are all the many sources that

15   in general Apartment Hunters gets listings from?            12:41:33

16        A.    Correct.

17        Q.    Are you also saying as to the CoStar photos and

18   listings in particular, you have emails as to those?

19        A.    No, sir.

20        Q.    Okay.                                              12:41:43

21              And are you saying you have emails as to the

22   same buildings but with different photos?

23        A.    No, sir.

24        Q.    So let's just focus, then, on the CoStar photos

25   and listings, what you think has authorized those.          12:41:55
```

 1          You said you have some things from ForRent, and

 2     those are photos -- different photos of the same

 3     building; correct?

 4          A.   Uh-huh.

 5          Q.   Okay.                                    12:42:08

 6          And you had -- you said you had five sources of

 7     CoStar photos.

 8          A.   Allow me.

 9          The speed post would allow any manager of the

10     CoStar buildings to go in and put the listing in, which   12:42:18

11     would be seeding our database.

12          Q.   I don't want to interrupt you, but are there

13     specific speed posts that you have identified?

14          A.   We cannot identify speed posts, because the

15     name explains it all.  You could just go in without us    12:42:35

16     capturing any movement, and it just says, "Description,"

17     "Title," "Photo," "Push Post."  It does not go in front

18     of me for approval.  It just goes up.

19          Q.   So do you --

20          A.   It's unmanaged, unlooked at, whatever you call   12:42:56

21     it --

22               MR. BANDLOW:  Quality-controlled.

23               THE WITNESS:  -- posting system.

24               MR. BAUMGARTEN:  I'd appreciate if he testifies

25     rather than you.  I think that's fair to ask.

CERTIFIED COPY

```
 1          MR. BANDLOW:  I knew there was a word that he
 2   wanted me to remind him of.
 3          MR. BAUMGARTEN:  I would still appreciate that,
 4   though.  There's been a lot since lunch.
 5     Q.   The speed posts -- this is a yes-or-no          12:43:21
 6   question.
 7          Have you -- are you aware of specific speed
 8   posts that contain the CoStar photos we've identified,
 9   yes or no?
10     A.   No.                                             12:43:31
11     Q.   Are you aware of specific emails from landlords
12   or from property management companies giving you
13   permission as to the specific CoStar listings and
14   photographs that we've referenced, yes or no?
15     A.   No.                                             12:43:50
16     Q.   Are you aware of specific faxes from whomever
17   referencing the specific CoStar photos and listings that
18   we've referenced?
19     A.   No.
20     Q.   Going back to the oral agreements, does         12:44:01
21   Apartment Hunters keep records of oral agreements it
22   receives?
23     A.   No.
24     Q.   So if property owner Joe calls you up and says,
25   "You can use all of my listings," there's no -- how do  12:44:23
```

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1    you -- how do you know in a month that you can use it?
 2         How do you remember?
 3    A.    This is just notes that Steve and I would make
 4    on a pad, and it was back when we were cold calling the
 5    landlords and made notes next to their names.  We pretty      12:44:44
 6    much no longer do it.  They're coming to the site and
 7    doing it themselves.  And we haven't done this since, I
 8    want to tell you, four years ago.  I don't have the
 9    exact date.
10    Q.    So if you haven't done this, then there's no          12:45:09
11    way that any oral agreements could --
12    A.    Oral agreements do not come in this --
13    Q.    Please, you have to let me ask the question.
14         If you haven't done this for four years,
15    there's no way that oral agreements could have been the     12:45:21
16    basis for the CoStar photos appearing on your website;
17    correct?
18    A.    100 percent correct, sir.
19    Q.    Is there a reason, then, that in paragraph 15
20    you've included:                                            12:45:34
21              "Aside from the written agreements
22              produced, Apartment Hunters also has
23              agreements with specific property owners
24              and/or managers that were orally entered
25              into"?
```

125

CERTIFIED COPY

1      You agree that that's not relevant to this case

2  now; correct?

3      A.   Right.

4      Q.   Okay.

5      A.   Just wanted to . . .                          12:45:50

6      Q.   When you have a listing up on the website, if

7  you look at that listing, based on the listing ID, can

8  you tell what feed it came from?

9      A.   No.

10     Q.   Can you in any way tell what a specific        12:46:10

11  listing, where the feed came from?

12     A.   No, sir.

13     Q.   There's no tracking of listings?

14     A.   No, sir.

15          MR. BAUMGARTEN:  Let me pull another document  12:46:39

16  up.  We'll mark this as Exhibit 11.

17          (Exhibit 11 was marked for identification.)

18     Q.   BY MR. BAUMGARTEN:  And this is a copy of the

19  testimony -- a transcript of the testimony that you

20  provided before the California Bureau of Real Estate on  12:47:04

21  February 25th, 2015.

22          I think earlier today you referenced that

23  testimony.

24          Do you recall giving it?

25     A.   Yes, sir.                                       12:47:13

126

Abrams, Mah & Kahn

CERTIFIED COPY

```
 1        Q.   If I could ask you to turn to page 202.  I just
 2   want to ask a quick question.
 3        A.   Yes, sir.
 4        Q.   At the very bottom of page 202 your lawyer
 5   Mr. Tahmazian --                                         12:47:32
 6        A.   Yes, sir.
 7        Q.   Okay.  Mr. Tahmazian asks you:
 8             "Now, when you receive this feed
 9             from other sources, you obviously know
10             that these are listings that are on Trulia    12:47:39
11             or any other company that you receive
12             from; correct?"
13             And you say, "Yes."
14             I understood that to mean that you know
15   where -- that you know when you get a listing, you know  12:47:52
16   the source.
17             Is that not what you're testifying to here?
18        A.   That is not what he asked me.  That is not in
19   this manner what he asked me.
20        Q.   Okay.                                          12:48:05
21             What was he asking you?
22        A.   That is previous to it being on the website.
23   That is what he meant.  Receiving it and displaying it
24   is two different things.
25             You asked me when I look at a listing and it's 12:48:20
```

127

1      on the website, do I know where it's from.  This is --

2      this is a different question.

3          Q.   Is there any phase -- so when you have the XML

4      file with all of the many listings coming in, you know

5      which source that's from --                              12:48:39

6          A.   If it was --

7          Q.   -- in each XML file?

8          A.   -- was opened for me and segregated for me,

9      yes.

10         Q.   Mr. Macys could tell you that?                   12:48:45

11         A.   Yes.

12         Q.   But then once that XML file is transformed into

13     listings on the website --

14         A.   I couldn't.

15         Q.   And no one else at Apartment Hunters could       12:48:55

16     either?

17         A.   We don't mark them.

18         Q.   Okay.  Let me ask you to go back -- I'm sorry

19     for jumping around, but go back to Exhibit 9, your

20     declaration.                                              12:49:16

21         A.   Yes, sir.

22         Q.   And one more question about paragraph 15.

23     I just want to know, you referenced the CoStar --

24         A.   Paragraph?

25         Q.   15, I'm sorry.  I'll give you time to get        12:49:31

CERTIFIED COPY

```
 1   there.  I apologize.

 2        A.   15.  Yes, sir.

 3        Q.   And the last -- in the last sentence you talk

 4   about that there are no other agreements that reasonably

 5   relate to "CoStar Listing" or "CoStar Photographs."  And     12:49:42

 6   "CoStar Listing" and "CoStar Photographs" are both

 7   capitalized terms here.  I think that is meant to be a

 8   defined term.  In other words, if there was a specific

 9   set of listings and photographs you're referring to.

10             What are the specific CoStar listings and         12:50:03

11   photographs you're referencing when you use that defined

12   term?

13        A.   I did not type this, so -- I mean, I had not

14   written this.

15        Q.   Well, let me rephrase then, if you're not sure

16   exactly what --

17        A.   If you're looking for capitalization, I did not

18   type this.  I had written this and handed it to my

19   attorney, so . . .

20        Q.   Let me -- let me ask you this question in a       12:50:29

21   different way then.

22             When you went and looked for the CoStar

23   listings and CoStar photographs, were you only looking

24   for the listings and photographs that we identified in

25   Exhibit A, which has been marked today as Exhibit 10?        12:50:47
```

129

CERTIFIED COPY

1      Is that the list -- the full list of listings

2  and photographs you were searching for?

3      A.   Can you give me a minute to read this, please?

4      Q.   Sure.

5      A.   (The witness reviews a document.)                12:51:03

6      (Discussion held off the record

7  between Mr. Bandlow and the witness.)

8      MR. BAUMGARTEN:  Sorry.  A question is pending

9  here, so I'm not sure why you're consulting.

10     MR. BANDLOW:  I'm allowed to consult with my         12:51:23

11  client anytime I'd like to.  I just did and I'll do it

12  again if I want to.

13     MR. BOYLE:  During a -- when there's a question

14  pending you're going to talk to your client?

15     MR. BANDLOW:  I can talk to my client, yes.          12:51:31

16     MR. BOYLE:  About the substance of it?

17     Was that question about privilege?

18     MR. BANDLOW:  I'm not going to tell you

19  anything about what that conversation was about.

20     MR. BOYLE:  Well, it's improper to coach your        12:51:39

21  client --

22     MR. BANDLOW:  I'm not coaching my client.

23     MR. BOYLE:  -- to coach a client when a

24  question of substance is pending.  And we --

25     MR. BANDLOW:  And that's not what I did.

130

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1              MR. BOYLE:  And we object.

 2              MR. BANDLOW:  Okay.

 3              MR. BOYLE:  And don't do it again.

 4              MR. BANDLOW:  I'll do it -- as often as I feel

 5     like talking to my client, I'll lean in and talk to him.    12:51:53

 6              THE WITNESS:  I'm not sure what you're asking

 7     me.  I'm confused.

 8         Q.   BY MR. BAUMGARTEN:  Let me ask you the --

 9         A.   So I don't know what the question is.

10         Q.   Let me ask you the question again.                 12:52:06

11              Both in this declaration and generally today

12     you've testified that you searched for listings and

13     photo- -- CoStar listings and photographs; correct?

14         A.   Uh-huh.

15         Q.   What was the source that you were getting the      12:52:19

16     listings and photographs to search for?

17              How did you know which ones to search for?

18         A.   The entire database.

19         Q.   Not where did you search, but what specific

20     photographs and listings were you looking for?             12:52:35

21              How did you decide which photos you were trying

22     to --

23         A.   The ones in Exhibit A and the ones in the other

24     file.  The ones that you had given us with the

25     addresses.  There's another page.                          12:52:42
```

131

CERTIFIED COPY

1    Q.   We have not produced -- okay.  That has not

2   been marked as an exhibit.

3    A.   That's not here.

4    Q.   That's fine.

5    A.   Please refer to it by name.                    12:52:50

6    Q.   There's not a question pending right now.

7    A.   Please refer to it by name, because it's not

8   here.  So it's not just this.  It's the other one with

9   the thin lines.

10    Q.   We understand your answer.                     12:53:05

11    A.   (To Mr. Bandlow) Right?

12         MR. BANDLOW:  Yeah.

13    Q.   BY MR. BAUMGARTEN:  When Apartment Hunters

14   receives the feeds, you said there's a team that --

15   there's a four-person team in Lithuania who works on the  12:53:30

16   uploads?

17    A.   Correct.

18    Q.   Okay.

19         And those feeds go into a database?

20    A.   Correct.                                        12:53:40

21    Q.   Is the database a piece of software?

22         What is the database?

23    A.   The database is a MySQL database.

24    Q.   MySQL?

25    A.   Right.                                          12:53:56

132

CERTIFIED COPY

1    Q.   Okay.  And is there a specific piece of

2    software used to run that?

3    A.   MySQL is a platform.  It's used by every single

4    company that runs queries, so . . .

5    Q.   And what is it that the four employees who are        12:54:23

6    doing the uploading do when they're putting the feed

7    into the database?

8         What are they doing?

9    A.   They're putting the feed into the database.

10   That's what they do.                                        12:54:36

11   Q.   What does that involve?

12        Do you know what that involves?

13   A.   I don't know the technical stuff.

14   Q.   The content that is stored, each listing, how

15   is each listing identified?                                 12:54:48

16        You mentioned that there is a listing ID.

17        Is that the main way listings are identified?

18   A.   I'm not -- again, that's technical stuff.  I'm

19   not sure if they're broken down by session, by cookie,

20   by how.  But the MySQL to me is like a honey bee that       12:55:09

21   one column is the beds, one column is the baths, one

22   column is hardwood floors, one column is that.  I'm not

23   sure how it's identified.

24   Q.   You testified before that every listing has a

25   unique listing ID; correct?                                 12:55:31

133

CERTIFIED COPY

```
 1        A.   Correct.
 2        Q.   Okay.  And is that --
 3        A.   That pulls it up.
 4        Q.   Sure.
 5             And is that -- the listing ID, is that by          12:55:36
 6   building or unit?
 7        A.   No, unit.
 8        Q.   And that listing ID is then used to create the
 9   URL for the website on apartmenthunterz.com, for
10   instance?                                                    12:55:53
11        A.   Correct, sir.
12        Q.   And I believe your testimony earlier today is
13   that the listing ID for each unit changes each day at
14   midnight?
15        A.   Correct.                                           12:56:02
16             And/or during the day if that same -- it
17   changes even several times during the day.
18        Q.   So if I were to search for a listing right now
19   and find a listing in Los Angeles that I liked, and I
20   bookmarked that URL, and then in three days I went back     12:56:17
21   to that --
22        A.   It won't be there.  For sure it won't be there
23   because -- in three days for sure it won't be there.  In
24   the same day it might have changed, but in three days it
25   will be gone.  It will --                                   12:56:36
```

134

CERTIFIED COPY

```
 1      Q.   Even if all else stays --

 2      A.   It will be a changed URL, and it will say

 3  "Sorry.  The listing you are inquiring about is not

 4  available.  You might also like" . . .

 5      Q.   The photographs that your website published,      12:56:53

 6  those are also published through an SQL database?

 7      A.   Of course.  They're married to the text, or

 8  they get married at some point.

 9      Q.   So each photograph is linked to a specific unit

10  listing; correct?                                          12:57:12

11      A.   Again, it's too technical for me when they get

12  married or connected, so I'd like to not take a guess.

13      Q.   You know there's a unique ID for each unit

14  listing.

15           Is there a unique ID for each photograph?         12:57:25

16      A.   I'm not positive of that, so I don't want to

17  answer how they're married.

18      Q.   Your attorneys have told us that at some point

19  since October or November of 2015, Apartment Hunters has

20  changed the way it stores or organizes its photographs.    12:57:44

21           Can you explain how that -- what that change

22  was?

23      A.   I cannot.  I'm not sure.  I can't.  I don't

24  have . . .

25      Q.   Do you agree with that statement, that the        12:58:03
```

135

CERTIFIED COPY

1  system of organizing Apartment Hunters' photos has

2  changed since October, November of 2015?

3       A.   I'm not sure in what way, but if that is what

4  they've said, then that is.  But I'm not sure in what

5  fashion you're talking about.                                    12:58:22

6       Q.   All right.

7            The answers that we've just been talking about

8  for the past five or so minutes about how the feeds come

9  in and how things are stored, is the same true both for

10 apartmenthunterz -- not only for apartmenthunterz.com           12:58:42

11 but for featuredrentals and all the other websites that

12 your company operates?

13      A.   Yes.

14           But apartmenthunterz and featuredrentals are

15 two different, because apartmenthunterz is just              12:58:57

16 California, and featuredrentals is nationwide, and the

17 URLs are different than each other.

18      Q.   Understood.

19      A.   So the same property in California on

20 apartmenthunterz is different than the same property as      12:59:11

21 a URL ID.

22      Q.   Sure.

23           But the principles of data storage --

24      A.   Yes, sir.

25      Q.   -- are the same?                                    12:59:19

**Abrams, Mah & Kahn**

1      A.    The same, sir.

2      Q.    When you said you had -- that you've preserved

3  all of the incoming feeds, is that true for websites

4  other than apartmenthunterz.com, or have you only

5  preserved the feeds for apartmenthunterz.com?                    12:59:40

6      A.    We don't get separate feeds.

7      Q.    You've talked about deactivation of listings.

8            I take it that there is no logging of when

9  listings are deactivated.  It just happens when you get

10 the feed in?                                                      01:00:24

11     A.    That is not related to the feed.  The

12 deactivation is strictly on the landlord's side.

13     Q.    Okay.

14           When a landlord tells you to deactivate a

15 listing --

16     A.    The landlord doesn't tell me to deactivate the

17 listing.

18     Q.    Okay.

19           You said there's deactivation on the landlord

20 side?                                                             01:00:46

21     A.    Correct.

22     Q.    When is there deactivation on the landlord

23 side?

24     A.    We started this from the beginning where the

25 landlord comes and types in a huge description of the             01:00:51

137

**Abrams, Mah & Kahn**

1    property.  We wanted to make sure they don't have to

2    type it again.  So we actually were one of the first

3    companies that the delete button doesn't work, so you

4    cannot delete.  Even if you intentionally want to hurt

5    us, it wouldn't delete it.  You just deactivate that          01:01:15

6    listing.  So when it's vacant, you activate.  When it's

7    full you deactivate.  You price-change it.  And we have

8    nothing to do with that.

9          If there is a major change, it will come back

10   to that approval that earlier we spoke about that Steve       01:01:36

11   and I see, if it's a drastic change.  If it's a minor

12   change, we don't even get to see it.  It goes live.

13        Q.   Are there any records of the minor changes?

14             Are there any records kept in the Apartment

15   Hunters system of when a --                                   01:01:55

16        A.   No, sir.

17        Q.   -- landlord makes minor changes?

18        A.   No, sir.

19             There's I believe -- I believe again.  I don't

20   know the background code.  But I believe there's a            01:02:02

21   filter of drastic changes being those derogatory words

22   or some crazy prices on a six bedroom being $500.  But I

23   don't know the protection of the back end when it comes

24   to our attention.  But usually a registered landlord

25   that we have the IP, usually we don't intervene.              01:02:32

138

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1      Q.   Have any of these landlord postings -- do you

 2   have -- sitting here today, do you believe that any of

 3   those landlord postings are the source for the CoStar

 4   photographs --

 5      A.   They could very well be.                        01:02:46

 6           Because previously to CoStar purchasing

 7   apartments.com, we had relationships with the buildings

 8   when Times Company owned apartments.com.  And all the

 9   managers used to come and post on our website.

10      Q.   Okay.                                           01:03:08

11           Have you found specific postings from landlords

12   with CoStar -- the CoStar photos and listings at issue?

13      A.   I have not looked.  On the landlord database, I

14   have not looked.

15      Q.   On the landlord database, you've mentioned that 01:03:23

16   nothing is ever deleted.  It's only activated or

17   deactivated; correct?

18      A.   Yes.

19      Q.   So is it correct to say that every posting from

20   a landlord over the past decade would still be there on 01:03:41

21   the cloud somewhere?

22      A.   I cannot attest to that.  But I know that the

23   text of the landlords is preserved by

24   activate/deactivate.  I don't know if the photos are

25   overwritten or there.  However, I can check.  I don't   01:03:58
```

139

CERTIFIED COPY

```
 1    know the answer.
 2            I know the accounts are there.  I know the
 3    managers' names are there.  I know the IP address of the
 4    buildings could be there.
 5        Q.    Do you still have tab No. 9 in front of you?        01:04:30
 6        A.    Yes, sir.
 7        Q.    Paragraph 8.  I'll read this again.
 8                "Apartment Hunters cannot simply
 9                'look up' the listing on its servers
10                and find the alleged photos, because the
11                specific photos were not on Apartment
12                Hunters' website or part of its data in
13                December 2015 when Apartment Hunters
14                froze the listings at issue."
15            When you say "froze the listings at issue,"
16    what does that mean?
17        A.    That's the preservation.
18        Q.    What does that mean?
19            What does that -- how did you preserve listings
20    if you couldn't find them?                                   01:05:12
21        A.    That is the document preservation and stopping
22    the scripts.  That's -- that's what we spoke about
23    earlier.
24        Q.    And what are the listings at issue then?
25            Is it the specific -- what are the listings at       01:05:25
```

                                                               140

CERTIFIED COPY

```
 1  issue?
 2      A.    The listings that you had given us with the
 3  lawsuit, we just froze everything.  We froze the
 4  processes.  I had mentioned this earlier again.  I don't
 5  know what other answer you're looking for, but that's          01:05:40
 6  what I have explained.
 7      Q.    Okay.
 8            When you say "the listing," do you mean the
 9  URL?
10      A.    Yes.                                                  01:05:50
11      Q.    And you testified earlier that the URL
12  changes --
13      A.    Changes.
14      Q.    -- from day to day?
15      A.    Right.                                                01:05:57
16            So we didn't look up.  These photos weren't
17  there.
18      Q.    You're talking about Exhibit --
19      A.    Exhibit A.
20      Q.    -- that's been marked as Exhibit 10?                  01:06:06
21      A.    Yes.
22            And then in the back end of the property, we
23  just went and put a wall on these particular listings.
24  Whether the -- first of all, these photos weren't there,
25  but we just put a halt to the normal scripts that          01:06:19
```

141

1    override and did everything.  We just did it, document

2    preservation, but --

3        Q.   For those URLs?

4        A.   For the company's back-end processors.

5            You keep trying to trick me into something, and      01:06:38

6    it's not going to happen.  So the twisting of words is

7    actually becoming a little bit boring.

8            We stopped everything, and it was written here

9    by me.  If my English was bad, forgive me.

10       Q.   I'm sorry.  I don't mean to bore you, sir.  I'm     01:06:56

11   certainly not trying --

12       A.   It's not boring --

13       Q.   -- to twist your words.

14       A.   -- boring me.  It's exciting me actually.  But

15   it's too much exciting.  I've explained it with my         01:07:01

16   horrible English as good as I could.

17       Q.   Okay.

18           The listings at issue -- I just want to try to

19   ask one more time.

20           The listings at issue, are they just the URLs      01:07:12

21   that were listed in Exhibit A, or was it every URL for

22   the entire website?

23       A.   What I said here is that in lieu of the

24   horrible screen shots where the top of the screen shot

25   was from one building and the bottom of it was from        01:07:30

142

Abrams, Mah & Kahn

CERTIFIED COPY

1    another building.

2         In other words, the bottom of the screen shots

3    were a pair of men's pants and the top was a lady's

4    shirt.  That's how horrible the screen shots were.  We

5    are still going through and finding those backup and          01:07:48

6    photos, and we're done, and we are -- handed it to

7    Lincoln, and we have found the photos.

8         So I'm not sure which period you're asking

9    about.

10        You guys didn't give us the data --                      01:08:20

11   Q.   There's no question pending right now.

12   A.   Good.  So I'll take a bathroom break.

13   Q.   Okay.

14        MR. BANDLOW:  Let's go off the record for his

15   bathroom break, please.                                       01:08:31

16        THE VIDEOGRAPHER:  Off record, 1:08 p.m.

17        (Recess taken from 1:08 p.m. to 1:27 p.m.)

18        THE VIDEOGRAPHER:  Returning to record,

19   1:27 p.m.

20   Q.   BY MR. BAUMGARTEN:  Mr. Shayan, let me start by          01:27:38

21   just going back to one issue we talked about.

22        You said the data for apartmenthunterz.com is

23   in the same location as all the data for all the other

24   websites that Apartment Hunters owns; correct?

25   A.   Yes, sir.                                                01:27:56

143

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1       Q.   Have there been -- the various steps that
 2   you've talked about today regarding the preservation of
 3   data relating to apartmenthunterz.com, have all those
 4   same steps also been taken as to every other website
 5   owned by --                                              01:28:14
 6       A.   You're at the same exact database.  The answer
 7   is yes.
 8       Q.   You've testified that you have located certain
 9   listings and photographs in going through the files that
10   were preserved; correct?                                 01:28:39
11       A.   Yes.
12       Q.   And I want to understand sort of the full scope
13   of what you are searching through.
14       A.    I had mentioned that I'm not testifying until
15   we submit the photos, so I'm not going deeper than we    01:28:55
16   have located some photos.  And I said that immediately
17   after I retracted.  Because I don't want to get into the
18   deposition of something that is not here nor was it in
19   your deposition papers.
20       Q.   Okay.  I'm going to --                          01:29:18
21       A.   (To Mr. Bandlow) Are you okay?
22            MR. BANDLOW:  (Nods head up and down.)
23            THE WITNESS:  Okay.
24       Q.   BY MR. BAUMGARTEN:  Let me first state for the
25   record that looking at Exhibit No. 1, the notice, we     01:29:28
```

144

CERTIFIED COPY

1   have item 11.  The topic is:

2            "The sources of documents, if any,

3        that have been searched electronically

4        (e.g., drives, servers, networks, databases)

5        in order to locate documents for collection

6        or production in this action, and, if any

7        electronic searches were conducted, who

8        conducted such searches."

9        A.   And the reply says we're still looking, and

10   we're continuing to look, and we'll provide them as soon      01:29:53

11   as possible.  And prior to getting here we were

12   preparing them, so I can't be deposed on something we

13   haven't given you.

14       Q.   Mr. Shayan, I'd appreciate it if you don't cut

15   me off while I'm asking questions.

16       A.   Okay.

17       Q.   Second, I'm not sure what you mean by your

18   response to this.  This is a list of topics.  There were

19   no responses.

20            Third, again, just for the record I want to be    01:30:12

21   clear that I also emailed with Ms. Arnold last week to

22   confirm that given that we had agreed to postpone our

23   motion to compel until this deposition was held, given

24   counsel's representations repeatedly that our various

25   questions relating to the motion to compel would be

145

CERTIFIED COPY

1    answered with this depo, I emailed with Ms. Arnold to

2    confirm that the witness would be prepared to testify on

3    behalf of Apartment Hunters regarding all of the various

4    issues that have been discussed in a motion to compel,

5    the draft that was exchanged at the end of August and                01:30:50

6    early September, and Ms. Arnold confirmed that the

7    witness would be.

8                MR. BANDLOW:  What we confirmed was the witness

9    would be able to testify about retention, about search,

10   about et cetera.                                                     01:31:06

11               What he's saying to you now is the results of

12   that search we have just come up with within the last

13   few days.

14               And to the extent that you want to ask

15   questions about the entirety of the results of that                 01:31:16

16   search, he doesn't have that information in front of him

17   right now and would feel uncomfortable testifying

18   because it would require him to speculate.

19               So to the extent you want to ask him what was

20   done to preserve documents, what kind of searches were             01:31:29

21   done, who conducted those things, he's here to do that.

22   But if you get into the specifics of, well, so now you

23   found out X, Y, and Z, he can't answer that because he

24   doesn't have that data in front of him.

25               THE WITNESS:  Right.  Right.  I'm not being            01:31:46

146

**Abrams, Mah & Kahn**

1    uncooperative.  It's just --

2           MR. BOYLE:  There's no question pending.

3           First, the failure to disclose to us that some

4    of our listing information has been found in advance of

5    this deposition, I think, is highly troubling.          01:31:58

6           THE WITNESS:  We don't have it.

7           MR. BANDLOW:  I don't have it yet.  I don't

8    have it in my possession.

9           MR. BOYLE:  Second --

10          MR. BANDLOW:  It doesn't exist yet.          01:32:04

11          MR. BOYLE:  Obviously Mr. Shayan and his

12   counsel knew that it had been located.

13          Second, the response, Mr. Shayan, from you is a

14   non sequitur.  The question was:  What was searched?

15   There's no --                                      01:32:22

16          THE WITNESS:  I didn't get his question, so --

17          MR. BOYLE:  It's got nothing to do with the

18   topic that has been raised.  The question is:  What is

19   the universe that was searched?

20          THE WITNESS:  The servers.                  01:32:36

21          MR. BAUMGARTEN:  Let me try to ask the question

22   again.  If you could listen to the whole question before

23   cutting me off, I'd appreciate it.

24          The question I would like to ask is, you have

25   stated that you have located certain listings and feeds.  01:32:43

147

Abrams, Mah & Kahn

CERTIFIED COPY

1   And I'm trying to understand exactly what was searched.

2           You also stated, and we've talked about this,

3   in paragraph 8 of Exhibit 9, your declaration, you

4   stated that Apartment Hunters "froze the listings at

5   issue," and that paragraph continues:                    01:33:05

6               "Thus, Apartment Hunters is

7           diligently going through its backup

8           servers and comparing each photo to

9           CoStar's Exhibit A in order to identify

10          the photos and then the sources."             01:33:15

11          So I just want to confirm that whether or not

12  where you have now apparently located some listing

13  information is in this universe of frozen listings from

14  December of 2015.

15          Is that where you have found the listings and  01:33:31

16  feeds, from the information you froze in December of

17  2015?

18      A.   No.   It will be -- no, sir.

19          I found -- no.   We have located some from the

20  feeds and not from the frozen of 2015.   It's after 2015.  01:33:45

21      Q.   So you have found it in new feeds that have

22  come in --

23      A.   See, the --

24      Q.   I'm asking a question.   You must let me finish.

25          You have found listings and feeds that you     01:34:01

148

CERTIFIED COPY

```
 1    think relate to CoStar's content in feeds that came in
 2    after December 18, 2015?
 3        A.    I cannot answer that correctly because I did
 4    not open the feeds myself, and I cannot give you a
 5    specific date of which feed contained the photos.              01:34:19
 6    That's what I'm trying to explain.
 7            I had my employees get the data, and they did
 8    find the photos, but I don't know the dates that you're
 9    asking, was it pre-December 2015 or post-December 2015.
10        Q.    Did -- have listings -- has information that      01:34:42
11    you think relates to CoStar's content also been found on
12    the backup servers?
13            Is that a separate --
14        A.    Yes.
15        Q.    -- in your mind -- let me finish.                 01:34:54
16            Is that in your mind a separate place to search
17    than the feeds?
18        A.    100 percent.
19        Q.    So your testimony today -- I just want to make
20    sure we're correct -- is that you have now -- your         01:35:04
21    company has now found information that you think relates
22    to CoStar's content in both No. 2, feeds of unknown
23    dates, and 2, in your backup servers?
24        A.    Correct.
25        Q.    Okay.                                             01:35:21
```

149

1        A.    And previous feeds backed up, yes.

2              Sorry.  I didn't understand in the beginning.

3        Q.    Have you found any content that you believe was

4   related to -- sorry.  Let me strike that.

5              Your attorneys have represented to us that you        01:35:52

6   were searching -- you were spending substantial time and

7   effort trying to identify the material that CoStar

8   claims it has found on www.apartmenthunterz.com.

9              Has Apartment Hunters also searched for

10  material that CoStar has found on other websites?            01:36:16

11       A.    Correct.  Yes.

12       Q.    And the substantial -- the substantial time and

13  effort, who has spent that substantial time and effort?

14             Is that Mr. Macys and Mr. Portnov?

15       A.    Yes, sir.                                         01:36:35

16       Q.    Would you say you personally have spent time

17  and effort?

18       A.    I cannot do the search on the servers, sir.

19       Q.    Other than Mr. Macys and Mr. Portnov, is there

20  anyone else who has spent substantial time and effort         01:36:45

21  searching for material?

22       A.    I'm not aware of that.  But usually top

23  management, those two guys are the ones that I consult

24  with.

25       Q.    Okay.                                             01:36:55

150

 1          And to the extent they have been searching for

 2     photographs, do you have an understanding of how that

 3     search was being conducted?

 4          Were they, for instance, going one by one

 5     looking at photos and comparing them visually?                    01:37:11

 6          Was there some electronic searching of the

 7     photographs?

 8          Do you have any idea how the search was

 9     conducted?

10     A.   I believe that they would be looking at a time            01:37:20

11     period first, and then they would be looking by address

12     ID to find them.  That would be my guess.  By ZIP code,

13     by address ID.

14     Q.   So you've said time period, ZIP code, and

15     address ID?                                                      01:37:42

16     A.   Right.

17          And then what I heard is geocoding.  Again,

18     that goes to -- I am not savvy on the server what kind

19     of a search bar they have in MySQL.  But I believe they

20     would be looking at it by address, ZIP code, and then to        01:38:02

21     find a photo that relates to the properties mentioned.

22     I'm not -- I have no idea what a search bar inside the

23     server would give you.

24     Q.   So your understanding of the process, which I

25     understand is not firsthand, is that Mr. Macys or                01:38:21

                                                                    151

CERTIFIED COPY

1    Mr. Portnov took, for instance, the address of the

2    building that was listed on Exhibit A, which has been

3    marked here as Exhibit 10, and would put that into the

4    SQL server and try to find other listings from the same

5    period -- from the same period with that address?                    01:38:45

6        A.   That was given to us or entered into the fast

7    post or by a landlord, yes.  That's what we were looking

8    for.

9        Q.   And separate and apart from the search that

10   started by trying to identify the listing and then look            01:39:04

11   for the information, photograph, was there any search

12   that just used the photograph as the primary searching

13   tool?

14       A.   We don't have a system like that, sir.

15       Q.   So you don't have the ability to, for instance,          01:39:19

16   hash photos or do anything like that?

17       A.   I don't know what "hash photos" is.

18       Q.   You said that you've identified photos from the

19   same buildings as some of the addresses that are listed

20   in Exhibit A, marked here as Exhibit 10, but that you              01:39:45

21   have not found the same exact photographs; correct?

22       A.   Yes.

23       Q.   And you have not found -- I just want to make

24   sure.

25            And you're saying that you have not found even           01:40:02

152

Abrams, Mah & Kahn

CERTIFIED COPY

1    a single one of the same exact photographs?  Everything

2    you have found is just a similar photo?

3        A.    I just got the research like two days ago from

4    my team, and I haven't sent it even over to Lincoln yet.

5    So I cannot give you an accurate answer in this -- in          01:40:24

6    this session.

7        Q.    Okay.

8             Do you know whether the SQL database can be

9    searched by listing ID?

10       A.    Yes.                                                   01:40:53

11       Q.    It can be?

12       A.    I believe so.

13            But again, if you opened up a MySQL database

14    here, I don't know how to search it.  This is the honest

15    truth.  I don't have any of that knowledge.                    01:41:05

16       Q.    But you understand that you were asked to

17    testify today about the sources of documents, if any,

18    that have been searched electronically?

19       A.    But I don't have that knowledge.  I only know

20    the front end of the computer.  I can't tell you what I        01:41:22

21    don't know.

22       Q.    Do you ever -- are you familiar with the

23    portion of Apartment Hunters' terms and conditions that

24    set forth the steps that someone can request to take

25    down a photo by?                                               01:41:56

153

CERTIFIED COPY

```
 1      A.   Very little.  It would be -- we have a button
 2   there that says "Claim This Listing," and then we have a
 3   digital copyright act there that says, you know, if you
 4   believe that we're violating your copyright, you push
 5   the button, and you would let us know.  And to that          01:42:16
 6   extent I know.
 7          And at the time we built the website in 1999,
 8   we had our initial attorney, Jilbert, help us with the
 9   terms and conditions and privacy report.  And then one
10   more time we had purchased the privacy seals.  It's on       01:42:41
11   the bottom of our website.  And they reviewed every
12   30 days to make sure it's the updated privacy.
13          It's called TRUSTe.  It's the largest company
14   that there is for privacy statements and customer
15   protection.  They are the ones who audit our terms and       01:43:07
16   conditions and privacy seals.  They charge like $2,500
17   or something.  They make us modify and make sure it's up
18   to the latest standards.
19      Q.   When you search for a listing by address,
20   I understand that you might get a number of listings;        01:43:35
21   right?
22          So if there is a building that has 20
23   apartments, there might be three listings; correct?
24      A.   Correct, sir.
25      Q.   Do you have any sense of from the -- there           01:43:49
```

154

 1    are -- in Exhibit A, marked here as Exhibit 10, there

 2    are, I think, 26 different addresses.

 3         Do you have any idea of during the search

 4    process that we've been discussing today, how many

 5    individual listings those addresses lead to?                01:44:05

 6        A.   No, sir.

 7        Q.   And do you have any idea how many photos were

 8    associated over any period of time with those addresses?

 9        A.   No, sir.

10        Q.   And you said you don't use any sort of hashing    01:44:20

11    software.

12         Just so there's no doubt, do you use any sort

13    of image-comparison software?

14        A.   We don't even -- I don't know what "hashing"

15    means.  And "image comparison," I never heard of it       01:44:32

16    except in Google Photos.  Like you can go to Google

17    Photos, take a picture of this phone, and it will tell

18    you what it is.  I've never seen anything else like

19    that.

20        Q.   So about a week and a half ago on                 01:45:00

21    September 21st I provided Mr. Bandlow and Ms. Arnold

22    with a list of 34 URLs in which the specific CoStar

23    photos had been published, the specific URLs.  And it

24    seems like it's after we provided that is when you found

25    the information you're going to disclose to us at some     01:45:18

155

CERTIFIED COPY

1    point; correct?

2        A.   Yes.

3        Q.   Who was involved in taking that information and

4    running searches with it?

5        A.   Do you have that paper?  May I look at it?          01:45:31

6        Q.   Sure.

7             I would like you to first answer the question,

8    though.

9        A.   I would like to look at the document so I could

10   exactly explain to you what you had provided.              01:45:46

11            MR. BAUMGARTEN:  I'm going to mark this as

12   Exhibit 12.  This is a letter that I sent to Mr. Bandlow

13   and Ms. Arnold on September 21st, 2016, with a

14   spreadsheet attached.

15            (Exhibit 12 was marked for identification.)        01:46:05

16            THE WITNESS:  (The witness reviews a document.)

17            I'll explain to you.  These URLs are

18   absolutely -- the addresses I could pull up.  Okay.  At

19   the time that you pulled these listing URLs, they were

20   alive.  But these picture URLs are completely             01:46:30

21   meaningless, because this is a session ID created for

22   that photo.  These are just session IDs.  In a --

23       Q.   BY MR. BAUMGARTEN:  I just want to clarify,

24   just because we're using so many --

25            MR. BANDLOW:  When you say "these" and "those,"    01:46:49

                                                                156

```
 1   for the record let's make sure you tell what you're

 2   referring to.

 3          THE WITNESS:  I'm referring --

 4      Q.   BY MR. BAUMGARTEN:  You're talking about the

 5   third column --                                          01:46:54

 6      A.   -- that photograph URLs --

 7      Q.   This information is useless?

 8      A.   Correct, sir.

 9          So the listing URL changes, and the photograph

10   URL that's attached to that is a long string that's      01:47:03

11   generated by the server, and it is gone.  The only thing

12   good here is this first column, which is the property

13   name and the street name and Oceanside, California, and

14   the ZIP code.  The rest of it, this would not pull up if

15   you pasted it, and that would not pull up if you pasted  01:47:27

16   it.

17      Q.   Okay.

18          Are you aware that CoStar has asked your

19   attorneys whether your company would provide a

20   third-party vendor access to Apartment Hunters' photo    01:48:02

21   database so that that third-party vendor could run an

22   automated photo image comparison between CoStar's images

23   and Apartment Hunters'.

24          Are you aware of that?

25      A.   Yes.                                             01:48:12
```

157

CERTIFIED COPY

```
 1       Q.   Okay.
 2            And Apartment Hunters has refused; correct?
 3       A.   100 percent.
 4       Q.   Okay.
 5            And in your declaration, this is Exhibit 9,        01:48:17
 6  paragraph 18, you've written:
 7                 "If Apartment Hunters were ordered
 8            to produce its servers to a third party
 9            for inspection, the time and effort that
10            Apartment Hunters would have to spend        01:48:30
11            to prepare its data for such a review
12            would effectively shut down its business
13            for weeks and likely forever."
14       A.   Put us out of business.  And there's nobody
15  else more qualified than our team to provide this.      01:48:41
16       Q.   Okay.
17            And so you understand that what we propose is
18  not for you to turn over your servers to someone, but --
19       A.   Just to give you access.
20       Q.   You have to let me finish.                    01:48:54
21            What we proposed is to provide a third party
22  remote access to the server; correct?
23       A.   Yes, sir.
24       Q.   Okay.
25            And have you -- has Apartment Hunters ever     01:49:01
```

158

CERTIFIED COPY

1   worked with a company called PicScout?

2       A.   We have never worked with an outside party, and

3   we will not let an outside party come in because of the

4   sophisticated way that our system is and how old it is.

5   Because we have written code on top of code, and we                01:49:27

6   don't -- it's spaghetti.  This company started on, you

7   know, very little money, and we don't really know.  I

8   don't know -- what's the name of it?

9       Q.   PicScout.

10          Just yes or no, have you worked with PicScout?           01:49:51

11      A.   No, sir.

12      Q.   Have you worked -- again, yes or no, have you

13  worked with Vobile?

14      A.   What?

15      Q.   Vobile, V-o-b-i-l-e.                                      01:49:59

16      A.   No, sir.

17      Q.   And are you aware that another CoStar

18  competitor, which is named RealMassive, has implemented

19  a realtime in-line filtering system that compares its

20  photographs to CoStar?                                             01:50:17

21      A.   I saw that in a settlement agreement.  That was

22  agreed upon.  And that could be a possibility if there

23  is a settlement.  But, again, I've never used that, but

24  I'm open to it.

25      Q.   You realize that's what we're talking about            01:50:38

159

CERTIFIED COPY

1    here, as just -- as a net settlement, that's the sort of

2    monitoring and/or third-party remote access that we've

3    proposed; right?

4         A.   We won't -- it's not an access.  It would be --

5    access is not what would be agreed to, but it would            01:50:54

6    be . . . how can I put it?  Guaranteed that this --

7    first of all, this did not happen.

8              And I'm not sure, Lincoln, help me out here.

9              If there was ever an agreement -- first of all,

10   we've never been to the site.  There's no digital             01:51:20

11   footprint.  There's no IP addresses.  And there's no

12   photos found on our website.

13             But if this thing could go away with a

14   guarantee that these photos would be compared to

15   CoStar's, you guys would have to provide us photos for        01:51:40

16   the comparison to happen.  There's going to be no access

17   given.

18        Q.   My question was whether or not you're aware

19   that this settlement is in place, which it sounds like

20   you are.                                                      01:51:53

21             And so my next question is whether you're aware

22   that this comparison system, this third-party comparison

23   system has been implemented with no negative impacts on

24   RealMassive's business?

25        A.   Well, I --

160

CERTIFIED COPY

```
 1          MR. BAUMGARTEN:  Objection.  Lacks foundation.

 2   Calls for speculation, for him to speculate about what

 3   it has done to someone else's business.

 4          But you can answer.

 5          MR. BANDLOW:  I'm asking if he's aware of it.        01:52:14

 6   If the answer's no, then he's not.

 7          THE WITNESS:  If it involves remote access, the

 8   answer is no.  We will not get --

 9      Q.   BY MR. BAUMGARTEN:  Sir, that's not my

10   question.                                                    01:52:20

11          My question is whether you're aware of how this

12   agreement, which you apparently know about --

13      A.   I have no idea how the agreement was drawn.

14      Q.   That's all I'm asking.

15      A.   Okay.                                                01:52:29

16      Q.   So can you tell me what Apartment Hunters would

17   have to do to, quote, prepare its data to allow a third

18   party to run a comparison software?

19      A.   We will not allow a third party into our system

20   or give them our data.                                       01:52:48

21      Q.   I understand that's your position.  But what

22   you've written in your sworn declaration is that --

23      A.   It would pretty much shut us down.

24      Q.   What you've written in your declaration is that

25   it would -- we can go with that, that it would            01:52:59
```

161

CERTIFIED COPY

```
 1   effectively shut down your business.
 2            Why would giving a third party monitoring
 3   access shut down the business?
 4       A.   It entails a gigantic amount of research and
 5   copying of our data and photographs, and we're not set      01:53:17
 6   up for that, period.
 7       Q.   And if you've never worked with one of these
 8   companies that does this, how do you know that you would
 9   have to do --
10       A.   I asked our top programmers, and we're just a       01:53:37
11   small company, and we're not set up for that.  You're
12   asking for a giant to come in or for us to give a copy.
13   We're not set up for that.
14            Well, you can shake your head all you want, and
15   we're not.                                                   01:53:52
16            MR. BOYLE:  Can we go off the record for just
17   one second?  I think the witness is confused.
18            Can we just go off the record?
19            THE REPORTER:  Counsel?
20            MR. BANDLOW:  Sure.                                  01:54:01
21            THE VIDEOGRAPHER:  Off record, 1:54 p.m.
22            (Discussion held off the record.)
23            THE VIDEOGRAPHER:  Returning to record,
24   1:59 p.m.
25       Q.   BY MR. BAUMGARTEN:  Mr. Shayan, we've talked        01:59:14
```

162

```
 1   about Amazon Web Services hosting the website.
 2          Does Amazon Web Services also host the email
 3   server for Apartment Hunters?
 4      A.   I don't know that we have an email server.  I'm
 5   not sure.  Again, that's too technical for me.  I know          01:59:33
 6   we send and receive emails.  I don't think we have an
 7   email server.
 8          MR. BANDLOW:  Could we take a quick break?
 9          MR. BAUMGARTEN:  Sure.
10          MR. BOYLE:  Sure.                                        02:00:09
11          THE VIDEOGRAPHER:  Off record, 2:00 p.m.
12          (Recess from 2:00 p.m. to 2:07 p.m.)
13          THE VIDEOGRAPHER:  Returning to record,
14   2:07 p.m.
15      Q.   BY MR. BAUMGARTEN:  Mr. Shayan, we were talking        02:07:05
16   about Apartment Hunters, Incorporated's email server.
17          So your testimony is that you're not sure
18   whether the company has an email server?
19      A.   I'm not positive, sir.  I know we use an email
20   front named Zimbra.                                            02:07:18
21      Q.   Zimbra?  Is that sort of like a client, sort of
22   like a Microsoft Outlook --
23      A.   Uh-huh.  Client.  Yes, sir.
24      Q.   And is -- everyone uses that, both yourself as
25   well as the employees in Lithuania and Russia?                02:07:38
```

163

CERTIFIED COPY

1      A.    I believe my employees use a different client.

2      Q.    Do you know what that one is?

3      A.    No.

4            They do an IMAP or a POP3 or something.  I'm

5      not sure.  But I don't think -- as far as paying, we

6      don't have a server.

7      Q.    Okay.

8            In order to send emails from a -- at an

9      apartmenthunterz.com address, there must be some sort of

10     server somewhere.

11           Let me show you a look-up we did.

12           So this is Exhibit 13, and this is a look-up we

13     did online a few days ago on a website called MxToolbox.

14           (Exhibit 13 was marked for identification.)

15     Q.    BY MR. BAUMGARTEN:  And what we did is we took

16     the domain name of mail.apartmenthunterz.com and ran

17     this to find the IP address.  And so this sort of

18     confirms that there is an IP address it says with its

19     domain name?

20     A.    Oh, excuse me.  Oh, there's info at Apartment

21     Hunters and the customers send and receive emails and

22     all that.  I didn't say no.  But if there's --

23     Q.    If you need water, take a second.

24     A.    Sorry.  I didn't -- I'm thinking of a server as

25     a physical box that just sends and receives emails.  But

02:07:49

02:08:04

02:08:30

02:08:49

02:09:03

164

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1    of course there is emails.
 2        Q.   And when I say "server," I mean -- I'm not
 3    saying whether or not --
 4        A.   I was thinking that it's the same place where
 5    the Amazon servers are, and we're using the same          02:09:16
 6    platform, yeah.
 7        Q.   So to the extent that you guys do have email
 8    addresses, it would be run through --
 9        A.   Oh, for sure.
10        Q.   I have to ask the question.                       02:09:29
11             To the extent you guys have email addresses, it
12    would be run through Amazon?
13        A.   Yes, sir.
14        Q.   Okay.
15        A.   There you go.                                     02:09:37
16        Q.   So you have some email addresses, and
17    we'll talk about them specifically, that end in
18    apartmenthunterz.com.
19             Are there other email addresses that your
20    company has that end in, for instance, @ifindrentals.com  02:09:52
21    or @ any other website name?
22        A.   Yes, sir.
23        Q.   And what are the other --
24        A.   Each domain has an @featuredrentals,
25    @wetakesection8, @ifindrentals, the websites that we       02:10:18
```

165

1    mentioned earlier.

2         Q.   4rentinnewyork?

3         A.   4rentinnewyork, I believe that it's no reply

4    right now.  Don't quote me.  I didn't follow up on what

5    the company -- the employees did with the emails.                    02:10:32

6         Q.   Okay.

7         A.    Or if it says the site is no longer up.  But

8    the live sites have an info@, and I don't have a kevin@

9    on all the sites.  I have kevin@apartmenthunterz,

10   kevin@featuredrentals.  And only the employees also have      02:10:54

11   @apartmenthunterz and @featuredrentals, not @ . . .

12        Q.   Okay.

13        A.   And then there's customersupport@.

14        Q.   At both -- at apartmenthunterz and

15   featuredrentals --

16        A.   At all of them.

17        Q.   So every -- every domain we mentioned earlier

18   there's going to be info@ and customersupport@?

19        A.   Yes.

20             And then there's also landlords@, except          02:11:29

21   section8 there's no landlords@.

22        Q.   Okay.  So --

23        A.   Oh, ifindrentals there's no landlords@.

24        Q.   Let me ask it this way.  Let's start with the

25   info@apartmenthunterz.com.                                    02:12:07

166

CERTIFIED COPY

```
 1        A.   Uh-huh.
 2        Q.   Has anyone searched that email account for
 3    documents responsive in this litigation?
 4        A.   Yes, sir.
 5        Q.   And who performed that search?                 02:12:19
 6        A.   That's a keyboard search.  Dennis, Vid, and
 7    myself, I did.
 8        Q.   When you say "a keyboard search," I'm not
 9    familiar with that term.
10        A.   Inside the keyboard.
11             MR. BANDLOW:  Keyword.
12        Q.   BY MR. BAUMGARTEN:  Keyword.  I'm sorry?
13        A.   And nothing comes up.
14        Q.   And so --
15        A.   Right now if you type it, all of this comes up. 02:12:45
16        Q.   So a keyword search, in other words, you're
17    using search terms?
18        A.   Yes.
19        Q.   And did you develop the list of search terms?
20        A.   As far as the building numbers, the building   02:12:57
21    names, ZIP codes, any mention of those building names,
22    once you gave us the suit, we went in there and tried
23    and we -- there was no mention of it.
24             Then among the employees, if you're asking,
25    there is no communication.  It's all between us.         02:13:19
```

167

CERTIFIED COPY

1    Q.   Okay.  I don't want to know about your

2    communications with your attorney.  What I'm asking is a

3    very narrow question.

4         Who decided which search terms to run against

5    your email?                                        02:13:37

6    A.   Independently each one I did.  I don't know

7    what Dennis did.  I don't know what Vid did.  I checked,

8    and there is no negative communication among the two of

9    them.

10   Q.   So you -- you ran some searches in your email    02:13:52

11   accounts?

12   A.   Actually, I ran some searches just to look to

13   see if a landlord had posted, if there was any seeding

14   if there was a landlord account.  But among the two of

15   them, I explicitly trust them, and it wasn't in my mind  02:14:10

16   that they were doing something between the two of them

17   regarding these CoStar accounts.

18   Q.   Let me try to narrow the question then.  If you

19   could just focus on the very narrow question I'm asking.

20        You personally ran some searches; correct?     02:14:29

21   A.   Yes.

22   Q.   Was that over many email addresses?

23        Was it against one email account?

24   A.   They're all in the same place.  They're

25   aliases.

168

CERTIFIED COPY

1      Q.   So you can run a search for every email account

2   at once?

3      A.   Yes.

4      Q.   Okay.

5           Everything that's on the apartmenthunterz.com          02:14:49

6   group?

7      A.   Right.

8      Q.   And is that same -- would that same search also

9   get all the addresses at featuredrentals.com?

10     A.   Right.                                                  02:14:59

11     Q.   So you have one search that searches every

12  email account in the whole --

13     A.   Right.

14     Q.   And in the entire company, all the different

15  domain names, about how many email accounts are there        02:15:08

16  total or email aliases?

17     A.   I'm not positive to give you an accurate

18  number, sir.

19     Q.   Do you have a sense of whether it's dozens or

20  hundreds or any --                                            02:15:21

21     A.   It's below -- below 50 easy.

22     Q.   And you can search all of these aliases at

23  once?

24     A.   Yes, sir.

25     Q.   And you performed some searches?                       02:15:33

169

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1       A.   I did.
 2       Q.   And about how many different terms would you
 3  say you ran?  Was it ten?  Was --
 4       A.   I'm not positive.
 5       Q.   Do you have a sense?  I mean, you ran them.    02:15:42
 6       A.   No.
 7       Q.   And who -- and you yourself said, "These seem
 8  like some good search terms to run.  I'll run them."
 9  You didn't consult with anyone else about what other
10  words you should be using?
11       A.   No, sir.
12       Q.   Okay.
13            Now, you've also said that Mr. Macys and
14  Mr. Portnov also ran some searches?
15       A.   Right.                                         02:16:02
16       Q.   And you told them to run searches?
17       A.   Right.
18       Q.   And do you know what terms they actually used
19  to search?
20       A.   Initially we were looking for "Welcome to      02:16:10
21  Apartment Hunters.  Your listing has been posted,"
22  Welcoming the building manager or the landlord of the
23  addresses that were in the initial lawsuit document.
24  And later on the next day we decided that that is not
25  a good place to look, so we put our efforts elsewhere.   02:16:39
```

170

CERTIFIED COPY

1          Post that among communications between the two

2   employees, I've checked probably once because I was

3   looking for some docs, and there's no communications

4   between Dennis and Vidmantas, and that's about it.

5      Q.   So let me ask my question, because I'm not sure          02:17:11

6   that was responsive.

7          My question is:  Do you know what search terms

8   Mr. Macys has run?

9      A.   No.

10     Q.   Do you know what search terms Mr. Portnov has          02:17:18

11  run?

12     A.   No.

13     Q.   Do you have reason to believe that anyone other

14  than yourself and those two individuals has run search

15  terms?                                                          02:17:30

16     A.   No.

17     Q.   You believe -- the answer is no.  Okay.

18         So I think you talked about two different types

19  of searches.  One was you were looking for emails to

20  landlords, the "Welcome to Apartment Hunters"?                  02:18:03

21     A.   Uh-huh.

22     Q.   And I think you talked a little bit about

23  searches for emails between Mr. Macys and Mr. Portnov?

24     A.   The reason I said that is because initially you

25  brought up a question that do your employees discuss           02:18:18

171

CERTIFIED COPY

1    this case among them as a trust issue, and I said my

2    employees do not discuss this case between them.  The

3    three of us have telephonic meetings, and I explicitly

4    trust them.

5         So when I went to look for a particular                      02:18:37

6    document and I typed "CoStar," there was no emails back

7    and forth as a conversation in that search result.

8         Q.   Okay.

9         So the searches of the -- between Mr. Macys and

10   Mr. Portnov that you're talking about, that's just a            02:18:59

11   different search term that you used?

12        It wasn't that it was in a different part of

13   the server or a different search box?

14        A.   No, sir, not at all.

15        Q.   Okay.                                                  02:19:10

16        Can you access your -- any of your accounts

17   through, like, a smartphone, through an iPhone, or a

18   BlackBerry?  Can you access apartmenthunterz.com?

19        A.   I don't have a BlackBerry, and I am not sure

20   our website is BlackBerry friendly.  I can access them          02:19:27

21   through a phone, an iPad.  We were trying, but my phone

22   died.

23        Q.   And so my question is not whether you can

24   access the website, but whether you can check your --

25   for instance, I think it's kshayan@apartmenthunterz.com,        02:19:41

172

CERTIFIED COPY

```
 1    can you on an iPhone pull up the emails for that?

 2        A.   kshayan@apartments.com?

 3        Q.   @apartmenthunterz.com, yes.

 4        A.   I don't have that email.

 5        Q.   Okay.  We'll come back to --                      02:19:57

 6             MR. BOYLE:  Kevin@apartmenthunterz?

 7             THE WITNESS:  Yes, I have

 8    kevin@apartmenthunterz.com.

 9        Q.   BY MR. BAUMGARTEN:  Okay.

10        A.   Yes.  And I can pull up those emails.            02:20:04

11        Q.   You can pull that up on the phone.  Okay.

12    I apologize.  I just wrote that down wrong.

13             So you can pull that up on your phone?

14        A.   Yes, sir.

15        Q.   And can other employees also check their        02:20:17

16    apartmenthunterz.com email on their phone?

17        A.   Previously there was total transparency, and

18    everybody could see everything.  Recently I have

19    separated mine into a separate folder, and now they

20    cannot see my --                                          02:20:42

21             MR. BANDLOW:  He's asking you can other

22    employees check their own email addresses.

23             THE WITNESS:  Oh, sorry.  I didn't get it.

24    Yes, all of them have their own email addresses.

25    I thought you were talking about mine.                    02:20:55
```

173

```
 1        Q.   BY MR. BAUMGARTEN:   No.

 2             Have steps been taken in connection with this

 3   litigation to search anyone's phone for responsive

 4   emails?

 5        A.   I'm not sure I get it.   Check their phones?          02:21:07

 6        Q.   Have any steps been taken to search either your

 7   phone or any employees' phones for responsive

 8   communications?

 9        A.   No.

10        Q.   Do you frequently send text messages?               02:21:21

11        A.   To my brothers and sometimes family.

12        Q.   Do you text with your brother about your

13   business?

14        A.   No.

15        Q.   Do you text with anyone about the business?          02:21:38

16        A.   No.

17             I only have two brothers and nothing about

18   business.

19        Q.   One of your brothers is Steven; correct?

20        A.   Right, but he lives two blocks away from my          02:21:49

21   house, so texting would be kind of . . .

22        Q.   You know, kids these days text all the time, so

23   you never know.

24        A.   Go ahead.

25        Q.   So your address is kevin@apartmenthunterz.com,        02:22:04
```

174

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1    that's your personal one?
 2         A.    For the company, yes.
 3         Q.    Do you have like a Gmail account also or Yahoo
 4    or something like that?
 5         A.    My Yahoo was kevin@listmyrentals.com.          02:22:17
 6         Q.    Kevin --
 7         A.    Kevin@listmyrentals.com.
 8         Q.    And when you said that was your Yahoo, what do
 9    you mean by that?
10         A.    I had -- we owned a domain called             02:22:38
11    listmyrentals.com.
12         Q.    Yes.
13         A.    And I had my personal email there.
14               MR. BANDLOW:  You did not have a Yahoo email
15    account.  You're using Yahoo generically.  You're not    02:22:47
16    saying --
17               THE WITNESS:  Right.
18               MR. BANDLOW:  -- you have a Yahoo --
19               THE WITNESS:  See, that domain was being hosted
20    by Yahoo.  It was a one-page website way when we.  And    02:22:54
21    that domain is being hosted on a 1495 Yahoo hosting.
22         Q.    BY MR. BAUMGARTEN:  Understood.
23         A.    And it's a Yahoo-hosted website with a Yahoo
24    email hosting.
25               Does that make sense?                          02:23:09
```

175

CERTIFIED COPY

```
 1              MR. BANDLOW:  Yes.

 2       Q.   BY MR. BAUMGARTEN:  Yes.

 3              Do you still use that kevin@listmyrentals.com?

 4       A.   Yeah.

 5              Occasionally, until a few nights ago when I saw    02:23:15

 6    everybody's been hacked.

 7       Q.   Have you searched that email address for

 8    documents relating to this case?

 9       A.   Yes.

10              But it is full of spam.  There is nothing of      02:23:29

11    substance in there.

12       Q.   But you have searched it?

13       A.   Not particularly for this case.  There is

14    nothing there except solicitations.

15       Q.   So this kevin@apartmenthunterz.com, you use        02:23:46

16    this every so often to communicate with folks outside of

17    Apartment Hunters; correct?

18       A.   Yes.  Vendors, friends, family, yeah.

19       Q.   And do you also use that email account --

20    actually, I'll strike that.  Give me one second.  I'm      02:24:15

21    sorry.

22              Does your brother have a similar

23    steven@apartmenthunterz.com address?

24       A.   Yes, sir.

25              His is steveshayan@apartmenthunterz.com.  And     02:24:45
```

176

CERTIFIED COPY

1   he doesn't have a featuredrentals.

2       Q.   Does Mr. Macys have any email addresses with

3   just his specific name?

4       A.   Yes.

5       Q.   And what is that?                               02:25:03

6       A.   It's vidmantasmacys -- his full name --

7   @apartmenthunterz.com.

8       Q.   And does Mr. Portnov have one?

9       A.   His is just his first name,

10  dennis@apartmenthunterz.com.                             02:25:18

11      Q.   And the six customer -- six or seven customer

12  support representatives in Lithuania, do they have email

13  addresses with their names?

14      A.   I believe it's support@apartmenthunterz.com.

15      Q.   And you mentioned there's the two groups of     02:25:38

16  four, so eight total programmers in Lithuania.

17          Do they have individual email accounts?

18      A.   No.  I think they use

19  management@apartmenthunterz.com.

20      Q.   So every --                                     02:26:01

21      A.   And that comes to all of us.  It comes to me,

22  Steve, Dennis, Vid.  It's a grouping.

23      Q.   So every one -- all of your employees that

24  we've been discussing all day, every one has at least

25  one, if not more, email accounts that they can use       02:26:20

177

Abrams, Mah & Kahn

1    personally?

2         A.   Right, sir.

3         Q.   And your testimony is that no one ever e-mails

4    within the company to each other, no one ever sends

5    emails?                                                      02:26:34

6         A.   No, sir.

7         Q.   You only use it for outside people?

8         A.   Yes, sir.

9         Q.   That management@apartmenthunterz.com account,

10   how long are emails stored there for?                        02:26:46

11        A.   I don't have any idea.

12        Q.   If one of the programmers in Lithuania sees an

13   email and says, "Well, I've dealt with this," can he

14   just go ahead and delete it?

15        A.   Yes.                                                02:27:05

16        Q.   And that's still the case today?

17        A.   Yes.  Sorry.  I have allergies.  Go ahead.

18        Q.   If you need water or a break --

19        A.   I'm good.  Thank you.

20             MR. BANDLOW:  Do you need something else?           02:27:28

21             THE WITNESS:  No, I'm good.  Thank you.

22        Q.   BY MR. BAUMGARTEN:  Okay.

23             The info@apartmenthunterz.com address, who can

24   access that?

25        A.   Everyone, but it's monitored constantly by the     02:27:40

178

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
 1   support ladies and Vid.
 2       Q.   Any idea about how many emails you get a month
 3   at that address?
 4       A.   Well, a number?  No.
 5       Q.   But you get emails to that account on a daily        02:28:04
 6   basis?
 7       A.   A lot.
 8       Q.   Do emails ever get sent out from
 9   info@apartmenthunterz.com?  So do people respond to
10   customers using that address?                                 02:28:20
11       A.   Yes.
12       Q.   And those -- the customer support
13   representatives when they are -- if they've gotten an
14   email and they're done with it, they can delete the
15   email?                                                        02:28:40
16       A.   Yes, sir.
17       Q.   That's still the case today?
18       A.   Yes, sir.
19       Q.   The address -- you said -- you said there are a
20   lot of emails every day.                                      02:28:48
21           Any idea, is that two dozen?  A hundred?  Any
22   idea what the ballpark is, email --
23       A.   It's probably -- I don't know.  6-, 7-, 800, if
24   not a thousand, because --
25       Q.   Per day?                                             02:29:04
```

179

CERTIFIED COPY

1    A.   Per day.  Because every customer that comes and

2    signs up gets a welcome.  "Here's your receipt for the

3    payment," and then immediately they get the listings

4    that are matching their search criteria.

5         And also the landlords get an e-mail that "The          02:29:19

6    following properties are about to expire," you know,

7    "Would you like to delete them or add seven more days to

8    them?"  There is a lot of going-back-and-forth emails

9    both to landlords, guests who didn't sign up, and

10   members who did sign up.                                      02:29:45

11   Q.   So the info@apartmenthunterz.com address that's

12   monitored by the customer support team, I assume that's

13   then the address that you're going to be corresponding

14   with customers from?

15        That's where customer complaints --                     02:29:57

16   A.   Also, for example, if some company wants to do

17   business with us, they would be -- contact us at this

18   email.

19   Q.   Okay.

20        And so, for instance, if the company wanted to          02:30:07

21   set up a feed agreement, they would contact you at that

22   info?

23   A.   Correct.

24   Q.   What about the address

25   management@apartmenthunterz.com, what types of               02:30:24

180

**Abrams, Mah & Kahn**

```
 1   communications come in there?

 2       A.   We don't have any -- it's published.  It's

 3   among us.  When we want to circulate something, that's

 4   all of us get it.

 5           MR. BAUMGARTEN:  Let me ask about -- well, why     02:30:49

 6   don't we take a quick break to change the tape.

 7           THE VIDEOGRAPHER:  Off record, 2:30 p.m.

 8           This concludes tape No. 2.

 9           (Recess taken from 2:30 p.m. to 2:33 p.m.)

10           THE VIDEOGRAPHER:  This begins tape No. 4 in      02:33:13

11   the videotaped deposition of Kevin Shayan taken at

12   725 South Figueroa Street, 31st Floor, Los Angeles,

13   California, on September 29th, 2016.

14           My name is Jeannie Schwarze with Dean Jones

15   Legal Videos, Inc. out of Santa Ana, California.

16           Returning to record, 2:33 p.m.

17       Q.   BY MR. BAUMGARTEN:  Mr. Shayan, we were talking

18   about email addresses before the break, so let me ask

19   you about another one, affiliate@apartmenthunterz.com.

20       A.   Yes, sir.                                         02:33:45

21           That is the one that people who are our

22   affiliates contact us with.  Because -- yes, affiliates.

23       Q.   And who are your affiliates?  Who would you

24   contact --

25       A.   A lot of other rental websites who don't have    02:33:58
```

Abrams, Mah & Kahn

1    any data, meaning listings, come to us for data.  So we

2    feed a lot of data to other websites.  And that's how

3    they communicate with us.

4         Q.   Who gets the emails -- or who checks that email

5    address?                                              02:34:23

6         A.   All of these, our manager, Vidmantas.

7         Q.   Does anyone else track the affiliates?

8         A.   I have access to it.  Dennis has access to it,

9    but I don't check it.

10        Q.   And it's up to Mr. Macys to decide when to     02:34:39

11    delete emails on this account?

12        A.   Correct.

13             We are on a clean in-box system.

14        Q.   There was a -- I can show you the exhibit if

15    you need it -- but let me strike that.  Hold on one     02:35:02

16    second.

17             What do you mean by "clean in-box system"?

18        A.   No.  I was just saying there's a lot of effort

19    being put on keeping your in-boxes organized.  That's

20    what I meant as an effort, but . . .                    02:35:19

21        Q.   Okay.

22             I can show you an exhibit, if you need it,

23    but I assume you're familiar with that on

24    apartmenthunterz.com there's a contact desk page where

25    there's a little form where a customer can enter a      02:35:36

182

**Abrams, Mah & Kahn**

```
 1    complaint and send it, and it goes to you?
 2        A.    Uh-huh.
 3        Q.    I just need a verbal response.
 4              Not to you, but it goes to the company.  You're
 5    familiar --
 6        A.    Yes.
 7        Q.    -- with that?
 8        A.    Yes.  Yes.
 9        Q.    So who gets that one, that form where someone
10    clicks enter and sends you a complaint?                          02:35:50
11        A.    The ladies, the support ladies.
12        Q.    And that --
13        A.    It goes into our ticketing system.  We have a
14    sophisticated ticketing system, and depending on what
15    the words inside there are, we have a sophisticated            02:36:01
16    filter.  So what you type, it actually recognizes anger
17    and it actually rates it and puts it in front of the
18    ladies.
19        Q.    And so the ticketing system is a piece of
20    software?                                                       02:36:18
21              It's not an email box, it's a separate piece of
22    software?
23        A.    No.
24              We used to have software, but we wrote our own.
25    And it's connected also to our phone system, where it         02:36:27
```

183

1    does the phones and the little "Contact Us" box.  So in

2    there if you go and say, "Hi, I want to sign up," it

3    right away goes as a priority.

4            And if you say, "Hi, I'm frustrated and I would

5    like my money back," it goes as a priority.                    02:36:49

6            If you say, "I'm interested to see a two

7    bedroom/two bathroom," it gets an automated response

8    that you can sign up for the service for $49 and you'll

9    be able to see the property.

10   Q.    So this ticketing system that you guys have         02:37:08

11   created in a program, I assume there is some sort of

12   database where -- that holds these incoming messages?

13   A.    It's the ticketing system.  Every company has

14   it.

15           It's similar to an in-box of an email except       02:37:27

16   there is condensers and then separated into an

17   organized -- allow me one second -- an organized system

18   where if I accidentally pick up the phone, I could see

19   the interactions between you and the ladies.  And I

20   could --  I don't have to again ask you, "Who did you       02:37:55

21   speak to?  What did she tell you?"  It's the notes that

22   an operator would take on you.  So when I pick up the

23   phone I could say, "I see like Barbara told you this,

24   and she promised you this."  It's the whole shebang.

25   Q.    Understood.  Understood.                              02:38:13

                                                                        184

1      And that system when an incoming message is
2  received, is it then preserved?
3      A.   Oh, yeah.  It pops up right -- right -- yes.
4      Q.   But my question, though, is:  Is it preserved,
5  meaning saved?                                        02:38:29
6      Does it -- after the customer has been dealt
7  with, does a record stay --
8      A.   It's preserved until the subscription of that
9  person ends.
10     Q.   And is that -- that's still the policy today,   02:38:40
11  that if --
12     A.   Yes.
13     Q.   -- someone who had sent a message in last
14  December, if their subscription --
15     A.   Has ended or we refunded them, it ends.  If     02:38:54
16  they were a guest and haven't paid us, we usually keep
17  it for 30 days because we still solicit them, "Please
18  come and sign up."  But we have the information.
19     Q.   And has this ticketing system been searched in
20  connection with this lawsuit?                          02:39:14
21     A.   No.
22     Q.   Let me move to a different email address.
23     I think you briefly mentioned
24  landlord@apartmenthunterz.com?
25     A.   Yes.  I believe that's it.                      02:39:23

185

**Abrams, Mah & Kahn**

```
 1        Q.   Who would have access to that email account?

 2        A.   I . . . that's an outgoing box where we invite

 3    the landlords.

 4        Q.   So if people -- messages go out from landlord?

 5        A.   Right.                                                02:39:40

 6             We would say, you know, "We haven't seen you

 7    come into the site for a long time."  "Here's your user

 8    name.  Here's your password.  Please come list with us

 9    or update your listing," something like that.

10        Q.   And about how many emails a day would you say      02:39:54

11    go out from landlord?

12        A.   We haven't sent that many out in the last year

13    due to the volume that we're sending, and our servers

14    were incapable of invitations right now.

15        Q.   Was that the case that you were not sending        02:40:11

16    many of those in October, November of 2015?

17        A.   Yes.

18             Our capacity would not allow us to send any

19    more invitations of this magnitude.

20        Q.   And so if someone got that and they hit           02:40:29

21    "Reply," what would happen?

22             Would you --

23        A.   It wasn't that.  It was sending it out.  It

24    wasn't getting it back.  It was just even sending them

25    out we had a bottleneck.                                   02:40:42
```

186

CERTIFIED COPY

```
 1        Q.    I understand.

 2              Before the bottleneck when you were able to

 3   send out from this address, if the recipient had

 4   replied, would it come back to you?

 5        A.    It was a no reply.  They were either -- from      02:40:53

 6   within that email, they would log in or they would take

 7   some other action.  It wasn't a two-way talk back and

 8   forth.

 9              (To Mr. Bandlow) Are you okay?

10              MR. BANDLOW:  Uh-huh.  Stop checking on me.      02:41:11

11   I'm good.

12        Q.    BY MR. BAUMGARTEN:  So that's interactive, they

13   can click a box in that email.

14              What does that -- does that feed into some sort

15   of system, if they click "Yes, use our listing" or "No"?  02:41:24

16        A.    It would actually take you into their account.

17              So behind the button, we had embedded the user

18   name and password.  So it would say "Log In" and through

19   a cookie, just in case the email was opened by somebody

20   else, it would take you right into their account.         02:41:51

21        Q.    Sure.  And so --

22        A.    And then they would see their listings.

23        Q.    And then once they were in the account, they

24   could click another button that granted Apartment

25   Hunters permission or denied them permission?             02:42:08
```

187

CERTIFIED COPY

```
 1        A.    Right.

 2        Q.    And where was that permission or denial?

 3              Was that recorded?

 4        A.    What do you mean "permission or denial"?  These

 5   were registered landlords.                                    02:42:13

 6        Q.    Right.

 7              And my understanding is that these emails were

 8   essentially asking them whether they would like you to

 9   list a certain property for them, and that they --

10        A.    Oh, those are separate emails.  Those are still   02:42:24

11   going out.

12        Q.    Okay.

13        A.    These were -- these were old landlords that had

14   not come to the site recently, and we would re-invite

15   them and remind them that their user name is this, their   02:42:41

16   password is this, and say "Please come back.  Your

17   properties are still there typed up and inactive."

18        Q.    I see.

19        A.    The other one we would be sending them, "This

20   is Apartment Hunters.  We have your listing.  Would you     02:42:58

21   please give us permission to list it?"  And we would put

22   a "Yes" button with a session ID and a cookie collected,

23   and a "No" button with a session ID and a cookie

24   collected.  And that would be a recorded permission, and

25   it's a very simple four-line thing, and that is to this     02:43:17
```

188

 1    day going on.

 2         Q.   Okay.  Great.  So let me ask you a couple of

 3    follow-ups.

 4              No. 1, where did these -- this second set of --

 5    I'm not talking about the landlords that have been gone        02:43:29

 6    for a while.  I'm putting that aside.

 7              These asking for "We have your website" --

 8         A.   Not your website.  As we find websites and

 9    management companies on the internet, we type the email

10    and say, "Do we have permission for your website?"  It's      02:43:44

11    just we put their URL.  We don't type the list.

12         Q.   Understand.  So we'll call these -- can I call

13    these the permission emails?

14         A.   Yes, sir.

15         Q.   Okay, the permission emails.                        02:43:58

16              Are those also sent out by

17    landlord@apartmenthunterz.com?

18         A.   I'm not sure what we use.

19         Q.   Okay.

20         A.   But it's -- it might be info.  I am not sure        02:44:05

21    which email we use.

22              But it just says, "We have noticed your

23    management company URL.  Would you like us to list your

24    properties on our website?  Push here for permission, or

25    push here for not permission."                               02:44:23

1          MR. BAUMGARTEN:  Let me get another exhibit

2     that I think will help refresh.  I'll mark this as

3     Exhibit 14.

4          And this was an exhibit in the California Board

5     of Real Estate hearing.  This was marked as State's          02:44:43

6     Exhibit 8 in that hearing.  We've now marked it as

7     Exhibit 14.

8          (Exhibit 14 was marked for identification.)

9          THE WITNESS:  This is the yes and the no.

10     Q.   BY MR. BAUMGARTEN:  And if you look at the          02:44:56

11     second page, there is a spreadsheet.  The back of the

12     first page for you really.

13     A.   Uh-huh.

14     Q.   That you testified at the time was a record of

15     the emails that had gone out.          02:45:08

16     A.   Right.

17          This one was produced by Dennis, yes.

18     Q.   Right.

19          And so the "Email From" column says

20     landlord@apartmenthunterz.com.

21     A.   Correct.  Yeah.

22          I just said I'm not sure, but it could be, yes.

23     Q.   But based on that you think most likely the

24     permission emails probably do come out from landlord?

25     A.   Yeah.          02:45:28

```
 1              Based on this, because it's a declaration of
 2   Vidmantas.  So this email just so -- because Lincoln has
 3   never seen it.  It goes out to the landlord, and there's
 4   a "Yes" button to the left.  There's a "No" button to
 5   the left.  And these are the affiliates.  And it says                02:45:47
 6   "May we put your listings on our website?  We've noticed
 7   you have a website, and if you let us put it, we'll
 8   syndicate it to these other websites."  And it says that
 9   we own these other companies, websites.  And then you
10   push "Yes" or "No" and it lets the database know.                     02:46:05
11        Q.   Okay.  So --
12        A.   You want me to put it here?
13        Q.   You can keep it in front of you.
14        A.   Okay.
15        Q.   This -- these emails were -- I guess there was           02:46:15
16   a recording made of the emails that went out.
17              Is that what this spreadsheet represents?
18        A.   See, we know the "Yes" or "No" via that session
19   and cookie ID.
20        Q.   And you get that, and it fills in a                        02:46:31
21   spreadsheet?
22        A.   No.
23              It fills in the MySQL database.
24        Q.   It goes --
25        A.   We just brought it down for the Department of            02:46:39
```

191

CERTIFIED COPY

```
 1    Real Estate into a MySQL.
 2        Q.    This is an excerpt from the MySQL database?
 3        A.    Yes, sir.
 4        Q.    Okay.
 5              And is the "Yes" and "No" preserved in that SQL      02:46:48
 6    database forever?
 7        A.    Well, after this, they would have to send us an
 8    email if they want us to stop putting it.
 9        Q.    Okay.  That wasn't my question.
10              My question was:  The "Yes" or "No" goes into        02:47:02
11    the SQL database --
12        A.    And preserved forever.
13        Q.    Preserved forever.  Okay.
14              In the California Board of Real Estate case,
15    the question -- or the issue was whether a company             02:47:23
16    called HomeTeam Property had given you permission via
17    this form to use their listings; correct?
18        A.    Correct.
19        Q.    And your testimony in that case was that you
20    had sent them an email, and they had given you                 02:47:40
21    permission, but that you no longer had either the email
22    that you sent or the record of them giving you
23    permission.
24        A.    And his brother, who was a broker, had opened
25    up a landlord account and/or posted it through the speed       02:48:00
```

192

CERTIFIED COPY

1    post.  This was the younger brother that was just trying

2    to, you know, make an impression on his brother.

3         Q.   Okay.

4              So my question was:  Am I correct that you

5    testified that the outgoing email had been purged                02:48:15

6    because you only keep the outgoing emails for every --

7         A.   Correct --

8         Q.   -- for a few months?

9         A.   Correct.

10        Q.   And is it still your policy today that these           02:48:24

11   outgoing permission emails are only preserved for a few

12   months?

13        A.   Yes.

14             I don't know how long, but we don't keep them.

15   Once we grab the "Yes" or a "No," we don't actually keep        02:48:37

16   the physical HTML.

17             Is that what you're asking me, the color

18   version of it?  This kind of version of it?

19        Q.   Any record of the outgoing email.

20        A.   Are you asking me about this pretty kind of            02:48:50

21   version of it?

22        Q.   I'm asking about any version of the outgoing

23   email in whatever form.

24        A.   Okay.

25             The record of a "Yes" or a "No" is recorded in        02:49:00

193

**Abrams, Mah & Kahn**

CERTIFIED COPY

1   a database, and it stays there.  And if the landlord

2   wants to change the "Yes" to a "No," they have to send

3   us an email.

4        This pretty HTML version is just a printout.

5   So if you're asking if this is preserved, the answer is          02:49:22

6   no.

7        Q.   Okay.  And just for the record, "this pretty

8   version" was the first page of Exhibit --

9        A.   14.

10       Q.   -- 14.                                                   02:49:32

11       If a customer submits a request for refund by

12  email, is that going to go to the

13  info@apartmenthunterz.com address?

14       A.   Customer support, info, we pick it up.

15       We have a parsing system that if you use the         02:50:03

16  words "unhappy," "money back," "did not find the place,"

17  "sucks," "your website," "your website sucks," "the

18  listings were rented" -- seriously.  We've thought about

19  every bad word or dissatisfaction in the rental industry

20  possible.  Our back end automatically has a light pink,          02:50:28

21  medium pink, and a super red.  It reads what was typed

22  and pushes it into -- in front of the ladies, and the

23  ladies push a button and refund the people.  We have a

24  28 percent refund ratio in our company.

25       Q.   Okay.                                                    02:50:53

**Abrams, Mah & Kahn**

CERTIFIED COPY

1      The emails that go into the customer support at

2   the apartmenthunterz.com address, those go to the

3   customer service representatives.

4      Once they deal with those emails, they delete

5   the emails?                                                    02:51:11

6      A.   It's not just emails.  They come to the chat.

7   We have almost 21 hours out of the 24 hours live

8   customer support, and they also are picking up the

9   phones.

10      So now we have live phone, them picking up, we      02:51:26

11   have live chat, and right away email.  So they either

12   pick up the phone, do the chat, or receive that ticket

13   by that page, and they push the button, they refund.

14      That is hell because some of them right away

15   call and go, "I just opened my bank account.  I don't   02:51:51

16   see the refund."  So they have to explain, "Ma'am, it

17   takes 24 hours for it to hit your account."

18      Those are preserved until the customer's happy

19   and sees the refund posted to their account and that

20   account has been settled.                               02:52:09

21      Q.   Okay.

22      And that's -- you've testified earlier, I

23   think, the ticketing system information is preserved

24   until the account is closed?

25      A.   And also, we reconcile with the credit card   02:52:24

195

**Abrams, Mah & Kahn**

CERTIFIED COPY

1    companies payments to us.  So once we close a batch, we

2    get paid from the payment processor for a Visa or a

3    Mastercard.  It all has to go hand in hand.

4        Q.   Okay.

5             And does the chat, does that also go into the          02:52:37

6    ticketing system?

7        A.   It all goes into the customer interaction.  So

8    we gather it all into one simple place.

9             So when you call and go, "My name is James

10   Johnson," they ask you, "Mr. Johnson, there's twenty        02:52:54

11   other Johnsons.  Can I get the last, you know, four

12   digits of your phone number?  Or can you tell me, you

13   know, some other unique thing?"  And it comes up, and

14   they see you've chatted once, you've called twice, and

15   you've emailed six times.                                  02:53:11

16       Q.   Okay.

17            So all that information, whether it comes in by

18   chat or by phone or the contact-us form, it all goes

19   into one system.  And the answer is the same for

20   everything in that system, it's preserved until the       02:53:23

21   account is closed and all the financials are reconciled?

22       A.   Yes, sir.

23       Q.   And then it's deleted?

24       A.   Right.

25       Q.   Okay.

196

CERTIFIED COPY

```
 1        A.    This was to make it faster for them to help the
 2   customer.
 3        Q.    Do you have a sense of about how many requests
 4   for refunds you get in a day?
 5        A.    Too many.  Actually, I just told you.  It          02:53:50
 6   becomes so much easier for $49 to refund them than to go
 7   to a chargeback system and all of that.  The refund
 8   ratio is exactly 26.5 or 27 percent out of a hundred.
 9        Q.    Okay.
10        A.    But by per day, I do not have a perfect count.     02:54:11
11   I could tell you per month.
12        Q.    Sure.
13        A.    Out of a hundred grand, 25,000 of it is gone.
14        Q.    Okay.
15              But do you have a sense of the number of people    02:54:20
16   who sign up a month?
17        A.    3,000 memberships.  I don't -- I can't do the
18   math of 3,000 memberships.
19        Q.    But per month, roughly 3,000 new memberships?
20        A.    3,000 new memberships.                             02:54:40
21              I don't know what the average dollar amount is
22   because we offer coupons, discounts, affiliate payments,
23   so --
24        Q.    That's fine.
25              MR. BANDLOW:  Your question was what is the        02:54:53
```

197

CERTIFIED COPY

```
 1    estimate of how many people are signing up per month?
 2            MR. BAUMGARTEN:  Yes.
 3            MR. BANDLOW:  Okay.
 4            THE WITNESS:  3,000.
 5       Q.   BY MR. BAUMGARTEN:  3,000.                        02:55:00
 6            And so roughly 25 percent of that end up
 7    seeking a refund.
 8       A.   And then dollar amount, you would have to
 9    figure it out.
10       Q.   I won't try to do that math right now.  That's  02:55:09
11    fine.  I just wanted to get a sense of the numbers.
12       A.   See, this part I like.  The earlier part was
13    tough questions.
14            MR. BANDLOW:  None of them are tough.  You're
15    doing fine.                                              02:55:27
16       Q.   BY MR. BAUMGARTEN:  Are there any other
17    non-individual email accounts; in other words, other
18    things that are like info@ or landlord@ that we haven't
19    discussed?
20            And that's true both of apartmenthunterz.com    02:55:42
21    and any of the other websites.
22       A.   No.
23       Q.   We've discussed all of them?
24       A.   Yeah.
25            MR. BAUMGARTEN:  Okay.  Why don't we take a      02:55:54
```

198

Abrams, Mah & Kahn

CERTIFIED COPY

```
 1   quick five-minute break, and let me look through what
 2   else we have.
 3            MR. BANDLOW:  Sure.
 4            THE VIDEOGRAPHER:  Off record, 2:56 p.m.
 5            (Recess taken from 2:56 p.m. to 3:03 p.m.)          02:56:03
 6            THE VIDEOGRAPHER:  Returning to record,
 7   3:03 p.m.
 8       Q.   BY MR. BAUMGARTEN:  Mr. Shayan, just a couple
 9   more questions about how folks access the internet.
10            Do you have -- in your office with your brother    03:03:31
11   here in California, do you have an internet service
12   provider you use, for instance, Comcast, Verizon?
13       A.   I use Cox.
14       Q.   Cox.  Okay.
15       A.   And my brother uses AT&T U-verse.                  03:03:48
16       Q.   Do you know how your employees in Lithuania --
17   do they have a Lithuania version of AT&T perhaps?
18       A.   They're more fortunate.  They have fiber.
19       Q.   They have fiber.  Okay.
20            Do you know what company they use?                 03:04:07
21       A.   I have no idea, sir.
22       Q.   Do you have the ability to monitor or track the
23   IP addresses that your employees in Lithuania visit?
24       A.   No, sir.
25       Q.   And do you have the ability to monitor or track   03:04:21
```

199

**Abrams, Mah & Kahn**

1    the IP addresses of Mr. Portnov?

2        A.   I have no idea, sir.

3        Q.   To use the Amazon Cloud server, can everyone,

4    both you and your brother in the U.S. and everyone in

5    Lithuania, just log in directly to -- is there like a          03:04:54

6    website Amazon.com/ something that you log into?

7        A.   No.

8             There is no Amazon.com.  It's just -- just like

9    that -- just like that -- if you can please turn on your

10   computer for a second, and I'll tell you where to go           03:05:09

11   really quickly, that apartmenthunterz.info, if you

12   could.  You'll see it's just a module of a website, and

13   you could access it, and it just takes you in.  It's all

14   web based.

15       Q.   So I think your answer is that your employees          03:05:31

16   will log into apartmenthunterz.info --

17       A.   No.

18            My employees know how to get into the Amazon

19   web servers through the Amazon interface.  My brother

20   and I, as non-web server people, have been given an            03:05:43

21   internet page for dummies that displays the dummy way of

22   the server information.

23       Q.   So you're not 100 percent sure, then, how your

24   employees actually get into the --

25       A.   No.                                                    03:06:04

200

Abrams, Mah & Kahn

CERTIFIED COPY

```
 1          There is an interface.  There's a web -- there
 2   is a server interface for server people that I don't
 3   understand, and if I touch something, the whole thing
 4   blows up.
 5      Q.   But it's some sort of web interface that they      03:06:16
 6   use?
 7      A.   A server interface.  It's not web based.  It's
 8   actually Linux -- Linux based.
 9      Q.   Okay.
10          And apart from the cloud, from everything          03:06:35
11   that's on Amazon Cloud, does the company have any other
12   sort of shared drives or any other networks that are
13   used?
14      A.   Nothing.  We don't -- we don't store anything.
15   We just access it.                                        03:06:53
16      Q.   Access it.  Okay.
17          Do you ever circulate information among
18   management about the feed agreements that you guys are
19   receiving?
20      A.   Circulate?                                        03:07:12
21      Q.   Yeah.
22      A.   No.
23          I just -- we -- we actually -- when I, myself,
24   get an agreement with, for example, a company for rent,
25   or Vidmantas solicits one of the larger companies and    03:07:27
```

201

CERTIFIED COPY

1    gets an agreement, or we were at the San Francisco

2    Apartment Owners Association -- I wasn't there -- my

3    brother Steve was there and gets an agreement, we come

4    back and telephonically we say, "Guys, we have an

5    agreement, and the original copy stays with me and Steve          03:07:48

6    here."  And then they contact the tech people at that

7    company, and they say, "Please send the feed to this

8    email address," and that's it.

9        Q.   I apologize if I already asked it, but you said

10   the original copy.                                                03:08:08

11       That's a hard copy agreement?

12       A.   It's a signed thing that "I, forrent.com, agree

13   to give Apartment Hunters our listings for posting."

14   It's the same kind that we have shown you but with other

15   people.                                                          03:08:23

16       Q.   And so those hard copy originals, those are

17   stored by your brother at his office in California?

18       A.   Right.

19       Except ApartmentGuide, which we don't have.  We

20   were negotiating to -- they were -- they came to us to           03:08:36

21   buy the company.  And during the negotiation to buy the

22   company at $8 million, they said, "We're going to just

23   first give you data while we're negotiating," and, you

24   know, we didn't -- we decided not to sell at that time.

25       So that paperwork is not there, but the feed is             03:08:57

202

**Abrams, Mah & Kahn**

```
 1    legitimately coming.  We have an unsigned copy of the

 2    permission to receive the feed.

 3        Q.   Okay.

 4             And to the extent that you have other hard copy

 5    documents, have those all been searched in connection          03:09:17

 6    with this litigation?

 7        A.   Yes.

 8             And we have it, and we presented it to you.

 9    You can pick up the phone and call.

10        Q.   When you get the hard copy agreement, for            03:09:36

11    instance, the ForRent one that you had or the Move one,

12    do you scan those and stick them anywhere?

13        A.   Just stick them in the file cabinet, home

14    office.

15        Q.   And your testimony was that a lot of those were     03:09:53

16    lost in a move?

17        A.   No, a couple of them that we didn't have.

18             There's one of them we don't have.  The

19    ApartmentGuide one we have, but I just explained that it

20    was in the company merger, and that's it.  One of them      03:10:07

21    we don't have because we moved out of our Beverly Hills

22    office here.

23        Q.   Okay.

24             Does the company have any sort of archive of

25    files related to the California Bureau of Real Estate       03:10:25
```

203

CERTIFIED COPY

1  proceedings?

2      A.   It's with the attorney, in my emails, and also

3  physically in the home office from the beginning to now.

4           Also, if you're going to the archives of the

5  Department of Real Estate, I would like to say that in          03:10:47

6  2004, in December of 2004, we had a complete burndown in

7  our offices in 201 North Robertson.  The entire building

8  burnt down to the ground.  So my desk, my computers, my

9  -- everything was burned down to the ground.

10          And when I walked out of the car to go into the     03:11:14

11  office, I didn't even see it, but I stepped into this

12  much water (indicating), and they had red-taped the

13  place.  There was nothing left.  And the office above me

14  had plugged in too many things into one plug.  So we

15  lost everything.  It's with the Beverly Hills Fire          03:11:35

16  Department, and you could look it up.

17      Q.   That sounds awful, and I'm sorry you had to go

18  through that.

19      A.   So some of the documents then are gone, the

20  hard copy.                                                   03:11:49

21      Q.   And so have you -- has anyone searched any of

22  these records of the California Bureau of Real Estate

23  proceedings that are with your lawyer in your home

24  office and in your emails?

25          Has anyone searched those?                          03:12:04

204

CERTIFIED COPY

1      A.   Everything that we have, we have gotten from

2  the lawyer, or he still has and we have forwarded it to

3  Mr. Lincoln [sic].

4           MR. BANDLOW:  I think we've -- didn't we

5  produce that to you, our BRE files?                        03:12:15

6           MR. BAUMGARTEN:  No.

7           MR. BANDLOW:  Oh, okay.  I think that's being

8  processed.  We're producing that to you.

9           THE WITNESS:  We have all the BRE files for

10 you.                                                       03:12:23

11          MR. BANDLOW:  Everything from BRE we're

12 producing.  I thought it had been, but it's probably

13 just getting arranged.

14          MR. BAUMGARTEN:  Now we have one page from BRE.

15          MR. BANDLOW:  Oh, no.  You're going to get a     03:12:26

16 very big stack.

17          THE WITNESS:  We have this big of a file

18 (indicating).

19          MR. BANDLOW:  Sorry.  I thought that had gone

20 out the door.  It's probably being processed.             03:12:35

21     Q.   BY MR. BAUMGARTEN:  Does the company have any

22 sort of archive of files related to the litigation with

23 Mr. Verge and Westside Rentals?

24     A.   Oh, I would have to ask Mr. Tahmazian, yes.

25 But you could look up the case.                            03:12:50

205

CERTIFIED COPY

```
 1       Q.   Does the company have any sort of archive of
 2   files related to the lawsuit with Property Three
 3   Technology Group?
 4       A.   That's with Jilbert too.  If you would like, I
 5   can give you his number.  But I can get it for you also,     03:13:06
 6   but it's also on the web, LexisNexis, wherever you guys
 7   go.
 8       Q.   Do you have any sort of hard copy files related
 9   to customer complaints?
10       A.   No, sir.                                            03:13:24
11       Q.   And do you have any collection of files related
12   to complaints received through the Better Business
13   Bureau or any other third parties?
14       A.   No, sir.
15       Q.   So I just want to quickly go through a couple       03:13:37
16   of things.  Besides -- just sort of want to make sure
17   there's noting we're missing.
18            Besides what we've already talked about today,
19   is there any other information that you can provide me
20   about the approximate volume of emails sent and received    03:14:01
21   on any of your company's domains in 2015?
22       A.   No, sir.
23       Q.   Do you have any information about any documents
24   that you think might have been responsive to the
25   requests for documents that we served you that you've        03:14:33
```

206

CERTIFIED COPY

1   been unable to produce because they were deleted or

2   otherwise unavailable?

3       A.   No, sir.

4       Q.   Any other information to provide about the

5   steps that you've taken to ensure that your employees          03:14:55

6   preserve relevant documents in this matter?

7       A.   No, sir.

8       Q.   Any other information that you can provide

9   about the methods by which your preserved data has been

10  searched in connection with this matter?                       03:15:18

11      A.   No, sir.

12      Q.   Any other information you can provide about the

13  policies and practices you have regarding deletion of or

14  purging or letting expire data from your website?

15      A.   No, sir.                                              03:15:52

16          MR. BAUMGARTEN:  Why don't we take one more

17  quick two-minute break, and I think we're very, very

18  close to being done.

19          THE VIDEOGRAPHER:  Off record, 3:16 p.m.

20          (Recess taken from 3:16 p.m. to 3:21 p.m.)           03:16:07

21          THE VIDEOGRAPHER:  Returning to record,

22  3:21 p.m.

23      Q.   BY MR. BAUMGARTEN:  Just a couple quick

24  questions about things that I meant to ask about

25  earlier.                                                       03:22:04

207

CERTIFIED COPY

1    We were talking about the landlord-submitted

2    listings, and I think you testified that when there's

3    a -- once they're up, when there's a major change, it

4    goes into a box where you or your brother would sign

5    off.  If it's a minor change, they can just do it.  I          03:22:20

6    don't think I ever asked.

7        When they first put it up, does it --

8        A.   Oh, brand-new ones?  They come right up.  It

9    means it comes for our approval.  Sorry about that.  The

10   first time landlord comes in no matter what they type.         03:22:37

11   After that, they can do more listings -- let me clarify.

12       When the landlord puts up one listing, first

13   time they've signed up, comes to the box.  That same

14   landlord puts another brand-new listing, comes to the

15   box for approval.                                              03:22:58

16       From there if they do small changes on those

17   listings, it goes up to the changes.  If they take a

18   2,000 rental and make it $800, it comes back going this

19   guy is trying to do something crazy.  And same with the

20   bad text.                                                      03:23:18

21       So the housing authority people came to us and

22   Westside Rentals on a couple of bad words, and we had to

23   pay a $14,000 fine.  So we have written filters that you

24   cannot say "perfect for professionals" or "close to a

25   temple."  We got fined for "close to a temple."  So           03:23:41

208

**Abrams, Mah & Kahn**

CERTIFIED COPY

1    that's why we have put these in place.

2          MR. BOYLE:  So that lets you and your brother

3    closely review everything that is uploaded?

4          THE WITNESS:  Right.

5          And also if you go to apartmenthunterz.com,          03:23:56

6    Fox 11 Channel News and the FBI came to us to do a

7    piece, because the Nigerians were inputting listings

8    into sites, including ours.  And we have an IP discovery

9    system.  And they had put listings at a good price.  And

10   the mother and daughter were Western-Unioning money to    03:24:21

11   this guy, and he would pretend to be a landlord of the

12   property.  And he would say, "I'm not there right now,

13   but send me this money, and I'll leave the keys in the

14   mailbox."  And these poor Spanish people would send the

15   money, and two days later they would go there and the     03:24:43

16   real landlord would have given the keys to somebody

17   else.

18         And the FBI had requested us to go on Fox 11

19   and explain.  So the video is six minutes.  If you go to

20   our home page, you will see exactly -- oh, you'll see     03:25:01

21   our admin home page.  It's all there.

22         So pretty much, yeah.  That's why we wrote all

23   those filters, and we're filtering.  Even

24   out-of-the-country IP addresses we filter.

25    Q.   BY MR. BAUMGARTEN:  So you guys have the             03:25:20

209

**Abrams, Mah & Kahn**

CERTIFIED COPY

1    ability to see what IP addresses are coming to

2    apartmenthunterz.com?

3        A.   Yes.  On there, yes.

4             On the speed post one, we let them just go

5    through, you know.  The speed post equals posting to        03:25:32

6    Craigslist.  It's kind of a non-monitored, get-in-quick

7    system.

8        Q.   So if I go home today and I just pull up

9    www.apartmenthunterz.com --

10       A.   And go to speed post, you're in.                   03:25:46

11       Q.   Well, I'm not -- I'm not going to post

12   anything.

13            If I just go to the website and look around,

14   can you see the IP address that I came looking from?

15       A.   No, no, no, no.                                    03:25:56

16       Q.   So it's only the IPs that are posted?

17       A.   You're a guest.

18       Q.   Okay.  Switching topics quickly.

19            We were talking about, actually, Exhibit 14,

20   these permission emails.  And you said those go out to,     03:26:08

21   I guess, sort of smaller landlords and people who you

22   think they have a listing that they might want to post?

23       A.   When we find a website, and we constantly look,

24   and also there is Apartment Owners Association book that

25   gives you a list of all management companies, and each      03:26:26

Abrams, Mah & Kahn

CERTIFIED COPY

1    management company has 20 buildings that they manage.

2         So AAGLA, Greater Apartment Association of

3    Los Angeles, then we take that keyword and go up to

4    Florida or to everywhere.  And we find the apartment

5    associations, and then we find out that that particular

6    association has a hundred buildings under it.

7         These are not the REITs.  These are the smaller

8    20-unit, 80-unit, 60-unit buildings that apartments.com

9    doesn't like or have, and also the owners don't want to

10   pay $350 per unit to be on apartments.com.  So we beg        03:27:09

11   for permission and then try to get their permission to

12   put the listings.  That's what I meant.

13        Q.   So some of these -- in terms of how you find

14   them, I just want to clarify that.

15        A.   It's a Google search.  We just type "property   03:27:28

16   management companies residential."

17        Q.   And who's doing these searches?

18        A.   Initially, I was.  Now I passed it on.

19        Q.   To who?

20        A.   To the team.                                       03:27:45

21        Q.   The team?  The engineers in Lithuania?

22        A.   Yes.  It's a simple job.

23        Q.   Do you have any sense of about how many of

24   these new potential listings they're finding per month?

25        A.   I don't, sir.                                      03:28:02

211

CERTIFIED COPY

```
 1            MR. BOYLE:  It's David's deposition, and I'm

 2   not going to ask questions other than just I wanted to

 3   clarify something on the topic that we were discussing

 4   on the record and then off the record.

 5            Because I think on the record you said earlier     03:28:25

 6   that the company might be open to having a third party

 7   come in and check its photographs.

 8            THE WITNESS:  Then I retracted it.

 9            MR. BOYLE:  Okay.  That's what -- I just wanted

10   to make sure that the record reflected you're not open     03:28:42

11   to having a third party come in and check whether

12   CoStar's photographs are on your system?

13            THE WITNESS:  Because they're not, and, no, I'm

14   not open to it.  I retracted that.

15            MR. BOYLE:  Okay.

16            THE WITNESS:  Because whatever this other

17   company CoStar sued agreed to, I am not going to follow

18   their footsteps.

19            MR. BOYLE:  Right.  And you also said to me

20   that even if a court ordered you to do that, you're       03:29:12

21   still not going --

22            THE WITNESS:  Well, I'm not going to disobey a

23   judge at this moment.

24            But, you know, again, you don't have us going

25   into apartments.com, and honestly we have ten times more   03:29:25
```

212

CERTIFIED COPY

1   listings than apartments.com.  We don't need these

2   listings.

3          So why would we ruin ourselves going in there

4   and taking listings that we don't even need.  Because

5   these are not vacancies.  These are communities.  We          03:29:44

6   drill down to the unit that is vacant.  That's the

7   difference between us and apartments.com.

8          Apartments.com sends you to a 400-unit

9   community and sends you there hoping there's a vacancy,

10  and there always is with a REIT, you know, either now or     03:30:01

11  it's coming up in a few days.  We are sending you to

12  unit 202, floor plan number this.  It's either facing

13  the pool or the garage.  And we know the vacancy.

14         So it's -- it's kind of foolish for us to go

15  looking for data on a website that doesn't have              03:30:22

16  up-to-the-minute real vacant data.  That's all.

17         And in conclusion, that's all.  We didn't go.

18  We don't get.  We weren't interested.

19         MR. BOYLE:  Okay.  So I'm not -- obviously, I'm

20  not going to debate the merits with you.  Our record         03:30:40

21  reflects that CoStar's photographs and information, a

22  large number were on your site.

23         I have nothing further.

24         MR. BAUMGARTEN:  We have nothing further at

25  this time.

213

**Abrams, Mah & Kahn**

CERTIFIED COPY

1          MR. BANDLOW:  Nothing further.

2          Do you want to put a stipulation on the record?

3          MR. BAUMGARTEN:  Regarding . . .

4          MR. BANDLOW:  You guys are non-Californians.

5  It's about the custody of the transcript, and all that          03:31:00

6  good stuff.

7          Do you know anything about standard

8  stipulations for the ends of depositions in California?

9          MR. BOYLE:  We're going to go with the Federal

10  Rules.          03:31:09

11          MR. BANDLOW:  Okay.  We usually put it on the

12  record here as to where is the original going to be sent

13  to, who has to maintain custody of it.

14          MR. BOYLE:  No.

15          MR. BANDLOW:  You're not going to do any of          03:31:18

16  that?

17          MR. BOYLE:  No.

18          MR. BANDLOW:  Okay.  All right.

19          THE VIDEOGRAPHER:  The videotaped deposition of

20  Kevin Shayan is being concluded at 3:31 p.m.          03:31:28

21          This concludes tape 4 of 4.  Thank you.

22          THE REPORTER:  Counsel, will you need a copy

23  and an ASCII of the deposition?

24          MR. BANDLOW:  Yeah.  I'll need a copy, yes.

25          (Proceedings adjourned at 3:31 P.M.)

214

DEPONENT'S DECLARATION

I, KEVIN SHAYAN, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making, and that the foregoing is a true and correct transcript of my testimony contained therein.

Executed this _____ day of _____, 20_____, at _____, _____.
            (City)                    (State)

_____
           KEVIN SHAYAN

215

REPORTER'S CERTIFICATE

   I, Kathleen Mary O'Neill, Certified Shorthand Reporter No. 5023, RPR, CLR, duly empowered to administer oaths, do hereby certify:

   I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

   Prior to being examined, the deponent was by me first duly sworn;

   Said deposition is a true, correct, and complete transcript of said proceedings taken to the best of my ability;

   The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void;

   Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, it was requested that the deponent shall have 30 days to review the transcript; therefore, any changes made by the deponent or whether or not the deponent signed the transcript cannot at this time be set forth.


Dated: October 3, 2016


_____
KATHLEEN MARY O'NEILL
CSR 5023, RPR, CLR

216

**Abrams, Mah & Kahn**

CERTIFIED COPY

```
1   STATE OF CALIFORNIA    )
                           )   ss.
2   COUNTY OF LOS ANGELES  )

3

4        I, Kathleen Mary O'Neill, Certified Shorthand Reporter,

5   CSR No. 5023, hereby certify:

6        The foregoing is a true and correct copy of the

7   original transcript of the proceedings taken by me

8   as thereon stated.

9

10

11

12  Dated: _____

13

14

15

16          Kathleen Mary O'Neill, CSR No. 5023

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 3

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

DAVID K. BAUMGARTEN
(202) 434-5929
dbaumgarten@wc.com

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 15, 2016

<u>Via E-mail</u>

Lincoln D. Bandlow
Margo J. Arnold
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506

      Re:    CoStar Realty Information, Inc., *et al.* v. Apartment Hunters, Inc., *et al.*, No. 8:15-cv-02111-JLS-KES

Dear Lincoln and Margo,

      I write in response to your June 22, 2016, letter regarding the adequacy of the production made by Defendant Apartment Hunters, Inc. ("AHI") in the above-captioned matter.

      As set forth in more detail below, in more than three months since Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar") served discovery requests on AHI, AHI has produced just seven responsive documents from its files, from a single custodian.  This deficient production contains neither "valid third party agreements" authorizing AHI's use of CoStar listings and photographs (which AHI has repeatedly promised to produce) nor a single e-mail (which you represent not to exist based on a demonstrably untrue assertion). Combined with AHI's past history of failing to produce key documents in litigation, AHI's limited and insufficient production strongly suggests that AHI has failed to preserve documents and/or failed to undertake a reasonable search for documents.

      As you know, civil litigation, and the discovery process in particular, works only if there is a good faith effort to comply with obligations—and counsel are obligated to ensure their clients participate in good faith. Accordingly, CoStar sets forth several questions at the close of this letter regarding AHI's compliance with its discovery obligations, and asks that AHI provide a detailed written response to those questions by Friday, July 22, 2016.  *CoStar also requests that you preserve all documents and communications in <u>your or your clients'</u> possession, custody, or control relating to your client's preservation and production responsibilities, and the steps <u>both you and your clients</u> have taken to comply with those obligations.*  CoStar reserves all rights to seek Court intervention and/or sanctions, including without limitation seeking formal discovery from counsel concerning its role in AHI's response to CoStar's discovery requests.

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 2

## I.      Plaintiff's Requests, AHI's Reponses, and AHI's Production to Date

On March 21, 2016, CoStar propounded thirty-three document requests to AHI (the "Requests").  AHI submitted its initial Response and Objections to the Requests on April 20, 2016.  Following a telephonic meet and confer on May 4, 2016, AHI withdrew many of its initial objections and agreed to produce documents responsive to all but two of the Requests.  *See* Defendant Apartment Hunters, Inc., Supplemental Responses and Objections to Plaintiffs' First Set of [Requests For] Production of Documents (May 19, 2016) ("AHI's Supplemental Responses").

On May 27, 2016, AHI produced 121 documents—its first and only production to date.  The contents of that production are as follows:

- One hundred and seven (107) of these documents were unreadable native files, which also lacked basic metadata, including custodian and date information.  Upon our inquiry, you informally represented to be "seed files" for AHI's listings.  We raised numerous questions regarding these files during a second telephonic meet and confer (on June 7, 2016) and in a follow-up letter (dated June 13, 2016).  On June 22, you informed us that these files were created between four and five months *after* CoStar brought this lawsuit—***effectively conceding that the files are irrelevant and non-responsive*** (in addition to being unreadable).

- Of the other fourteen documents produced, six were publically available domain registry records (which appear to have been created for the purpose of this litigation by entering website names into the website <https:whois.icann.org/en>). And one additional document was a duplicate.

Accordingly, AHI has produced ***just seven responsive documents from its files, from a single custodian***.  And none of those documents directly concern AHI's copying of CoStar's content.[1]

## II.     AHI Has Not Produced Any "Valid Third Party Agreements," Despite Counsel's Repeated References to These Purportedly Exculpatory Agreements

Over the last four months, Defendants have repeatedly represented to CoStar—and to the Court—that it possesses "valid third party agreements" authorizing AHI to publish CoStar's listings and photographs. *See, e.g.*, Joint Report of the Parties' Rule 26 Planning Meeting, Part 1(b) (Defendants' Statement) (March 18, 2016).  And Defendants have repeatedly assured CoStar, both informally and through AHI's discovery responses, that they will produce these purported agreements in short order.

---

[1] These seven documents consist of: (a) four agreements with AHI's back-end service providers (Amazon Web Services, Google AdWords, and LiveChat); (b) one document pertaining to AHI's 2014 application to renew its (suspended) Prepaid Rental Listing Service license with the California Bureau of Real Estate; and (c) two content-sourcing agreements which are unrelated to CoStar.

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 3

Yet, AHI has not produced a single document substantiating its claim that it was authorized to publish CoStar's listings and photographs.  As we have explained, the two content-sourcing agreements AHI has produced to date have no bearing on this case.[2]

We ask that you confirm whether or not AHI possesses any additional content-sourcing agreements that it believes authorize it to publish CoStar's listings and photographs, and if so, to produce such documents immediately.[3]

## III.    AHI Has Not Produced a Single E-mail, and the Recent Purported Explanation for the Lack of E-mails is Demonstrably False.

CoStar's Requests call for the production of e-mails.  *See* Requests, Definitions 5, 8.  There is no doubt that internal AHI e-mails, AHI e-mails with third party service providers (including content providers), and AHI e-mails with customers are all responsive to numerous of CoStar's Requests.  *See, e.g.*, Request Nos. 3, 4, 6, 8, 9, 20.  And AHI has agreed to produce documents responsive to such requests.  *See* AHI's Supplemental Responses.[4]  Thus, during our second telephonic meet and confer (on June 7, 2016) and in a follow-up letter (dated June 13, 2016), we expressed surprise and concern that AHI had not produced a single e-mail.

During the meet and confer, you represented that you would speak with AHI regarding its efforts to locate responsive e-mails. In your most recent letter, you then represented that "there are no e-mails responsive to CoStar's document requests" because AHI "is a three-person company that primarily interacts through oral communications."  Arnold Lttr to Baumgarten (June 22, 2016) at 2.  This facially implausible explanation for AHI's failure to produce a single e-mail is, moreover, refuted by representations made, and documents submitted, by AHI and its principals in prior litigation.

As an initial matter, AHI is not a three-person company—but rather a ***three-office*** company with, it appears, ***at least two dozen employees***.  In his recent (2015) testimony before the California Bureau of Real Estate (the "CalBRE"), Kevin Shayan disclosed that in addition to

---

[2] ForRent is a CoStar competitor to which CoStar does not provide its listings.  The content sources in the Move/ListHub license (Exhibit C-1) do not include CoStar or any entity to which CoStar has licensed its content, and CoStar had no relationship with Move at the time of the infringement at issue.

[3] To be clear, CoStar does not believe that any such agreements exist, which would explain AHI's failure to produce them, and underscore AHI's lack of a liability defense in this case.

[4] CoStar requested documents and communications relating to the source of the CoStar-owned listings and photographs published on AHI's website, permission received to make those publications, and software used to copy and publish those listings.  Request Nos. 3, 4, 6.  CoStar requested documents and communications relating to the methods AHI uses to populate its websites with listings and photographs.  Request No. 8.  CoStar requested documents and communications relating to the individuals and entities that AHI has engaged to collect apartment listings and photographs.  Request No. 9.  CoStar requested AHI's communications with customers relating to CoStar.  Request No. 20.  CoStar requested communications relating to complaints, including from customers, regarding AHI's unauthorized copying of apartment listings and photographs (AHI has objected to producing customer complaints).  Request No. 27.

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 4

AHI's Orange County home office (where the Shayan brothers work), AHI has offices in
Lithuania and Russia.  *See* Ex. A (Hr'g Tr., Case No. H-39404, Feb. 25, 2015) at 222.  Kevin
Shayan further testified that:

- AHI owns and controls Apartment Hunters LT, a subsidiary run in Kaunas, Lithuania by
  Vidmantas Macys, which has "16 or 17 Lithuanian employees," *id.* at 246, including "a
  bunch of young men who sit down and program [AHI's website]," *id.* at 247.

- AHI has at least one employee in its Russian office, Dennis Portnov.  *Id.* at 223.

- AHI employs "six support ladies" to answer incoming customer calls; Shayan did not
  specific those employees' location.  *Id.* at 214.

It strains credulity to believe that any 21st Century technology-driven company with two
dozen employees in three different offices would conduct its business primarily via oral
communications. The fact that ten time zones separate Messrs. Shayan and Shayan in Los
Angeles from AHI's Lithuanian and Russian offices only magnifies the impracticality, if not
impossibility, of such an arrangement, particularly given that Kevin Shayan testified that he and
his brother supervise their overseas employees "on a daily basis." Ex. A at 225.  Indeed, Kevin
Shayan repeatedly emphasized that AHI is an "internet-based company," *id.* at 241-43, further
underscoring the implausibility that AHI's employees do not communicate by e-mail.  *See also*
Ex. B (Proposed Decision, Case No. H-39404, May 27, 2015) at ¶ 24.  In sum, the representation
that AHI's employees do not use e-mail for internal AHI communications is not credible.

Moreover, Kevin Shayan's testimony in the CalBRE matter, along with various
documents submitted as in the same proceeding, directly establishes that ***AHI regularly uses e-
mail to communicate with both customers and the sources of its listings***:

- Kevin Shayan authenticated, and AHI entered into evidence, an e-mail chain in which he
  (using the e-mail address kevin@apartmenthunterz.com) and Macys (using the e-mail
  address affiliate@apartmenthunterz.com) corresponded with employees of the real estate
  listing website Trulia regarding entering into a referral agreement.  Ex. A at 198-199 & Ex.
  C.  This e-mail is directly responsive to Request No. 8, but has not been produced in this
  matter.

- Shayan also testified that each website owned and operated by AHI and/or the Shayans has
  its own e-mail address (for the purpose of receiving customer e-mails).  Ex. A at 189.

- Shayan testified that AHI regularly send e-mails to landlords and management companies to
  ask permission to republish their listings and photographs.  *Id.* at 201-202, 216-218.  An
  affidavit executed by Macys further explained that AHI uses "a sophisticated automated
  system" to send e-mails to management companies when it collects apartment listings and
  track those companies' responses to its e-mails.  Ex. D at 4-5.  Though a sample e-mail
  submitted by AHI did not display an e-mail address, a spreadsheet prepared and submitted by

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 5

AHI purported to show that these e-mails are sent from the address landlord@apartmenthunterz.com.  Ex. D at 1-2.  E-mails with the sources of AHI's listings would be responsive to Request No. 8 (as well as Request Nos. 3 and 4, to the extent the e-mails concern CoStar Listings or CoStar Photographs, as those terms are defined in the Requests), but none have been produced in this matter.  Shayan also testified that AHI maintains spreadsheets that log authorizations to publish listings.  *See* Ex. A at 219-220.  Such spreadsheets similarly would be responsive to Request No. 8 (and potentially Request Nos. 3 and 4), but none have been produced in this matter.

- According to Shayan's testimony, AHI also has an e-mail system integrated into its customer support capabilities.  *Id.* at 214 ("The calls are recorded where we can listen to the audio file, as well they're transcribed in a text and into a ticketing system.  So we have a ticketing system, audio recording system, ***and then we also have an e-mail system***, and we have a very accurate tracking system that shows us from the time of customers calling in or making a ticket request, to the time that we reply to their request." (emphasis added)).[5]  Customers' e-mails to AHI are potentially responsive to Request Nos. 20 and 27, but none have been produced in this matter.

- Shayan testified further that the employees in AHI's Lithuanian office "sit down and program the website.  They data entry, type, validate, and ***check the listings***.  ***They make sure the e-mails have gone out.  The e-mails have been replied to***." *Id.* at 247-48 (emphasis added).  Yet not one such e-mail from AHI's Lithuanian team relating to listings (Request Nos. 2, 3, 6, and 8) or customers (Request Nos. 20 and 27) has been produced in this matter.

In sum, the foregoing testimony and documents (which are necessarily limited, in that they relate to another case) by themselves confirm that (a) AHI conducts its business, both internally across its multiple offices and employees, and externally with listing sources and customers, via e-mail, and (b) in particular, AHI sends and receives e-mails responsive to many of CoStar's discovery requests.  As noted above, AHI has stated that it will produce documents responsive to the vast majority of CoStar's Requests.  AHI cannot now avoid producing responsive documents by falsely claiming to be a three-person company that communicates "primarily" orally.

## IV.  AHI's History of Failing to Produce Key Documents in Litigation

AHI's prior document production shortcomings in connection with the 2015 CalBRE proceeding cast further doubt upon the adequacy of its production, and the reliability of its representations, in this litigation. In that matter, AHI did not produce the purported e-mail at the core of its defense, instead representing that it had been deleted as part of a routine document purge.  The presiding administrative law judge found Kevin Shayan's testimony that the e-mail

---

[5] Shayan specifically testified that AHI accepts customer requests for payment refunds by e-mail, *id.* at 232, and sends e-mails to customers confirming refunds when processed, *id.* at 215.  *See also id.* at 253 (testifying regarding e-mails relating to refunds).  No such refund requests or confirmations have been produced in this matter, nor have any audio recordings, nor have any documents from or relating to AHI's "ticketing system."

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 6

could not be produced because "such messages had been purged from its system three or four months after being sent" was "not convincing," since Shayan produced other e-mails from the same time period in those proceedings. *See* Ex. B (Proposed Decision, Case No. H-39404, May 27, 2015) at ¶ 17.

## V.     Counsel Are Required to Ensure Client's Good Faith Discovery Participation

As you know, the Federal Rules of Civil Procedure and the Rules of Professional Conduct of the State Bar of California require cooperation in the discovery process by both litigants and lawyers.  Where a party and/or its counsel fail to meet this duty, sanctions are warranted.

As an initial matter, both parties and their lawyers are obligated to take steps to preserve documents, including through the issuance of—and monitoring by counsel of compliance with—a litigation hold.  "[I]t is generally recognized that when a company or organization has a document retention policy, it 'is obligated to suspend' that policy and 'implement a litigation hold to ensure the preservation of relevant documents' after the preservation duty has been triggered." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1137 (N.D. Cal. 2012) (adopting preservation requirements set forth in *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)).  But "[a] party's discovery obligations do not end with the implementation of a 'litigation hold'—to the contrary, that's only the beginning.  Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); *see also* Cal. Bar Comm. on Prof. Resp. & Conduct, Formal Op. 2015-193, at 3-4 n.6 ("[T]he duty to [issue a litigation hold] falls on both the party and outside counsel working on the matter.").  A party's failure to monitor its employees' preservation efforts warrants sanctions. *Apple*, 881 F.Supp.2d at 1150-51 (imposing adverse jury instruction sanction) (imposition of adverse jury instruction sanction upheld, with modification, by *Apple, Inc. v. Samsung Electronics*, 888 F.Supp. 976 (N.D. Cal. 2012)).

Counsel are also required to ensure that a client's collection of, search for, and production of responsive documents are conducted in good faith.  Counsel may not simply accept a client's uncorroborated assertions or look the other way when a client's discovery efforts appear lacking. *See* Cal. Bar Comm. on Prof. Resp. & Conduct, Formal Op. 2015-193, at 5.  Indeed, a District Court in California sanctioned both a party and its attorneys where the attorneys "chose not to look in the correct locations for the correct documents, to accept the unsubstantiated assurances of an important client that its search was sufficient, to ignore the warning signs that the document search and production were inadequate, [and] not to press [the client's] employees for the truth . . ." *Qualcomm Inc. v. Broadcom Corp.*, No. 05-v-1958, 2008 WL 66932, at *13, *18 (S.D. Cal. Jan. 7, 2008) (imposing monetary sanctions against party and referring the involved attorneys to the State Bar of California for investigation); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010) (cited approvingly by Cal. Bar Comm. on Prof. Resp. & Conduct, Formal Op. 2015-193) (finding party's "conduct was negligent" where "[k]ey players searched their own files without

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 7

supervision from management or counsel, and accordingly issuing both monetary and adverse jury instruction sanctions).

## VI.   Questions for AHI

Based on the issues set forth above, CoStar has significant cause for concern that AHI has failed to preserve documents and/or failed to undertake a reasonable search for documents. In hopes of assuaging these concerns, CoStar asks that AHI provide detailed written responses to the following questions by the close of business on Friday, July 22, 2016:

1. When, if ever, and to whom, if anyone, did AHI issue a litigation hold in connection with this suit?

2. What steps has AHI taken to ensure that its employees, as well its subsidiaries and agents and their employees, implemented the litigation hold?  Please specify the role of outside counsel, if any, in these steps.

3. How did AHI determine which individual custodians and/or other sources of documents should be collected and reviewed for potentially responsive documents?  Please specify the role of outside counsel, if any, in this determination.

4. From which individual custodians and/or other sources of documents has AHI (and its counsel) collected documents to be reviewed?  For each custodian from whom documents were collected, please specify whether the collection was made by AHI principals or employees, or by outside counsel.

5. What sources of documents, if any, has AHI searched electronically (*i.e.*, drives, servers, networks, databases) in order to identify documents for collection or production?  If any electronic searches were conducted, please specify whether they were conducted by AHI principals or employees, or by outside counsel.

6. Please list each individual with whom outside counsel has <u>directly</u> spoken regarding AHI's document preservation, collection, and/or review processes.

7. How did AHI determine which documents and e-mails were responsive to CoStar's Requests?  To what extent did outside counsel rely upon AHI principals or employees to determine the responsiveness of particular documents?

8. Does AHI intend to rely upon any e-mails for its defense at trial in this litigation, as it did in its defense before the California Bureau of Real Estate?

9. When, if ever, did AHI suspend the e-mail "purges" that allegedly resulted in the deletion of the key e-mail at issue in the California Bureau of Real Estate proceedings?

WILLIAMS & CONNOLLY LLP

July 15, 2016
Page 8

10. Will AHI produce the "valid third party agreements" that it has represented to the Court and Costar authorize its copying and display of CoStar's copyrighted photographs and other listing information, and any e-mails regarding such agreements?

As noted at the outset of this letter, CoStar reserves all rights to seek Court intervention and/or sanctions, including without limitation seeking formal discovery from counsel concerning its role in AHI's response to CoStar's discovery requests, in the event AHI refuses to answer the foregoing questions or if its responses establish a failure to meet its duties to participate in discovery in good faith.

We appreciate your prompt attention to this matter.

Sincerely,

David K. Baumgarten

# EXHIBIT A

BEFORE THE BUREAU OF REAL ESTATE

STATE OF CALIFORNIA

ERIC C. SAWYER, ADMINISTRATIVE LAW JUDGE

COPY

In the Matter of the Accusation of:  )
                                     )
APARTMENT HUNTERS, INC. and          )   No. 2014050485
STEVEN K. SHAYAN,                    )   2014060980
                                     )
            Respondent.              )
_____)

RECEIVED
Bureau of Real Estate

AUG 03 2015

L.A.D.O. Legal

TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, February 25, 2015

Reported by:

BRITTANY GUTIERREZ
Hearing Reporter

Job No.:
44590AH



*Kennedy*
COURT REPORTERS, INC.
920 WEST 17TH STREET
SECOND FLOOR
SANTA ANA, CALIFORNIA
92706

2

1                    BEFORE THE BUREAU OF REAL ESTATE

2                         STATE OF CALIFORNIA

3            ERIC C. SAWYER, ADMINISTRATIVE LAW JUDGE

4

5

6    In the Matter of the Accusation of:    )
                                            )
7    APARTMENT HUNTERS, INC. and            )    No. 2014050485
     STEVEN K. SHAYAN,                      )    2014060980
8                                           )
                  Respondent.               )
9    _____   )

10

11

12

13                                              •

14

15

16            TRANSCRIPT OF PROCEEDINGS, taken at

17        320 West Fourth Street, Suite 630, Los Angeles,

18        California, commencing at 9:00 a.m.

19        on Wednesday, February 25, 2015, heard before

20        ERIC C. SAWYER, Administrative Law Judge,

21        reported by BRITTANY GUTIERREZ, Hearing Reporter.

22

23

24

25

3

```
 1   APPEARANCES:

 2         For the COMPLAINANT:    STATE OF CALIFORNIA
                                   BUREAU OF REAL ESTATE
 3                                 LISSETE GARCIA, ESQ.
                                   320 West Fourth Street
 4                                 Suite 350
                                   Los Angeles, California
 5                                                 90013

 6
           For the RESPONDENT:    LAW OFFICES OF
 7                                 JILBERT TAHMAZIAN
                                   JILBERT TAHMAZIAN, ESQ.
 8                                 1518 West Glenoaks Boulevard
                                   Glendale, California
 9                                               91201

10

11

12

13                                           .

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                           I N D E X

2   COMPLAINANT'S
    Witnesses:           Direct   Cross   Redirect   Recross
3
    Yo Wakita              22       42       79        88
4
    David Huang           107      122      167       175
5
    RESPONDENT'S
6   Witness:

7   Kevin Shayan          187      221

8

9

10                      E X H I B I T S

11                                  Marked for      Received
    COMPLAINANT'S:               Identification    In Evidence
12
13  1A   Hearing file for Case Number      13          13
         H-39404 LA

14  1B   Hearing file for Case Number      13          13
         H-36458 LA
15
16  2    License history certification     14          14
         for Apartment Hunters dated
17       May 1, 2014

18  3    License certification showing     14          14
         no record of license for
19       Steven K. Shayan

20  4    Certified copy of records for     16          16
         CAL BRE Case Number H-36485 LA
21
22  5    Complaint from Yo Wakita with     17          41
         attachments
23
    6    Declaration of David Huang        17         185
24       dated August 27, 2013

25  7    E-mail from Yo Wakita to David    18         106
         Huang

5

E X H I B I T S (Continued)

| COMPLAINANT'S: | | Marked for Identification | Received In Evidence |
|---|---|---|---|
| 8 | Apartment Hunters documents | 19 | 19 |
| 9 | Declaration regarding recovery of investigation costs | 19 | 21 |
| 10 | Declaration regarding recovery of enforcement costs | 21 | 21 |

| RESPONDENT'S: | | | |
|---|---|---|---|
| A | License printout of Apartment Hunters, Inc. | 148 | 264 |
| B | Apartmentguide.com data feed | 195 | 265 |
| C | Document entitled "Los Angles Great Locations" | 197 | 265 |
| D | eight-page e-mail document from Trulia | 199 | 266 |
| E | Screen shot entitled "Contract and Receipt" | 212 | 266 |

187

1                      KEVIN SHAYAN,

2    called as a witness, and having been first duly sworn by

3    the Hearing Reporter, was examined and testified as follows:

4         THE WITNESS:  Yes, I do.

5         THE COURT:  Good afternoon.

6         THE WITNESS:  Good afternoon, your Honor.  How are you?

7         THE COURT:  Good.  For the record please state and spell

8    your name.

9         THE WITNESS:  Kevin, K-e-v-i-n.  Last name Shayan,

10   S-h-a-y-a-n.

11        THE COURT:  Okay.  Thank you.  Mr. Tahmazian?

12        MR. TAHMAZIAN:  Thank you, your Honor.

13

14                   DIRECT EXAMINATION

15   BY MR. TAHMAZIAN:

16        Q    Mr. Shayan, what is your relation to Apartment

17   Hunters?

18        A    I've been there since 1999.  And I'm mostly in

19   charge of designing the website, the website structure,

20   technical stuff.  As well as some graphic design oversight,

21   not personally doing it, but I pretty much design and dream

22   it up.

23        Q    And what is your relation to Steven Shayan?

24        A    I'm his brother.

25        Q    You said you've been there since 1998?

· 188

1     A    1999.

2     Q    '99.  And with no breaks?

3     A    No breaks, no vacations.

4     Q    Were you --

5     MS. GARCIA:  Your Honor, if I may, the witness has a

6  mobile phone, cellphone, and it's out of view -- my view.

7  So I can't tell if he's referring to it or not.

8     THE COURT:  Okay.

9     MR. TAHMAZIAN:  Just like the record to reflect it's a

10  covered iPhone, but that's okay.

11  BY MR. TAHMAZIAN:

12     Q    Are you familiar with the procedure that Apartment

13  Hunters follows to follow with the rules and regulations of

14  the Department as far as a PRLS license is concerned?

15     A    Can you ask me again, please?

16     Q    Sure.  Are you familiar with the procedures and

17  policies of Apartment Hunters, and how they follow the rules

18  of the Department with respect to being compliant with the

19  PRLS licensees?

20     A    Yes, sir.

21     Q    Do you deal with the Department yourself also?

22     A    I've been involved in the previous proceedings.  I

23  know what the rules are, but Steve is the licensee.

24     Q    I understand.  Now, I want to direct your attention

25  back to May of 2013, April 2013, around that area.

1          Approximately how many different contracts did you

2  have approved by the Department and uploaded on your

3  website?

4      A    DRE contracts?

5      Q    Yes?

6      A    Six.

7      Q    Why six contracts?

8      A    Because the Department requires you to have one

9  contract for each website, or as you called it, "DBA," or as

10  we call it, "domain name," or "address."  So we own

11  Apartment Hunters, with a "Z" .com.  The For Rent in LA,

12  which is a Los Angeles-based domain.  Lease in San Diego,

13  which is a San Diego regional domain.  Rent in San

14  Francisco, which is a San Francisco-based domain.  And

15  Section Eight, which is a low income government housing

16  domain.

17          Each one had to have it's own contract with it's

18  own phone number.  Each one has his own phone number for

19  guests, landlords, and members, each one.  And it's own

20  e-mail address and it's own contract.

21      Q    Okay.  Now, this is something that was required by

22  the Department; correct?

23      A    Correct, sir.

24      Q    In fact, did you go through a process with the

25  Department; them demanding this from you?

190

1     A    Yes, sir.

2     Q    And when you say domain, what does that mean?

3     A    URL address, business address.

4     Q    What is that address?  Is that where you conduct

5  business?

6     A    Yes.

7     Q    And you were saying the Department -- in your

8  opinion, in your conversation with the Department

9  previously, they considered a domain an address of the

10  business?

11    A    Yes.

12    Q    Okay.  Now, going back to 2013 when you had these

13  domain names, these were -- the contracts themselves were

14  all the same.  The only difference was the domain address

15  and the information related to that domain; is that correct?

16    A    No, sir.  The contracts were slightly different in

17  price and in refund amount.  So some were at 49, some were

18  at 59; therefore, their refund commitments were different.

19         But, yes, basically they were all the same.  I

20  think only one had a different pricing by $10.  But they

21  were all the same except the address, yes.

22    Q    And did you go through a process to have the

23  Department approve these contracts?

24    A    Several processes, and they were kicked back and

25  forth several times.

191

1     Q     And then finally approved?

2     A     Yes.

3     Q     And to your knowledge, does the Department have a

4  copy of those contracts on file?

5     A     Yes.  We had to put up a security bond, a $10,000

6  bond.  All kinds of papers to get this.

7     Q     And to your knowledge, did this contract appear on

8  your Apartment Hunters website?

9     A     It was always up.  For us to get going we had to

10  have it first visible on the website at the time we

11  submitted for approval to Sacramento.  So we had to have a

12  printed copy.  A copy that opens up on the website matching,

13  and then wait for them to stamp it.  So Steve would go

14  downtown here to the counter, submit it.  They would stamp

15  it, send the copy to Sacramento.

16        At all times during the business we had a contract

17  printable -- viewable -- to the consumer with today's date

18  and his signature always, from inception.

19     Q     By "his," you mean Steve's signature?

20     A     Yes, sir.

21     Q     Now, tell us a little about how your business is

22  conducted, in a sense that how do you service your

23  customers?

24     A     Via the internet.

25     Q     Tell me how that happens?

192

1      A     What happens is we're an apartment rental and

2   listing service.  We don't make any money from the landlord.

3           So what happens is the landlords come and list

4   their properties with us for free.  It comes from landlords,

5   smaller landlords, mom and pop, two-unit, ten-unit

6   landlords, management companies.  We're authorized by the

7   MLS to have our MLS data.  As well as real estate investment

8   trust.  So they come and list the properties with us.

9           When a tenant comes to the website, they enter

10  their search criteria.  For example, two bedroom, two

11  bathroom in West Los Angeles for $1,500.

12     Q     Before you go there, how does a tenant get the

13  rights to enter the website?

14     A     They come to the website as a guest.  Initially as

15  a guest, you don't have to have anything, they're just

16  coming.

17     Q     Okay.

18     A     In the guest search they will type the criteria

19  what they are looking for.  All the listings appear,

20  complete description, photos, interior, exterior, virtual

21  tour, if there is any.  You can see everything.

22           We have demographics, what's nearby, ATMs.  Every

23  possible thing about that particular property, zip code,

24  down to longitude, latitude, street view, everything.  The

25  only thing we don't show is the landlord's phone number and

193

```
 1    the address.
 2            Once you pay the subscription fee, instantaneously
 3    the address and the phone number of the landlord appears.
 4       Q    What is the usual subscription fee?
 5       A    $49.
 6       Q    For how long of a period?
 7       A    30 days.
 8       Q    Is that the only money you really make?
 9       A    Only money we really make.  And sometimes a lot
10    less because we offer coupons or specials.
11       Q    And now, your database you testified comes from
12    other sources; correct?
13       A    Yes, it comes directly from landlords, management
14    companies, as well as other sources.
15       Q    Now, do you get the information from other
16    syndicates like Craigslist, Trulia, Zillow, and those kind
17    of places?
18       A    Large companies, yes.
19       Q    How does that workout?
20       A    What happens is we have a partnership with, for
21    example, Apartment Guide.  Apartment Guide is a publicly
22    traded Fortune 500 company.  So what happens on a daily
23    basis they send us a XML Feed, which I brought a sample.
24            It's a raw feed where it contains a ton of data,
25    right, that comes every 24 hours.  It either comes or we go
```

194

1    to pick it up.  So when we say pick it up, it sits in a bin.

2    So they either leave it on the Apartment Guide server for us

3    to go pick up, or they drop it off in a bin on our server.

4            So every night we pick up hundreds or thousands of

5    fresh listings that Apartment Guide is providing to us that

6    has been verified by them.  So that's called the XML Feed.

7    Once we take that raw feed and throw it inside the database,

8    it becomes a visible listing where the pictures come, the

9    raw data converted to bedrooms, bathrooms, pets, all the

10   text, and all of that.  Kind of like a excel sheet that's

11   exploding into reality-type text.

12       Q    When you say partners with Trulia or Zillow, how

13   does that work?

14       A    It's a feed partnership.  So, for example, we have

15   a contract there stating actually, you know, that Trulia had

16   asked us to be their data provider.

17           So what happens with a lot of the smaller or larger

18   companies is that they don't have enough sufficient data in

19   certain areas or certain regions.  In this case Trulia came

20   to us and asked us for data for the Los Angeles County

21   region, San Fernando, Los Angeles, San Diego County region

22   it's specified in the contract.  And they ask us for a

23   two-year run for us to be the data provider, specifically

24   because of our relationships with a smaller management

25   companies.

195

1      MR. TAHMAZIAN:  Let me stop you there.  You testified

2  earlier about some raw data you received.

3           Your Honor, if you look in your package, there's a

4  package that starts like this.  It should be number six.

5  Right there.

6      THE COURT:  This one?

7      MR. TAHMAZIAN:  Yes.

8      THE WITNESS:  That's the raw data, yes, sir.

9           That's how it arrives in a chunk.

10      MR. TAHMAZIAN:  I mark that as Respondent's "B".

11      THE COURT:  Okay.  On the top of the first page is says,

12  "Apartmentguide.com data feed."

13           We'll mark it for identification as Exhibit "B".

14           (Respondent's Exhibit B was marked for

15       identification by the Court.)

16      THE COURT:  Okay.  Go ahead.

17  BY MR. TAHMAZIAN:

18      Q    Now, you testified that you receive feed; is that

19  what you are talking about?

20      A    Yes, sir.

21      Q    This is information received from who?

22      A    Apartment Guide in a raw format prior to it being

23  converted into a visible format.

24      Q    We'll talk about that.

25           You get this because you're partners with them?

196

1     A     Correct.

2     MS. GARCIA:  I'm going to object to this line of

3     questioning.  We've been here for a while now today.

4          Can Counsel try to at least get to the properties

5     at issue here?  Because he's asking a lot of general

6     questions about contracts with other websites and if he can

7     just focus his questioning to the issues that are here

8     today, the three or four properties alleged that were

9     advertised without the authorization, and on those specific

10    websites that they were advertised on.

11         There is no mention in the Accusation about

12    apartmentguide.com.

13    THE COURT:  All right.  Look, I'm sure we'll get there,

14    but I think it has some probative value of explaining what

15    the business is, and that might help explain how the four

16    properties became involved in this.

17    MS. GARCIA:  Okay.

18    THE COURT:  I'm sure we won't spend to much time on

19    this, but go ahead.

20    BY MR. TAHMAZIAN:

21    Q     And then you testified that once with you get this

22    documentation, it transforms into data for your users; is

23    that correct?

24    A     Yes.

25    MR. TAHMAZIAN:  And if I can ask the Court to look at

 1   the next document, it's a package, on top it says "Los

 2   Angeles Great Locations."

 3        THE WITNESS:  That's what it turns out to look like,

 4   sir.

 5        MR. TAHMAZIAN:  Right there.

 6        THE COURT:  This one?

 7        MR. TAHMAZIAN:  And I'm marking it as Respondent's "C".

 8        THE WITNESS:  That's what that raw data will look as

 9   when it's converted.

10        THE COURT:  Okay.  Give me one moment.  Hold off a

11   second.

12             (Respondent's Exhibit C was marked for

13        identification by the Court.)

14        THE COURT:  Okay.  So "C" this is what's visible on your

15   website?

16        THE WITNESS:  Yes, sir.  This is how it arrives and this

17   is what this will get converted to when it gets displayed.

18        MR. TAHMAZIAN:  By this he means Exhibit "B."

19        THE WITNESS:  Exhibit "B" is how it arrives in raw

20   format and then finished format it gets displayed as that.

21             So in here there's a link that says images, if you

22   see HTTP, and the image would then be that.

23        THE COURT:  Okay.  So "C" is a sample of what is on the

24   Apartment Hunters website?

25        THE WITNESS:  Website.  And sent by this partner.

1       THE COURT:  Okay.  Thank you.

2           Go ahead, Mr. Tahmazian.

3   BY MR. TAHMAZIAN:

4       Q    You also testified about an invitation by Trulia to

5   become the --

6       A    Data provider.

7       Q    -- data provider.

8           And you were working with Trulia as of when?

9       A    I don't recall the exact date, but we're working

10  with over 15 other websites right now that we provide data

11  to.

12      Q    Do you pay anything to Trulia to become a partner

13  with them?

14      A    Yes.

15      Q    What do you pay them?

16      A    The relationship at that time was -- in one month I

17  think it was $5,200.  But we were also -- based on that we

18  were also making sales from the relationship.  So they were

19  displaying our listings, we were paying for our listings to

20  be displayed and also receiving subscription via the traffic

21  they were sending.

22      Q    I see.  And you indicated about an e-mail

23  conversation with them that had you previously back in 2013;

24  correct?

25      A    Correct.  There's a five-page back and forth, a

```
 1   little bit of actual push from them for us to sign the

 2   agreement.  They wanted to move forward faster than we could

 3   actually sign the contract.  It's all provided to you.

 4       MR. TAHMAZIAN:  In your package, your Honor, there is a

 5   document, 8 pages on the left-hand corner it says Zimbra

 6   (phonetic).

 7       THE WITNESS:  That's the e-mail from Trulia.  "Are you

 8   guys ready to move forward?"

 9       MR. TAHMAZIAN:  Next one.  I'm going to mark that as

10   Respondent's "D", your Honor.

11       THE COURT:  Okay.  Give me a moment.

12           Okay.  That item is the marked as requested.

13           (Respondent's Exhibit D was marked for

14       identification by the Court.)

15   BY MR. TAHMAZIAN:

16       Q    Now, tell me within that e-mail, when did you

17   receive the proposal initially from Trulia to get

18   information fed from them into your website for the proposed

19   listings?

20       A    It started as early back as -- I want to tell you

21   February or March.

22       Q    Of what year?

23       A    Of 2013.

24       Q    And from that time you're receiving feed from

25   Trulia; is that correct?
```

1      A    We were receiving feed from several companies and

2    giving feeds.

3      Q    I see.

4      A    So two sides to all of this.  We're providing and

5    receiving.

6      Q    I understand that, but I'm talking about the

7    company Trulia.

8      A    Yes.

9      Q    From February you started working with them?

10      A    Yes.

11      Q    Which means at that time you were feeding them with

12    the listing you had and receiving listings they had?

13      A    Yes, sir.

14      Q    Is that correct?

15      A    Yes.

16      Q    To your knowledge was there a limitation of what

17    kind of feedings they would send to you?

18      A    Well, not for sale.  For rent only.

19      Q    For rent, I'm sorry.

20      A    And not the ones that were duplicate that we

21    already had.

22      Q    So what was the limitation about what kind of feed

23    they would send you?

24      A    Rental listings that were unique data that we

25    already did not have, via filter we created, within the

1    geographic area of California that we covered, and vice

2    versa.  We would send them listings that was not multiple

3    listing services, because they already had that and was not

4    from the larger management companies because they already

5    had that.  Yet, from smaller management companies.

6            There's a detailed discussion of what they needed

7    and what we were in need of.

8        Q    There was also a different method by which you

9    received listings from various landlords and management

10   companies; correct?

11       A    Correct.

12       Q    How was that's done?

13       A    A feed.

14       Q    Okay.  Procedurally what would you do?  Was there

15   something automated within your system?

16       A    Landlords, once you call for a permission to get

17   permission to list their properties, they would actually

18   give you a blanket permission, because once you call a

19   management company and say, "May I get permission to list

20   your listings?"  And two days later they have another

21   vacancy and you say, "May I get permission?"  Pretty much

22   they're going say, "Look, I told you 48 hours ago.  The

23   answer is yes.  Stop calling.  Go ahead and get my listing."

24           So we switched to this system where we take the

25   listing that we find on their website, or anywhere else, we

1  include it in an e-mail and we go, "Dear landlord, we have

2  the following listings and we would like to get your

3  permission to list it.  If it's okay with you click here for

4  yes.  If it's not, click here for no."  And, you know, "If

5  you'd like us to update the price or change the price, type

6  a few sentences," whatever it is.  And we also let them know

7  that we multiply the advertising efforts of theirs by

8  putting it other Trulia, Zillow, Rental Source, Rentix, a

9  lot of other websites; however, we don't benefit.

10      MS. GARCIA:  Move to strike as nonresponsive.  I think

11  the witness (unintelligible).

12      THE COURT:  I'm sorry?

13      THE REPORTER:  I'm sorry?

14      MS. GARCIA:  I'm sorry.  Move to strike as

15  nonresponsive.  Everything that's been said about what the

16  landlords.  I guess the last sentence of the witness's

17  statement.

18      THE COURT:  That they also tell the landlords they'll

19  send the info to the other sites, or --

20      MS. GARCIA:  No.  I'll withdraw my objection.

21      THE COURT:  Okay.

22      MS. GARCIA:  I thought he said something else.

23      THE COURT:  Okay.  Go ahead.

24  BY MR. TAHMAZIAN:

25      Q    Now, when you receive this feed from other sources,

1  you obviously know that these are listings that are on

2  Trulia or any other company that you receive from; correct?

3      A    Yes.

4      Q    And when you receive that and put them up on your

5  website or on Trulia, feed them back with the same listing,

6  and if a prospective tenant likes that particular unit and

7  wants to look at it or rent it, and try to contact them

8  through your website, who would they contact?

9      A    The actual owner or the realtor of that property.

10  In the cases of the -- if I may?

11     Q    Yes.

12     A    If in the cases of this four listings in question,

13  they would contact that gentleman right there, Mr. --

14     Q    The HomeTeam Property Management?

15     A    Yes, sir.  We don't have anything to do with it.

16  Once they pay us our subscription fee, we don't make a

17  penny.  We don't have an intermediate phone number.  It goes

18  straight to him.

19     Q    So, in fact, by the fee that you get from Trulia

20  and other engines --

21     A    And/or putting up listings on other engines.

22     Q    You are actually expanding the audience --

23     A    Yes.

24     Q    -- of HomeTeam Property Management; is that

25  correct?

1     A     By 300 times.

2     Q     By them contracting through your website, you get

3     no monetary benefit; is that correct?

4     A     None whatsoever.

5     Q     The tenant doesn't pay you a penny more --

6     A     No.

7     Q     -- to get those listings; is that correct?

8     A     No, sir.  Just the amount of calls to HomeTeam

9     would quadruple verses sitting vacant.

10    Q     In May 2013, how many phone numbers did Apartment

11    Hunters have?

12    A     Apartment Hunters company?

13    Q     Yes?

14    A     At any given time, I want to tell you about 30, 35

15    phone numbers.

16    Q     And how many of those phone numbers appeared on the

17    database of BRE, approximately?

18    A     On each domain name has to be at least three.

19    Q     What are those three?

20    A     Guests, billing and credit card, and landlords.

21    Q     And had you six domain numbers; correct?

22    A     Six times at the minimum should be three.  Worse

23    case scenario should be two, which would be tenant and the

24    landlord.

25    Q     So at least minimum of ten numbers listed --

```
 1      A    12.  Six times two.

 2      MS. GARCIA:  Objection.

 3      MR. TAHMAZIAN:  Let me finish the question.

 4  BY MR. TAHMAZIAN:

 5      Q    To your knowledge you have provided to the

 6  Department with at least more than 10 telephone numbers

 7  related to the Apartment Hunters; correct?

 8      A    Yes, sir.

 9      Q    Those phone numbers were working?

10      A    And published on the website.

11      Q    And still working today?

12      A    Yes, sir.

13      Q    And was working back in 2013?

14      A    And on the contract, on the Department contract.

15      Q    There was a phone number that appeared on the

16  worksheet.

17      MR. TAHMAZIAN:  Is that what it's called, the worksheet?

18  I apologize.

19      MS. GARCIA:  I don't know what you are talking about?

20      THE COURT:  The Case Analysis.

21      MS. GARCIA:  Oh.

22      MR. TAHMAZIAN:  The Case Analysis.  810 --

23      THE WITNESS:  575, sir.

24  BY MR. TAHMAZIAN:

25      Q    Yes.  Is that phone number Apartment Hunters's
```

1    phone number?

2        A    I just got ahold of all of our program owners, if I

3    may?

4        Q    Well, no.  Don't touch anything.

5            Is that phone number Apartment Hunters's telephone

6    number?

7        A    No, sir.

8        Q    How do you know that?

9        A    It goes to an address on Federal Avenue in West Los

10   Angeles, which we never had anything to do with that

11   location.  We never had an office there.  We never went

12   there.  It's a Google search that brings up this phone

13   number.

14           This phone number was never -- it's disconnected

15   first of all.  And we have never had a disconnected phone

16   number in our life.  So this phone number was never

17   registered to us from 1999 to now.

18       MR. TAHMAZIAN:  If I may ask, your Honor, can he show

19   you on his phone when he Googled, how he came up with that

20   number, so you can see where that number comes from?

21       THE COURT:  All right.  Ms. Garcia, what do you think of

22   that?

23       MS. GARCIA:  I'm going to object, your Honor.  I don't

24   see what the point of that is.  I don't have any objection

25   to Counsel submitting something on a printed form, showing a

207

1    Google search for that phone number, but I don't think it's

2    appropriate to --

3        THE WITNESS:  I can send it.

4        MS. GARCIA:  -- testimony from a cellphone number that

5    we don't have any copy of for the record.

6        THE COURT:  Well, I think the request that he does a

7    Google search on his smartphone and that this number that's

8    on the Case Analysis will come up as one of the search

9    results.  If I'm understanding --

10       MR. TAHMAZIAN:  That's correct.

11       THE WITNESS:  Correct.

12       MS. GARCIA:  Okay.  That's fine then.

13       THE COURT:  All right.  Why don't you come up,

14   Ms. Garcia.

15       MS. GARCIA:  Sure.

16       THE COURT:  Do you want to watch him do it?

17       THE WITNESS:  It's right here.

18       THE COURT:  Show her -- do the search, show her the

19   process.

20       THE WITNESS:  It's right here.  It says 1507 Federal

21   Avenue --

22       MS. GARCIA:  What's the phone number --

23       THE WITNESS:  I'm going to show you.  Right here,

24   575-4098.

25       MS. GARCIA:  And what's the website listed on that?

1    THE WITNESS:  Apartmenthunterz.com.  And we were never
2  on Federal Avenue ever, never, ever, ever.
3    MS. GARCIA:  So when you search that number it shows up
4  apartmenthunterz.com?
5    THE WITNESS:  No.  It shows up Federal Avenue.  We were
6  never on Federal Avenue.
7    THE COURT:  Okay.
8    MR. STEVEN SHAYAN:  It says California Apartments.
9    THE WITNESS:  It says California Apartments, Federal
10  Avenue West L.A.  We were never on Federal Avenue in West
11  L.A., and that's the phone number it shows.
12    MS. GARCIA:  Your Honor, when he scrolled down I saw
13  Apartment Hunters --
14    THE WITNESS:  Yeah.  It does say the domain name.
15    THE COURT:  All right.  I see that under the website
16  just above the hours.  Apartment Hunters with a "Z" .com.
17    THE WITNESS:  Correct.
18    THE COURT:  Is that what you wanted me to see?
19    MR. TAHMAZIAN:  Yes, your Honor.
20    THE WITNESS:  But that number and address has never been
21  ours.
22    THE COURT:  Okay.  Thank you.
23  BY MR. TAHMAZIAN:
24    Q    And that number was never your number?
25    A    Ever, never.

1      Q     What was the number that's listed with the

2    Department?  The very first number?

3      A     (310) 276-4663.

4      Q     And to your knowledge is that number still with the

5    Department as of today?

6      A     Always been.

7      Q     And is it there as of today?

8      A     Yes, sir.

9      Q     Has it ever been disconnected?

10     A     No, sir.

11     Q     Has that ever been removed from the Department's

12   database?

13     A     No.

14     Q     Do you recall having a conversation with the

15   Department about submitting different applications with the

16   various domain names about three years ago -- four years

17   ago?

18     A     Yes.

19     Q     At that time you were operating out of the

20   Robertson address; correct?

21     A     Yes.

22     Q     And you had prepared the contracts with that single

23   address; is that correct?

24     A     Yes.

25     Q     At one point; is that correct?

210

```
 1      A    Yes.

 2      Q    Do you recall if the Department objected to that?

 3      A    No.

 4      Q    Do you recall if the Department requested that you

 5  submit a contract for every separate address you've got?

 6      A    Every separate domain address.

 7      Q    Well --

 8      A    Yes.

 9      Q    Yes?

10      A    Yes.

11      Q    Right.  Do you recall that conversation with the

12  Department?

13      A    Yeah.  Unlike the previous testimony, I couldn't

14  have one contract with six websites on it.  So had I to

15  have -- each address had to have it's own contract, and as a

16  matter of fact, it's own phone number.

17      Q    And, in fact, none of those contracts had the

18  Robertson address; correct?

19      A    No.  They had the domain address.

20      Q    At that time did you have any contracts on file

21  with the Robert address?

22      A    The Apartment Hunters.

23      Q    Now, when you moved from the Robertson address, did

24  you send some notification to the Department about page?

25      A    I believe by mail we did.
```

211

```
 1        Q     You believe or you know you did?

 2        A     I know we did.  And I know we did through your

 3   office.

 4        Q     Well, I want to know what you did.

 5              Back in 2013, what did you send to the Department?

 6        A     That we are moving from that address to the Golden

 7   Lantern address in Dana Point.

 8        Q     Now, you also -- strike that.

 9              You had a restricted license until March of 2014;

10   correct?

11        A     Yes, sir.

12        Q     Now, in March of 2014, did you do anything to try

13   to remove yourself?

14        A     Yeah.  We applied for a brand-new unrestricted

15   license.

16        Q     And on that application, did you put your new

17   address?

18        A     Yes.

19        Q     What was the address?

20        A     The Golden Lantern address.

21        Q     Now, is that the address that appears on your

22   contract -- one of your contacts -- on the website at this

23   time?

24        A     Yes, sir.

25        MR. TAHMAZIAN:  I'm going to ask the Court for one more
```

212

```
 1   document, your Honor.  If you can mark it has Respondent's
 2   "E" please.  And I can show you what it is, it's a screen
 3   shot, one single page right there.
 4        THE COURT:  This one?
 5        THE WITNESS:  That contract, yes.
 6        MR. TAHMAZIAN:  Please.
 7        THE COURT:  Okay.  It says, "Contract and receipt," on
 8   the top of the image depicted in the middle of the screen
 9   shot.
10            And I'll mark it as Exhibit "E".
11            (Respondent's Exhibit E was marked for
12        identification by the Court.)
13        THE COURT:  Okay.  Go ahead.
14   BY MR. TAHMAZIAN:
15        Q    Mr. Shayan, tell me about this exhibit.
16            First of all, who wrote the red letters on the
17   bottom?  If you look at the document, the red lettering and
18   all that, who wrote that at the bottom?
19        A    This is our program owner.  This is us.
20        Q    And the screen shot of Apartment Hunters?
21        A    Was done by us to demonstrate here today that we
22   had this up on the site.
23        Q    Have you, yourself, gone online and checked if this
24   contract is up on your website?
25        A    Of course.
```

1     Q     Have you yourself verified that this contract is in

2     possession of the Department?

3     A     Yes, sir.

4     Q     Now, tell me at the bottom what information you

5     provided to the Department?

6     A     That the domain name is listed under the DBA

7     section.

8     Q     And the address for Apartment Hunters?

9     A     Which is right here, yes.  And the license number

10    is present on both the member registration page and contract

11    page.

12    Q     What about the address for Apartment Hunters?

13    A     It's there, sir.

14    Q     And when did you provide this particular contract

15    to the Department?

16    A     Way back when we went to -- first of all, this was

17    there when we moved from Robertson.

18    Q     Okay.  I understand.

19    A     And then one more time when we went to remove the

20    restriction.

21    Q     And you have a few more contracts online?

22    A     For each address.

23    Q     Each address.

24          And you are familiar with this document; correct?

25    A     Of course.

214

1     Q    And you've seen it on the website; is that correct?

2     A    It's there everyday.

3     Q    What is the -- as far as Apartment Hunters business

4   is concerned, do you have any walk-in customers?

5     A    None.

6     Q    Are your customers 100 percent internet based?

7     A    Yes, sir.

8     Q    And how do you communicate with the your customers?

9     A    We have six support ladies that attempt to do a

10  24-hour shift where we chat with the customers.  We have 18

11  to 22 incoming lines that people call into.  The calls are

12  recorded where we can listen to the audio file, as well

13  they're transcribed in a text and into a ticketing system.

14        So we have a ticketing system, audio recording

15  system, and then we also have an e-mail system, and we have

16  a very accurate tracking system that shows us from the time

17  of customers calling in or making a ticket request, to the

18  time that we reply to their request.  They have an 18.22

19  second average total response time.

20        Whether it be a subscription, a refund, a customer

21  satisfaction, or even helping the customer do something on

22  the web, 18.22 seconds.

23     Q    Now, obviously in your business, do you get

24  customers complaining and wanting refunds?

25     A    Yes.

215

1    Q    And how do you handle that?

2    A    With the ticketing system so it's documented.  With

3    the recorded audio of their request, and we push a button.

4    We refund the money to the same last four digits of the

5    credit card they use to pay.

6         However, instantaneously a text goes to their

7    cellphone that we refund to.  An e-mail goes to the e-mail

8    address with a transaction ID of their refund, and a robotic

9    phone call that the robot calls the phone and goes, "This is

10   a call to confirm a refund has been made to your credit

11   card."  Three ways we reach to the customer outbound to

12   confirm their refund.

13   Q    Now, did you look at your -- strike that.

14        Do you document this data on your website?

15   A    Hundred percent.

16   Q    Did you look at your data back in January of this

17   year?

18   A    Which data?

19   Q    The data about your sales and refund?

20   A    Yes, sir.

21   Q    And out of your entire sales in 2013, January, how

22   many percent was your refund, approximately?

23   A    Out of 2,000 sales we had a 3.47 percent refund,

24   but that didn't necessarily mean that is data related.  Some

25   people are looking for unreasonable price points.  Like if

216

1   you are looking for six-bedroom, six-bathroom by the ocean

2   for $600 you get your money back.

3        Q      But you refund the customers to keep them happy?

4        A      Hundred percent because the laws of the Department

5   of Real Estate says if within five days you don't find them

6   exactly what they are looking for, you have to give them

7   their money back.

8        Q      Have had you any complaints in the last two years

9   from any customers that were unable to communicate with your

10   company or get a refund?

11       A      Not at all.

12       Q      The information received from the landlords, as

13   well as from these companies like Trulia, Zillow, and MLS,

14   and all that, how do you make sure that they are updated?

15       A      The feeds that come are every night.  The landlords

16   that come and list their properties, we have a system that

17   we know when they last lodged in.  So with the market of Los

18   Angeles usually with these properties that we have here,

19   usually they're gone within 72 hours, right.

20            So, for example, a one-bedroom, one-bathroom in

21   West L.A., it's not going to sit on the market for more than

22   one, two, or three days.  So if the landlord doesn't come to

23   login check within 72 hours, an e-mail goes out.  That goes,

24   "Dear Landlord, we show you have not come and logged into

25   the website.  Click here to extend the life of the vacancy

1    for seven days."

2          That will actually allow the vacancy to be

3    refreshed and stay seven more days or expire.  If the

4    landlord doesn't open that e-mail, or if that e-mail lands

5    in his junk box, we kill the vacancy automatically.  That's

6    his job to come back.  We deactivate it, we don't kill it so

7    he doesn't have to type it all over again.  So he just comes

8    back and reactivates it.

9          Q    What about Trulia and Zillow?

10         A    Those are fresh feeds.  They come every night

11   fresh, fresh.  We pick up the feed or they put it in our

12   bin.  It's a server to server discussion.

13         Q    If you look at the exhibit package, Exhibit 8,

14   please?

15         A    Where is it?

16         Q    The exhibit package right there.  Exhibit Number 8.

17         A    Okay.

18         Q    Page one, right there.

19              Can you explain to the Court what this page

20   depicts?

21         A    This one says that we would send this listing to a

22   landlord that owns the website called DMinvestments.com,

23   that we noticed they have available vacancies.  We introduce

24   ourselves and a family of our websites, and exactly what we

25   do.  And we'd like to refer prospective tenants to them on a

218

1    daily basis to maximize their marketing efforts, as well as

2    to syndicate the listings to our partner websites.

3         Q    What's the purpose of this e-mail?

4         A    To get their permission to list their vacancies.

5         Q    This is stuff that you send on a daily basis?

6         A    On an hourly basis as we located their vacancy.

7    But mostly daily basis, yes, sir.

8         Q    Now, would you have sent similar e-mails to a

9    company called HomeTeam Property Management?

10        A    Yes, sir.

11        Q    Now, what did you learn about the Complaint from

12   HomeTeam?

13        A    When the DRE sent us the Complaint --

14        Q    Which was in?

15        A    I don't know.

16        Q    April of last year?

17        A    Yes.

18        Q    Is that about right?

19        A    Yes.

20        Q    And from reading the Complaint, you do recall that

21   the Complaint was made back in May of 2013; correct?

22        A    Correct.

23        Q    Now, do you maintain this data of contacting the

24   landlords in your website in that ten months?

25        A    This far back, no.  But we maintain it for some

1    time, but we purge them eventually.

2        Q    How often?

3        A    I think every three or four months after we get the

4    permission, because the listing is gone.  We get the

5    permission, we put the listing, then the listing expires and

6    the permission has to be reset.

7        Q    Is page one of Exhibit 8 the document you prepared

8    and gave to me?

9        A    Yes.

10       Q    Go to page two?

11       A    Yes, sir.

12       Q    Is that something you prepared?

13       A    Yes, sir.

14       Q    And why did you prepare this document?

15       A    Because when you click on this yes, there is a

16   unique session ID on the server, this is sitting on the

17   server.  That unique ID is what's behind that yes or no

18   button.

19           Then the second column, that's column "B".  So that

20   column "A" is the date the e-mail was sent.  Column "B" is

21   the unique session ID, the cookie as you would call it.  And

22   unit "C" is who the e-mail was sent to, and column "D" is

23   the sender, which is landlord@apartmenthunterz.com, which is

24   the sender, us.

25       Q    What is the --

1    A    "E" is the authorization.  They decided to say yes

2    or no.  Some said no, some said yes.

3    Q    Okay.  And you are trying to -- with this

4    spreadsheet or excel, you are trying to show the

5    communication within HomeTeam and Apartment Hunters back in

6    May 2013?

7    A    Yeah.  And several other landlords, not just

8    HomeTeam.

9    Q    Okay.  Go to the next page.

10   A    Yes, sir.

11   Q    Is this something you prepared?

12   A    Yes, sir.

13   Q    What are you trying to show?

14   A    First of all the listing status was deactivated in

15   column "B".

16   Q    As of when?

17   A    As of the date this thing -- as of 05-05-2013.  The

18   listing status was deactivated.  It shows the street, the

19   city, the state, the zip code, and then it shows that the

20   listing -- the date it was listed, sir, it shows the date it

21   was expired and the date it was authorized.

22        So the date authorized goes back to this other page

23   that you just -- previous page you mentioned.  And the day

24   it was expired was the date we expired the listing.  The

25   05-05 was authorized, 05-07 it was listed.  It took us some

 1  time to make it live.

 2      Q    Are you familiar with Vidmantas Macys?

 3      A    Vidmantas Macys is one of our lead IT programmers,

 4  sir.

 5      Q    Were you familiar with the Declaration you

 6  prepared?

 7      A    Yes, sir.

 8      Q    Were you involved in preparing this Declaration?

 9      A    Yes, sir.

10      Q    Have you read this Declaration before?

11      A    Yes, sir.

12      Q    Would you agree with what he says in the

13  Declaration?

14      A    100 percent, yes.

15      MR. TAHMAZIAN:  No further questions, your Honor.

16      THE COURT:  All right.  Thank you.  Give me one moment.

17           Okay.  When you are ready, Ms. Garcia.

18

19                     CROSS-EXAMINATION

20  BY MS. GARCIA:

21      Q    Looking at Exhibit 8, since you have that in front

22  of you.

23      A    Exhibit --

24      Q    Eight, first page.

25           Are you claiming that Apartment Hunters sent a

222

1   similar e-mail to the e-mail address for

2   leasing@hometeampm.com on May 5th of 2013, and that --

3   that's my questions.

4       A    Yes.

5       Q    And are you claiming that somehow this e-mail was

6   purged from your system, and you don't have proof of that

7   e-mail; is that correct?

8       A    I have the session ID.  That the unique session ID

9   was there and the date that it was sent there.  But I don't

10  keep records going back to 2013.  That's two years ago.

11      Q    For the record, the witness is referring to page

12  two of Exhibit 8, and he's reading from the excel

13  spreadsheet that he claimed he prepared; is that correct?

14      A    Right.  Correct.

15      Q    So other than this excel spreadsheet, you don't

16  have any proof of that e-mail that was allegedly sent to

17  Apartment Hunters; isn't that correct?

18      A    Other than the session ID, no.

19      Q    And can you explain to me why this excel

20  spreadsheet is in a different language other than in

21  English?

22      A    Because we have offices overseas.

23      Q    And where did you prepare this?

24      A    In our office overseas.  We have offices in

25  Lithuania and in Russia.

223

1      Q     And where were you when you prepared this?

2      A     In the United States.

3      Q     And so what language is this excel sheet?

4      A     In Russian.

5      Q     Okay.  And can you explain why you would prepare an

6   excel spreadsheet in the U.S. using the Russian language?

7      A     This documentation -- we work on Skype and on

8   screen-sharing systems like half of the United States.

9      MS. GARCIA:  Move to strike as nonresponsive.

10  BY MS. GARCIA:

11     Q     Why did you prepare this --

12     THE COURT:  Granted.

13     MS. GARCIA:  -- excel spreadsheet in Russian?

14     THE WITNESS:  It was on a screen share.

15          I didn't prepare this, my programmers prepared this

16  with me there.

17  BY MS. GARCIA:

18     Q     Okay.  You testified earlier that you prepared

19  this.  Now who are you claiming prepared this?

20     A     This is with our programmers with Vidmantas Macys

21  and Dennis Portnof (phonetic) in our offices overseas.

22     Q     What office was this excel spreadsheet prepared in?

23     A     In our Russian office with Dennis Portnof, and

24  Vidmantas Macys.

25     Q     Have you ever notified the Bureau of Real Estate

1    that you have offices overseas?

2        A    I don't have to.

3        Q    Okay.  Has Apartment Hunters ever notified the

4    Bureau of Real Estate that they maintain offices overseas?

5        A    These are programing offices, not location offices

6    that has anything to the with customers or landlord --

7        MS. GARCIA:  Move to strike as nonresponsive.

8        THE COURT:  Granted.  I think it's just yes or no.

9        THE WITNESS:  No.

10   BY MS. GARCIA:

11       Q    Okay.  Now, taking a look at page three of

12   Exhibit 8, this also appears to be in a different language.

13           What language is this in?

14       A    Page?

15       Q    Three.

16       A    Same as the other one.

17       Q    Is that Russian?

18       A    Yes.  The headings are Russian, the rest is

19   English.

20       Q    And is it your testimony still that you prepared

21   this, or did someone else prepare this?

22       A    It was prepared by Dennis and Vidmantas, my

23   employees overseas.

24       Q    And who supervises these employees overseas?

25       A    I do.

225

| | | |
|---|---|---|
| 1 | Q | Are you license by the Bureau in any capacity? |
| 2 | A | No. |
| 3 | Q | Okay.  And does Mr. Steven Shayan supervise those |

4 employees?

| | | |
|---|---|---|
| 5 | A | On a daily basis. |
| 6 | Q | How does he do that? |
| 7 | A | We're both together there while all of this is |

8 working.  We work 16 hours a day with these gentlemen.

| | | |
|---|---|---|
| 9 | Q | And when were these excel sheets prepared? |
| 10 | A | After the Complaint was filed. |
| 11 | Q | Okay.  Do you recall exactly when or what month -- |
| 12 | A | I don't. |
| 13 | Q | -- or what year? |
| 14 | A | I don't remember. |
| 15 | Q | Were they prepared this year? |
| 16 | A | No.  They were prepared prior to this year. |
| 17 | Q | So just to sort of help you along, the Accusation |

18 was filed in April of 2014, does that help you?

| | | |
|---|---|---|
| 19 | A | It was done after April of 2014. |
| 20 | Q | Do you know approximately what part of the year? |
| 21 | A | No, ma'am, I don't. |
| 22 | Q | Okay.  Now, you stated when looking at page three |

23 that these listings were deactivated on May 5th, 2013.  And

24 then you went on to testify that the properties were listed

25 as is noted on column "K".

226

1          Why would you deactivate listings before they were

2     listed?

3          A    Which one again?  Say again.

4          Q    Your testimony earlier as to page three, the four

5     properties listed there, you stated that the listings were

6     deactivated on May 5th of 2013.

7               I'm asking why you would deactivate the listings

8     prior to them being listed according to this spreadsheet?

9          A    At the time this report was prepared, the listings

10    were deactivated.  This column says authorized, listed, and

11    expired.

12         Q    Okay.  And --

13         A    Those are three columns are different than the

14    status.

15         Q    Now, your testimony is that they were deactivated

16    at the time of this spreadsheet?

17         MR. TAHMAZIAN:  I'm going to object to that question.

18    He never testified to that, your Honor.

19         THE COURT:  Sustained.  Why don't you rephrase?

20         MS. GARCIA:  Okay.

21    BY MS. GARCIA:

22         Q    So when were these properties deactivated?

23         A    I'm not sure.  It just shows that at the time this

24    report was printed the status was deactivated.  I could tell

25    you when they were expired, it says it there in the column,

1  column "F".

2     Q    And these excel spreadsheets were prepared by --

3     A    Staff.

4     Q    -- Russian employees?

5     A    They are first of all, the word "Russian employees"

6  is disrespect.  They are our staff.  So what country they're

7  from is very disrespectful and racial.

8     Q    I wasn't -- I apologize.

9     A    Right.  Apologize to them, not me.

10    Q    Where were these employees located?

11    A    In Russia, correct.

12    Q    So they were prepared by your employees in Russia?

13    A    Correct.

14    Q    Where were they getting -- and this information

15  reflects what, the Apartment Hunters listings for these

16  properties?

17    A    Correct.

18    Q    And they claim that these properties were listed or

19  authorized by whom on May 5th of 2013?

20    A    I don't understand the question.  "They claim," who

21  is "they claim"?

22    Q    Well, Apartment Hunters.

23         You have the date authorized under column "M" as

24  May 5th, 2013; who authorized these?

25    A    That's the day that they were -- this e-mail was

228

1    clicked on.

2        Q    So you are claiming that the -- are you referring

3    to page two?

4        A    Yes, ma'am.

5        Q    Okay.  So --

6        A    Page one actually.  When this e-mail was clicked

7    on.

8        Q    Okay.  But that e-mail is to Doug Wetton?

9        A    Right.  It's similar like this.

10       Q    Okay.  So you are claiming that --

11       A    We don't keep the actual graphic e-mail.

12       Q    Okay.  But you are claiming that HomeTeam

13   authorized those listings on May 5th, 2013?

14       A    Correct.

15       Q    And how did they authorize that?

16       A    By clicking on that box.

17       Q    And where was that e-mail sent?  To what e-mail

18   address?

19       A    To HomeTeam Leasing at

20   hometeampropertymanagement.com (sic).

21       Q    So you've been present while Mr. Yo Wakita

22   testified earlier today.  And his claim that he searched

23   through his e-mails at leasing@hometeampm.com, and he spoke

24   to his brother who is the broker for HomeTeam, and that he

25   denies ever having authorized Apartment Hunters to use those

```
 1   listings.  So --
 2       A    That's his testimony.
 3       Q    -- are you saying that's not true?
 4       A    I'm saying we did send this e-mail out.  We have a
 5   valid unique session ID that we prepared, sent this.
 6       Q    So other than these excel spreadsheets that you've
 7   had your employees prepare, does Apartment Hunters have any
 8   written or oral -- any proof of any written or oral
 9   permission to list these properties?
10       A    No.
11       Q    Okay.  And how many properties, or how many
12   listings for properties did Apartment Hunters have in May of
13   2013?
14       A    At any given time, Apartment Hunters has about 65
15   to 75,000 active listings.
16       Q    Okay.  And how do you know -- how are you able to
17   update within a five-day period whether those 65,000 or so
18   listings are still vacant and available for rent?
19       A    We have a staff updater, entry people that do it on
20   a daily basis, and a lot are via feeds, and automated data
21   input via the management companies website themselves.
22       Q    Do you have any proof of any contact to HomeTeam
23   Property Management to inquire whether the four listings
24   that are at issue here today were still available on the
25   dates that you claim were listed for those properties?
```

230

1      A     I don't have that, no.  We just have proof that we

2   sent and got permission for them, and that they were

3   activated and expired in a proper date format.

4      Q     Okay.  Are you aware that PRLS licensees have to

5   keep copies of any contracts for PRLS services that they use

6   for a period of three years?

7      A     Which contracts?

8      Q     The PRLS license contract.  PRLS service contract

9   that they use?

10     A     With the customer or with the landlord?

11     Q     With the customers.

12     A     Sure.

13     Q     You are aware of that?

14     A     Right.

15     Q     And is it your company policy to purge -- is it

16   still your testimony that it's your company policy to purge

17   information for listings after only three months?

18     A     This is PRLS contract with the customer, I have it

19   goes back as far as you need, which is the contract we enter

20   into with a tenant to provide them with prepaid rental

21   listing services, which means the last four digits of credit

22   card.  When they signed up.  When they have came.  How many

23   living they look at --

24     MS. GARCIA:  Objection.  Move to strike as

25   nonresponsive.

231

| | |
|---|---|
| 1 | THE WITNESS:  Yeah, well, I'm responding. |
| 2 | THE COURT:  Granted. |
| 3 | THE WITNESS:  It's not that. |
| 4 | THE COURT:  Hold on.  I'm going to grant it. |
| 5 | Do you remember what she asked you? |
| 6 | THE WITNESS:  She asked me if I understand that PRLS |
| 7 | license requires you to keep documents for three years.  Not |
| 8 | on the side of landlords.  On the side of tenants I keep |
| 9 | them longer than three years. |
| 10 | THE COURT:  Go ahead. |
| 11 | BY MS. GARCIA: |
| 12 | Q    And if there's a dispute by a prospective tenant |
| 13 | over a property, wouldn't it make sense to keep copies of |
| 14 | the records related to that listing.  If you have to answer |
| 15 | a request for a refund. |
| 16 | A    We've refunded everything going back right away. |
| 17 | MS. GARCIA:  Move to strike as nonresponsive.  That's |
| 18 | not my question. |
| 19 | THE COURT:  Granted. |
| 20 | BY MS. GARCIA: |
| 21 | Q    How long of a period do you keep records relating |
| 22 | to the authorizations that you receive from property |
| 23 | managers or property owners for your listings? |
| 24 | A    Approximately six months I would say. |
| 25 | Q    Okay.  And how are you able to respond to requests |

232

```
 1    for refunds that relate to PRLS services that go beyond the
 2    six months?
 3        A    Our refunds have nothing to do with the properties.
 4    As a policy, we refund anybody who asks for a refund,
 5    period.
 6        Q    What if the request for a refund has to do with a
 7    listing of a property that wasn't authorized?
 8             How are you able to determine --
 9        A    We haven't had that.
10        Q    Okay.  You are claiming that every listing that
11    Apartment Hunters has used has been authorized by the
12    property owner or manager?
13        A    I'm claiming every refund we've had has not been
14    property related.
15        Q    And you reviewed every request for a fund?
16        A    I am the one who issues a refund.
17        Q    Okay.  And how did you receive those requests for
18    refunds?
19        A    By e-mail, by ticketing system, by a recording
20    telephonic request for a refund, or via credit card company
21    request.
22        Q    Have you ever actually received a mailing of a
23    request for a refund from a customer?
24        A    Never.
25        Q    I'm sorry?
```

233

1    A    Never.

2    Q    Is that because the addresses listed for Apartment

3    Hunters are no longer valid?

4    A    No, ma'am, that's not because.

5    Q    Okay.  Are you aware that the refund requirement --

6    the refund wording requirements for PRLS listings also

7    require that the request for refund be mailed by certified

8    mail or by regular mail by the client asking for a refund?

9    A    Correct.

10   MR. TAHMAZIAN:  Objection.  This is beyond the scope of

11   the Accusation, your Honor.

12   THE COURT:  How is this relevant?

13   MS. GARCIA:  Well, there's been testimony about their

14   procedure for refunding requests for a refund.  And there's

15   been testimony about his knowledge of the PRLS requirements.

16   I just want to know whether he is aware of the fact

17   that in order to request a refund, the customer has to show

18   proof of mailing.

19   THE COURT:  Okay.  It's probative.  Let's not spend too

20   much time on it.

21   MS. GARCIA:  Okay.

22   THE COURT:  Do you remember what she asked?

23   THE WITNESS:  Yes, your Honor.

24   THE COURT:  Okay.

25   THE WITNESS:  But we refund without even waiting for a

234

1    refund request.

2        MR. TAHMAZIAN:   I think the question --

3    BY MS. GARCIA:

4        Q    What are the business addresses that Apartment

5    Hunters operates out of?

6        A    What are the current business addresses?

7        Q    Yes.

8        A    32565 Golden Lantern, Dana Point, 92629.

9        Q    And is that a business address, or is that a

10   residence?

11       A    That's a business address.

12       Q    And how long has Apartment Hunters been at that

13   address?

14       A    Since -- it's been approximately three and a half

15   years, almost four years.

16       Q    So since 2012?

17       A    I would say so, yeah.  I don't know the exact date.

18   It's been over three years.

19       Q    And are you claiming that you notified the Bureau

20   of this change of address?

21       A    Yes, ma'am, I did.

22       Q    And where was Apartment Hunters before that?

23       A    201 North Robertson Boulevard in Beverly Hills.

24       THE COURT:   Okay.  Make sure that you let Ms. Garcia

25   finish.

1      THE WITNESS:  I apologize.

2      THE COURT:  Okay.  Go ahead.

3      MS. GARCIA:  Sorry, your Honor.

4  BY MS. GARCIA:

5      Q    When did Apartment Hunters vacate that location on

6  Robertson?

7      A    Approximately three years ago, around the same time

8  that the new location was announced.

9           I don't know the exact vacate and new date to give

10  you an exact date.

11      Q    So this year is 2015.  Three years ago would have

12  been 2012; is that correct?

13      A    Correct.

14      Q    So it's fair to say that by August of 2013, the

15  address at Robertson avenue had been vacated --

16      A    Correct.

17      Q    -- by Apartment Hunters.

18           And do you have proof of any of the applications or

19  notices of change of addresses or new versions of contract

20  with the new address for Apartment Hunters that were

21  submitted to the Bureau of Real Estate?

22           Do you have any of those with you?

23      A    Yes.  With us, yes, we submitted it -- it's right

24  here.  Each website, right now live has it.  They're here.

25  ///

```
1   BY MS. GARCIA:

2       Q    For the record the witness is referring to R's

3   Exhibit "E"; is that correct?

4       A    Correct, ma'am.

5       MR. TAHMAZIAN:  Yes.

6       THE COURT:  Yes.

7   BY MS. GARCIA:

8       Q    Who obtained this screen shot?

9       A    I did.

10      Q    And when did you get the screen shot?

11      A    It is three days old.

12      Q    Okay.  And where did you -- what website did you

13  pull this screen shot from?

14      A    It is, I believe, Apartment Hunters.

15      Q    So this was from Apartment Hunters's website?

16      A    Yes, ma'am.

17      Q    Okay.  So other than the screen shot that you

18  allegedly took from Apartment Hunters's website, do you have

19  any other copies of any contracts or license applications or

20  change of address notices that were submitted to the Bureau?

21      A    They were all submitted the Department.

22      Q    When were they submitted?

23      A    When we asked for the restriction to be removed.

24      Q    When was that?

25      A    I don't recall the date.
```

237

1    Q    Was it this year?

2    A    No, ma'am, it was last year.

3    Q    2014?

4    A    Right.

5    Q    Okay.  But you claim that you've been at the

6    address at Golden Lantern since 2012; is that correct?

7    A    That is correct.

8    Q    Okay.  Now, Apartment Hunters restricted real

9    estate license was suspended as of May 8th, 2014; isn't that

10   correct?

11   A    Yes.

12   Q    And so why is Apartment Hunters, as of at least

13   three days ago, according to your testimony, is still having

14   a website up for PRLS services even though their license has

15   been suspended?

16   A    We were not about to cease operations of the

17   company for a suspension that has not been fought yet.

18   Q    Okay.  So you've continued to engage in PRLS

19   services, even after you received the order suspending the

20   restricted real estate license from the Bureau; is that

21   correct?

22   A    Correct.

23   Q    And you were with the company at the time of the

24   previous disciplinary action that was filed against

25   Apartment Hunters back in 2010; isn't that correct?

238

1    A    Correct.

2    Q    And you actually testified at the hearing for that

3    previous action; is that correct?

4    A    Correct.

5    Q    So it is fair to say that you were familiar with

6    the allegation against Apartment Hunters in that previous

7    action; isn't that correct?

8    A    Correct.

9    Q    And is it fair to say that you were familiar with

10   the final decision on that matter that granted the

11   restricted license to Apartment Hunters; isn't that correct?

12   A    Correct.

13   Q    Okay.  And isn't it true that the allegations with

14   respect to the use of various domain names, as your attorney

15   has referred to them as, isn't it true that those

16   allegations had to do with an unlicensed use of a fictitious

17   business name?

18   MR. TAHMAZIAN:  Objection.  Relevance, your Honor.  It's

19   got no baring on this Accusation.  The last case was heard

20   and dealt with, and as a result a restricted license was

21   issued.  And now we're talking about a new Accusation.  That

22   has no relevance in this case, your Honor.

23   THE COURT:  Overruled.  It's probative.  The prior

24   disciplinary history of the licensee is always relevant.

25          You can answer.

239

1      THE WITNESS:  Ask your question again, please.

2   BY MS. GARCIA:

3      Q    Well, let me see if I can just clarify the issue

4   here, because you were asked earlier about the steps that

5   Apartment Hunters took to address the previous allegations

6   by the Bureau of Real Estate.  And Counsel kept referring to

7   them as domain names and trying to tie them into property

8   addresses?

9           But isn't it a fact that what the Bureau actually

10  alleged against Apartment Hunters for those use of the

11  website names such as forrentinla.com, or

12  wetakesection8.com, et cetera, the DBAs that were

13  subsequently licenses under Apartment Hunters.

14          Isn't it true is that the allegations had to do

15  with an unlicensed use of a fictitious business name, and

16  not the failure -- or use of other actual physical

17  addresses?  Do you understand my question?

18      A    No.  No, I don't.  I'm sorry.

19      Q    Why did Apartment Hunters add all of those DBAs

20  after the previous disciplinary action?

21      A    They're hyper regional, specifically targeted

22  towards business -- different business models.

23      Q    Isn't it true that the Bureau alleged against

24  Apartment Hunters in the previous action, that Apartment

25  Hunters was using unlicensed fictitious business names

240

1    including For Rent in L.A. and For Rent in San Francisco?

2    A    They were all licensed and they all had the PRLS

3    contract on their website.

4    Q    And that was after the previous Accusation was

5    filed against Apartment Hunters; isn't that correct?

6    A    I don't recall that.

7    Q    Okay.  But the use of a fictitious business name

8    such a website that isn't exactly apartmenthunterz.com,

9    isn't it required that Apartment Hunters file and obtain

10    authority from the Bureau of Real Estate to use that

11    fictitious business name?

12    A    And it did.

13    Q    Okay.  The use of a website is not the same thing

14    as a business -- a physical business location; is that

15    correct?

16    MR. TAHMAZIAN:  Objection.  Calls for argumentation and

17    it's a legal conclusion, your Honor.

18    THE COURT:  Sustained.

19    BY MS. GARCIA:

20    Q    Okay.  Is it your understanding in order to operate

21    out of any location that's not the main principle address

22    that's listed on Apartment Hunters records with the Bureau,

23    that Apartment Hunters has to obtain a license or authority

24    from the bureau to use that additional location?

25    A    I don't believe so.  I believe that the location is

1    the domain.

2        MS. GARCIA:  Move to strike as nonresponsive.

3        THE WITNESS:  Since it's an internet-based company,

4    there is no location.  A location is the internet.

5        THE COURT:  Overruled.  I think he's trying to answer

6    your question.

7    BY MS. GARCIA:

8        Q    I'm referring to physical office addresses, such as

9    the address Golden Lantern, or the Robertson address.

10            Assuming that you have one physical main office

11   address listed with the Bureau, in order for Apartment

12   Hunters to operate out of any other address besides that

13   address; isn't that correct that Apartment Hunters has to

14   obtain a bond for that location and get approval from the

15   Bureau to operate out of that location?

16       MR. TAHMAZIAN:  Objection.  That calls for legal

17   conclusion.  Vague and ambiguous.  Counsel talks about a

18   physical address and then a location, which is very

19   confusing.

20       THE COURT:  All right.  I'll overrule it, but you can

21   just tell us if you have an understanding on that issue one

22   way or the other what it is.

23       THE WITNESS:  I mean, if I may, the Department of Real

24   Estate has given a PRLS license to a website that

25   Ms. Lissete is mentioning.  That's a 50-state website, We

242

1  Take Section 8, and I'm not sure if we're suppose to have 50

2  offices.  For that matter, Rent for San France if I'm

3  suppose to have a location in San Francisco for customers to

4  come pick up their money or send mail to.

5       The entire thing is just a completely confusing set

6  up to shut this operation down.

7  BY MS. GARCIA:

8    Q   Do you understand the difference between a website

9  and a physical office location?

10   A   Ms. Garcia, if you are going to disrespect me,

11 please go ahead and do it in a different manner.

12       I fully understand the difference between a website

13 and a physical location.  We're in a physical location, not

14 on the court's website.  Yes, I do.

15   Q   Okay.  And how many physical locations is Apartment

16 Hunters currently operating out of?

17   A   There is no physical location, it's an internet

18 company.

19   Q   So what's actually at the location on Golden

20 Lantern?  What is there?

21   A   It's an office, an office address.  It's a location

22 address.  It's an address to receive mail.

23   Q   Is it a P.O. box?

24   A   It's an office address.

25   Q   How many desks are at that location?

243

```
 1        A    There is none.  We don't need a desk.  We don't

 2    need an office.  It's an internet company.

 3        Q    Okay.  So where do you and Mr. Shayan regularly

 4    work out of on a day-to-day basis?

 5        A    Out of a location.

 6        Q    What location?

 7        A    Out of our home office.

 8        Q    And what location is that?  What address is that?

 9        A    I don't think it's relevant.

10        Q    Okay.

11        A    Out of a hotel room.  It doesn't really have

12    anything to do with where we work out of.

13        Q    How is the Bureau suppose to serve any documents

14    related to Apartment Hunters PRLS license if they don't have

15    a valid address as to where --

16        A    On Golden Lantern there is someone there to receive

17    service live.

18        Q    You just stated that there's no person there and no

19    desk there.

20        A    There's person there to receive service.

21        Q    Who is there?

22        A    There is a service to receive live lawsuits.

23             Is that what you want to ask?  There is a person to

24    receive service from you.

25        Q    What is the name of that person?
```

1      A      There's always -- I don't know a full first name,

2   last name, but you are welcome to serve us there.

3      Q      Who employs that person?

4      A      The location owner.  I'm not sure, ma'am.

5      Q      So who owns that location?

6      A      I'm not sure.  There is someone there between 9:00

7   to 5:00 standing to sign a certified letter or a sheriff can

8   come and serve anything there under our name, 9:00 a.m. to

9   5:00 p.m.

10      Q      But you don't know the name of this person who

11   supposedly is there to receive service on behalf of

12   Apartment Hunters?

13      A      No.

14      Q      And you don't know the name of the owner who

15   allegedly owns Golden Lantern; is that correct?

16      A      No.  I know there is a person.  I believe his name

17   is Mike Lee, as Steve just mentioned.  But it could be Mike

18   Lee, it could be somebody else.  There is a human being

19   there 9:00 to 5:00.  Feel free to serve.

20      Q      Who employs Mike Lee?

21      A      I have no idea, ma'am.

22      Q      So how is he authorized to accept service on behalf

23   of the Apartment Hunters?

24      A      Well, your process server would come up and go,

25   "I'd like to serve Steve Shayan and Kevin Shayan of

1   Apartment Hunters," and the guy would sign and we would go

2   and pick up the package.

3       Q    But Mike Lee is not an employee of the Apartment

4   Hunters; is that correct?

5       A    No.

6       Q    Okay.  And who owns Apartment Hunters?

7       A    Steven Shayan.

8       Q    Anyone else?

9       A    No.

10      Q    So Steven Shayan owns 100 percent of Apartment

11  Hunters?

12      A    Correct.

13      Q    Is Apartment Hunters a corporation incorporated in

14  California?

15      A    You'd have to ask Steve.  Yes, it is.

16      Q    And does the corporation have any officers?

17      A    Are you asking me?

18      Q    Yes?

19      A    Yes, Steve is the officer.

20      Q    What's his title?

21      A    CEO and President.

22      Q    He's President?

23      A    Right.

24      Q    How long has he been President?

25      A    You would have to ask these questions from Steve.

1   I'm not privy to that information.

2       Q    What's your title with Apartment Hunters?

3       A    I'm just running, as I mentioned earlier, the

4   company's design and supporting my brother who has some

5   health issues, with the website's design, back and listing

6   quality, and the employees overseas.

7       Q    And how long have you held that position?

8       A    Since 1999.

9       Q    Has your brother been President of Apartment

10  Hunters for the last year?

11      A    He's been from inception.

12      Q    Do you know why the Declaration that was submitted

13  to the Bureau from Vidmantas Macys, and if you want to refer

14  to it, I'm looking at page four of Exhibit 8.

15          Do you know why Mr. Macys would claim that he's

16  President of Apartment Hunters LT?

17      A    Absolutely.  That's a Lithuanian corporation we

18  own, and we pay Lithuanian taxes to the Lithuanian

19  Government.  So it's Apartment Hunters LT.  Lithuanian

20  corporation with 16 or 17 Lithuanian employees that pays

21  Lithuanian taxes.

22      Q    Okay.  And has the Bureau of Real Estate -- well,

23  let me move back.

24          Is Apartment Hunters LT engaging in PRLS services?

25      A    No, ma'am.

247

1    Q   So what is Mr. Macys's relation to, or involvement

2  with the PRLS services that are alleged in this Accusation?

3    A   He's one of the programmers who was handling data

4  listings and listing quality on our behalf.

5    Q   Who's behalf?

6    A   On mine and Steve's behalf that -- he's being

7  supervised by Steve, the licensee, and me assisting Steve.

8    Q   For Apartment Hunters?

9    A   Correct.

10    Q   Using the license that was issued by the California

11  Bureau of Real Estate to Apartment Hunters?

12    A   No, ma'am.  He is a programmer.  So if I'm getting

13  your question right, next week I have to bring my girlfriend

14  and my wife in under the license in here to tell you what's

15  going on in the bedroom or -- he's a programmer, that's all.

16    Q   I'm trying to understand what Apartment Hunters LT

17  is.

18    A   It's a corporation.

19    Q   Is that --

20    A   In Lithuania with a bunch of young men who sit down

21  and program.

22    Q   And what do they do?

23    A   They sit down and program the website.  They data

24  entry, type, validate, and check the listings.  They make

25  sure the e-mails have gone out.  The e-mails have been

1    replied to.  The customers have been answered to.  And the

2    photographs are of good quality, watermarked, et cetera.

3        Q    And for what company are they doing this for?

4        A    For Apartment Hunters Lithuania corporation.

5        Q    And these listings are located where?

6        A    In California.

7        Q    Is Apartment Hunters Lithuania licensed by the

8    Bureau of Real Estate in California?

9        A    Apartment Hunters Lithuania is not a PRLS, it's

10   programmers.  There are not the ones soliciting or entering

11   into a any negotiations with the user, the customer.

12       Q    So who is?

13       A    We are.

14       Q    Meaning?

15       A    In the United States.

16       Q    Meaning Apartment Hunters, Inc.?

17       A    Right.  So the customers are not negotiating with

18   Vidmantas Macys.

19       Q    Okay.  So does Apartment Hunters have an office in

20   Lithuania?

21       A    I just said that.

22       MR. TAHMAZIAN:  Apartment Hunters who?  Lithuania or the

23   one here?

24   BY MS. GARCIA:

25       Q    Does Apartment Hunters, Inc. control Apartment

249

```
 1    Hunters LT?
 2        A    Of course.
 3        Q    Okay.  And is there an office for Apartment Hunters
 4    LT in Lithuania?
 5        A    Yes.
 6        Q    Okay.  And has the Bureau been notified of the
 7    address for that office address in Lithuania?
 8        A    Ma'am, I don't have to notify --
 9        MR. TAHMAZIAN:  Just yes or no.
10        THE WITNESS:  No.
11    BY MS. GARCIA:
12        Q    Now, looking at the Complaint for Mr. Wakita in
13    Exhibit 5, can you please turn to page eight of Exhibit 5.
14        A    Page.
15        Q    Eight.
16        A    Exhibit 5.
17             I want to take a quick break.
18             Is that okay to use the restroom?
19        THE COURT:  Yes.  Let's go off the record.
20             (Off the record)
21        THE COURT:  Back on the record.
22    BY MS. GARCIA:
23        Q    Looking the page eight of Exhibit 5.
24        A    Exhibit 5, page eight.
25        Q    It should say CAL BRE page eight.
```

1    A    Yes, sir -- yes, ma'am.

2    Q    Did Apartment Hunters ever use a phone number

3    (310) 982-2536?

4    A    Yes.

5    Q    Okay.  And you testified earlier that the listings

6    that Apartment Hunters used for other property managers,

7    that they would list the numbers to direct the property

8    managers directly.

9        So according to this listing, why would Apartment

10   Hunters list their own phone number, and not HomeTeam's

11   number?

12   A    We're a Prepaid Rental Listing Service, and our

13   only source of revenue is the subscription.  So what I

14   stated earlier is that once the customer pays our

15   subscription fee, we're out of the system, and they get to

16   the contract that gentleman direct.

17       So when you contact that (310) 982-2536, you would

18   get us, at which point you would become a subscriber, and

19   then directly contact the property, which would be HomeTeam.

20   We don't interfere between the point -- after the point that

21   the customer pays us, they can contact HomeTeam directly 200

22   sometimes a day.

23   Q    Did you get permission from HomeTeam to list this

24   property?

25   A    I believe I already said that earlier, yes.

251

```
 1      Q    And do you have proof other than the excel
 2   spreadsheets that were prepared by Apartment Hunters
 3   employees?
 4      A    Yes.
 5      MR. TAHMAZIAN:  Objection.  Asked and answered, your
 6   Honor.
 7      THE COURT:  We've covered that before, didn't we?
 8      MS. GARCIA:  Yeah.  I think so.  Sorry.
 9   BY MS. GARCIA:
10      Q    This phone number, (310) 982-2536, is that a
11   landline number?  Is that a cellphone number?
12      A    It's our company number.
13      Q    And what address does that number belong to?
14      A    We have over 30-someodd numbers that are actually
15   belonging to the company and dedicated to separate,
16   different websites.  And what address are you thinking
17   about?  Is it a Pacific Bell phone number with a specific
18   address?
19      Q    Correct?
20      A    It's not -- their phones are not set up like that.
21   These are like Cisco Phones, so they're IP based phones.
22      Q    Okay.  So is there a physical address as to who
23   answers the calls that are made to this phone number?
24      A    Yes.  These calls are answered via intelligent
25   voice response system, an IVR that automatically recognizes
```

1    who you are, and knows that if you are a tenant or a

2    landlord.  It talks to you, you can talk to it.  You'll hear

3    everything you have to have say similar to the same way you

4    called Chase Bank or Direct TV, and it would read you a

5    listing.  It would call you back with a listing.  You can

6    enter your phone number.  It would do everything a human

7    does and more, including recorded and/or transfer you to

8    any -- including a payment system if you'd like to pay.

9        Q    So a physical human person does not answer these

10   calls that are made to this number?  It's an automated

11   machine?

12       A    It's not a machine.  It's an interactive voice

13   response system.  It's intelligent interactive voice

14   response system.  It's 21st century, very intelligent stuff.

15       Q    Okay.  Who runs the system for Apartment Hunters?

16       A    It's two billion dollar company called Ifbyphone,

17   I-F-B-Y phone.

18       Q    Where are the offices located for Ifbyphone?

19       A    They're in Chicago.

20       Q    Okay.  And so this is -- is Ifbyphone owned by

21   Apartment Hunters?

22       A    No, ma'am.  I wish.

23       Q    So how does Apartment Hunters control or supervise

24   what information is going out calling the phone number

25   listed here on the listing?

1       A    It's all a huge sophisticated server connected into

2    our back end.  I could demonstrate if we had time,

3    unfortunately I can't right now.  But you would call in and

4    if you are a member of our service what would happen if you

5    call in, it right away knows you are Lissete Garcia, you are

6    a member of our service.  At the tone, please tell me what I

7    can do for you.

8           If you even say the word "ref" without the word

9    "und" it says you want a refund, I'll do it.  Goes there,

10   makes a ticket.  Comes in front of one of our six ladies

11   that are there.  Shows up as text, they push a button.  A

12   text goes, an e-mail goes, an automatic callback goes.  If

13   you are a landlord you can even activate, deactivated

14   listings if you have the right criteria inside our system.

15          You can talk to this thing as if it's human.  It

16   recognizes every single word you say.  Once is does it, it

17   gets transcribed with an audio file where we can listen to

18   what you say.  Again, within an 18-minute highest response

19   time.

20      Q    And somebody calling in for a refund to Apartment

21   Hunters, they are going to get an automated machine, and not

22   speak to a physical person?

23      A    They get a refund within 18 minutes, whether they

24   do one or not --

25      Q    Move to strike as nonresponsive.

254

1          Do they talk to a person, or do they get a machine?

2     A    It's not a machine.  It's an interactive voice

3    response that interacts with you back and forth.  So you'd

4    say, "I'd like a refund."  It says, "Please tell me the last

5    four digits of your credit card."  You say it, you get your

6    money back.

7          It's better than a person.  It doesn't argue with

8    you.

9     Q    And where would clients of Apartment Hunters go to

10   if they are not satisfied with the response they get with

11   this IVR system?

12    A    Where would they go to?

13    Q    Yeah.

14    A    It would escalate their complaint to a supervisor

15   and would make all kinds of red flags and come directly into

16   a huge box where it would be flashing to me, Steve, and one

17   of our senior supervisors -- which that box is usually empty

18   because we have a punishment system for our staff not doing

19   a good job, but we don't have that.

20    Q    And if a client wanted to sue Apartment Hunters in

21   a small claim suit, where would they serve the small claims

22   action?

23    A    Right here.  To this address on the contract.

24    Q    You are referring to the Golden Lantern address?

25    A    Correct.  Exactly where you would serve us.

1    Q   And according to as of February 24th -- I'm looking

2  at R's Exhibit "A" -- the address listed for Apartment

3  Hunters, according to the Bureau's website is still

4  Apartment Hunters, Inc.; is that correct?

5     MR. TAHMAZIAN:  I'm going to object to that question

6  based on the fact that what the Bureau has done in the past

7  year and a half is not before the Court.  You've heard

8  testimony about the fact that they've supplied information,

9  filed the applications with the new address.

10      If the Bureau does not take the proper precaution

11  to update their records, that's not the clients fault their

12  records still show the old one.

13      The document shows what it shows, your Honor.

14    THE COURT:  Overruled.  You can explain that.

15      Do you remember what the question was?

16  BY MS. GARCIA:

17    Q   So if a member of the public is looking up

18  Apartment Hunters, Inc. on the Bureau's website, they are

19  going find the invalid address that's on Robertson

20  Boulevard; isn't that correct?

21    A   Correct.

22    Q   And you are claiming that if someone tries to serve

23  a lawsuit on Apartment Hunters, Inc. at the Golden Lantern

24  address that they would have to serve it on someone who's

25  not an employee of Apartment Hunters, a person that you've

1   names as Mike Lee; isn't that correct?

2       A    Someone is there to accept any kind of lawsuit,

3   small claims, regular, any kind of suit.

4       Q    Okay.  When did you start working with Trulia.com?

5       A    I don't recall the exact date.  I believe it's back

6   in -- we started the negotiating February, I think of -- the

7   e-mail is here.  I don't have the dates right in front of me

8   right now.

9       THE COURT:  Do you remember the year?

10      THE WITNESS:  Yeah.  February of 2013, sir.

11  BY MS. GARCIA:

12      Q    February of 2013 is when you claim that you started

13  working with Trulia?

14      A    The communications started back in that time, yes.

15      Q    When did you actually have permission to list

16  Apartment Hunters listings on Trulia's website?

17      A    The negotiations started in February and were on

18  paper, I want to say in March of 2013, and finalized in that

19  time.  The exhibits are here.

20      Q    Are you referring to Exhibit "D"?

21      A    Yes, ma'am.  It's "D", yes.

22      Q    And so I'm looking at the first page of

23  Exhibit "D", and the top e-mail.

24           Did Apartment Hunters have a contract in place with

25  Trulia as of June 5th of 2013?

257

1    A    It had it before.  This is an older e-mail.  If you
2  go further down, you'll see March 29, 2013.  This is put in
3  reverse order, ma'am.
4    Q    Okay.  Now, the --
5    A    March 11, 2013 if you look.
6    Q    What page?
7    A    There's e-mail dates, ma'am.  March 29, 2013 you'll
8  see.  And look here it says right here, I'll show it to you.
9  Right there, ma'am, March 11th.
10   Q    On the bottom left corner there's the page --
11   A    No, no.  On the e-mail from Trulia to us starting
12 portion of the negotiation, your Honor.
13   THE COURT:  Second to the last page.
14   THE WITNESS:  Right here.
15   THE COURT:  Do you see it, Ms. Garcia?
16   MS. GARCIA:  Yes.
17   THE COURT:  Okay.  She's got it.
18   THE WITNESS:  Sorry.
19 BY MS. GARCIA:
20   Q    Okay.  That e-mail purports to reflect a question
21 from a Trulia employee as to how they can work with
22 Apartment Hunters?
23   A    That's when they start the negotiations.
24   Q    Okay.  So when exactly did Apartment Hunters start
25 listing properties on Trulia.com is my question?

258

1     A     I believe it was in April, April or May.  I'm not
2  sure of the exact date.  I'd have to go look it up.  I've
3  provided every communication or most of them here.
4     Q     And what year?
5     A     2013.
6     Q     And the listings that Apartment Hunters was placing
7  on Trulia's website, were those properties owned by Trulia?
8     A     One more time, please?
9     Q     The listings that Apartment Hunters posted on
10 Trulia's website, were those properties owned by Trulia?
11    A     Your question is confusing.
12          Why would I be taking properties that are owned by
13 Trulia and put it up on Trulia?
14    Q     So you are claiming that the properties on Trulia's
15 website are owned by Trulia?
16    A     You just told me that.  I think we're -- either I'm
17 confused or we're all getting tired.
18          I would be putting up properties on Trulia that
19 Trulia doesn't have.  What you just asked me is:  Did I put
20 up properties owned by Trulia on Trulia.
21          Why would they come to me for properties that they
22 own?
23    Q     So Trulia didn't have authority to give you to list
24 properties that they do not own; is that correct?
25    MR. TAHMAZIAN:  That's a vague questions.  Objection.

259

1    Vague.

2         THE COURT:  Do you understand what she's asking?

3         THE WITNESS:  I fully do.  May I respond?

4         THE COURT:  Yes.

5         THE WITNESS:  Where you are going is that and once

6    Trulia gets permission from the landlord to list the

7    property on Trulia, they give it to me via a feed, and I

8    don't have to call again to get permission from that

9    landlord.

10        We've been going through this with your company,

11   with your office for 15 years now.

12        MS. GARCIA:  So --

13        THE WITNESS:  One, Trulia calls the landlord, gets

14   permission.  Two, gets that vacancy.  Overnight they can

15   transfer that vacancy to us without us having to call again

16   to get permission.  Same goes with the MLS.  I have a

17   license to get and display MLS data, which means I don't

18   have to call each MLS broker and get permission for that

19   rental listing, because the MLS gave it to me.  So we can go

20   again and again for 15 more years.

21   BY MS. GARCIA:

22        Q    Okay.  So you are claiming that the four properties

23   that HomeTeam is complaining about, that you had permission

24   to list those properties because HomeTeam may have listed

25   those onto Trulia?

1      MR. TAHMAZIAN:  Objection.  Misstates his testimony.  He

2  testified about the exhibits very clearly and about the

3  e-mail that he got from HomeTeam.  That wasn't his

4  testimony.

5      THE COURT:  Okay.  He can agree or disagree.  Is what --

6      THE WITNESS:  It can be both.

7  BY MS. GARCIA:

8      Q    So do you actually contact the property manager or

9  the owner for every single listing that you are pulling from

10 Trulia or any other website that you are using to list

11 Apartment Hunters information on?

12     A    No.

13     Q    You do not contact the property manager?

14     A    No, because once the data comes from Trulia, Trulia

15 has already contacted those properties and then they send it

16 to us.

17     Q    Those properties have allowed Trulia to list their

18 listing or properties.  They have not given --

19     A    And once Trulia sends it to us, the permission has

20 already been given over.  That's a legal thing.  That's your

21 fight with them, not mine.

22     THE COURT:  All right.  You cut off Ms. Garcia there.

23     THE WITNESS:  Sorry.

24     THE COURT:  Let her --

25     THE WITNESS:  I'm very passionate about this permission

261

1    thing.  They've been trying to shut down our company for

2    15 years.

3        THE COURT:  I see that.  But if you both speak at the

4    same time and the reporter doesn't get it, your passion just

5    kind of evaporates --

6        THE WITNESS:  Sorry.

7        THE COURT:  -- and is it doesn't get on the record,

8    which is not what you want to do.

9        THE WITNESS:  No.  I appreciate that, your Honor.

10       THE COURT:  Go ahead.

11   BY MS. GARCIA:

12       Q    Do you understand that a PRLS licensee has to

13   obtain information from the property management or manager

14   in order to list that property on their listings that they

15   sell to prospective tenants?

16       A    I do.

17       Q    Okay.  And you didn't obtain -- never mind --

18   strike that.

19            Why did Apartment Hunters vacate the office at the

20   Beverly Hills address?

21       A    We wanted to be by the ocean in Orange County.

22       Q    Okay.  Now, looking at your set of exhibits, please

23   look at Exhibit "B".

24       A    Yes, ma'am.

25       Q    Who prepared this document?

1    A    I did.

2    Q    When did you prepare it?

3    A    I believe two nights ago -- three nights ago.

4    Q    Okay.  And looking at Exhibit "C", how did you

5    obtain these documents?

6    A    This is a feed that is a sample of how data arrives

7    from a data feed partner.  And this is a sample of what it

8    looks like, which I went through all of this, I believe,

9    earlier.  Comes raw, looks like this when it gets displayed.

10   Q    I'm referring to Exhibit "C" specifically?

11   A    You go to our website, you do a screen shot, you

12   print it, it comes like this.

13   Q    So this is from Apartment Hunters website?

14   A    Correct, ma'am.  That's what is says.

15   Q    And when did you print these documents out?

16   A    Same time I did these.  Couple of nights ago.

17   Q    Okay.  And just from my brief review of these

18   documents, it doesn't look like the property addresses match

19   up from the ones --

20   A    These are samples.  These are just samples for the

21   Court to understand raw data, transformed data.  They're not

22   exactly from these.

23   Q    They are not the same properties?

24   A    They're not.  Just an example.

25   Q    And how did you get the information for these

263

1    properties on Exhibit's "B" and "C"?

2        A    How did I get?

3        Q    Are these properties owned by Apartment Hunters?

4        A    Ma'am, these came to us.  On top, Apartment Guide,

5    it's a partner who sends the listings to us every night.  So

6    I obtained these properties from a feed partner.

7        Q    Okay.

8        A    And these I obtained by printing them on our own

9    website, which is a direct transformation of raw data to

10   regular pages.

11       Q    Okay.  And does Apartmentguide.com -- are they the

12   owners or property managers --

13       A    Absolutely not.  They are the legal advertiser and

14   they have been -- they get paid by the property manager to

15   promote, advertise, and syndicate these listings.

16       Q    Did Apartment Hunters obtain permission for every

17   one of these properties from the property owner or property

18   manager to list them?

19       A    No.  And we don't have to.

20       THE COURT:  All right.  Ms. Garcia, it's 4:30 I think

21   we're going to have to stop at this time.

22            Let's have a chat off the record.

23            Off the record now.

24            (Discussion off the record)

25       THE COURT:  My understanding from Ms. Garcia is that she

# EXHIBIT B

BEFORE THE
BUREAU OF REAL ESTATE
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Accusation (Order Suspending Restricted License) Against:<br><br>APARTMENT HUNTERS, INC.,<br>a Prepaid Rental Listing Service (PRLS) corporation,<br><br>      Respondent. | Case No. H-36458 LA<br><br>OAH No. 2014060980 |
| In the Matter of the First Amended Accusation Against:<br><br>APARTMENT HUNTERS, INC., and STEVEN K. SHAYAN, as designated officer for Apartment Hunters, Inc.,<br><br>      Respondents. | Case No. H-39404 LA<br><br>OAH No. 2014050485 |

## PROPOSED DECISION

These consolidated matters were heard by Eric Sawyer, Administrative Law Judge (ALJ), Office of Administrative Hearings, State of California, on February 25, 2015, in Los Angeles.[1]

Lissete Garcia, Real Estate Counsel, represented Complainants.

Jilbert Tahmazian, Esq., represented Respondents Apartment Hunters, Inc. and Steven K. Shayan.

The record was held open after the hearing concluded so the parties could submit closing argument briefs, which were timely received and marked for identification as described in orders the ALJ issued describing the events that transpired while the record remained open. The record was closed and the matter submitted on April 30, 2015.

---

[1] These two matters were consolidated for hearing on February 13, 2015, by order of Presiding Administrative Law Judge Susan Formaker, without objection.

# FACTUAL FINDINGS

*Parties and Jurisdiction in Case No. H-39404 LA*

1.     Complainant Maria Suarez brought the Accusation in Bureau of Real Estate (Bureau) case number H-39404 LA (OAH No. 2014050485) in her official capacity as a Deputy Real Estate Commissioner. Respondents timely submitted a request for a hearing to contest the allegations of the Accusation.

2.     While the record remained open after the hearing concluded, Complainant was given leave to file a First Amended Accusation and Respondents were allowed to file an opposition to any such amended pleading. (See ALJ's order, Ex. 13.) On April 17, 2015, Complainant filed the First Amended Accusation. On April 27, 2015, Respondents filed an opposition to the First Amended Accusation. The record was thereafter closed. (See ALJ's order, Ex. 14.) Respondents filed another opposition to the First Amended Accusation and requested another day of hearing to respond. The ALJ denied Respondents' request and the record remained closed.[2] (See ALJ order, Ex. 15.)

3.     In 2007, Respondent Apartment Hunters, Inc. (AHI) was issued a prepaid rental listing service (or PRLS) license, as a corporation. As a result of the prior disciplinary action described in more detail below, Respondent AHI was issued, upon its application, a restricted PRLS license pursuant to, and subject to, the provisions of Business and Professions Code section 10156.7. However, Respondent AHI's license expired on March 12, 2014, and was not subsequently renewed.[3]

4.     Respondent Steven K. Shayan (Respondent Shayan) is the president of and designated officer for Respondent AHI. Respondent Shayan has never been licensed by the Bureau in any capacity.

*Parties and Jurisdiction in Case No. H-36458 LA*

5.     Respondent AHI's PRLS license was restricted as a result of discipline issued after an accusation filed against it in Bureau case number H-36458 LA. The order restricting AHI's PRLS license in that matter became effective on February 23, 2012, and included a condition whereby the restricted license could be suspended prior to a hearing by order of the Real Estate Commissioner (Commissioner). As a result of the above-described Accusation filed in Bureau case number H-39404 LA, the Commissioner issued an Order Suspending Restricted Real Estate License (Suspension Order) against Respondent AHI, also bearing Bureau case number H-36458 LA (OAH No. 2014050485), on May 8, 2014.

---

[2] The events that transpired after the hearing, and the documents filed by the parties during that time, are described in more detail in exhibits 13-15.

[3] The Bureau retains jurisdiction to seek disciplinary action against this expired license pursuant to Business and Professions Code section 10103.

6.      Respondent AHI requested a stay of the Suspension Order. The Bureau denied that request. Respondent AHI thereafter timely requested a hearing to contest the Suspension Order. Respondent AHI's restricted PRLS license has been suspended since May 8, 2014.

*Prior Discipline*

7.      Respondent AHI supplied prospective tenants with listings of residential real properties for rent pursuant to an arrangement under which the prospective tenants were required to pay a fee in advance of, or contemporaneously with, supplying listings.

8.      On February 11, 2010, the Bureau filed the aforementioned accusation against Respondent AHI in Bureau case number H-36458 LA. The matter was heard by an administrative law judge on October 20, 2010, and a Proposed Decision was issued on December 29, 2010, in which it was recommended that Respondent AHI's license be suspended for six months. The Proposed Decision was not adopted.

9.      On September 30, 2011, a Decision After Rejection in said case became effective. In that Decision, the Acting Commissioner concluded that Respondent AHI's license should be revoked because it had violated the following provisions of the Business and Professions Code:

a. sections 10167.2, 10167.3 and 10167.12, by engaging in the business of a prepaid rental listing service under two fictitious business names without having a valid license to operate under those names;

b. sections 10167.9 and 10167.12, by using PRLS contracts not previously approved by the Commissioner;

c. section 10167.12, by continuing to operate as a PRLS business under two unlicensed fictitious business names after the Department had issued a Desist and Refrain Order demanding that it stop doing so;

d. sections 10167.11 and 10167.12, by not confirming the availability of property for tenancy during the four-day period immediately preceding the dissemination of the listing information; and

e. sections 10167.10 and 10167.12, by failing to timely provide refunds of fees paid by prospective tenants for PRLS rental lists that did not meet contracted specifications.

10.      On February 3, 2012, the Acting Commissioner issued a Decision After Reconsideration, in which she maintained the same findings and conclusions made in the Decision After Rejection. However, the Acting Commissioner set aside the revocation and granted Respondent AHI a restricted PRLS license, which included a condition that it may be suspended prior to a hearing by order of the Commissioner on satisfactory evidence that

Respondent AHI violated provisions of the Real Estate Law, the Subdivided Lands Law, Regulations of the Commissioner or conditions attaching to the restricted license.

11.  According to the terms of the restricted license, Respondent AHI was not eligible to apply for the issuance of an unrestricted license or for removal of any of the terms or conditions of said restricted license until two years had elapsed from the effective date. It was not established that Respondent AHI had submitted such a request at any time.

*Respondents' Use of Information from Hometeam Property Management*

12.  On June 7, 2013, the Bureau received a complaint from Mr. Yo Wakita, a leasing manager and co-owner of Hometeam Property Management (Hometeam). Hometeam is a licensed real estate corporation that performs property management services for property owners in Southern California, particularly the San Diego area. Hometeam lists available rental properties on the Multiple Listing Service (MLS), on Hometeam's own website, and on various syndicated real estate marketing websites, such as Craigslist, Trulia, and Zillow.

13.  Mr. Wakita submitted his complaint to the Bureau after he discovered that Respondents had, without Hometeam's authorization, used copyrighted pictures and information about four separate rental properties listed on Hometeam's website; and, without written or oral permission, posted said pictures and information about the properties on different websites including, but not limited to, Trulia and Zillow. Specifically, Respondents took photographs of the four properties displayed on Hometeam's website, eliminated the "Hometeam" watermark inserted on the photographs by cropping and shrinking the borders of the photographs, and placed an "ApartmentHunterZ" watermark on the photographs. The photographs and information from Hometeam's website concerning the four properties, as well as AHI's website address, were placed on promotions for the properties found on the other websites.

14.  Hometeam had an exclusive listing with the landlords of the four properties in question, which were located in Chula Vista as follows: one on Thompson Avenue; one of Reisling Terrance; and two on Stanislaus Drive. Respondents listed an incorrect rental amount for one of the properties, although the rest of the information was generally the same as that on Hometeam's website for the four properties.

15.  A person viewing Respondents' advertisements for the four properties on the Trulia and Zillow websites would initially believe Respondents were authorized to solicit prospective tenants for those properties on behalf of the property owners, managers, or any authorized agent. However, as established by the testimony of AHI employee Kevin Shayan, the brother of Steven Shayan, somebody viewing these four listings on either another website or AHI's would receive access to the property address and landlord contact information only when they paid a fee to AHI. Once that was done, the prospective tenant would be referred only to Hometeam, not AHI. Respondents only receive compensation on such listings by customers who pay Respondents a subscription fee. Respondents do not participate in renting out the properties and receive no compensation when the properties are leased.

4

16.    A. Mr. Wakita was convincing in his testimony that at no time did Hometeam provide consent to Respondents to list the four properties in question on any website. Mr. Wakita never gave any such verbal consent. He checked his company's e-mail system and could find no e-mails from Respondents during the relevant time. His testimony was corroborated by a screenshot of his company's received e-mail file during the relevant time that shows nothing received from Respondents.

B. Mr. Wakita was also convincing in his testimony that his only partner, his brother, did not have access to the e-mail system at the time and that his brother did not give any consent to Respondents.

17.    Respondents' evidence supporting their contention that they had obtained consent from Hometeam to list the four properties was not convincing. Kevin Shayan testified that AHI would have sent Hometeam an e-mail in May 2013 advising that it could promote the properties in question and that AHI would have done so only if someone from Hometeam clicked on a consent link on that e-mail. However, Mr. Shayan testified that Respondents could not produce that e-mail because such messages had been purged from its system three or four months after being sent. Since the Accusation in Bureau case number H-39404 LA was filed and served well after that time, Mr. Shayan testified there was no reason for Respondents to save the e-mail in question. However, Mr. Shayan's testimony was undercut by several e-mails he presented during the hearing between he and Trulia which were generated from March through June 2013, well before the time he testified AHI's e-mails had been purged. No explanation was presented why those e-mails would be available, but not an e-mail sent to Hometeam in May 2013. The only tangible evidence presented by Respondents concerning an e-mail received from Hometeam was a copy of an Excel spreadsheet in which such an e-mail was described, along with a "Unique ID" number for said e-mail. However, that document does not purport to be a screenshot of information contained in an e-mail system, but rather information inputted into the spreadsheet by another person. The document is not convincing.

18.    At no time did Respondents contact and obtain consent from the landlords owning the four properties in question to promote them on the other websites. Kevin Shayan conceded in his testimony that no such efforts were taken. Instead, he testified that the way in which consent would have been obtained from Hometeam should be deemed as consent from the actual landlords as well. For that reason, it was established that Respondents did not confirm the availability of the four properties for tenancy during a four-day period immediately preceding their dissemination of the listing information.

19.    Respondents contend but failed to establish that either Trulia or Zillow served as a constructive or authorized agent on behalf of Hometeam or the four property owners. It is true that Mr. Wakita admitted on cross-examination that he has used Trulia to upload property listings, and that he has not read Trulia's terms and conditions of doing so. However, Mr. Wakita did not testify that he uploaded the four properties in question onto Trulia, nor did he testify that he agreed to allow Trulia to be an authorized agent for purposes of the four properties in question. In fact, after seeing Respondents' promotions of the four

5

properties in question, Mr. Wakita complained to both Trulia and Zillow. Both websites removed Respondents' promotions of the four properties in question. Those events indicate that Mr. Wakita had not authorized Respondents or Trulia to list the four properties in question. In any event, Respondents agree that they never contacted any of the property owners, and they presented no documentation showing that Trulia or Zillow were appointed to act as an authorized agent with regard to the four properties in question.

20.     Mr. Wakita conceded that all of the four properties were rented out by Hometeam. No evidence indicates that Respondents had interfered with Hometeam's efforts in that regard. Mr. Wakita expressed concern that Respondents' promotions duplicating what Hometeam had placed on its website would cause confusion in the market that could interfere with Hometeam's business. Based on the evidence presented in this case, that concern at this time is speculative.

*Respondents' Vacant Office*

21.     Bureau Special Investigator David Huang was assigned to investigate Mr. Wakita's complaint. While doing so, Special Investigator Huang tried to contact Respondents. He could not reach them by telephone, so he decided to visit their office.

22.     On August 12, 2013, Special Investigator Huang went to the address listed by Respondents with the Bureau as their main office and mailing address: 201 N. Robertson Blvd., Suite 202, in Beverly Hills. Special Investigator Huang discovered that the office suite there previously used by Respondents had been vacant for some time.

23.     According to Kevin Shayan, Respondents moved from their designated address to an office in Orange County about three years ago. However, Respondents failed to notify the Commissioner of a new main office or mailing address. Kevin Shayan testified that Respondents had mailed such a notification to the Bureau, but he failed to corroborate that testimony, such as by presenting a copy of a notification kept in a business file. The Bureau's official license history record shows no such notification was received. Kevin Shayan also testified that Respondents submitted new PRLS contracts to the Commissioner for approval which contained the new address in Orange County. However, his testimony was self-serving, uncorroborated and for those reasons not persuasive.

24.     Mr. Shayan conceded in his testimony that AHI is a virtual office, in that AHI employees work mainly from their homes over the internet. Some of the AHI employees are located overseas in Lithuania and Russia. The new office address in Orange County is simply a place to receive mail and service of process. There are no desks or offices or employees there. Thus, if Respondents' PRLS consumers tried to visit the office to complain or seek other information, there would be no AHI employee there to help them.

25.     Respondents' essentially conduct all of their business over the internet and telephone lines. Kevin Shayan testified that if a consumer complains and asks for a refund, they receive it "no questions asked." Thus, he testified there is no need for an employee to

be located at Respondents' physical address. He also testified that personnel at the office in Orange County can accept service of process or official Bureau requests, if need be.

*Unlicensed Activity*

26.     Other than unsuccessfully requesting a stay, Respondents have ignored the Suspension Order. Kevin Shayan was clear in his testimony that Respondents have continued to engage in PRLS activity after receiving the Suspension Order on or about May 8, 2014, and have continued doing so to the present time. Respondent Shayan was not licensed in any capacity by the Bureau during this period.

27.     Respondents contend, but did not establish, that the Bureau knew at all times relevant that they were continuing to engage in PRLS activities after the restricted license was suspended and/or expired. If anything, the record created in this case tends to indicate the Bureau was not aware of such activity until Kevin Shayan testified as described above during the hearing.

28.     Kevin Shayan testified that Respondents continued to engage in PRLS activity after AHI's restricted license was suspended because they had not yet had an opportunity to challenge the Suspension Order, presumably referring to the hearing. Respondents thereafter contended in their opposition to the First Amended Accusation that they continued to engage in PRLS activity after the Suspension Order was issued because they "would be cut off at the knees if they stopped their fifteen year business and left with no livelihood." (Ex. G, at p. 5.) They also intimated that their continued engagement in licensed activity after the restricted license was suspended and/or expired was justified because the Bureau has engaged in "relentless and ruthless efforts to shut Respondent's business down." (*Id.*)

29.     Respondents did not address the fact that AHI's restricted license expired on March 12, 2014. They did not explain why the restricted license was not subsequently renewed.

*Costs*

30.     The Bureau incurred reasonable costs in the investigation and prosecution of this matter in the amount of $2,859.90.

31.     The Bureau submitted a copy of the documents evidencing its costs to Respondents before the hearing. Respondents' counsel sent to the Bureau legal objections to said costs before the hearing. Respondents' objections have been considered and are overruled. Those objections did not include that the pleadings involved in this case do not contain a prayer for costs.

///

///

## LEGAL CONCLUSIONS

*Cause for Discipline Generally*

1.      Pursuant to Business and Professions Code section 10167.12,[4] subdivision
(a)(1), the Commissioner has authority to discipline a PRLS licensee for violating Article 2.3
of the Real Estate Law, which pertains to PRLS activity. Pursuant to section 10177,
subdivision (k), the Commissioner has authority to discipline any licensee under the Real
Estate Law for violating the terms of an order granting a restricted license. Pursuant to
section 10177, subdivision (d), the Commissioner also has authority to discipline any
licensee for willfully disregarding or violating the Real Estate Law or the regulations
promulgated to enforce it.

*Cause for Discipline for False, Misleading or Deceptive Advertisements*

2.      Section 10167.11, which pertains to PRLS activity, states in relevant part:

"[I]t shall be a violation of this article for any licensee or any employee or agent of a
licensee to do the following:

[¶] . . . [¶]

(b) Refer a property to a prospective tenant knowing or having reason to know that:

      (1) The property does not exist or is unavailable for tenancy.

      (2) The property has been described or advertised by or on behalf of the
      licensee in a false, misleading, or deceptive manner.

      (3) The licensee has not confirmed the availability of the property for tenancy
      during the four-day period immediately preceding dissemination of the listing
      information.

      (4) The licensee has not obtained written or oral permission to list the property
      from the property owner, manager, or other authorized agent."

3.      A. In this case, it was established that Respondents violated section 10167.11,
subdivision (b)(2), by promoting and advertising the four properties in question in a false,
misleading or deceptive way. By taking information about the four properties from
Hometeam's website, changing it, and placing it on AHI's website, Respondents misled the
viewing public into believing that Respondents were authorized to solicit prospective tenants
for those properties. It was only after a prospective tenant paid a subscription fee to
Respondents that they would learn otherwise. In addition, Respondents violated section

---

[4] All further statutory references are to the Business and Professions Code.

10167.11, subdivision (b)(4), in that they had not obtained written or oral permission to list the four properties in question on their website by the owner, manager or other authorized agent of the properties.

B. Respondents' argument that they directly obtained authorization from Hometeam to use the information was not credible. So too was their argument that somehow Trulia became a "constructive authorized agent" of either Hometeam or the property owners simply because Hometeam had used Trulia in the past to upload information about other properties and Respondents used Trulia to upload information about the four properties in question. That argument is further undercut by the fact that Respondents did not verify at any time the availability of Hometeam's properties for rent, which they would have been required to do four days before they placed information about the four properties on the Trulia and Zillow websites, pursuant to section 10167.11, subdivision (b)(3).

4.      Cause exists for discipline of Respondents' real estate license and/or license rights pursuant to sections 10167.12, subdivision (a)(1), and 10177, subdivision (k), in that it was established that Respondents violated section 10167.11, subdivision (b), which is contained in Article 2.3 of the Real Estate Law. By violating the Real Estate Law, Respondents violated a term and condition of AHI's restricted PRLS license. (Factual Findings 1-20.)

*Cause for Discipline for Office Abandonment*

5.      A. Pursuant to section 10167.5, which is part of Article 2.3 that specifically applies to PRLS licensees, "a license issued for a particular location shall automatically expire 60 days after the time the business conducted at such location ceases for any reason to be under the charge of and managed by the designated agent of record with the department, unless within such 60-day period the licensee submits written notice of the new designated agent to the department." Section 10167, subdivision (c), defines "location" as "the place, other than main or branch office of a real estate broker, where a prepaid rental listing service business is conducted."

B. Section 10162 provides, "Every licensed real estate broker shall have and maintain a definite place of business in the State of California which shall serve as his office for the transaction of business. This office shall be the place where his license is displayed and where personal consultations with clients are held. *No real estate license authorizes the licensee to do business except from the location stipulated in the real estate license as issued or as altered pursuant to Section 10161.8.*" (Emphasis added.) Section 10162 is part of Article 2 of Chapter 3 of the Real Estate Law.

C. California Code of Regulations, title 10, section (Regulation) 2715 states that whenever there is a change in the location or address of the principal place of business or of a branch office of a broker, the broker must notify the Commissioner thereof no later than the next business day following the change.

9

D. Regulation 2710, subdivision (c), provides that notices of changes in license information or status are to be submitted to the Bureau on prescribed forms not later than five days after the effective date of the change unless otherwise provided in the applicable statute or regulation. Regulations 2710 and 2715 are part of Article 3 of Chapter 6 of the California Code of Regulations that pertain to the Real Estate Law.

6.     It was established that Respondents violated sections 10167.5 and 10162, as well as Regulations 2710 and 2715, when they vacated their designated address of record with the Bureau and failed to notify the Commissioner in writing of that change over the course of three years. (Factual Findings 1-25.)

7.     Respondents contend but failed to establish that they had in fact submitted written notification of their change of address to the Commissioner.

8.     A. Respondents' argument that section 10162 and Regulation 2715 only apply to a licensed real estate broker or salesperson, but not to PRLS licensees, was not persuasive. The statutes and regulations contained Article 2 of Chapter 3 of the Real Estate Law generally apply to those engaged in PRLS activities, either those who have a PRLS license or licensed real estate brokers engaged in PRLS activity.

B. Respondents cite to section 10167.16, which provides that a person or corporation who has a PRLS license but is not engaged in acts for which a real estate license is required under Article 1 (brokers, salespersons, etc.) shall be subject to the provisions of Chapters 1 and 2, and sections 10450, 10452, 10453 and 10454. Since Respondents only have a PRLS license, but not a license issued under Article 1, they argue they are not subject to any of the provisions of Chapter 3, which includes section 10162. Respondents also argue that because Regulation 2715 only refers to brokers, it only applies to brokers.

C. While at face value Respondents' argument has some traction, a deeper review indicates that Respondents' interpretation of section 10167.16 is wrong and that the statute was not intended to exclude application of the provisions of Chapter 3 to PRLS licensees. First, section 10167.16 does not specifically exclude the provisions of Chapter 3 from application to PRLS licensees. Next, the argument that section 10162 does not apply to PRLS licensees (as opposed to real estate brokers engaged in PRLS activity) would lead to the absurd result that a PRLS licensee would not be required to provide the Commissioner with written notice of a change to their address of record. Moreover, Respondent AHI was issued a restricted PRLS license pursuant to section 10156.7 and able to obtain such a license as a corporate entity pursuant to section 10158. While those provisions are contained in Chapter 3, there are no such provisions in Chapters 1 or 2 allowing for a restricted license or for a corporate licensee. It is hard to conclude that the general provisions of Chapter 3 do not apply to Respondents when the very license they applied for and received was issued under Chapter 3. Ironically, Article 2.3, which contains the provisions specifically applying to PRLS activity, is contained within Chapter 3. Finally, the last sentence of section 10162 provides that "[n]o real estate license authorizes the licensee to do business except from the

10

location stipulated in the real estate license as issued or as altered pursuant to Section 10161.8." That excerpt demonstrates an intention for that statute to apply to all licensees.

        D. In any event, Respondents do not argue that section 10167.5 or Regulation 2710 do not apply to them. Thus, even assuming arguendo that Regulation 2715 does not apply to Respondents, they apparently agree that Regulation 2710 does. Regulation 2710 requires prompt written notification of a change in license status or information. As section 10167.5 specifically references both the identity of the designated agent of record and the location where the PRLS activity managed by that agent is to occur, a change in the designated address of record by the designated agent (here Respondent Shayan) can reasonably be construed as the sort of change of information contemplated by Regulation 2710. Thus, section 10167.5 and Regulation 2710 required Respondents to advise the Commissioner in writing promptly after they changed their physical office location from Los Angeles to Orange County.

    9.    Respondents' above-described violation of the Real Estate Law constitutes cause for discipline of their real estate license and/or license rights pursuant to sections 10167.12, subdivision (a)(1), and 10177, subdivision (k). (Factual Findings 1-25.)

*Cause for Unlicensed Activity*

    10.    Section 10167.2 prohibits any person from engaging in the business of prepaid rental listing service unless licensed in that capacity or licensed as a real estate broker. Section 10130 makes it unlawful for any person to act as a real estate broker or real estate salesperson without first obtaining the requisite license. A reasonable interpretation of the interplay between sections 10130 and 10167.2 is that a person or corporate entity may only be engaged in PRLS activity if a PRLS license pursuant to Article 2.3 of Chapter 3 of the Real Estate Law is first obtained or, if not, a real estate broker's license is first obtained pursuant to Article 1 of Chapter 3.

    11.    It was established that Respondents' refused to abide by the Suspension Order issued on May 8, 2014, and that they willfully continued to engage in the business of prepaid rental listing service while Respondent AHI's restricted PRLS license was suspended, had expired, and Respondent Shayan was not licensed in any capacity. That unlicensed activity violated sections 10167.2 and 10130, because at the relevant times Respondents did not have a valid PRLS license or real estate broker's license.

    12.    The violation of sections 10167.2 and 10130 were willful and deliberate violations of the Real Estate Law and the terms and conditions of Respondent AHI's restricted PRLS license and thereby constitute cause for discipline of Respondents' real estate license or licensing rights under sections 10167.12, subdivision (a)(1), and 10177, subdivisions (d) and (k). (Factual Findings 1-29.)

13.     Respondents do not dispute that they engaged in unlicensed activity. They only provided excuses for doing so. However, none of their excuses are valid justification for breaking the law. As the holder of a restricted license pursuant to section 10156.7, subdivision (b), Respondents were subject to an immediate suspension before a hearing could be convened. After unsuccessfully seeking a stay of the Suspension Order from the Commissioner, Respondents could have sought relief in Superior Court or requested an expedited hearing date of this matter. They did neither. Instead, they decided to willfully violate a legal order from the Commissioner. Moreover, Respondents allowed their restricted license to expire and failed to renew it. They have not explained how they could legally operate with an expired license. Whether or not the Bureau knew that Respondents continued to operate after the Suspension Order was issued is beside the point. In any event, it was not established that the Bureau knew Respondents were violating the Suspension Order before the hearing commenced.

*Disposition*

14.     <u>First Amended Accusation</u>. Since cause for discipline has been established in this case, a determination must be made on the level of discipline warranted. Respondents received their PRLS license in 2007. Just a few years later, they were subject to serious discipline for violating the Real Estate Law, which resulted in a restricted PRLS license being issued in 2012. Slightly over one year later, Respondents engaged in the deceptive advertising of the properties listed by Hometeam. Unbeknownst to the Bureau, Respondents had abandoned their designated office of record even before they received their restricted PRLS license and failed to advise the Commissioner of their new location. Respondents essentially ignored the Commissioner's Suspension Order, allowed their restricted PRLS license to expire, and thereafter engaged in unlicensed activity. Respondents have been unapologetic for any of this misconduct. Instead, Respondents present a picture of a licensee with little regard for the Commissioner and no desire to comply with the rules and regulations established by the Commissioner. Respondents have presented no evidence indicating such misconduct will not occur again soon. Under these circumstances, an order revoking the restricted PRLS license is warranted for the protection of the public. (Factual Findings 1-29; Legal Conclusions 1-13.)

15.     <u>Suspension Order</u>. The Suspension Order was premised only on the allegations concerning Respondents' use of the information taken from the Hometeam website. Since cause for discipline based on those allegations was established, there is cause to sustain the Suspension Order. Since Respondents' restricted PRLS license will be revoked, no further action on the Suspension Order is necessary. (Factual Findings 1-20; Legal Conclusions 1-4.)

*Costs*

16.     A. Section 10106 authorizes the Commissioner to request an order in resolution of any disciplinary proceeding directing a licensee found to have committed a violation of the Real Estate Law to pay the reasonable costs of the investigation and enforcement of the case. In an action against a licensed corporate entity, a costs order can be

against the corporation. (*Id.*) Here, it was established that Respondents violated the Real Estate Law, and that the Bureau incurred reasonable costs in the investigation and prosecution of this matter in the amount of $2,859.90. (Factual Finding 30.)

B. Curiously, the Accusation, First Amended Accusation and Suspension Order do not contain a prayer for costs. Nonetheless, prior to the hearing, the Bureau submitted copies of documentation evidencing its costs to Respondents. With notice that the Bureau would be seeking such costs at the hearing, Respondents objected to the costs on grounds other than the absence of a prayer for such relief in the operative pleadings. Respondents' substantive objections to the costs have been overruled. It can be construed from these events that the Bureau has made a request for costs, that Respondents were provided with notice of said request as well as the amount of the costs sought, and that they did not object on procedural grounds. Under these unusual circumstances, an order for costs is warranted. (Factual Findings 30-31.)

C. While a costs order can be made against Respondent AHI, as a licensed corporate entity, section 10106 does not appear to support a cost order against a non-licensed designated officer such as Respondent Shayan. The Bureau has not provided any authority supporting the same. Therefore, Respondent Shayan will not be subject to a costs order.

## ORDERS

The Order Suspending Restricted Real Estate License issued on May 8, 2014, to Respondent Apartment Hunters, Inc. is sustained.

All licenses and licensing rights of Respondents Apartment Hunters, Inc. and Steven K. Shayan under the Real Estate Law are revoked.

Respondent Apartment Hunters, Inc. shall pay costs of the investigation and prosecution of this matter in the amount of $2,859.90 to the Bureau of Real Estate within 30 days of the effective date of this decision.

DATED: May 27, 2015

ERIC SAWYER,
Administrative Law Judge
Office of Administrative Hearings

# EXHIBIT C

http://mail.apartmenthunterz.com/zimbra/h/printmessage?id=712513&t...

## Zimbra

**info@apartmenthunterz.com**

---

### RE: Trulia Feed

---

**From :** Devu Gandhi <dgandhi@trulia.com>

**Subject :** RE: Trulia Feed

**To :** ApartmentHunterZ.com Affiliate Partner
<affiliate@apartmenthunterz.com>, Kevin Shayan
(kevin@apartmenthunterz.com)
<kevin@apartmenthunterz.com>

**Cc :** Pierre Calzadilla <pierre@trulia.com>

Wed, Jun 05, 2013 04:54 AM

✐ important  ◆ red

⬦1 attachment

Hi Kevin,
Have you had a chance to review the proposal I sent over last week?  We're ready to turn your feed on and
begin sending you referrals, but I wanted to get your feedback on some of the linking ideas I included.  Can
we hop on a quick call to discuss tomorrow?
Thanks,
Devu

**From:** Devu Gandhi
**Sent:** Thursday, May 30, 2013 4:47 PM
**To:** 'ApartmentHunterZ.com Affiliate Partner'
**Cc:** Kevin Shayan (kevin@apartmenthunterz.com); Pierre Calzadilla
**Subject:** RE: Trulia Feed

Hi Vidmantas,
I've put together a few slides to reflect the conversations both Pierre and I have had with Kevin, plus a few
additional ideas we discussed the last time we spoke.  To summarize:

- We'll display your listings for LA and SD
- You'll pay us $0.20 per user referral, which will come from a PDP "contact" action
- You can respond to those referrals, and offer a $10 discount off a subscription to Trulia's users
- We can hide the exact address in the listings information that we show consumers

I also included a few slides of integration ideas for you to consider:

- Providing access to Trulia's local information
- Integrating some our widgets onto your pages

Finally, Pierre mentioned that he had spoken to Kevin about including a few complete listings in front of the
subscription wall.  Is this still an option and how would we accomplish this?

As for next steps –

1. We finalize the pieces of the relationship, i.e. listings, links, widgets, etc.
2. I'll send over a draft agreement that reflects the deal
3. We'll simultaneously begin working to integrate your feed into our site



2015-02-24 14:22

Zimbra                                        http://mail.apartmenthunterz.com/zimbra/h/printmessage?id=712513&t...

We're in high season, so we're excited about getting this done quickly!
Let me know if you have any questions; I'd be happy to jump on a call tomorrow or next week.
Thanks,
Devu

**From:** ApartmentHunterZ.com Affiliate Partner [mailto:affiliate@apartmenthunterz.com]
**Sent:** Wednesday, May 22, 2013 1:49 AM
**To:** Devu Gandhi
**Subject:** Re: Trulia Feed

Hello,

My name is Vidmantas, i am Senior Affiliate Manager at ApartmentHunterZ.com my goal is
to work with you to expedite our partnership.

Per your conversation with Kevin, Kevin had promised to send you our last email to Pierre
which mentions our affiliate offer, I attach the original email bellow.


Please let me know if you have more questions and when we can start sending our data to
your website.

Thank you


Vidmantas Ma
Senior Affiliate Manager


www.ApartmentHunterZ.com/Affiliate
Your Affiliate Partner
310-982-2536 / affiliate@apartmenthunterz.com

Affiliate Links:
**About Affiliate Program**
Sign Up (become Partner)

Sign In (existing account)


-------- Original Message --------
Subject: Fwd: Trulia Feed
From: Kevin Shayan <kevin@apartmenthunterz.com>
To: Pierre Calzadilla <pierre@trulia.com>
CC:

**Kevin Shayan**
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

Hi Pierre,

I tried to answering your questions as short as possible.
· Expected listing volume in LA County and SD:
Our Expected listing volume in Los Angeles County and San Diego county are as follows
LA County - over 10k, SD around 8k

This number could vary depending on the season, but I can assure you that we have
the largest most up to date volume listings for all of California.

Please see excel sheet attached for our total coverage. It's broken by county and zip code.

I had also suggested since we are including a ONE TIME feed with address & phone
numbers that you have your team do a check to see that we do have unique data in other
areas should you choose to include them.
· Conversion rate from past experience?
Conversion rate changes from 0.3% to 1.5% at hot season. ( Slow times are Oct, Nov, Dec
) during slow times because of the Holidays not too many relocate.
And also it depends on traffic source. Web search tend to have lowest rate, while relevant
websites like Trulia - highest.
· What would rev share look like?
In general we pay $0.15-0.2 per referral, and $5-10 per sale, it depends on the volume.

As far as I understand in terms of referrals the main thing for Trulia is the email inquiry
form,
because I see link to the site email inquiry  is at the very bottom of details page and not
very accessible.

For email inquiries we pay $0.2. We used to pay more but it didn't work very well for us.
There is a big chance to loose a customer over a long email conversation while converting
from click is sometimes a matter of minutes.
But it's all negotiable, so I'm sure we can work this out.

You had indicated that you were not particularly interested in a per subscription revenue
share.
So in this case we can discount for all Trulia visitors and have special coupon with a
$10.00 discount.

feed urls are:

http://www.apartmenthunterz.com/bulkupload/trulia/ah_feed_la_sd.xml - LA & SD

http://www.apartmenthunterz.com/bulkupload/trulia/ah_feed_full.xml - full

I have also attached data for our National Government housing Section 8 data.
Please comment. The site is www.wetakesection8.com

http://www.apartmenthunterz.com/bulkupload/trulia/s8_feed.xml


If there is anything else you need let me know I will make it happen.

Kevin


### Kevin Shayan
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

---

**From:** "Pierre Calzadilla" <pierre@trulia.com>
**To:** "Kevin Shayan" <kevin@apartmenthunterz.com>
**Sent:** Friday, March 29, 2013 10:31:42 PM
**Subject:** Re: Trulia Feed

Fantastic Kevin, looking forward to it.

Best,
Pierre A. Calzadilla
Trulia.com - 116 New Montgomery St, Suite 300
San Francisco, CA 94105
(415) 400-7260

Twitter: https://twitter.com/NYPierre
LinkedIn: http://www.linkedin.com/in/pierrecalzadilla
Trulia: http://www.trulia.com/profile/NYPierre/
Check out Trulia Rentals and our Mobile Tools.



**About Trulia, Inc.**

Trulia (NYSE: TRLA) gives home buyers, sellers, owners and renters the inside scoop on properties, places and real estate professionals. Trulia has unique info on the areas people want to live that can't be found anywhere else: users can learn about agents, neighborhoods, schools, crime, commute times and even ask the local community questions. Real estate professionals use Trulia to connect with millions of transaction-ready buyers and sellers each month via our hyper local advertising services, social recommendations and top-rated mobile real estate apps. Trulia is headquartered in downtown San Francisco. Trulia is a registered trademark of Trulia, Inc.

**From:** Kevin Shayan <kevin@apartmenthunterz.com>
**Reply-To:** Kevin Shayan <kevin@apartmenthunterz.com>
**Date:** Friday, March 29, 2013 1:30 AM
**To:** Pierre Calzadilla <pierre@trulia.com>
**Subject:** Re: Trulia Feed

Pierre,

I am working with my team to actually not only send you the data regarding traffic & conversions but to also give you the number of smaller properties  per zip code etc. Eventually we can even prepare a full feed & send it to you including full address & phone number , this way you guys can run a quick query to see how many unique listings per area we can provide & you can choose areas based on your needs.

I will put together a couple of quick scenarios  & send you an email by next Tuesday.

We can make this happen for sure.

Thanks
Kevin

**Kevin Shayan**
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

**From:** "Pierre Calzadilla" <pierre@trulia.com>

**To:** "Kevin Shayan" <kevin@apartmenthunterz.com>
**Sent:** Thursday, March 28, 2013 3:52:47 PM
**Subject:** Re: Trulia Feed

Kevin,

A few questions for clarity:

- Expected listing volume in LA County and SD:
- Conversion rate from past experience?
- What would rev share look like?

Best,
Pierre A. Calzadilla
Trulia.com - 116 New Montgomery St, Suite 300
San Francisco, CA 94105
(415) 400-7260

Twitter: https://twitter.com/NYPierre
LinkedIn: http://www.linkedin.com/in/pierrecalzadilla
Trulia: http://www.trulia.com/profile/NYPierre/
Check out Trulia Rentals and our Mobile Tools.



**About Trulia, Inc.**
Trulia (NYSE: TRLA) gives home buyers, sellers, owners and renters the inside scoop on properties, places and real estate professionals. Trulia has unique info on the areas people want to live that can't be found anywhere else: users can learn about agents, neighborhoods, schools, crime, commute times and even ask the local community questions. Real estate professionals use Trulia to connect with millions of transaction-ready buyers and sellers each month via our hyper local advertising services, social recommendations and top-rated mobile real estate apps. Trulia is headquartered in downtown San Francisco. Trulia is a registered trademark of Trulia, Inc.

**From:** Kevin Shayan <kevin@apartmenthunterz.com>
**Reply-To:** Kevin Shayan <kevin@apartmenthunterz.com>
**Date:** Monday, March 25, 2013 3:06 AM
**To:** Pierre Calzadilla <pierre@trulia.com>
**Subject:** Re: Trulia Feed

Hi Pierre,

Thank you for the call. I have discussed the feed & partnership with both my partner as

Zimbra
http://mail.apartmenthunterz.com/zimbra/h/printmessage?id=712513&t...

well as my senior developers.  We are excited to move forward, & put everything needed in
motion rather fast.

After our call it is clear that you are mainly interested in all of Los Angeles County & that
we should remove the larger communities. You also showed interest in San Diego both of
which we can drill down & provide smaller private management company data as well as
individual landlords.

We will provide this data as frequently as daily & no less than 3 times a week as the
listings do change much faster than the bigger communities.

I wanted to ask you to outline in detail how you see the partnership working in terms of
revenue on both sides. As you are aware our only source of revenue is the subscription
fee . For every guest as well as every member we invest a lot of money in 24 hour live
customer support as well online chat , text messages & listings via email.

We did have a long term partnership with Yahoo real estate , were we did provide the
visitor with one or 2 listings displaying the full address & phone number.

You had indicated that you were not particularly interested in a pay per subscription
revenue share. In this case we can even discount our subscription by for example $10.00
dollars . This way all memberships via your site are offered at a discount etc.

Please email me a few options & we can move forward from there. I can get this set up in
less than a week once we can agree on the terms you have in mind. If you need a member
access to the site please let me know.

I look forward to your response.


Kevin
Kevin@apartmenthunterz.com



**Kevin Shayan**
*President*

**Phone**: 949-248-0055, **Mobile**: 310-994-9595, **Fax**: 949-248-0056

**Email**: Kevin@ApartmentHunterZ.com

www.ApartmentHunterZ.com

**From:** "Pierre Calzadilla" <pierre@trulia.com>
**To:** development@apartmenthunterz.com
**Sent:** Monday, March 11, 2013 3:31:34 PM
**Subject:** Trulia Feed


Good afternoon,

Someone on your team submitted a feed to Trulia on approximately 2/1/2013. I would like
to connect with your business development, or leadership, to discuss how we can work
together.

Best,

Pierre A. Calzadilla
Trulia.com - 116 New Montgomery St, Suite 300
San Francisco, CA 94105
(415) 400-7260


Twitter: https://twitter.com/NYPierre
LinkedIn: http://www.linkedin.com/in/pierrecalzadilla
Trulia: http://www.trulia.com/profile/NYPierre/
Check out Trulia Rentals and our Mobile Tools.



**About Trulia, Inc.**
Trulia (NYSE: TRLA) gives home buyers, sellers, owners and renters the inside scoop on properties, places and
real estate professionals. Trulia has unique info on the areas people want to live that can't be found anywhere
else: users can learn about agents, neighborhoods, schools, crime, commute times and even ask the local
community questions. Real estate professionals use Trulia to connect with millions of transaction-ready
buyers and sellers each month via our hyper local advertising services, social recommendations and
top-rated mobile real estate apps. Trulia is headquartered in downtown San Francisco. Trulia is a registered
trademark of Trulia, Inc.



**image001.png**
23 KB

# EXHIBIT D

Can not see images? Open email in browser



 Dont let rentals sit vacant
## Find a Tenant
in less than 3 days!

**Dear doug wetton,**

Recently we noticed by visiting your website http://www.dwinvestments.com/ that you have available vacancies.

Apartmenthunterz.com & it's family of websites is one of the largest rental listing services in California with over 70,000 listings of apartments, houses and condos for rent. We have 5,000+ registered tenants and 40,000+ prospective tenants visiting daily. Landlords can post their listings 100% free of charge.

We would like to refer prospective tenants to you on a daily basis, and maximize your marketing efforts as well as syndicating and advertising your properties on our partner websites.

If you wish us to list all vacancies available on your website http://www.dwinvestments.com/ plese click this button

By clicking this button you grant Apartment Hunters Inc and its affiliates websites permission to list your vacancies on Apartment Hunters websites, including available vacancies on www.dwinvestments.com, syndicate and advertise those on Apartment Hunters partner websites.

**Our partner network.** List with us and we will advertise your listings on 30+ of our partner websites.

  Walk Score°

  

  

**How we obtained your contact information?** We have built relationships with property owners and mangers as well as multiple listing services since 1999, and have 30,000+ management companies and private landlords registered with us. There is a possibility that a member of your management company or a previous manager has signed up as landlord on one of our websites and granted us permission to list your available vacancies. Please contact our support service to obtain your login or register a new landlord account with us.

**Don't wish to list?** Please click this link to unsubscribe. You will not get emails from us regarding your listings in the future.

---

### The Apartment Hunters Network
Powerful apartment search websites, innovative search tools, unmatched service:

  

Find a Tenant in 3 days at

**STATE'S EXHIBIT**
8

CALBRE PAGE 1

| | DATE_SENT | UNIQUE_ID | EMAIL_TO | EMAIL_FROM | AUTH_CLICK |
|---|---|---|---|---|---|
| 1 | DATE_SENT | UNIQUE_ID | EMAIL_TO | EMAIL_FROM | AUTH_CLICK |
| 2 | 2013-05-05 | c4dce2d9030b2039c18410a243b60f6f7ae9 | davegilmore@me.com | landlord@apartmenthunterz.com | Y |
| 3 | 2013-05-05 | 2a680790783947d0a741dda6987d57ee6f7518eb | jmacteo@gmail.com | landlord@apartmenthunterz.com | N |
| 4 | 2013-05-05 | 01eff9aad858150301 9beb6ab282a637 59d0e36 | yvonne.miller@att.net | landlord@apartmenthunterz.com | Y |
| 5 | 2013-05-05 | 5af3d27ce124b8cb0136a5016f65a801a4cfa923 | qq955166@hotmail.com | landlord@apartmenthunterz.com | Y |
| 6 | 2013-05-05 | 307e2947c7611f40e2866c49d0a5b0e5ea34fb | dolphinmarina@gkind.com | landlord@apartmenthunterz.com | N |
| 7 | 2013-05-05 | 8589a41078f2e3659a0d fbbb9857649e63890 2a27 | maria1.murillo@gmail.com | landlord@apartmenthunterz.com | N |
| 8 | 2013-05-05 | fbb8b62a49897940c68e9afef6c2901569c2f1c | nitbin.s@gmail.com | landlord@apartmenthunterz.com | Y |
| 9 | 2013-05-05 | 81a2cef9ee93a96cfd68c70f23f1a8f52f1b7604 | angienava292006@yahoo.com | landlord@apartmenthunterz.com | Y |
| 10 | 2013-05-05 | dee39dd793866d372201df4780842501ea8765ffb | ang_nune21@gmail.com | landlord@apartmenthunterz.com | Y |
| 11 | 2013-05-05 | 50a8b7c4060087aa8627d3b1e67a9e86b09ded | edfonetcomoeste@gmail.com | landlord@apartmenthunterz.com | Y |
| 12 | 2013-05-05 | 902ba3cda18838015946b6e1b452790cc53948fda | keesling@houstexasown.com | landlord@apartmenthunterz.com | Y |
| 13 | 2013-05-05 | 1cac23a1ceb3b0b1ce135680815805235f3eb | johnnieanderson@sbcglobal.net | landlord@apartmenthunterz.com | N |
| 14 | 2013-05-05 | 87d991 22b669 0b6d093fe7cb25ed1 df b8654 9f22 | elviapena@cox.net | landlord@apartmenthunterz.com | Y |
| 15 | 2013-05-05 | 9a77895789331f44ca4f6158 6d734d69a0faff77 | ryllagga@rapidnyc.com | landlord@apartmenthunterz.com | Y |
| 16 | 2013-05-05 | 7f8fc0271ea874add822aecd374f6d6d9424fdd | jebrantky@hotmail.com | landlord@apartmenthunterz.com | Y |
| 17 | | | | | |

| ID | STATUS | STREET | CITY | STATE | ZIP | BD | BA | RENT | AREA | DATE_LISTED | DATE_EXPIRED | DATE_AUTHORIZED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 135912332 | deact | 1660 Thompson Ave | Chula Vista | CA | 91913 | 5 | 4.5 | 2995 | 2987 | 2013-08-06 | 2013-08-22 | 2013-05-05 |
| 135767261 | deact | 1437 Stanislaus Dr | Chula Vista | CA | 91913 | 4 | 3.5 | 3000 | 3280 | 2013-06-18 | 2013-06-24 | 2013-05-05 |
| 135767255 | deact | 1448 Stanislaus | Chula Vista | CA | 91913 | 5 | 3.5 | 3650 | 3649 | 2013-05-17 | 2013-06-10 | 2013-05-05 |
| 135626653 | deact | 524 Reisling Ter | Chula Vista | CA | 91913 | 4 | 3 | 3995 | 3831 | 2013-05-07 | 2013-06-10 | 2013-05-05 |

## DECLARATION OF VIDMANTAS MACYS

I, Vidmantas Macys, declare as follows:

1.    I am over the age of 18 and I am employed by Apartment Hunters, Inc. I have
personal knowledge of the facts set forth herein.  If called upon as a witness, I
could and would competently testify as to these facts.

2.    I am an employee of Apartment Hunters, Inc.  Specifically, I am the President for
UAB "Apartment Hunters LT"  based in Lithuania.

3.    I am knowledgeable about the process Apartment Hunters, Inc. utilizes in
collecting information for management companies, such as Hometeam Property
Management.  As part of its business, Apartment Hunters, Inc. collects contact
information of management companies from publicly available sources.  Then,
Apartment Hunters, Inc. has a sophisticated automated system that sends
automatically generated emails that ask the recipients whether or not they wish for
Apartment Hunters, Inc or its partner websites to list the recipients' available
vacancies.  Furthermore, Apartment Hunters, Inc. has a separate system which
maintains the registering of the "clicks" which shows whether the recipients agree
or disagree to list their vacancies in both a server log and a database record.  The
server log reveals information regarding the "clicks" in more depth as it tracks
very specific data, including, but not limited to, second timestamp and IP address.
These server logs are maintained for five to six months.

4.    I have reviewed Apartment Hunters, Inc.'s database record in connection to the
following four properties: 1660 Thompson Ave., Chula Vista, CA; 524 Reisling
Terrace, Chula Vista, CA; 1448 Stanislaus Dr., Chula Vista, CA; and 1437

1  Stanislaus Dr., Chula Vista, CA.  Based on Apartment Hunters, Inc.'s database

2  record that I personally reviewed, there were automated emails sent to Hometeam

3  Property Management, and an agent, employee, or other member of their

4

5  management team agreed to permit Apartment Hunters, Inc. to list their vacancies

6  by agreeing to the option provided in said email.

7  I declare under penalty of perjury under the laws of the State of California that the

8  foregoing is true and correct.  Executed on this 28th day of May, 2014 in Kaunas, Lithuania.

9

10

11

12  Vidmantas Macys,
   Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

Lincoln D. Bandlow (SBN 170449)
lbandlow@foxrothschild.com
Margo J. Arnold (SBN 27288)
marnold@foxrothschild.com
**FOX ROTHSCHILD LLP**
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Telephone:  310.598.4150
Facsimile:   310.556.9828

Attorneys for Defendants
Apartment Hunters, Inc.,
Kevin Shayan, and
Steven Shayan

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTAR REALTY INFORMATION, INC., and APARTMENTS, LLC<br><br>         Plaintiffs,<br><br>    vs.<br><br>APARTMENT HUNTERS, INC., KEVIN SHAYAN, and STEVEN SHAYAN<br><br>         Defendants. | Case No.: 8:15-cv-02111- JLS-KES<br><br>**HON. JOSEPHINE L. STATON**<br><br>**DEFENDANT APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |

PROPOUNDING PARTY:  Plaintiffs CoStar Realty Information, Inc. and

Apartments, LLC

RESPONDING PARTY:  Defendant Apartment Hunters, Inc.

SET NO:     ONE (1)

   Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Apartment Hunters, Inc. ("AHI") hereby objects and responds to Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC's, (collectively as "Plaintiffs") First Set of Interrogatories as follows:

## **GENERAL OBJECTIONS**

   The following general objections to Plaintiffs' Interrogatories are incorporated into each and every response to each individual Interrogatory as though fully set forth therein:

   1.  AHI objects to the Interrogatories to the extent that they seek to impose obligations on it greater than or more extensive than those required by the Federal Rules of Civil Procedure.

   2.  AHI objects to the Interrogatories to the extent that they seek information equally or more available to, or already in the possession, custody or control of Plaintiffs.

   3.  Discovery is continuing in this action, and AHI has not completed its factual investigation.  These responses are made in good faith and after diligent inquiry into the facts and information now known to AHI.  However, information that may be responsive to the Interrogatory may not have been discovered.  Accordingly, without asserting an obligation to do so, and without waiving the objections asserted herein, AHI reserves the right to amend/supplement its responses as and when additional information and/or documents are discovered.  Additionally, because AHI's responses are based upon information which it has identified to date, it does not preclude AHI from relying on facts or documents discovered or generated pursuant to subsequent investigation and discovery.

4.    In providing responses and objections to the Interrogatories, AHI expressly reserves all of its objections to the use of the responses herein, including but not limited to, objections as to the competency, relevance, materiality, and admissibility thereof.

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO.  1:**

Identify the source from and/or means by which You obtained each CoStar Photograph and each CoStar Listing, including, but not limited to, the names of any websites involved; the names, roles and contact information of any other Person involved; the method, including software or other technical means, used to capture the photograph or listing; and the title of any contract relating to such conduct.

**RESPONSE TO INTERROGATORY NO.  1:**

AHI objects to this interrogatory as burdensome and harassing because of its compound nature.  AHI further objects to this interrogatory because it is presently pursuing its investigation of the facts and law relating to this case, and has not completed its discovery or preparation for trial.  Therefore, this response is being provided without prejudice to AHI's right to add, modify or otherwise change or amend these responses and is subject to AHI's right to produce evidence of any subsequently-discovered fact or document.

Notwithstanding the foregoing objections, AHI has not yet been able to locate the  photographs identified on CoStar's Exhibit A within its stored website data and, without such information, it is unable to identify the source and/or means, if any, upon which those photographs were obtained.

**INTERROGATORY NO.  2:**

Identify each third party, including without limitation internet services providers (ISPs), hosting services, and server providers, you have utilized to obtain listings, photographs, and information for Your websites and database(s).

**RESPONSE TO INTERROGATORY NO.  2:**

1  AHI objects to this interrogatory as burdensome and harassing because of its

2  scope.  AHI obtains listings, photographs, and information from thousands of

3  landlords, management companies, and third party property owners, employees, or

4  agents and up to 100 of partner feeds, including but not limited to:

5    - RentPath (Apartmentguide.com, Rentals.com, MyNewPlace.com);

6    - Dominion Enterprises (ForRent.com, Homes.com);

7    - ListHub (Move.com, Nationwide MLS data);

8    - On-site.com;

9    - Rentalutions.com;

10    - ShowMojo.com; and

11    - IT49.com.

12  **INTERROGATORY NO.  3:**

13    For each CoStar Photograph and each CoStar Listing, identify any Person who

14  You assert gave permission to You to copy such photograph or listing, and the form of

15  the permission.

16  **RESPONSE TO INTERROGATORY NO.  3:**

17    AHI objects to this interrogatory because it is burdensome and harassing

18  because of its compound nature. AHI further objects to this interrogatory because it is

19  presently pursuing its investigation of the facts and law relating to this case, and has

20  not completed its discovery or preparation for trial.  Therefore, this response is being

21  provided without prejudice to AHI's right to add, modify or otherwise change or

22  amend these responses and is subject to AHI's right to produce evidence of any

23  subsequently-discovered fact or document.

24    Notwithstanding the foregoing objections, AHI has not been able to locate any

25  CoStar Photographs or Listings within its website data.  Without such information, it

26  is unable to identify the Persons who gave it permission to copy and display such

27  Photographs and Listings.

28  **INTERROGATORY NO.  4:**

Identify each Person to whom or which You have sold, licensed, or provided real estate information or listings for commercial use. For the avoidance of doubt, this Interrogatory does <u>not</u> call for the identification of individual customers who purchased monthly "memberships" to your website in order to view listings for their own personal, non-commercial use.

**RESPONSE TO INTERROGATORY NO. 4:**

AHI does not sell, license, or provide real estate information or listings for commercial use.

**INTERROGATORY NO. 5:**

Identify all instances in which You (which, for the avoidance of doubt, is defined to include agents and employees) have accessed any database or website (including without limitation www.apartments.com, www.apartmenthomeliving.com, and www.apartmentfinder.com) made available or hosts by CoStar or any of its affiliates, including, but not limited to, the date of that access, and any efforts taken (including but not limited to using rotating IP addresses) to try to ensure that CoStar and/or its affiliates did not discover that You (which, for the avoidance of doubt, is defined to include agents and employees) were accessing such database or website.

**RESPONSE TO INTERROGATORY NO. 5:**

No such instances have occurred.

**INTERROGATORY NO. 6:**

Identify each individual IP address You (which, for the avoidance of doubt, is defined to include agents and employees) used to access, view, or otherwise use www.apartments.com, www.apartmenthomeliving.com, and www.apartmentfinder.com.

**RESPONSE TO INTERROGATORY NO. 6:**

No such IP addresses exist.

**INTERROGATORY NO. 7:**

Identify the servers on which the photographs displayed on Your websites are stored, and any Person who own and/or license use of such servers to You.

**RESPONSE TO INTERROGATORY NO. 7:**

AHI objects to this interrogatory because it seeks information that is not related to a matter that is relevant to any party's claim or defense and proportional to the needs of the case.

Notwithstanding the foregoing objection, the photographs displayed on AHI's websites are stored on Amazon Cloud Drive which is licensed to AHI by Amazon.

**INTERROGATORY NO. 8:**

Describe any relationship between You (which, for the avoidance of doubt, is defined to include any affiliates or subsidiaries, whether domestic or foreign) and Delta Centric, LLC, Host1Plus, and/or Digital Energy Technologies (an/or with their respective affiliates), including without limitation identifying the names and dates of any contracts for services with such entities.

**RESPONSE TO INTERROGATORY NO. 8:**

No such relationships exist.

**INTERROGATORY NO. 9:**

Describe the methods You use to verify the availability of apartment listings displayed on Your websites, including the frequency with which You use those methods and the basis for statements on Your websites (appearing, for instance, on search result pages) that specific listings were "Updated," "Modified," "Posted," "Refreshed," "Vacant," or "Price Reduced" at a specific date and time.

**RESPONSE TO INTERROGATORY NO. 9:**

AHI objects to this interrogatory because it seeks information that is not related to a matter that is relevant to any party's claim or defense and proportional to the needs of the case. AHI further objects to this interrogatory as burdensome and harassing because it previously stipulated that rental listings are time-sensitive and discovery into this subject is no longer necessary.

**INTERROGATORY NO. 10:**

Describe the methods You use to process the photographs and listing information You acquire or post on Your websites, including without limitation any processes for editing, altering, or cropping of photographs or for editing, altering, reorganizing, or rewriting listing information.

**RESPONSE TO INTERROGATORY NO. 10:**

AHI does not modify feeder information.  Information received by third parties, including management companies, landlords, and third-party feeders, is reviewed for inappropriate or unwanted content and then is published as initially provided on the websites.

**INTERROGATORY NO. 11:**

Identify every instance in which You (which, for the avoidance of doubt, is defined to include agents and employees) have had any involvement (for example, without limitation, as a plaintiff, employee of a plaintiff, defendant, employee of a defendant, third party, employee of a third party, consultant, or actual or potential witness) in any claim, dispute or proceeding involving copyright or other intellectual property issues, or involving apartment listings or photographs, including without limitation any claims or disputes that were resolved without litigation.

**RESPONSE TO INTERROGATORY NO. 11:**

AHI objects to this interrogatory because it is burdensome and harassing as to its scope.  AHI objects to this interrogatory because it is compound.  AHI further objects to this interrogatory because it seeks information that is not related to a matter that is relevant to any party's claim or defense and proportional to the needs of the case.

Notwithstanding the foregoing objections, AHI states that in 2014 the California Bureau of Real Estate filed a complaint against it for allegedly using pictures and information about certain rental properties without permission. The Bureau Commissioner found AHI liable for such conduct on July 1, 2015.  AHI,

1   however, is in the process of appealing that decision.

2   **INTERROGATORY NO. 12:**

3       Identify every action You have taken to protect intellectual property owned or

4   claimed by You, including, without limitation, using copyright or trademark notices,

5   symbols or other indicators of intellectual property status; using terms of use, terms of

6   access, terms of service, or licenses; filing for copyright, trademark or patent

7   protection; engaging in litigation involving copyrights, trademarks or patents; and

8   engaging in non-litigation communications relating to copyright, trademarks or

9   patents.

10  **RESPONSE TO INTERROGATORY NO. 12:**

11      AHI objects to this interrogatory because it is burdensome and harassing as to

12  its scope.  AHI objects to this interrogatory because it is compound.  AHI further

13  objects to this interrogatory because it is presently pursuing its investigation of the

14  facts and law relating to this case, and has not completed its discovery or preparation

15  for trial.  Therefore, this response is being provided without prejudice to AHI'S right

16  to add, modify or otherwise change or amend these responses and is subject to AHI'S

17  right to produce evidence of any subsequently-discovered fact or document.

18      Notwithstanding the foregoing objections, AHI states that it has taken action to

19  protect its intellectual property through the use of (i) a Terms and Conditions

20  agreement that anyone accessing their websites agrees to be bound to by accessing the

21  website and (ii) copyright notices on each of their webpages.

22  **INTERROGATORY NO. 13:**

23      Identify all Persons You believe to have discoverable information concerning

24  this action and identify the subject matter of that knowledge.

25  **RESPONSE TO INTERROGATORY NO. 13:**

26      AHI objects to this interrogatory because it is burdensome and duplicative

27  given that it seeks the same information provided in Defendants' Initial Disclosures.

28  AHI objects to this interrogatory because it is compound.  AHI further objects to this

interrogatory because it is presently pursuing its investigation of the facts and law relating to this case, and has not completed its discovery or preparation for trial. Therefore, this response is being provided without prejudice to AHI's right to add, modify or otherwise change or amend these responses and is subject to AHI's right to produce evidence of any subsequently-discovered fact or document.

Notwithstanding the foregoing objections, the persons AHI currently believes have discoverable information concerning this action are as follows:

| Person | Subject Matter of Knowledge |
| --- | --- |
| Kevin Shayan, employee, Apartment Hunters, Inc.  Mr. Shayan can be contacted through his counsel, Lincoln D. Bandlow, at Fox Rothschild LLP, 1800 Century Park East, Suite 300 Los Angeles, CA 90067. | Apartment Hunters, Inc.'s policies, procedures, and activities; and Mr. Shayan's personal conduct. |
| Steven Shayan, Chief Executive Officer, Apartment Hunters, Inc.  Mr. Shayan can be contacted through his counsel, Lincoln D. Bandlow, at Fox Rothschild LLP, 1800 Century Park East, Suite 300 Los Angeles, CA 90067. | Apartment Hunters, Inc.'s policies, procedures, and activities; and Mr. Shayan's personal conduct. |
| Vidmantas Mačys, Manager of UAB Apartment Hunters LT, Savanorių pr. 349, LT-51480 Kaunas | Apartment Hunters, Inc.'s systems and operations. |
| Denis Portnov, employee, Apartment Hunters, Inc.  Mr. Portnov can be contacted through Lincoln D. Bandlow, at | Apartment Hunters, Inc.'s systems and operations. |

| | |
|---|---|
| Fox Rothschild LLP, 1800 Century Park East, Suite 300 Los Angeles, CA 90067. | |
| The corporate designee(s) of CoStar. CoStar's designee(s) may be contacted through CoStar's counsel, Kelly L. Perigoe, Caldwell, Leslie & Proctor, PC, 725 South Figueroa Street, 31st Floor, Los Angeles, California 90017-5525, 213-629-9040, perigee@caldwell-leslie.com | Plaintiffs believe the designee(s) will have knowledge of CoStar's policies, procedures, and activities, including copyright procedures, agreements for sharing of data and information provided by CoStar to third-party licensees, CoStar's copyright infringement protocol, and what information and photographs Defendants' allegedly have copied. |
| The corporate designee(s) of Apartments. Apartments' designee(s) may be contacted through Apartments' counsel, Kelly L. Perigoe, Caldwell, Leslie & Proctor, PC, 725 South Figueroa Street, 31st Floor, Los Angeles, California 90017-5525, 213-629-9040, perigee@caldwell-leslie.com | Plaintiffs believe the designee(s) will have knowledge of CoStar's policies, procedures, and activities, including copyright procedures, agreements for sharing of data and information provided by CoStar to third-party licensees, CoStar's copyright infringement protocol, and what information and photographs Defendants' allegedly have copied. |

Dated:  July 28, 2016             FOX ROTHSCHILD LLP

                                 By _____
                                    Lincoln D. Bandlow
                                    Margo J. Arnold
                                    Attorneys for Defendants
                                    Apartment Hunters, Inc.,
                                    Kevin Shayan, and
                                    Steven Shayan

10

**VERIFICATION**

I, Steven Shayan, declare:

I have read the foregoing DEFENDANT APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES and know its contents.

I am a principal for Apartment Hunters, Inc. and I am authorized to make this verification for and on its behalf, and I make this verification for that reason. These responses were assembled by our counsel of record and I am informed and believe that the responses are true and complete.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 27th day of July, 2016, at DANA POINT CA 11 YO AM.

Steven Shayan

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 1800 Century Park East, Suite 300, Los Angeles, CA 90067-1506.

On July 28, 2016, I served the following document(s) described as **DEFENDANT APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Fox Rothschild LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☐ **BY OVERNIGHT MAIL (FEDEX):** I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

☐ **BY PERSONAL SERVICE:** I personally delivered the document(s) to the person being at the addresses listed in the Service List. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

☑ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address marnold@foxrothschild.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of July, 2016 at Los Angeles, California.

_____

Cindy Liu

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

**SERVICE LIST**

Nicholas J. Boyle
David K. Baumgarten
Eric J. Hamilton
Williams and Connolly LLP
725 Twelfth Street NW
Washington, DC 20005-5901
202-434-5000
Fax: 202-434-5029
Email: nboyle@wc.com
Email: dbaumgarten@wc.com
Email: ehamilton@wc.com

Kelly L. Perigoe
Caldwell Leslie and Proctor PC
725 South Figueroa Street 31st Floor
Los Angeles, CA 90017-5524
213-629-9022
Fax: 213-629-9022
Email: perigoe@caldwell-leslie.com

DEFENDANTS APARTMENT HUNTERS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

# EXHIBIT 5

Home › Disclaimers › Terms of Service

# Terms of Service

## Introduction and Agreement

These Terms of Service apply to the services offered by Apartments, LLC ("Apartments.com") in connection with the Apartments.com and AparmentHomeLiving.com websites and related mobile applications, as well as any publicly available versions that may be offered through a distribution partner (collectively the "Site"). You may have arrived at a version of the Site from a distribution partner's website, in which case, that partner will be identified at the top of this page. Any individual who visits, views, accesses or uses any version of the Site, including through a bot or other automated means, ("You" or "User") is bound by these Terms of Service. By using the Site, You represent and warrant that You are at least eighteen (18) years of age and You hereby agree to be bound by all of the following provisions of these Terms of Service, which form a legally binding contract between You and Apartments.com.  You further represent and warrant that You are not a competitor of Apartments.com or any of its affiliates.  **If You do not agree to these Terms of Service, You are prohibited from accessing the Site and must immediately discontinue use.**

By accessing the Site, You consent to the collection and use of certain information, as specified in the Privacy Statement.

## Apartments.com is an Advertising and Information Service

The Site is an online advertising and information service for apartment hunters, dwellers, landlords, and property managers. Apartments.com does not broker, lease, or sublease apartments directly and is not a party to any transaction between landlords (including, as applicable, property management companies and/or property managers) and renters. As a result, Apartments.com does not (a) guarantee or ensure any apartment or any transaction between a renter and landlord, (b) collect or process payment or execute any lease or sublease documentation on behalf of renters or landlords, or (c) broker, lease, or sublease or offer to broker, lease or sublease, or own any apartments. You are strongly encouraged to personally inspect any apartment advertised for rent prior to: signing any lease documentation; providing personal information such as a social security number on a lease application; or wiring or otherwise sending money for any deposit, rent payment or application fee.  By using the Site, you acknowledge that published rents and availabilities are subject to change at the sole discretion of the property owner or manager at any time and without further notice.

COSTAR_0000507

# Site Materials

All information and content available on this Site (collectively, "Materials") is protected by copyright and other intellectual property laws. The Materials are owned by Apartments.com and its affiliates, and/or their respective licensors and suppliers (collectively, "Licensors"). The Materials are intended for personal and noncommercial use only. You may not copy, reproduce, sell, license, publish, distribute, modify, display, perform, re-post or otherwise use any portion of the Materials in any other way or for any other purpose without the prior written consent of Apartments.com. Requests regarding use of the Materials for any purpose other than personal, noncommercial use should be directed to CoStar Realty Information, Inc., 1331 L Street, NW, Washington, DC 20005, attn.: General Counsel.

# Third-Party Sites

During the course of Your visit to the Site, You may be taken to third-party websites to fulfill certain site features and functionality (e.g., if You choose to view community information or check availability of a certain apartment unit). You agree that when visiting third-party websites (e.g., websites not containing "Apartments.com" in the URL) You are subject to the privacy policy and terms of service, if any, of that third-party website, which may differ from those of Apartments.com. By selecting links to such third-party websites, You agree that You will be leaving the Site and that Apartments.com and its affiliates have no responsibility or liability whatsoever in connection with Your use or Your exchange of any information with such third-party websites. Apartments.com and its affiliates do not endorse, sponsor or guarantee these linked websites and are not responsible in any way for any advice, content, information, practices, products or services related to or made available through such linked websites.

# Copyrights and Copyright Agents

It is the policy of Apartments.com to respond to claims of intellectual property infringement. Apartments.com will promptly process and investigate notices of alleged infringement and take appropriate actions under the Digital Millennium Copyright Act, Title 17, United States Code, Section 512(c)(2) ("DMCA") and other applicable intellectual property laws. Pursuant to the DMCA, notifications of claimed copyright infringement should be sent to a Service Provider's Designated Agent. Notification must be submitted to the following Designated Agent for this Site:

CoStar Realty Information, Inc.
Attn: General Counsel
1331 L Street, NW
Washington, DC 20005
Phone: (202) 346-6500

Fax: (202) 346-6370

copyright@costar.com

To be effective, the notification must be a written communication that includes the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;

3. Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;

4. Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number and, if available, an electronic mail address at which the complaining party may be contacted;

5. A statement that the complaining party has a good-faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent or the law; and

6. A statement that the information in the notification is accurate and, under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

# Trademarks

You acknowledge that the Materials includes certain trademarks, service marks, and other indicia of source (together "Marks") that are owned by Apartments.com, its affiliates, Licensors and others. You agree not to copy, use, infringe or dilute the Marks.  You further agree that You will not alter or remove any Mark, copyright notice or other notice from the Materials or any copy thereof. The "Apartments.com" name and logo are trademarks of Apartments.com. Other product and company names herein may be trademarks of their respective owners.

# Software

All software contained in this Site ("Software"), is owned by Apartments.com, its affiliates and/or Licensors and is protected by copyright and other intellectual property laws, as well as international treaty provisions. Any unauthorized access to, reproduction, redistribution, publication, display or other use of

COSTAR_0000509

the Software is expressly prohibited by law and may result in severe civil and/or criminal penalties.
Violators will be prosecuted to the maximum extent possible. Use of the MapPoint/Virtual Earth Service
is also governed by the Microsoft Terms of Use and Privacy Statement located
at http://go.microsoft.com/fwlink/?LinkId=21969 andhttp://go.microsoft.com/fwlink/?LinkId=21970.

## Linking

If You operate a website and wish to link to the Site, You must link to the Site's home page
(www.apartments.com/) and/or You may also link to other pages found on the Site given that no
manipulation to the canonical URL has occurred specifically, but not limited to, the addition or removal
of any unique values, parameters or subfolders needed to render a page on the Site. Apartments.com
reserves the right to disavow, reject or terminate any links to the Materials or the Site.

## User Content

By submitting listings, ads, photos, descriptions, data, or other content or materials ("Content") to the
Site, You hereby grant to Apartments.com, its affiliates, and its parent and related companies a royalty-
free, perpetual, irrevocable, nonexclusive, fully transferable, fully sublicenseable right and license to
copy, modify, display, distribute, perform, create derivative works from, store, and otherwise use and
exploit all such Content in any form, media, software or technology of any kind now existing or
developed in the future. You further grant to Apartments.com, its affiliates, and its parent and related
companies, a royalty-free right and license to use Your name, image and likeness in connection with the
reproduction or distribution of the Content.

This Site may offer opportunities for Users 18 years of age and older to submit Content that express their
opinions and share their ideas, for example in a consumer blogging format ("Opinion Content").
Apartments.com and its affiliates do not endorse the accuracy or reliability of any Opinion Content. If
You decide to submit Opinion Content, please use Your best judgment and be respectful of other
individuals. By posting or submitting Opinion Content, You agree to abide by these Terms of Service.
You may not use the Site to engage in any Prohibited Activities (as defined below). Uploading
copyrighted or other proprietary material of any kind on the Site without the express permission of the
owner of that material is prohibited and may result in civil and/or criminal liability.

## Apartments.com's Rights

Given the nature of the Site and the volume of messages and postings, except as otherwise provided in
these Terms of Service or other applicable terms, Apartments.com cannot and does not monitor all of the
Content posted or transmitted by You and other third-party information providers. Apartments.com

COSTAR_0000510

reserves the right, in its sole discretion, to monitor, refuse to publish, remove, delete, move or edit any Content without notice, at any time for any reason. By using the Site, You expressly agree that Apartments.com (a) will not be liable for any claims, actions or judgments arising out of or related to any Content and (b) may monitor, refuse to publish, remove, delete, move or edit any Content without notice at any time for any reason, without liability and without providing a refund. You further expressly agree that You are solely responsible for any and all Content You submit to the Site.

## Unsolicited Content

Apartments.com does not accept unsolicited content or ideas for use or publication in its programming or in other digital, electronic or print media except in connection with the Forums, chat rooms and bulletin boards on the Site. Apartments.com and its affiliates shall not be responsible for the similarity of any of its content or programming in any media to Content or ideas transmitted to the Site.

## Representations/Indemnity

You hereby represent and warrant that (a) You have all necessary authority, rights and permissions to submit the Content to the Site, (b) the Content does not and will not infringe or misappropriate any copyright, trademark, trade secret, patent or other intellectual property right of any third party, including any rights of privacy or publicity, (c) the Content and Your use of the Site does not and will not violate any applicable federal, state, or local law or regulation including, but not limited to, any fair housing laws or regulations or applicable real estate licensure or brokerage regulations, or cause injury to any person, and (d) the Content is truthful and accurate. You agree to release, defend, indemnify and hold Apartments.com, its affiliates, Licensors, and their respective officers, directors, employees, agents and contractors harmless from and against any and all claims, costs, demands or expenses, including attorneys' fees, arising from (i) any distribution, publication, refusal to publish, removal, deletion, movement, editing or other use of the Content You provide, (ii) Your use of the Site or any reliance on the Materials, (iii) Your breach of these Terms of Service or (iv) any actual, prospective or terminated sale, lease or other transaction between You and a third party.

## Prohibited Activities

You shall not:

    (a) submit Content that is patently offensive to the online community, such as content that promotes racism, bigotry, hatred or physical harm of any kind against any group or individual;

    (b) engage in activity or submit Content that could be harmful to minors;

    (c) engage in activity or submit Content that harasses or advocates harassment of another person;

(d) engage in activity that involves the transmission of "junk mail" or unsolicited mass mailing or "spam" to others;

(e) engage in activity, submit Content, or promote information, that is fraudulent, false or misleading or promotes illegal activities or conduct that is abusive, threatening, obscene, defamatory or libelous;

(f) submit Content that contains restricted or password-only access pages, or hidden pages or images;

(g) submit Content that displays pornographic or sexually explicit material of any kind;

(h) submit Content that provides instructional information about illegal activities such as making or buying illegal weapons, violating someone's privacy, or providing or creating computer viruses;

(i) engage in activities or submit Content that solicit passwords or personally identifiable information for unlawful purposes from others;

(j) engage in commercial activities and/or sales without our prior written consent, such as contests, sweepstakes, barter, advertising and pyramid schemes;

(k) use the Site's lead forms and/or toll-free numbers to advertise or promote products and services to Apartments.com advertisers or to solicit Apartments.com advertisers in any manner;

(l) use any robot, spider or other automatic device, or a manual process, to access, monitor or copy web pages or the Materials contained in the Site or for any other unauthorized purpose;

(m) use any device, software or routine to interfere or attempt to interfere with the proper working of the Site;

(n) decompile, reverse engineer, disassemble or otherwise attempt to obtain the source code for the Software; or

(o) take any action that imposes an unreasonable or disproportionately large load on Apartments.com's hardware and software infrastructure.

## Compliance with Fair Housing Laws

All Content is subject to federal fair housing laws, which make it illegal to indicate in any advertisement any preference, limitation, or discrimination because of race, color, religion, sex, physical or mental disability, and/or familial status. Your state jurisdiction may also prohibit any preferences based on sexual orientation, marital status, ancestry, source of income, or other criteria. If You have any question about the fair housing laws and housing discrimination in general, please call Your local fair housing agency or the U.S. Department of Housing and Urban Development. For a list of all fair housing groups, go to the Housing Rights Center's website at www.hud.gov.

# Add a Listing Terms of Service

By listing an eligible property through the Site's "Add a Listing" service (the "Listing Service"), you acknowledge and agree to the Add a Listing Terms of Service, which are available http://corporate.apartments.com/add-a-listing-terms-of-service/ .

# Warranty Disclaimer

YOU EXPRESSLY AGREE THAT USE OF THE SITE AND RELIANCE ON ITS CONTENT IS AT YOUR OWN RISK. APARTMENTS.COM, ITS AFFILIATES AND THEIR RESPECTIVE THIRD-PARTY LICENSORS DO NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND REGARDING THE SITE, THE SOFTWARE, THE CONTENT, THE MATERIALS, THE LISTING SERVICE OR THE RESULTS THAT MAY BE OBTAINED FROM USE OF ANY OF THE FOREGOING. THE SITE, THE SOFTWARE, THE CONTENT, THE MATERIALS AND THE LISTING SERVICE ARE PROVIDED ON AN "AS IS, AS AVAILABLE" BASIS, AND APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE THIRD-PARTY LICENSORS SPECIFICALLY DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF NONINFRINGEMENT. APARTMENTS.COM AND ITS AFFILIATES MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, TO ANY ACTUAL OR PROSPECTIVE RENTER OF ANY APARTMENT AS TO THE EXISTENCE, OWNERSHIP OR CONDITION OF THE APARTMENT; AS TO THE ADVERTISED AVAILBILITIES, RENT, LEASE TERMS, SECURITY DEPOSIT, OR APPLICATION FEES, IF ANY; OR AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION ABOUT AN APARTMENT APPEARING ON THE SITE. APARTMENTS.COM DOES NOT WARRANT THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. APARTMENTS.COM RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO CORRECT ANY ERROR OR OMISSION ON THE SITE OR IN THE CONTENT. ALL APARTMENTS ARE SUBJECT TO PRIOR LEASE. ANY AND ALL CONCERNS, DIFFERENCES OR DISCREPANCIES REGARDING AN APARTMENT MUST BE ADDRESSED WITH THE LANDLORD AND/OR PROPERTY MANAGEMENT COMPANY PRIOR TO LEASING OF THE APARTMENT. APARTMENTS.COM DOES NOT MAKE AND EXPRESSLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES TO YOU REGARDING THE LISTING SERVICE INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES THAT YOU WILL LEASE YOUR APARTMENT, OBTAIN AN ACCEPTABLE RENT FOR YOUR APARTMENT, ONLY RECEIVE LEGITIMATE INQUIRIES OR SOLICITATIONS FROM QUALIFIED RENTERS, OR RECEIVE ANY INQUIRIES REGARDING YOUR APARTMENT FOR RENT. FOR PURPOSES OF THIS WARRANTY DISCLAIMER, "THIRD-PARTY LICENSOR"

DOES NOT INCLUDE YOU. Some states do not allow the disclaimer of implied warranties, so the foregoing disclaimer may not apply to You.

# Limitation of Liability

APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE OWNERS, EMPLOYEES, AGENTS, CONTRACTORS AND THIRD-PARTY LICENSORS SHALL IN NO EVENT BE LIABLE FOR ANY DAMAGES OR LOSSES INCLUDING, WITHOUT LIMITATION, DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, RESULTING FROM OR CAUSED BY THE SITE, THE SOFTWARE, CONTENT, THE MATERIALS, THE LISTING SERVICE, THESE TERMS OF SERVICE OR OTHERWISE (THE "SERVICE"), INCLUDING, WITHOUT LIMITATION, DAMAGES RESULTING FROM NEGLIGENCE. IN NO EVENT WILL THE AGGREGATE MAXIMUM LIABILITY OF APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE OWNERS, EMPLOYEES, AGENTS, CONTRACTORS AND THIRD-PARTY LICENSORS FOR ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF THE SERVICE EXCEED THE TOTAL AMOUNT OF FEES ACTUALLY PAID BY YOU TO APARTMENTS.COM. THE NEGATION OF DAMAGES SET FORTH ABOVE IS A FUNDAMENTAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN APARTMENTS.COM AND YOU. THE SERVICE WOULD NOT BE PROVIDED TO YOU WITHOUT SUCH LIMITATIONS. NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM APARTMENTS.COM CREATES ANY WARRANTY, REPRESENTATION AND/OR GUARANTEE NOT EXPRESSLY STATED IN THIS AGREEMENT. FOR PURPOSES OF THIS LIMITATION OF LIABILITY, "THIRD-PARTY LICENSOR" DOES NOT INCLUDE YOU. Some states do not allow the exclusion or limitation of incidental or consequential damages of implied warranties, so the above exclusion or limitation may not apply to You.

# Termination of Service

You understand and agree that in Apartments.coms sole discretion, and without prior notice, Your access to this Site may be terminated or suspended, and Apartments.com may exercise any other remedy available and remove any Content, if it believes that Your use of the Site and/or any Content You provide (a) violate (i) these Terms of Service, (ii) the rights of Apartments.com, its affiliates, a Licensor, or another User, or (iii) any law or regulation, or are otherwise objectionable or inappropriate or (b) constitute fraudulent activity of any nature. You agree that monetary damages may not provide a sufficient remedy to Apartments.com for violations of these Terms of Service, and You consent to injunctive or other equitable relief for such violations without the requirement that Apartments.com post a bond. Apartments.com is not required to provide any refund to You if Your use is terminated as a result of Apartments.com determination, in its sole discretion, that You have violated these Terms of Service.

# Miscellaneous

These Terms of Service may be changed at any time and You will be notified of any such changes by an updated posting of the new Terms of Service on this page of the Site. Your continued use of the Site after the posting of any amended Terms of Service shall constitute Your agreement to be bound by any such changes. Apartments.com may modify, suspend, discontinue or restrict the use of any portion of the Site without notice or liability. These Terms of Service will be governed by and construed in accordance with the laws of the State of Illinois without regard to its conflicts of law provisions. You hereby agree that any cause of action You may have with respect to the Site must be exclusively filed in the federal or state courts located in Cook County, Illinois, within one (1) year after the cause of action arises or the cause is barred. You hereby consent to personal jurisdiction in the federal and state courts in Cook County, Illinois, and waive any objection based on forum non conveniens. As a condition of using this Site, You agree that all causes of action arising out of or connected with this Site shall be resolved individually, without resort to any form of class action. If for any reason a court of competent jurisdiction finds any provision of these Terms of Service, or portion thereof, to be unenforceable, that provision of these Terms of Service will be enforced to the maximum extent permissible so as to affect the intent of the parties, and the remainder of these Terms of Service will continue in full force and effect. Failure by Apartments.com to enforce any provision of this Terms of Service will not be deemed a waiver of future enforcement of that or any other provision of these Terms of Service. These Terms of Service and any other terms and conditions or policies applying to Your use of the Site, constitute the entire agreement between the parties regarding the subject matter hereof. Nothing contained herein shall be construed as creating a partnership, joint venture or agency relationship or granting a franchise between the parties. Notwithstanding anything to the contrary herein, if you and Apartments.com have entered into a separate written Apartments.com advertising contract, the terms and conditions of such contract shall control with respect to any term that is inconsistent with these Terms of Service. IF YOU DO NOT AGREE TO THE TERMS STATED ABOVE OR TO ANY CHANGES TO THESE TERMS OF SERVICE, PLEASE EXIT THE SERVICE IMMEDIATELY.

©2015 Apartments, LLC, 1331 L Street, NW, Washington, DC 20005.
Last updated: March 25, 2015

COSTAR_0000515

# EXHIBIT 6

CALDWELL LESLIE & PROCTOR, PC
Kelly L. Perigoe (Cal. Bar No. 268872)
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5525
Telephone: (213) 629-9040
Facsimile: (213) 629-9022
perigoe@caldwell-leslie.com

WILLIAMS & CONNOLLY LLP
Nicholas J. Boyle (*pro hac vice application forthcoming*)
David K. Baumgarten (*pro hac vice application forthcoming*)
Eric J. Hamilton (Cal. Bar No. 296283; *C.D. Cal. admission pending*)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
nboyle@wc.com
dbaumgarten@wc.com
ehamilton@wc.com

*Attorneys for Plaintiffs CoStar Realty
Information, Inc., and Apartments, LLC*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| COSTAR REALTY INFORMATION, INC., and APARTMENTS, LLC, <br> Plaintiffs, <br><br> vs. <br><br> APARTMENT HUNTERS, INC., KEVIN SHAYAN, and STEVEN SHAYAN, <br> Defendants. | Case No. 15-cv-02111 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar"), by and through its undersigned counsel, brings this Complaint against Apartment Hunters, Inc. ("Apartment Hunters") and its co-owners, Kevin Shayan and Steven Shayan (collectively, "the Shayans," and together with Apartment Hunters, "Defendants"), and alleges as follows:

## **PRELIMINARY STATEMENT**

1.     CoStar brings this suit to redress Defendants' flagrant and widespread copyright infringement and misappropriation of information.  Defendants' business is based, in significant part, on the willful and systematic theft of CoStar's intellectual property.  Without permission, Defendants have displayed hundreds, if not thousands, of CoStar's real estate listings on their websites, including CoStar-copyrighted photographs and CoStar-collected and -verified information.  Defendants have infringed CoStar's photographs and misappropriated its time sensitive real estate listing information, and thereby are unfairly competing with CoStar's Apartments.com website.

2.     Defendants repeatedly have been sanctioned for violating the California Real Estate Law, including most recently for displaying, without authorization, third party real estate listings and copyrighted real estate photographs that Defendants had doctored to try to hide their misconduct. Undeterred, Defendants' massive piracy scheme continues apace, and now targets CoStar's intellectual property.

3.     In order to protect its business, redress past harm, and deter further unlawful conduct, CoStar is entitled to, among other remedies, millions of dollars in damages and a permanent injunction for copyright infringement, misappropriation, and unfair competition.

## I.     COSTAR'S BUSINESS

4.     Over the past three decades, through enormous effort and expense,

CoStar and its affiliates have developed an unparalleled database of commercial and multi-family residential real estate information, which includes millions of professionally-shot, copyrighted photographs. This database is the engine that drives CoStar's business, attracting paying subscribers and licensees to its various informational products, analytical tools, and online marketplaces.

5.     In April 2014, CoStar Group, Inc., the parent company of CoStar Realty Information, Inc., acquired Apartments, LLC, the operator of Apartments.com. Apartments.com is a leading national online apartment rental resource and database used by renters, property managers and owners. In the ensuing ten months, CoStar integrated its commercial real estate database with Apartments.com's marketing platform, and assigned more than one thousand researchers to verify existing information on multifamily properties, collect new information, and take photographs of the exterior, common areas, individual units, amenities and surrounding neighborhoods of these properties.

6.     Simultaneously, CoStar revolutionized the way people can search for apartments by showing *real time* availabilities across both paid listings and unpaid listings (*i.e.*, apartments available for rent that were identified independently by CoStar researchers), offering innovative map-based searching and plan commute tools, and displaying rich original content on local culture and neighborhood features.

7.     Based on these efforts, CoStar re-launched Apartments.com in February 2015, providing users access to an unmatched range of verified multifamily real estate listings and information, including, for the first time, the photographs taken by CoStar researchers and drawn from CoStar's newly integrated backend system.

8.     CoStar's copyrighted photographs, as well as the other listing information and materials in its databases, are central to CoStar's and its affiliates'

business, and are a crucial driver of the subscription and license fees and advertising sales that constitute CoStar's primary revenue streams. For this reason, CoStar protects its intellectual property by, among other things, regularly registering its photographs with the United States Copyright Office.

9. Since re-launching Apartments.com, CoStar has continued to publish real-time apartment data and availability information, making updates to about 75,000 listings every day. Keeping listing information constantly updated is expensive, but differentiates Apartments.com and adds significant value to consumers, who typically are focused on viewing information about apartments that are actually available to rent.

## II. DEFENDANT'S INFRINGEMENT AND MISAPPROPRIATION

10. Defendants' business, upon information and belief, is based in significant part on unlawfully exploiting CoStar's intellectual property.

11. Upon information and belief, Defendants operate a network of at least eleven domain names and websites, which are similarly structured: each allows users to view apartment listings for a number of markets, predominantly in California. The majority of Defendants' websites appear to require a user to pay a monthly membership fee (of $49) to access the listings contained therein.

12. Upon information and belief, Defendants procure a substantial portion of the listings displayed on their network of websites, including the listing information and photographs within them, by copying content from other internet listing sites without authorization—including from Apartments.com.

13. Indeed, Defendants' network of websites prominently display a substantial number of CoStar's listings, including the copyrighted photographs contained therein, of multifamily properties located in multiple California markets. CoStar-copyrighted photographs and real-time listing information have been displayed without authorization on at least nine different sites owned or operated

by Defendants: (a) ApartmentHunterz.com; (b) 4rentinla.com; (c) 4rentinnewyork.com; (d) wetakesection8.com; (e) ifindrentals.com; (f) featuredrentals.com; (g) leaseinsandiego.com; (h) rentinsanfrancisco.com; and (i) ineed2move.com.[1]

14.     Although the full scope of Defendants' infringement and misappropriation is impossible to determine without discovery, Defendants appear to have copied and displayed on their network of websites dozens, if not hundreds, of CoStar's listings, including the CoStar-verified information and the hundreds, if not thousands, of CoStar-copyrighted photographs contained within those listings. Even without access to Defendants' internal documents, CoStar has discovered more than one hundred of its copyrighted photographs on ApartmentHunterz.com alone, suggesting that discovery will reveal scores of additional instances of past or ongoing infringement and misappropriation just on that website. And discovery into the other websites owned or operated by Defendants—eight of which have already been discovered to be displaying CoStar copyrighted photographs— will only further multiply the documented scope of their infringement of photographs and misappropriation of time-sensitive listing information.

15.     CoStar has not granted Defendants any rights over any of its copyrighted photographs or its time-sensitive listing information. Defendants have taken, copied, published, distributed, and publicly displayed CoStar's photographs and real-time listing information without authorization to further their business and generate profits for themselves.

16.     Defendants have made commercial, competitive use of Apartments.com, including unauthorized copying of the CoStar-verified, time-sensitive listing information, to further their business and generate profits for

---

[1] As of December 17, 2015, one of these websites appears to have been taken offline, and two others now appear to redirect visitors to ApartmentHunterz.com.

themselves.

17.    Recognizing the unlawful nature of their scheme, Defendants have taken numerous steps to attempt to conceal their actions, including cropping and otherwise altering the photographs posted on their websites to remove the CoStar logo.  Further, Defendants appear to be rotating the IP addresses from which they systematically copy CoStar's photographs and time-sensitive listing information, in order to circumvent CoStar's abuse detection software.

18.    Accordingly, Defendants intentionally—and on a systematic basis— have infringed CoStar's copyrights, in violation of federal law, and misappropriated time-sensitive information from Apartments.com.  Apartment Hunters acts through the Shayans, who are instrumental in Apartment Hunters' unlawful activities and themselves have infringed CoStar's copyrights and misappropriated Apartments.com's information.  Moreover, as co-owners and senior executives of Apartment Hunters, the Shayans have caused, contributed to, and/or induced Apartment Hunters' infringement, misappropriation, and unfair competition.

19.    Defendants' conduct is knowing, willful, and volitional, and forms part of a pattern of repeated disregard for the law and intellectual property owners.  Over the last decade, Defendants have been sanctioned on three separate occasions by the California Bureau of Real Estate for violations of the California Real Estate Law (Cal. Bus. & Prof. Code §§ 10000 *et seq.*), including for conduct substantively identical to the activities at issue here.  Despite these repeated sanctions, and the loss of Apartment Hunters' license to operate, Defendants brazenly continue to engage in the same sorts of unlawful conduct.

20.    Defendants' unlawful actions have harmed CoStar in ways that cannot be measured fully and cannot be remedied fully by monetary damages.  CoStar brings this lawsuit to obtain damages and compensation for Defendants' conduct

and an injunction preventing further irreparable harm.

## THE PARTIES

21.     Plaintiff CoStar Realty Information, Inc. is a corporation organized and existing under the laws of the State of Delaware with corporate offices located at 1331 L Street, N.W., Washington, DC 20005.

22.     Plaintiff Apartments, LLC, which directly operates Apartments.com, is a corporation organized and existing under the laws of Illinois with corporate offices located at 222 West Adams, 15th Floor, Chicago, IL 60606.

23.     Defendant Apartment Hunters, upon information and belief, is a corporation organized and existing under the laws of California (entity number C2551818) with its principal place of business located in Dana Point, California. Apartment Hunters' exact business address is uncertain; the California Secretary of State's database lists an address of "Suite 148, Dana Point, California 92629." The address for its agent for service of process is 33592 Moon Ring Court, Dana Point, California 92629.

24.     Defendant Steven Shayan, upon information and belief, is the President or Co-President and owner or co-owner of Apartment Hunters. Upon information and belief, Steven Shayan is domiciled in Orange County, California, and uses the address of and/or resides at 32565 Golden Lantern Street, Dana Point, California 92629-3261. Upon information and belief, Steven Shayan personally participated in, directed, and benefitted from Apartment Hunters' infringement.

25.     Defendant Kevin Shayan, upon information and belief, is the President or Co-President and owner or co-owner of Apartment Hunters. Upon information and belief, Kevin Shayan is domiciled in Los Angeles County, California, with a last known address of 201 North Robertson Boulevard, Suite 202, Beverly Hills, California 90211. Upon information and belief, Kevin Shayan personally participated in, directed, and benefitted from Apartment Hunters'

1  infringement.

2      26.    Upon information and belief, the following domain names are owned

3  by, controlled by, and/or registered to Apartment Hunters, Steven Shayan, and/or

4  Kevin Shayan:  (a) ApartmentHunterz.com; (b) 4rentinla.com; (c)

5  4rentinnewyork.com; (d) wetakesection8.com; (e) ifindrentals.com; (f)

6  featuredrentals.com; (g) leaseinsandiego.com; (h) rentinsanfrancisco.com; (i)

7  w6.lt; (j) listmyrentals.com; and (k) ineed2move.com.[2]

8      27.    Upon information and belief, at all times relevant hereto, Defendants

9  acted under common ownership and control and/or served as the agents of one

10  another.

11                 **JURISDICTION AND VENUE**

12      28.    This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*

13  The Court has federal question jurisdiction over claims arising under that statute

14  pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental

15  jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367

16  because these claims are so related to the federal-law claims that they form part of

17  the same case or controversy.

18      29.    The Court has personal jurisdiction over Apartment Hunters because,

19  among other reasons, Apartment Hunters' principal place of business is in Orange

20  County, California.

21      30.    The Court has personal jurisdiction over the Shayans because, among

22  other reasons, they reside in California and have done, and are doing, business in

23  California, including the conduct alleged here.

24      31.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and

25  1400(a) because Defendants reside in this judicial district and a substantial part of

26

[2] The website ineed2move.com appears to have been recently taken offline.  As of December 17, 2015, several of the other websites appear to function solely as landing pages that immediately redirect visitors to ApartmentHunterz.com.

the events or omissions giving rise to CoStar's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I. COSTAR AND ITS BUSINESS

32. CoStar, along with its affiliates, is a leading provider of commercial real estate information, analytics, and online marketplaces, with three decades of experience in collecting and curating real estate information.

33. Like many technology companies, CoStar's business began in its founder's basement with a simple idea: empower commercial real estate brokers with researched, unbiased commercial property information. Since its founding, and thanks to investment in excess of one billion dollars, and the efforts of more than 2,900 employees, CoStar and its affiliates have become a leading provider of commercial and multi-family rental real estate information.

34. All of CoStar's and its affiliates' products revolve around one asset: the company's database of real estate information, which includes verified information about apartment communities and apartment availability in real time, integrated with millions of copyrighted photographs. The database is part of a suite of online services that include resources and tools for property owners, managers, and potential renters. CoStar and its affiliates generate and update the database's content at a cost of over $70 million each year.

35. CoStar's research team has more than 1,200 trained professionals who each year make millions of changes to the database, canvass more than half a million properties nationwide, and take more than one million new photographs.

36. CoStar and its affiliates have offered subscription services to, among others, the commercial real estate market and multifamily property managers and owners for over a decade. The resulting fees, which vary according to the scope of access and analytical detail, products, and services a user seeks, generate a

significant portion of CoStar's and its affiliates' revenue. CoStar also profits via advertising sales to residential rental property managers and owners, who pay fees to obtain enhanced visibility for their listings. CoStar uses these revenue streams to cover the millions of dollars it and its affiliates spend every year to take professional photographs of real estate and generate and verify the listing information in its database.

37. Constant innovation drives the success of CoStar and its affiliates. Last year, *Forbes* magazine recognized the CoStar Group, Inc. as one of the world's most innovative growth companies.

38. In April 2014, a CoStar affiliate acquired Apartments.com (the "Acquisition"), a leading national online apartment rental resource used by renters, property managers, and owners.

39. Prior to CoStar's acquisition, Apartments.com and its affiliates developed an extensive nationwide, online platform for listings of both single- and multi-family rental properties. All listings were paid advertisements, integrating information and photographs submitted by paying subscribers—property managers and owners—who also received access to cutting-edge marketing tools, capabilities, and analytics as part of their subscriptions. Renters and prospective renters could search the Apartments.com platform for free. The subscription fees paid by property owners and managers generated a significant portion of Apartments.com's revenue.

40. At the time of the Acquisition, CoStar's commercial real estate database already contained detailed verified information on (and, in the majority of instances, photographs of) hundreds of thousands of multi-family properties—*i.e.*, apartment buildings.

41. Following the Acquisition, CoStar invested significant financial and technological resources to upgrade Apartments.com's technology and integrate the

Apartments.com platform with its existing real estate information, paving the way for CoStar to re-launch an entirely overhauled Apartments.com website in February 2015. Apartments.com now integrates CoStar's independently researched and verified multifamily property content, including copyrighted photographs, with a redesigned consumer website aimed at providing renters and prospective renters the best search experience possible. As a result, following the re-launch of Apartments.com, the detailed property information and photographs that CoStar had developed and taken over many years are now available to renters who search the Apartments.com website.

42.    Additionally, between the time CoStar acquired and re-launched Apartments.com, more than one thousand CoStar researchers participated in researching, visiting, photographing, and otherwise collecting and verifying information about more than 400,000 multifamily rental properties—almost certainly the largest research effort ever directed at the apartment industry in the United States. The results of this research, including the copyrighted photographs taken by hundreds of CoStar professional photographers, are proprietary to CoStar and not available through any other apartment rental website.

43.    Including these recent technological and research investments, CoStar has now invested approximately $1 billion developing its multifamily rental-related products. As a result of CoStar's investments and efforts, it now provides up-to-date, time-sensitive information and analytics about more than 470,000 multifamily rental properties in 368 markets across the country.

44.    The scope of Apartment.com's verified information, including the professional photographs taken by CoStar researchers and drawn from CoStar's newly integrated database, distinguishes Apartments.com from its competitors.

45.    Apartments.com is also distinguished from its competitors by the real-time nature of its listings, which rely on CoStar's unmatched dataset of more than

60 million rent observations.  CoStar constantly adds to and updates that dataset with information from three distinct sources: listings posted on the Apartments.com leading network of sites; data collected from public sources; and real-time data actively collected by CoStar's research team, which makes announced and unannounced calls to more than 75,000 apartment communities each month.

46.    Apartments.com advertises the accuracy of its time-sensitive listings as a selling point for its users—both potential tenants who search the site for free and property owners and managers who pay to advertise.  For instance, the Apartments.com advertisers' home page prominently proclaims the advantage of "Real Time Intelligence" provided by the integration of Apartments.com directly with property management companies' rental inventory systems.  *See* <http://www.Advertise.Apartments.com> (last accessed Dec. 15, 2015). Apartments.com's popular television advertising campaign featuring Jeff Goldblum also touts the site's unmatched inventory of units that are available for rent.

47.    Based on the unmatched scope of its verified information, including its professional photographs, and the real-time accuracy of its time-sensitive listing data, Apartments.com has built and maintained an enormous user base of potential tenants.  That large user base of potential tenants in turn attracts property managers and owners to purchase advertising packages from Apartments.com to enhance the visibility for their listings among the potential tenants searching the website, generating the fees that constitute a significant portion of the company's revenue. Without the fees earned from Apartments.com's web traffic, CoStar could not and would not bring its verified, time-sensitive information to the market.

## II.    COSTAR'S INTELLECTUAL PROPERTY

48.    CoStar's intellectual property is at the root of the CoStar database and

therefore is central to its business.  A key element of CoStar's intellectual property is its repository of photographs of commercial and multifamily real estate.  CoStar owns those photographs and registers them with the United States Copyright Office.

49.  CoStar and its affiliates—including Apartments.com—take other steps to protect CoStar's property, including its time-sensitive listing information.

50.  At all relevant times, both the Apartments.com home page and each Apartments.com listing from which Defendants copied CoStar owned photographs and CoStar-collected and -verified information contained a hyperlink to Apartments.com's terms of service (the "Terms of Service"), which govern use of Apartments.com.  *See* <http://corporate.apartments.com/disclaimers/terms-of-service/>.

51.  The Terms of Service warn users that by using Apartments.com, they "represent and warrant that You are not a competitor of Apartments.com or any of its affiliates." *See id.*

52.  The Terms of Service further advise all users that:

> All information and content available on this Site (collectively, 'Materials') is protected by copyright and other intellectual property laws.  The Materials are owned by Apartments.com and its affiliates, and/or their respective licensors and suppliers (collectively, 'Licensors').  The Materials are intended for personal and noncommercial use only.  *You may not copy, reproduce, sell, license, publish, distribute, modify, display, perform, repost or otherwise use any portion of the Materials in any other way or for any other purpose without the prior written consent of Apartments.com.*

*See id.* (*emphasis added*).

53.     The Terms of Service further prohibit the use of "any robot, spider or other automatic device, or a manual process, to . . . copy web pages or the Materials contained in the Site or for any other unauthorized purpose." *See id.*

**III.    DEFENDANTS' UNLAWFUL BUSINESS MODEL**

54.     Upon information and belief, Defendants' business plan is built, in significant part, on infringing and misappropriating CoStar's proprietary content.

55.     Upon information and belief, Defendants' unlawful scheme operates as follows:

56.     Defendants obtain pre-existing apartment rental real estate information, including CoStar-copyrighted photographs and time-sensitive CoStar listings to which they have no rights, and copy the content they wish to duplicate onto computer servers that they own or that are provided to them.

57.     Defendants then republish and publicly display that content—including, without authorization, CoStar's copyright-protected photographs and CoStar-verified listing information—on the network of websites they own and/or control, including without limitation ApartmentHunterz.com.

58.     On information and belief, Defendants employ an automated copying or scraping process to enable a high volume of copying.  In a three-week period through November 2015, for instance, IP addresses believed to be controlled by Defendants were responsible for more than 160,000 hits on Apartments.com, predominantly in irregular bursts (*i.e.*, thousands of hits only seconds apart from one and other).  Such a staggering quantity of site visits, particularly in the observed pattern, is possible only with the use of automated tools.  Defendants appear to periodically update the information and photographs copied without CoStar's permission, apparently in high volume batches, further indicating the use of an automated copying or scraping process.

59.     On information and belief, Defendants intentionally sought to conceal their automated copying or scraping process, employing more than 500 different IP addresses to access Apartments.com.  Such rotation of IP addresses is a known tactic used by copyright pirates to attempt to circumvent a website's anti-abuse monitoring software.

60.     In many, if not all, instances, Defendants modify CoStar's copyright-protected photographs before posting them on their network of websites, in hopes of disguising Defendants' unlawful use.  For instance, the original version of a CoStar photograph displayed on Apartments.com will include CoStar's logo in the bottom right corner.  CoStar's investigation has found that in every instance in which a CoStar photograph is displayed on ApartmentHunterz.com, the original CoStar photograph has been cropped or otherwise modified so that CoStar's logo no longer is visible.

61.     The consequent mass infringement of CoStar's copyrighted photographs and misappropriation of the associated time-sensitive verified listing information enables Defendants to exploit the property and work of others, and thereby allows Defendants to provide listings in numerous markets throughout California and beyond with minimum investment.

62.     Defendants use the information they have obtained through mass infringement, including CoStar copyright-protected photographs and CoStar-verified listing information, to create listings on their network of websites that (falsely) suggest they are authorized to solicit prospective tenants for those properties on behalf of the property owners, managers, or other authorized agents.

63.     In most cases, the copied listings posted on Defendants' network of websites include both the CoStar copyright-protected photographs and all the CoStar-verified time-sensitive information available on Apartments.com, *e.g.*, availability, pricing, apartment size, apartment features, and building amenities.

64.     Defendants' users (potential renters) may search the listings provided by Defendants' network of websites, including the listings created with information and photographs wrongfully obtained from CoStar.  While these basic searches are free, the majority of Defendants' websites charge their users a subscription fee (generally set at $49 per month) to access the property address and contact information (which includes information impermissibly copied from CoStar).

65.     Recognizing the time-sensitive value of apartment listings, the websites controlled and/or owned by Defendants make various claims regarding the accuracy and timeliness of their listings.  These statements are made with the intent to induce potential renters to use Defendants' network of websites instead of using other websites that provide residential real estate rental listings, including Apartments.com.

66.     By way of example, ApartmentHunterz.com claims that "our unique, date-sensitive, rental software *updates the listings on a daily basis*, so that the data you receive from us is the *most accurate and up-to-date information available on the Web today*."  *See* <http://www.apartmenthunterz.com/company> (last accessed Dec. 17, 2015) (emphases added).   The website further "guarantee[s]" that its "listings are the most complete and come from [sic] most reliable and reputable sources in the Areas [they] cover." *See* <http://www.apartmenthunterz.com/help/kbase/tenant/271/4821> (last accessed Dec. 17, 2015).

67.     By way of example, 4rentinla.com claims that members receive access to "97,000+ *hourly-updated* rental listings" and "*Real-Time* vacancies just entered in real time." *See* <http://www.4rentinla.com/> (last accessed Dec. 17, 2015) (emphases added).

68.     By way of example, featuredrentals.com claims that "[w]e *update our*

*databases constantly* so you are always guaranteed of the *most up-to-date* listings for the area." *See* <http://www.featuredrentals.com/company> (last accessed Dec. 17, 2015) (emphases added).

69.     In this way, Defendants use listings copied from CoStar without its authorization, including CoStar-copyrighted photographs and CoStar-verified time-sensitive listing information, to induce its users to pay subscription fees—fees that, upon information and belief, provide Defendants' only significant revenue stream.

70.     In short, upon information and belief, Defendants' business model is built upon systematically copying and appropriating without permission, and then regurgitating, other people's data, including CoStar-copyrighted photographs and CoStar-verified time-sensitive listing information, to induce users of their network of websites to pay monthly subscription fees.

71.     Defendants' pattern of cropping of CoStar photographs so that CoStar's logo no longer is visible underscores the intentional and willful nature of their copyright infringement and demonstrates that Defendants understand their actions are unlawful.

72.     Upon information and belief, Defendants' parasitic business model reflects the fact that adopting a lawful approach—taking and developing their own database of millions of photographs and real-time listing information—would be both cost- and time-prohibitive.  Upon information and belief, Defendants have few employees, if any.  Working with such limited manpower, the Shayans could not possibly develop the broad informational and photographic database that CoStar and its affiliates have developed and update in real-time based on the labor of *thousands* of employees and contractors.

73.     Upon information and belief, Apartment Hunters' unlawful scheme is the product of the Shayans' actions.  The Shayans are the owners and/or senior executives of Apartment Hunters, and Apartment Hunters acts through the

Shayans, who engage in the conduct described herein.

74.     Upon information and belief, in addition to infringing CoStar's copyrights and misappropriating CoStar's verified information themselves, the Shayans personally directed, participated in, exercised control over, and benefited from the specific misconduct detailed below, and therefore have caused, contributed to, and/or induced Apartment Hunters' infringement, misappropriation, and unfair competition.  This includes, but is not limited to, adopting and pursuing a business plan dependent upon massive copyright infringement, misappropriation of time-sensitive listing information, and unfair competition.

## IV.     EXAMPLES OF DEFENDANTS' INTENTIONAL INFRINGEMENT OF COSTAR'S COPYRIGHTED CONTENT AND MISAPPROPRIATION OF COSTAR'S VERIFIED LISTING INFORMATION

75.     Although the full breadth of Defendants' operation and consequent copyright infringement and misappropriation cannot be known until discovery is completed, CoStar is aware of numerous instances of Defendants unlawfully copying, republishing, distributing, publicly displaying, and appropriating CoStar's intellectual property without CoStar's permission.

76.     Indeed, Defendants' network of websites is replete with CoStar-copyrighted content and CoStar-verified time-sensitive listing information.  A sample of listings displaying CoStar-verified information and 93 total instances of infringement of CoStar-owned photographs found just on ApartmentHunterz.com over a one week period is attached as Exhibit A.

77.     At the time ApartmentHunterz.com displayed each of those listings, CoStar had recently verified the apartments' time-sensitive rental availability.

78.     CoStar owns the exclusive rights in each of the infringed photographs detailed in Exhibit A.  Prior to the filing of this suit, CoStar has validly registered, or has submitted a valid application for registration for, each of the photographs

detailed in Exhibit A with the United States Copyright Office.

79.    Defendants copied, republished, distributed, publicly displayed, and appropriated on ApartmentHunterz.com without authorization each of the CoStar-verified listings and copyrighted photographs detailed in Exhibit A.

80.    Upon information and belief, Defendants' unlawful copying, republishing, distributing, public display, and appropriation of the CoStar-verified listings and CoStar photographs began in the months following CoStar's previously described "re-launch" of Apartments.com.

81.    On information and belief, a valid registration was obtained or a valid registration application was submitted by CoStar for each photograph detailed in Exhibit A prior to Defendants' first infringement of the photograph.

82.    By themselves, the examples of Defendants' infringement summarized in Exhibit A establish the breadth of Defendants' intentional unlawfulness and render Defendants liable for millions of dollars in damages.  But the true scope of Defendants' infringement almost certainly is much broader.  The examples in Exhibit A only are a snapshot of Defendants' infringement, taken from one of Defendants' network of websites over a limited time period, suggesting they are a mere fraction of Defendants' actual infringement, both on ApartmentHunterz.com and the other websites owned or operated by Defendants.

83.    The sample of Defendants' misappropriation and infringement contained in Exhibit A evidences Defendants' systematic efforts to exploit CoStar's intellectual property.  For instance, as of November 13, 2015, the webpage located at <http://www.apartmenthunterz.com/details/149690006> displayed a listing for an apartment at Victoria Village, 6601 Victoria Avenue, Highland, CA 92346 that relied on an Apartments.com listing (and on CoStar's confirmation that the apartment was available for rent).  The  "Overview" tab of that webpage displayed CoStar-verified information; the "Photos and Tours" tab of

that webpage displays both thumbnail and full-size versions of five Co-Star copyrighted photographs, including the below example:

*"Overview" tab of listing:*

*"Photos & Tours" tab, displaying two versions of one of the CoStar photographs:*



84.    Upon information and belief, Defendants know they are not authorized to copy, republish, display, or distribute CoStar's photographs or time-sensitive listing information on or via their network of websites.

85.    Defendants' infringement is willful, intentional, volitional, and of a purposeful nature.  Defendants' actions demonstrate their willful disregard for CoStar's intellectual property.  For example, as discussed above, Defendants have attempted to disguise their systematic high-volume copying of CoStar's photographs and information by rotating through more than 500 IP addresses.

86.    Similarly, Defendants have taken steps to disguise the extent of their copyright infringement by systematically modifying CoStar's copyright-protected photographs before posting them on ApartmentHunterz.com, including by cropping the CoStar photographs so that CoStar's logo no longer is visible.

87.    For example, as of October 27, 2015, the webpage available at the URL <http://www.apartmenthunterz.com/details/148849470> displayed a listing for an apartment at Glenwood Apartments, 18325 Vanowen Street, Reseda, CA 91335 that included CoStar-verified information and cropped versions of two CoStar-copyrighted photographs.  At right is a screen-capture of the webpage, and below is a comparison of (a) a higher-resolution version of one of the cropped photos— with part of the building cut off by the presumably-automated cropping effort— taken from Defendants' website, and (b) the original copyrighted photo, bearing the CoStar logo, taken from Apartments.com:



*The severely cropped photograph displayed on ApartmentHunterz.com*:



*The original Co-Star copyrighted-photograph, watermarked with the CoStar logo*:



88.    In many instances, Defendants apparently not only have cropped the CoStar photographs displayed on ApartmentHunterz.com so that CoStar's logo is no longer visible, but also have taken a further step to disguise their cropping—

adding a semi-transparent text banner, reading "For rent in [City]," at the bottom of the photograph.  In each case, the banner—though created to look as if merely superimposed over the bottom of the photograph—is actually an addition to the bottom of the photograph.  These banner additions appear intended to distract viewers from the fact that the dimensions of the cropped photographs would otherwise look unnatural.

89.    For example, as of October 27, 2015, the webpage available at the URL <http://www.apartmenthunterz.com/details/147678002> displayed a listing for an apartment at 835 W Avenue L, Lancaster, CA 93534 that included CoStar-verified information and two CoStar-copyrighted photographs that had been cropped, then further altered by the addition of a "For rent in Lancaster, CA" banner.  Below are two comparisons of (a) the original CoStar-copyrighted photograph, bearing the CoStar logo, taken from Apartments.com, and (b) a screen capture from the ApartmentHunterz.com URL that displayed an altered photo:

*CoStar Photograph*                  *ApartmentHunterz Capture*





*CoStar Photograph*                    *ApartmentHunterz Capture*





90.    By taking and publishing CoStar's content, including CoStar-copyrighted photographs and CoStar-verified listing information, without permission, Defendants' enterprise strikes at the heart of intellectual property law, and seeks to reap what they have not sown.

## V.    DEFENDANTS' HISTORY OF UNLAWFUL OPERATIONS AND DISREGARD FOR INTELLECTUAL PROPERTY RIGHTS FURTHER CONFIRMS DEFENDANTS' WILLFUL AND VOLITIONAL CONDUCT

91.    Defendants' pattern of unlawful operations and theft of intellectual property over more than a decade—for which they have been sanctioned on at least three separate occasions by the California Bureau of Real Estate (the "Bureau" or the "Department")[3]—underscores that Defendants' conduct is willful and

_____

[3] Prior to July 1, 2013, the California Bureau of Real Estate was known as the California Department of Real Estate.  For ease of reference, it is referred to as the Bureau herein, except in citations to administrative orders issued when it was still

volitional, and that the Shayans know their conduct is unlawful. Defendants have flagrantly and repeatedly violated numerous provisions of the California Real Estate Law, including by displaying listing information and photographs obtained from third party real estate websites without authorization.

92. Indeed, in testimony in hearings before the Bureau arising from their unlawful conduct, the Shayans *admitted* to employing the same basic *modus operandi* they now employ in infringing upon CoStar's copyrighted content and misappropriating its time-sensitive listing information—*i.e.*, copying listing information, including copyrighted photographs, without permission from legitimate residential rental listing websites and passing that information off as their own in order to induce potential renters to pay subscription fees to Defendants.

93. Defendants' past conduct, including their litigation and regulatory history, is relevant to the issues of willfulness, damages and injunctive relief. Defendants' repeated prior disregard for intellectual property rights supports a finding of willfulness in this action, and Defendants' recidivism is relevant to the determination of damages aimed at deterring future infringement and contractual breaches, and to the issuance of injunctive relief to address the prospect of future misconduct.

94. The Shayans' experience in Apartment Hunters' past legal and regulatory issues, as both testifying witnesses and as the registered agent for Apartment Hunters, similarly is relevant both to their knowledge of what conduct is unlawful and to establishing contributory infringement.

**A.     The Shayans' Unlicensed Operation of a PrePaid Rental Listing Service**

95. The Bureau, a division of the Department of Consumer Affairs, and

known as the Department.

its chief officer, the Real Estate Commissioner (the "Commissioner"), is responsible for enforcing the California Real Estate Law, Cal. Bus. & Prof. Code §§ 10000 *et seq.* (the "Code" or the "Real Estate Law").

96.    In California, individuals and companies must be licensed by the Bureau to operate a "Prepaid Rental Listing Service" ("PRLS")—the "business of supplying prospective tenants with listings of residential real properties for tenancy, by publication or otherwise, pursuant to an arrangement under which the prospective tenants are required to pay an advance or contemporaneous fee (1) specifically to obtain listings or (2) to purchase any other product or service in order to obtain listings, but which does not otherwise involve the negotiation of rentals by the person conducting the service." Cal. Bus. & Prof. Code §§ 10167(a), 10167.2.

97.    According to public records, the Shayans have operated a PRLS in California since at least 2001, under names including "Apartment Hunters," "4 Rent in LA," "4 Rent in San Francisco" and through websites including www.ApartmentHunterz.com, www.4rentinla.com, and www.rentinsanfrancisco.com. According to public records, neither of the Shayans have ever been licensed by the Bureau in any individual capacity.

98.    In October 2005, the Commissioner issued a Desist and Refrain Order to Steven Shayan, finding that he had operated a PRLS without a license in violation of Code § 10167.2 since at least 2001 under multiple business names, and ordering him to desist and refrain from engaging in business as a PRLS, individually or under any fictitious name, unless and until properly licensed under the Code. *See* Order to Desist and Refrain, Case No. H-32271 LA (Cal. Dept. of Real Est. Oct. 18, 2005) (attached hereto as Exhibit B).

**B.     The Shayans' Continued Unlicensed Operation of a PrePaid Rental Listing Service, and Admitted Posting of Third Parties' Real Estate Listings as Their Own**

99.     The Bureau's Desist and Refrain Order evidently had little effect on the Shayans, as their unlawful activity continued unabated.

100.     Although Steven Shayan received the Desist and Refrain Order, Apartment Hunters continued to solicit members and operate as a PRLS business under its own name (AHI), as well as under the unlicensed fictitious business names "4RentlnLA" and "RentlnSanFrancisco." *See* Decision After Rejection, Case No. H-36458, at *5 (Cal. Dept. of Real Estate Sept. 29, 2011) (attached hereto as Exhibit C).

101.     Apartment Hunters eventually was licensed by the Bureau as a PRLS on May 11, 2007, but was not licensed to conduct PRLS business under any other fictitious names. *Id.* at *6. Nonetheless, Defendants continued to operate as a PRLS under unlicensed fictitious business names, *id.*, including making misleading, deceptive, and/or false representations that websites and/or businesses operating in those fictitious names were licensed by the Bureau, *id.* at *9–10.

102.     During this time, the Bureau received a number of complaints regarding Defendants' activities and websites operated by Defendants.  For instance, in 2008, the Bureau received a written complaint from an agent working for Coldwell Banker, a leading real estate broker, that Defendants' website included a listing for a property indicating it was available for rent, despite the property in fact not having been available for rent—and despite Defendants never having been authorized by the owner or property manager to list the property as available for rent. *See id.* at *7–8.

103.     This complaint was revealed to be the tip of the iceberg.  A Bureau investigator thereafter determined in 2009 that websites operated by Defendants

were the subject of roughly *three dozen* Better Business Bureau complaints in the prior three years, all relating to their PRLS listing services.  *See id.* at *8–9.

104.    Testifying during a hearing before the Bureau's administrative law judge, the Shayans admitted that Defendants' *"agents and employees gleaned rental listings from other rental service listings*, such as Craigslist and the national MLS *and posted those listings as their own for a fee."  Id.* at *10 (emphases added).

105.    In a Decision issued in September 2011, the Commissioner concluded that Defendants unlawfully (a) engaged in PRLS business under unregistered fictitious names, including doing so after receipt of the 2005 Desist and Refrain Order, violating Code §§ 10167.2(a), and 10167.3(a); (b) utilized PRLS contracts not approved (and in fact previously rejected) by the Bureau, violating Code § 10167.9; (c) failed to timely confirm the availability of listings, violating Code § 10167.11; and (d) failed to provide timely refunds, violating Code § 10167.10(b)(2).  *Id.* at *11–12.

106.    Accordingly, pursuant to Code § 10167.12(a)(1), the Commissioner revoked Apartment Hunters' license to operate a PRLS.  *Id.* at *15.  After a motion for reconsideration by Apartment Hunters, the penalty was reduced, and it was granted the right to apply for a "restricted PRLS license" pursuant to Code § 10156.5.

C.    **Defendants' Unauthorized Posting of Copyrighted—and Defendant-Doctored—Real Estate Photographs and Listings**

107.    Defendants remained unaffected by the Board's sanction.  On April 11, 2014, the Deputy Commissioner filed a new claim charging Apartment Hunters with violating Code § 10167.11(b) by providing false, misleading, or deceptive advertisements to prospective tenants.  Pursuant to Code § 10156.7, Apartment Hunters' restricted PRLS license was suspended, effective May 8, 2014 (the

"Suspension Order").

108.   The new April 2014 claim was the result of a complaint received by the Bureau from the co-owner of Hometeam Property Management, who discovered that Defendants had "*without Hometeam's authorization, used copyrighted pictures and information about four separate rental properties listed on Hometeam's website; and, without written or oral permission, posted said pictures and information about the properties on different websites* including, but not limited to, Trulia and Zillow.  Specifically, Respondents copied photographs of the four properties displayed on Hometeam's website, *eliminated the 'Hometeam' watermark inserted on the photographs by cropping and shrinking the borders of the photographs*, and placed an 'ApartmentHunterZ' watermark on the photographs.  The photographs and information from Hometeam's website concerning the four properties, as well as [Apartment Hunters'] website address, were placed on promotions for the properties found on the other websites." Proposed Decision, Case No. H-39404 LA, *4 (Cal. Bur. of Real Estate May 27, 2015) (the "Proposed Decision") (emphases added) (attached hereto as Exhibit D).

109.   In short, Defendants were accused of misconduct that mirrors many of the unlawful actions at issue in this case: copying copyrighted photographs without permission, taking steps to disguise the infringement by doctoring the photographs to replace the watermark, misappropriating the related listing information, and, without authorization, presenting the photographs and related listing information on Defendants' website in competition with the owners and originators of that content.

110.   The Administrative Law Judge presiding over the ensuing hearing found Kevin Shayan's testimony that he had obtained consent to list the four properties "*not convincing*," and Shayan admitted that he made no effort to obtain consent from the properties' owners to promote them on other websites. *Id.* at *5

(emphasis added).

111. Kevin Shayan also admitted in his testimony that an Apartment Hunters' user would receive access to the property address and contact information for these properties only after paying a monthly subscription fee to Apartment Hunters, *id.* at *4—in other words, admitting that the impermissibly copied listings at issue were used to induce users to pay fees to Apartment Hunters.

112. The Judge concluded that, by the forgoing conduct, Apartment Hunters violated Code § 1067.11(b)(2) by promoting and advertising four properties in a false, misleading or deceptive way, and violated Code § 1067.11(b)(4) *by not obtaining permission to list the properties by their owner, manager or authorized agent.  See* Proposed Decision at *8.[4]

113. The Judge also concluded that Apartment Hunters had "ignored" the May 2014 Suspension Order, noting that Kevin Shayan admitted that Apartment Hunters was continuing to engage in PRLS activity through the present.  *Id.* at *7. The Judge thus found that Apartment Hunters had willfully and deliberately violated Code §§ 10167.2 and 10130, noting that "Respondents do not dispute that they engaged in unlicensed activity.  They only provided excuses for doing so. However, *none of their excuses are valid justification for breaking the law*."  *Id.* at *12 (emphasis added).

114. Based on the forgoing, the Judge concluded there was cause to sustain the Suspension Order, a conclusion the Commissioner ultimately adopted (along with the Judge's entire proposed order).  *See* Decision, Case No. H-39404 LA (Cal. Bur. of Real Estate July 1, 2015) (attached hereto as Exhibit E).

---

[4] The Bureau's investigation also revealed that Defendants failed to notify the Bureau after abandoning their registered offices; the Judge found Kevin Shayan's testimony on this topic to be "self-serving, uncorroborated and for those reasons not persuasive."  Proposed Decision at *6.  Apartment Hunters' conduct in abandoning its office was found to have violated, among other provisions, Code § 10167.5.  *Id.* at *9.

115.   In justifying his decision, the Judge wrote: "*Respondents have been unapologetic for any of this misconduct.  Instead, Respondents present a picture of a licensee with little regard for the Commissioner and no desire to comply with the rules and regulations established by the Commissioner.  Respondents have presented no evidence indicating such misconduct will not occur again soon*." Proposed Decision at *12 (emphasis added).

\* \* \* \* \*

116.   Sadly, the Judge's warning has proved prophetic:  Defendants have continued to operate outside the law, and now wrongly seek to profit from the CoStar-verified time-sensitive listing information and copyrighted photographs that CoStar has obtained at great expense.

117.   CoStar brings this action to vindicate its rights under federal and state law and stop Defendants' willful infringement of CoStar's copyrights, the misappropriation of CoStar's listing information, and Defendants' consequent engagement in unfair competition.

## CAUSES OF ACTION

### COUNT ONE: Direct Copyright Infringement Against All Defendants

118.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

119.   Each of CoStar's photographs constitutes an original work of authorship and copyrightable subject matter under the laws of the United States.

120.   CoStar owns or has exclusive rights to all rights, title, and interest in and to the photographs.

121.   Defendants had and have access to CoStar photographs through the internet or other means.

122.   Defendants have copied, reproduced, republished, distributed to the public, and/or displayed publicly CoStar-copyrighted photographs—including

without limitation those copyrighted works identified in Exhibit A hereto—without the consent or authority of CoStar, thereby infringing CoStar's copyrights.

123. CoStar owns the exclusive rights in each of the photographs detailed in Exhibit A. Prior to the filing of this suit, CoStar has validly registered, or has submitted a complete application for registration for, each of the photographs detailed in Exhibit A with the United States Copyright Office. Defendants copied, republished, distributed, and publicly displayed on ApartmentHunterz.com without authorization each of the copyrighted photographs detailed in Exhibit A.

124. Upon information and belief, Defendants' unlawful copying, republishing, distributing, and public displaying of the CoStar photographs began in the months following the previously described "re-launch" of Apartments.com. On information and belief, a valid registration was obtained or a valid registration application was submitted by CoStar for each photograph detailed in Exhibit A prior to Defendants' first infringement of the photograph.

125. Defendants' copies, reproductions, republications, distributions, and displays are identical and/or substantially similar to CoStar's photographs.

126. Apartment Hunters is directly liable for these acts of infringement in violation of 17 U.S.C. §§ 106 and 501.

127. The Shayans are jointly and severally liable for each act of Apartment Hunters' direct infringement because, upon information and belief, they personally directed and participated in and benefited from Apartment Hunters' infringing conduct as alleged above.

128. The infringement of CoStar's rights in each of its copyrighted photographs constitutes a separate and distinct act of infringement.

129. Defendants' acts of infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act. Defendants knew their acts were infringing and intentionally or recklessly

1   disregarded the law by their conduct.

2         130.   CoStar did not authorize Defendants' acts.

3         131.   CoStar believes that additional instances of Defendants' infringement

4   of its copyrighted photographs, both on ApartmentHunterz.com and other websites

5   and domains owned or operated by Defendants, will be revealed during the

6   discovery process.

7         132.   As a result of Defendants' willful copyright infringement, CoStar has

8   been and will continue to be damaged as a direct and proximate result of the

9   infringing acts set forth above, and Defendants have been unjustly enriched by

10  their unlawful infringement of CoStar's copyrighted photographs in an amount to

11  be proven at trial.

12        133.   Defendants' conduct also has caused irreparable and incalculable

13  harm and injuries to CoStar and is ongoing.  Unless enjoined, Defendants' conduct

14  will cause further irreparable and incalculable injury, for which CoStar has no

15  adequate remedy at law.

16  **COUNT TWO: Contributory Copyright Infringement Against the Shayans**

17        134.   CoStar repeats and realleges each and every allegation set forth above,

18  and incorporates them herein by reference.

19        135.   Apartment Hunters has directly infringed CoStar's works to which

20  CoStar owns exclusive rights under copyright—including without limitation those

21  copyrighted works identified in Exhibit A hereto—by copying, reproducing,

22  republishing, distributing to the public, and/or displaying publicly CoStar-

23  copyrighted photographs owned by CoStar, without authorization from CoStar, or

24  right under law, in violation of the Copyright Act.  The Shayans are liable as

25  secondary infringers under the Copyright Act for each act of direct infringement of

26  CoStar's works by Apartment Hunters.

27        136.   The Shayans are liable under the Copyright Act for the infringing acts

28

of Apartment Hunters as contributory copyright infringers. The Shayans had actual and constructive knowledge of Apartment Hunters' infringement of CoStar's copyrighted works. Despite having that knowledge, the Shayans continued to cause, contribute materially to, and/or induce that infringement as set forth above. Without the active and material contributions from the Shayans, the infringement CoStar details above could not have taken place. The Shayans therefore are contributorily liable for Apartment Hunters' direct infringement of CoStar's copyrighted works in violation of the Copyright Act.

137. The Shayans likewise are liable for the acts of infringement identified above for acting in concert with Apartment Hunters to operate Apartment Hunters' network of websites and for personally directing, participating in, and benefiting from Apartment Hunters' infringing conduct as alleged herein.

138. The Shayans' acts of contribution to copyright infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act. The Shayans knew that their acts were infringing and intentionally or recklessly disregarded the law by their conduct.

139. CoStar did not authorize the Shayans' acts.

140. CoStar believes that additional instances of Defendants' infringement of its copyrighted photographs will be revealed during the discovery process.

141. As a result of the Shayans' willful contribution to copyright infringement, CoStar has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, and the Shayans have been unjustly enriched by their unlawful infringement of CoStar's copyrighted materials in an amount to be proven at trial.

142. The Shayans' conduct also has caused irreparable and incalculable harm and injuries to CoStar and is ongoing. Unless enjoined, the Shayans' conduct will cause further irreparable and incalculable injury, for which CoStar has no

1    adequate remedy at law.

2          **COUNT THREE: Misappropriation Against All Defendants**

3          143.    CoStar repeats and realleges each and every allegation set forth above,

4    and incorporates them herein by reference.

5          144.    CoStar has invested substantial time, labor, skill, and financial

6    resources into the creation and maintenance of Apartments.com, its computer

7    systems and servers, including system and server capacity, as well as the content

8    on the Apartments.com website.

9          145.    The CoStar-verified listings displayed on the Apartments.com website

10   are time-sensitive.  The Apartments.com content is updated in real time, an

11   indispensible feature of the website that attracts users to the website and

12   contributes to its value.

13         146.    Without authorization, Defendants wrongfully access and appropriate

14   the Apartments.com website, computer systems and servers, and its content

15   without having to make the substantial investment in time, labor, skill, and

16   financial resources made by CoStar.  Defendants are in direct competition with

17   CoStar and have made CoStar's content available to their customers and other third

18   parties.  As such, Defendants' use of CoStar's computer systems and servers,

19   including system and server capacity, as well as CoStar's content constitutes free-

20   riding on CoStar's substantial investment of time, effort, and expense.  Defendants

21   are reaping where they have not sown.

22         147.    As a result of this misappropriation, Defendants wrongfully compete

23   and/or enable others to compete, with CoStar, and CoStar has been forced to

24   expend additional time and resources, including but not limited to, investigating

25   Defendants' activities and attempting to prevent such misappropriation by

26   technological means.

27         148.    CoStar has been and will continue to be damaged as a result of

28

Defendants' misappropriation of CoStar's valuable information and property. If permitted to continue, the ability of Defendants and other parties to free-ride on CoStar's substantial investment would so reduce its incentive to produce products or services such as Apartments.com that the existence or quality of these products or services would be substantially threatened.

149. CoStar has suffered and will continue to suffer irreparable injury, and its remedy at law is not itself adequate to compensate it for injuries inflicted by Defendants.

**COUNT FOUR: California Unfair Competition Against All Defendants**

150. CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

151. By the acts described herein, Defendants have engaged in unlawful business practices by misappropriating CoStar's property, as set forth in Count Three. These unlawful business practices have injured and will continue to injure CoStar in its business and property, in violation of California Business and Professions Code § 17200, *et seq.*

152. Defendants' acts alleged herein have caused monetary damages to CoStar in an amount to be proven at trial, and have caused, and will continue to cause, irreparable injury to CoStar, unless and until Defendants are permanently enjoined.

153. As a direct and proximate result of Defendants' conduct alleged herein, Defendants have been unjustly enriched and should be ordered to disgorge any and all profits earned as a result of such unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, CoStar prays for judgment against all Defendants as follows:

A.    For an order pursuant to 17 U.S.C. § 502 permanently enjoining and restraining Defendants and their officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of CoStar's exclusive rights under the Copyright Act, or from authorizing any other person to do the same;

B.    For an award pursuant to 17 U.S.C. § 504 of CoStar's actual damages and Defendants' profits or, alternatively at CoStar's election, for statutory damages for Defendants' infringement and willful infringement—including without limitation for the instances of infringement identified in Exhibit A, and other instances of infringement uncovered during discovery—in the maximum amount allowable by law;

C.    For a finding that Defendants have willfully infringed CoStar's federally registered copyrights;

D.    For an award of damages from Defendants' misappropriation of CoStar data and information;

E.    For an order permanently enjoining and restraining Defendants and their officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the misappropriation of CoStar data and information;

F.    For an order granting restitution and disgorgement of Defendants' wrongful gains from their unfair competition;

G.    For an order permanently enjoining and restraining Defendants and their officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling,

1  inducing, causing, materially contributing to, or otherwise facilitating Defendants'

2  unfair competition;

3       H.     For an award of CoStar's costs, including its reasonable attorneys'

4  fees;

5       I.     For pre-judgment and post-judgment interest according to law;

6       J.     For such further and additional relief as the Court may deem just and

7  proper.

8  **DEMAND FOR A JURY TRIAL**

9       CoStar demands a trial by jury on all issues properly tried to a jury.

10

11       Respectfully submitted,

12

13  Dated: December 18, 2015     CALDWELL LESLIE & PROCTOR, PC

14       */s/ Kelly L. Perigoe*

15       Kelly L. Perigoe (Cal. Bar No. 268872)

     725 South Figueroa Street, 31st Floor

16       Los Angeles, CA 90017-5525

     Telephone: (213) 629-9040

17       Facsimile: (213) 629-9022

18       perigoe@caldwell-leslie.com

19       WILLIAMS & CONNOLLY LLP

20       Nicholas J. Boyle (*pro hac vice application forthcoming*)

21       David K. Baumgarten (*pro hac vice application forthcoming*)

22       Eric J. Hamilton (Cal. Bar No. 296283; *C.D. Cal. admission pending*)

23       725 Twelfth Street, N.W.

24       Washington, DC 20005

25       (202) 434-5000 (phone)

     (202) 434-5029 (facsimile)

26       *Attorneys for CoStar Realty*

27       *Information, Inc., and Apartments, LLC*

28

# EXHIBIT 7

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

NICHOLAS BOYLE
(202) 434-5343
nboyle@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

December 18, 2015

***Via Hand Delivery***

Legal Department
Apartment Hunters, Inc.
33592 Moon Ring Ct.
Dana Point, CA 92629-1820

> Re:   *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan*

Counsel:

I represent CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar"). If Apartment Hunters is represented by outside counsel, please forward this correspondence to your attorneys.

***First,*** it has come to our attention that Apartment Hunters, Inc. ("Apartment Hunters"), by and through Kevin Shayan and Steven Shayan (collectively, the "Shayans"), has been copying from apartments.com, then publishing and publicly displaying without permission, CoStar-copyrighted photographs and CoStar-verified listing information on its network of websites, including ApartmentHunterz.com, thereby infringing upon CoStar's intellectual property, misappropriating its time-sensitive proprietary information, and unfairly competing with CoStar's apartments.com website. To redress that infringement, misappropriation, and unfair competition, CoStar has filed a complaint in the United States District Court for the Central District of California, captioned *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan* (the "Complaint"), with which you have been personally served.

***Second,*** as you should already be aware, your actions, as detailed above and in the Complaint, also violate the binding Terms of Service which govern use of apartments.com (the "Site"). For your convenience, we enclose a hard copy of the Terms of Service, which are also available in their entirety at <http://corporate.apartments.com/disclaimers/terms-of-service/>.

As the Terms of Service provide, ***any user who visits, views, accesses or uses any version of the Site, including through a bot or other automated means, is bound by the Terms of Service.*** Moreover, ***any user who does not agree to the Terms of Service is prohibited from***

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 2

*accessing the Site and must immediately discontinue use*.  Accordingly, you are hereby directed to **CEASE AND DESIST** any and all usage of apartments.com which violates the Terms of Service, including but not limited to:

- using the Site for competitive, commercial, or non-personal purposes;

- copying, reproducing, selling, licensing, publishing, distributing, modifying, displaying, performing, re-posting or otherwise using the photographs and information available on the Site; or

- using any robot, spider or other automatic device, or a manual process, to access, monitor or copy web pages or the Materials contained in the Site or for any other unauthorized purpose.

Continued impermissible usage of apartments.com constitutes willful and intentional breach of the binding Terms of Service, and CoStar will seek monetary and equitable relief for such breaches.  CoStar reserves all rights in connection herewith.

*Third*, in connection with the above-referenced lawsuit, we are sending this letter to remind Apartment Hunters, and its affiliates, directors, officers, employees, and agents, of their legal obligation to take immediate steps to preserve relevant documents and evidence in their possession, custody, or control.  We are sending similar letters to Messrs. Kevin Shayan and Steven Shayan.

In the context of this letter, "documents" should be construed in its broadest sense.  The term therefore includes, without limitation:  (1) contracts, correspondence, memoranda, spreadsheets and files; (2) information in notebooks, handwritten notes, post-its, telephone messages and logs, date books, diaries and agendas; (3) information that is stored electronically, such as e-mails, word processing documents, images (*i.e.*, .jpg and .gif files), spreadsheets, PowerPoint presentations, calendars, instant messages, text or SMS messages, log and access files, directory files, history files, cache and "cookie" files, databases or other applications, including without limitation information stored on firm-hosted or third party-hosted servers, company-issued or personal computers, company-issued or personal laptops, and company-issued or personal smart phones or other portable handheld devices; and (4) information that is stored in any other medium, including without limitation on USB drives, external hard drives, DVDs, or tape.  The information and documents that must be retained include not only formal documents and final versions, but also drafts.  The obligation to retain documents extends to all existing documents as well as to documents created in the future.

The steps Apartment Hunters and its affiliates, directors, officers, employees, and agents should take to preserve and maintain relevant documents should include without limitation the following:

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 3

- issue a litigation hold memorandum to all Apartment Hunters affiliates, directors, officers, employees and agents that may have relevant documents in their possession, custody, or control;

- suspend any routine document-destruction policies and switch off any function that could result in the automatic deletion of relevant documents, including without limitation the automatic deletion of email or website content;

- taking appropriate steps to preserve any company-issued or personal computers, laptops, servers, drives, web-based email accounts, smart phones or other portable handheld devices that may contain relevant documents; and

- maintain all reasonably accessible back-up tapes and other disaster-recovery technology that could contain relevant documents and ensure that such back-up tapes are not overwritten.

Given the claims at issue in this particular case, we note in particular that Apartment Hunters is required to take steps to retain electronic data constituting the various websites that appear to be owned or controlled by Apartment Hunters and/or Messrs. Kevin Shayan and Steven Shayan, including without limitation: (a) ApartmentHunterz.com; (b) 4rentinla.com; (c) 4rentinnewyork.com; (d) wetakesection8.com; (e) ifindrentals.com; (f) featuredrentals.com; (g) leaseinsandiego.com; (h) rentinsanfrancisco.com; and (i) ineed2move.com (the "Apartment Hunters Websites"). The electronic data that must be preserved includes without limitation: web pages that are currently being displayed, web pages that have in the past been displayed and remain in existence, web pages that are being prepared for future display, log files, access files, and directory files. These data, which easily could be deleted or altered in the ordinary course of business, must be preserved. Accordingly, we ask that Apartment Hunters immediately take affirmative actions to preserve the entire content of the Apartment Hunters Websites as they exist today, to preserve any currently existing prior content, and to ensure that, going forward, all website content is preserved.

This letter is without prejudice to CoStar's rights, and shall in no way be construed to modify, limit, or restrict the requirement that any persons, including without limitation Apartment Hunters, comply with their legal obligation to preserve documents that relate to the pending lawsuit.

We appreciate your cooperation in this matter.

Sincerely,

Nicholas J. Boyle

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 4


Enclosures




About Us    Management    Careers    Corporate Responsibility    Press Room    Disclaimers    Contact Us

Home › Disclaimers › Terms of Service

# Terms of Service

## Introduction and Agreement

These Terms of Service apply to the services offered by Apartments, LLC ("Apartments.com") in connection with the Apartments.com and AparmentHomeLiving.com websites and related mobile applications, as well as any publicly available versions that may be offered through a distribution partner (collectively the "Site"). You may have arrived at a version of the Site from a distribution partner's website, in which case, that partner will be identified at the top of this page. Any individual who visits, views, accesses or uses any version of the Site, including through a bot or other automated means, ("You" or "User") is bound by these Terms of Service. By using the Site, You represent and warrant that You are at least eighteen (18) years of age and You hereby agree to be bound by all of the following provisions of these Terms of Service, which form a legally binding contract between You and Apartments.com. You further represent and warrant that You are not a competitor of Apartments.com or any of its affiliates. **If You do not agree to these Terms of Service, You are prohibited from accessing the Site and must immediately discontinue use.**

By accessing the Site, You consent to the collection and use of certain information, as specified in the Privacy Statement.

## Apartments.com is an Advertising and Information Service

The Site is an online advertising and information service for apartment hunters, dwellers, landlords, and property managers. Apartments.com does not broker, lease, or sublease apartments directly and is not a party to any transaction between landlords (including, as applicable, property management companies and/or property managers) and renters. As a result, Apartments.com does not (a) guarantee or ensure any apartment or any transaction between a renter and landlord, (b) collect or process payment or execute any lease or sublease documentation on behalf of renters or landlords, or (c) broker, lease, or sublease or offer to broker, lease or sublease, or own any apartments. You are strongly encouraged to personally inspect any apartment advertised for rent prior to: signing any lease documentation; providing personal information such as a social security number on a lease application; or wiring or otherwise sending money for any deposit, rent payment or application fee. By using the Site, you acknowledge that published rents and availabilities are subject to change at the sole discretion of the property owner or manager at any time and without further notice.

## Site Materials

All information and content available on this Site (collectively, "Materials") is protected by copyright and other intellectual property laws. The Materials are owned by Apartments.com and its affiliates, and/or their respective licensors and suppliers (collectively, "Licensors"). The Materials are intended for personal and noncommercial use only. You may not copy, reproduce, sell, license, publish, distribute, modify, display, perform, re-post or otherwise use any portion of the Materials in any other way or for any other purpose without the prior written consent of Apartments.com. Requests regarding use of the Materials for any purpose other than personal, noncommercial use should be directed to CoStar Realty Information, Inc., 1331 L Street, NW, Washington, DC 20005, attn.: General Counsel.

## Third-Party Sites

During the course of Your visit to the Site, You may be taken to third-party websites to fulfill certain site features and functionality (e.g., if You choose to view community information or check availability of a certain apartment unit). You agree that when visiting third-party websites (e.g., websites not

Case 8:15-cv-02111-JLS-KES   Document 4-4   Filed 12/02/16   Page 415 of 439   Page ID #:1839

containing "Apartments.com" in the URL) You are subject to the privacy policy and terms of service, if any, of that third-party website, which may differ from those of Apartments.com. By selecting links to such third-party websites, You agree that You will be leaving the Site and that Apartments.com and its affiliates have no responsibility or liability whatsoever in connection with Your use or Your exchange of any information with such third-party websites. Apartments.com and its affiliates do not endorse, sponsor or guarantee these linked websites and are not responsible in any way for any advice, content, information, practices, products or services related to or made available through such linked websites.

## Copyrights and Copyright Agents

It is the policy of Apartments.com to respond to claims of intellectual property infringement. Apartments.com will promptly process and investigate notices of alleged infringement and take appropriate actions under the Digital Millennium Copyright Act, Title 17, United States Code, Section 512(c)(2) ("DMCA") and other applicable intellectual property laws. Pursuant to the DMCA, notifications of claimed copyright infringement should be sent to a Service Provider's Designated Agent. Notification must be submitted to the following Designated Agent for this Site:

CoStar Realty Information, Inc.
Attn: General Counsel
1331 L Street, NW
Washington, DC 20005
Phone: (202) 346-6500
Fax: (202) 346-6370
copyright@costar.com

To be effective, the notification must be a written communication that includes the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;

3. Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;

4. Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number and, if available, an electronic mail address at which the complaining party may be contacted;

5. A statement that the complaining party has a good-faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent or the law; and

6. A statement that the information in the notification is accurate and, under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

## Trademarks

You acknowledge that the Materials includes certain trademarks, service marks, and other indicia of source (together "Marks") that are owned by Apartments.com, its affiliates, Licensors and others. You agree not to copy, use, infringe or dilute the Marks.  You further agree that You will not alter or remove any Mark, copyright notice or other notice from the Materials or any copy thereof. The "Apartments.com" name and logo are trademarks of Apartments.com. Other product and company names herein may be trademarks of their respective owners.

## Software

All software contained in this Site ("Software"), is owned by Apartments.com, its affiliates and/or Licensors and is protected by copyright and other intellectual property laws, as well as international treaty provisions.

Any unauthorized access to, reproduction, redistribution, publication, display or other use of the Software is expressly prohibited by law and may result in severe civil and/or criminal penalties. Violators will be prosecuted to the maximum extent possible. Use of the MapPoint/Virtual Earth Service is also governed by the Microsoft Terms of Use and Privacy Statement located at http://go.microsoft.com/fwlink/?LinkId=21969 and http://go.microsoft.com/fwlink/?LinkId=21970.

## Linking

If You operate a website and wish to link to the Site, You must link to the Site's home page (www.apartments.com/) and/or You may also link to other pages found on the Site given that no manipulation to the canonical URL has occurred specifically, but not limited to, the addition or removal of any unique values, parameters or subfolders needed to render a page on the Site. Apartments.com reserves the right to disavow, reject or terminate any links to the Materials or the Site.

## User Content

By submitting listings, ads, photos, descriptions, data, or other content or materials ("Content") to the Site, You hereby grant to Apartments.com, its affiliates, and its parent and related companies a royalty-free, perpetual, irrevocable, nonexclusive, fully transferable, fully sublicenseable right and license to copy, modify, display, distribute, perform, create derivative works from, store, and otherwise use and exploit all such Content in any form, media, software or technology of any kind now existing or developed in the future. You further grant to Apartments.com, its affiliates, and its parent and related companies, a royalty-free right and license to use Your name, image and likeness in connection with the reproduction or distribution of the Content.

This Site may offer opportunities for Users 18 years of age and older to submit Content that express their opinions and share their ideas, for example in a consumer blogging format ("Opinion Content"). Apartments.com and its affiliates do not endorse the accuracy or reliability of any Opinion Content.  If You decide to submit Opinion Content, please use Your best judgment and be respectful of other individuals. By posting or submitting Opinion Content, You agree to abide by these Terms of Service. You may not use the Site to engage in any Prohibited Activities (as defined below). Uploading copyrighted or other proprietary material of any kind on the Site without the express permission of the owner of that material is prohibited and may result in civil and/or criminal liability.

## Apartments.com's Rights

Given the nature of the Site and the volume of messages and postings, except as otherwise provided in these Terms of Service or other applicable terms, Apartments.com cannot and does not monitor all of the Content posted or transmitted by You and other third-party information providers. Apartments.com reserves the right, in its sole discretion, to monitor, refuse to publish, remove, delete, move or edit any Content without notice, at any time for any reason. By using the Site, You expressly agree that Apartments.com (a) will not be liable for any claims, actions or judgments arising out of or related to any Content and (b) may monitor, refuse to publish, remove, delete, move or edit any Content without notice at any time for any reason, without liability and without providing a refund. You further expressly agree that You are solely responsible for any and all Content You submit to the Site.

## Unsolicited Content

Apartments.com does not accept unsolicited content or ideas for use or publication in its programming or in other digital, electronic or print media except in connection with the Forums, chat rooms and bulletin boards on the Site. Apartments.com and its affiliates shall not be responsible for the similarity of any of its content or programming in any media to Content or ideas transmitted to the Site.

## Representations/Indemnity

You hereby represent and warrant that (a) You have all necessary authority, rights and permissions to submit the Content to the Site, (b) the Content does not and will not infringe or misappropriate any copyright, trademark, trade secret, patent or other intellectual property right of any third party, including any rights of

privacy or publicity, (c) the Content and Your use of the Site does not and will not violate any applicable federal, state, or local law or regulation including, but not limited to, any fair housing laws or regulations or applicable real estate licensure or brokerage regulations, or cause injury to any person, and (d) the Content is truthful and accurate. You agree to release, defend, indemnify and hold Apartments.com, its affiliates, Licensors, and their respective officers, directors, employees, agents and contractors harmless from and against any and all claims, costs, demands or expenses, including attorneys' fees, arising from (i) any distribution, publication, refusal to publish, removal, deletion, movement, editing or other use of the Content You provide, (ii) Your use of the Site or any reliance on the Materials, (iii) Your breach of these Terms of Service or (iv) any actual, prospective or terminated sale, lease or other transaction between You and a third party.

## Prohibited Activities

You shall not:

- submit Content that is patently offensive to the online community, such as content that promotes racism, bigotry, hatred or physical harm of any kind against any group or individual;

- engage in activity or submit Content that could be harmful to minors;

- engage in activity or submit Content that harasses or advocates harassment of another person;

- engage in activity that involves the transmission of "junk mail" or unsolicited mass mailing or "spam" to others;

- engage in activity, submit Content, or promote information, that is fraudulent, false or misleading or promotes illegal activities or conduct that is abusive, threatening, obscene, defamatory or libelous;

- submit Content that contains restricted or password-only access pages, or hidden pages or images;

- submit Content that displays pornographic or sexually explicit material of any kind;

- submit Content that provides instructional information about illegal activities such as making or buying illegal weapons, violating someone's privacy, or providing or creating computer viruses;

- engage in activities or submit Content that solicit passwords or personally identifiable information for unlawful purposes from others;

- engage in commercial activities and/or sales without our prior written consent, such as contests, sweepstakes, barter, advertising and pyramid schemes;

- use the Site's lead forms and/or toll-free numbers to advertise or promote products and services to Apartments.com advertisers or to solicit Apartments.com advertisers in any manner;

- use any robot, spider or other automatic device, or a manual process, to access, monitor or copy web pages or the Materials contained in the Site or for any other unauthorized purpose;

- use any device, software or routine to interfere or attempt to interfere with the proper working of the Site;

- decompile, reverse engineer, disassemble or otherwise attempt to obtain the source code for the Software; or

- take any action that imposes an unreasonable or disproportionately large load on Apartments.com's hardware and software infrastructure.

## Compliance with Fair Housing Laws

All Content is subject to federal fair housing laws, which make it illegal to indicate in any advertisement any preference, limitation, or discrimination because of race, color, religion, sex, physical or mental disability, and/or familial status. Your state jurisdiction may also prohibit any preferences based on sexual orientation, marital status, ancestry, source of income, or other criteria. If You have any question about the fair housing laws and housing discrimination in general, please call Your local fair housing agency or the U.S. Department of Housing and Urban Development. For a list of all fair housing groups, go to the Housing Rights Center's website at www.hud.gov.

## Add a Listing Terms of Service

Case 8:15-cv-02111-JLS-KES   Document 4-4 Filed 12/02/16   Page 418 of 439   Page ID
#:1842

By listing an eligible property through the Site's "Add a Listing" service (the "Listing Service"), you
acknowledge and agree to the Add a Listing Terms of Service, which are available
http://corporate.apartments.com/ad-manager-terms-of-service :

## Warranty Disclaimer

YOU EXPRESSLY AGREE THAT USE OF THE SITE AND RELIANCE ON ITS CONTENT IS AT YOUR OWN
RISK. APARTMENTS.COM, ITS AFFILIATES AND THEIR RESPECTIVE THIRD-PARTY LICENSORS DO NOT
MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND REGARDING THE SITE, THE SOFTWARE,
THE CONTENT, THE MATERIALS, THE LISTING SERVICE OR THE RESULTS THAT MAY BE OBTAINED
FROM USE OF ANY OF THE FOREGOING. THE SITE, THE SOFTWARE, THE CONTENT, THE MATERIALS
AND THE LISTING SERVICE ARE PROVIDED ON AN "AS IS, AS AVAILABLE" BASIS, AND
APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE THIRD-PARTY LICENSORS SPECIFICALLY
DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES INCLUDING, WITHOUT LIMITATION, THE
WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF MERCHANTABILITY AND
WARRANTIES OF NONINFRINGEMENT. APARTMENTS.COM AND ITS AFFILIATES MAKE NO
REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, TO ANY ACTUAL OR PROSPECTIVE
RENTER OF ANY APARTMENT AS TO THE EXISTENCE, OWNERSHIP OR CONDITION OF THE
APARTMENT; AS TO THE ADVERTISED AVAILBILITIES, RENT, LEASE TERMS, SECURITY DEPOSIT, OR
APPLICATION FEES, IF ANY; OR AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION
ABOUT AN APARTMENT APPEARING ON THE SITE. APARTMENTS.COM DOES NOT  WARRANT THE
ACCURACY OR COMPLETENESS OF SUCH INFORMATION. APARTMENTS.COM RESERVES THE RIGHT,
IN ITS SOLE DISCRETION, TO CORRECT ANY ERROR OR OMISSION ON THE SITE OR IN THE CONTENT.
ALL APARTMENTS ARE SUBJECT TO PRIOR LEASE. ANY AND ALL CONCERNS, DIFFERENCES OR
DISCREPANCIES REGARDING AN APARTMENT MUST BE ADDRESSED WITH THE LANDLORD AND/OR
PROPERTY MANAGEMENT COMPANY PRIOR TO LEASING OF THE APARTMENT. APARTMENTS.COM
DOES NOT MAKE AND EXPRESSLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES OR
GUARANTEES TO YOU REGARDING THE LISTING SERVICE INCLUDING, WITHOUT LIMITATION, ANY
REPRESENTATIONS, WARRANTIES OR GUARANTEES THAT YOU WILL LEASE YOUR APARTMENT,
OBTAIN AN ACCEPTABLE RENT FOR YOUR APARTMENT, ONLY RECEIVE LEGITIMATE INQUIRIES OR
SOLICITATIONS FROM QUALIFIED RENTERS, OR RECEIVE ANY INQUIRIES REGARDING YOUR
APARTMENT FOR RENT. FOR PURPOSES OF THIS WARRANTY DISCLAIMER, "THIRD-PARTY LICENSOR"
DOES NOT INCLUDE YOU. Some states do not allow the disclaimer of implied warranties, so the foregoing
disclaimer may not apply to You.

## Limitation of Liability

APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE OWNERS, EMPLOYEES, AGENTS,
CONTRACTORS AND THIRD-PARTY LICENSORS SHALL IN NO EVENT BE LIABLE FOR ANY DAMAGES OR
LOSSES INCLUDING, WITHOUT LIMITATION, DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL,
INCIDENTAL OR PUNITIVE DAMAGES, RESULTING FROM OR CAUSED BY THE SITE, THE SOFTWARE,
CONTENT, THE MATERIALS, THE LISTING SERVICE, THESE TERMS OF SERVICE OR OTHERWISE (THE
"SERVICE"), INCLUDING, WITHOUT LIMITATION, DAMAGES RESULTING FROM NEGLIGENCE. IN NO
EVENT WILL THE AGGREGATE MAXIMUM LIABILITY OF APARTMENTS.COM, ITS AFFILIATES, AND THEIR
RESPECTIVE OWNERS, EMPLOYEES, AGENTS, CONTRACTORS AND THIRD-PARTY LICENSORS FOR
ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF THE SERVICE EXCEED THE
TOTAL AMOUNT OF FEES ACTUALLY PAID BY YOU TO APARTMENTS.COM. THE NEGATION OF
DAMAGES SET FORTH ABOVE IS A FUNDAMENTAL ELEMENT OF THE BASIS OF THE BARGAIN
BETWEEN APARTMENTS.COM AND YOU.  THE SERVICE WOULD NOT BE PROVIDED TO YOU WITHOUT
SUCH LIMITATIONS.  NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU
FROM APARTMENTS.COM CREATES ANY WARRANTY, REPRESENTATION AND/OR GUARANTEE NOT
EXPRESSLY STATED IN THIS AGREEMENT.   FOR PURPOSES OF THIS LIMITATION OF LIABILITY,
"THIRD-PARTY LICENSOR" DOES NOT INCLUDE YOU. Some states do not allow the exclusion or limitation
of incidental or consequential damages of implied warranties, so the above exclusion or limitation may not
apply to You.

## Termination of Service

You understand and agree that in Apartments.com's sole discretion, and without prior notice, Your access to this Site may be terminated or suspended, and Apartments.com may exercise any other remedy available and remove any Content, if it believes that Your use of the Site and/or any Content You provide (a) violate (i) these Terms of Service, (ii) the rights of Apartments.com, its affiliates, a Licensor, or another User, or (iii) any law or regulation, or are otherwise objectionable or inappropriate or (b) constitute fraudulent activity of any nature. You agree that monetary damages may not provide a sufficient remedy to Apartments.com for violations of these Terms of Service, and You consent to injunctive or other equitable relief for such violations without the requirement that Apartments.com post a bond. Apartments.com is not required to provide any refund to You if Your use is terminated as a result of Apartments.com determination, in its sole discretion, that You have violated these Terms of Service.

## Miscellaneous

These Terms of Service may be changed at any time and You will be notified of any such changes by an updated posting of the new Terms of Service on this page of the Site. Your continued use of the Site after the posting of any amended Terms of Service shall constitute Your agreement to be bound by any such changes. Apartments.com may modify, suspend, discontinue or restrict the use of any portion of the Site without notice or liability. These Terms of Service will be governed by and construed in accordance with the laws of the State of Illinois without regard to its conflicts of law provisions. You hereby agree that any cause of action You may have with respect to the Site must be exclusively filed in the federal or state courts located in Cook County, Illinois, within one (1) year after the cause of action arises or the cause is barred. You hereby consent to personal jurisdiction in the federal and state courts in Cook County, Illinois, and waive any objection based on forum non conveniens. As a condition of using this Site, You agree that all causes of action arising out of or connected with this Site shall be resolved individually, without resort to any form of class action. If for any reason a court of competent jurisdiction finds any provision of these Terms of Service, or portion thereof, to be unenforceable, that provision of these Terms of Service will be enforced to the maximum extent permissible so as to affect the intent of the parties, and the remainder of these Terms of Service will continue in full force and effect. Failure by Apartments.com to enforce any provision of this Terms of Service will not be deemed a waiver of future enforcement of that or any other provision of these Terms of Service. These Terms of Service and any other terms and conditions or policies applying to Your use of the Site, constitute the entire agreement between the parties regarding the subject matter hereof. Nothing contained herein shall be construed as creating a partnership, joint venture or agency relationship or granting a franchise between the parties. Notwithstanding anything to the contrary herein, if you and Apartments.com have entered into a separate written Apartments.com advertising contract, the terms and conditions of such contract shall control with respect to any term that is inconsistent with these Terms of Service.  IF YOU DO NOT AGREE TO THE TERMS STATED ABOVE OR TO ANY CHANGES TO THESE TERMS OF SERVICE, PLEASE EXIT THE SERVICE IMMEDIATELY.

©2015 Apartments, LLC, 1331 L Street, NW, Washington, DC 20005.
Last updated: March 30, 2015

Advertisers                                                                                    +

The Marketplace                                                                               +

Neighborhoods                                                                                 +

Top Cities                                                                                    +

About Us                                                                                      +



12/18/2015
Terms of Service | Apartments.com Corporate
Case 8:15-cv-02111-JLS-KES   Document 4-4   Filed 12/02/16   Page 420 of 439   Page ID #:1844

© 2015 CoStar Group, Inc.



🏠 Equal Housing Opportunity

# EXHIBIT 8

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DAVID K. BAUMGARTEN
(202) 434-5929
dbaumgarten@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 9, 2016

<u>Via E-mail & U.S. Mail</u>

Lincoln Bandlow, Esq.
Fox Rothschild LLP
1800 Century Park East
Suite 300
Los Angeles, CA, 90067

Re: *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan*, Case No. 8:15-cv-02111-JLS-KES

Dear Lincoln:

I write on behalf of Plaintiffs CoStar Realty and Apartments, LLC (collectively, "CoStar") regarding the above-referenced matter.

As you know, Defendants Kevin Shayan, Steven Shayan, and Apartment Hunters, Inc. (and its affiliates, directors, officers, employees, and agents) have a legal obligation to preserve relevant documents and evidence in their possession, custody, or control. Each of the Defendants received a letter from my colleague Nicholas Boyle (dated December 18, 2015) at the outset of the case reminding them of this legal obligation and discussing, by way of example, specific sources of data that they should take immediate steps to preserve. (Copies of these letters are enclosed herein for your reference.) We trust that you have made sure that your clients understand their obligations.

In addition to the sources of documents and electronic data referenced in Mr. Boyle's letter, it has recently come to CoStar's attention that Defendants maintain six servers with www.amazon.com web hosting services. Please confirm that your clients have taken appropriate measures—including issuing the necessary instructions to Amazon—to preserve all electronic data associated with these servers. These actions should have included, without limitation, the taking of affirmative actions to preserve the entire content of these servers as they existed when the lawsuit was filed, to preserve any then-existing prior content, and to ensure that, going forward, all server content is preserved.

WILLIAMS & CONNOLLY LLP

Lincoln Bandlow, Esq.
March 9, 2016
Page 2

       This letter is without prejudice to CoStar's rights, and shall in no way be construed to modify, limit, or restrict the requirement that any persons, including without limitation Apartment Hunters, Kevin Shayan, and Steven Shayan, comply with their legal obligation to preserve documents that relate to the pending lawsuit.

Sincerely,

David K. Baumgarten

Enclosures

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

NICHOLAS BOYLE
(202) 434-5343
nboyle@wc.com

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

December 18, 2015

***Via Hand Delivery***

Legal Department
Apartment Hunters, Inc.
33592 Moon Ring Ct.
Dana Point, CA 92629-1820

> Re:   *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan*

Counsel:

I represent CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar"). If Apartment Hunters is represented by outside counsel, please forward this correspondence to your attorneys.

***First,*** it has come to our attention that Apartment Hunters, Inc. ("Apartment Hunters"), by and through Kevin Shayan and Steven Shayan (collectively, the "Shayans"), has been copying from apartments.com, then publishing and publicly displaying without permission, CoStar-copyrighted photographs and CoStar-verified listing information on its network of websites, including ApartmentHunterz.com, thereby infringing upon CoStar's intellectual property, misappropriating its time-sensitive proprietary information, and unfairly competing with CoStar's apartments.com website. To redress that infringement, misappropriation, and unfair competition, CoStar has filed a complaint in the United States District Court for the Central District of California, captioned *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan* (the "Complaint"), with which you have been personally served.

***Second,*** as you should already be aware, your actions, as detailed above and in the Complaint, also violate the binding Terms of Service which govern use of apartments.com (the "Site"). For your convenience, we enclose a hard copy of the Terms of Service, which are also available in their entirety at <http://corporate.apartments.com/disclaimers/terms-of-service/>.

As the Terns of Service provide, ***any user who visits, views, accesses or uses any version of the Site, including through a bot or other automated means, is bound by the Terms of Service.*** Moreover, ***any user who does not agree to the Terms of Service is prohibited from***

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 2

*accessing the Site and must immediately discontinue use*.  Accordingly, you are hereby directed
to **CEASE AND DESIST** any and all usage of apartments.com which violates the Terms of
Service, including but not limited to:

- using the Site for competitive, commercial, or non-personal purposes;

- copying, reproducing, selling, licensing, publishing, distributing, modifying, displaying,
  performing, re-posting or otherwise using the photographs and information available on
  the Site; or

- using any robot, spider or other automatic device, or a manual process, to access,
  monitor or copy web pages or the Materials contained in the Site or for any other
  unauthorized purpose.

Continued impermissible usage of apartments.com constitutes willful and intentional breach of
the binding Terms of Service, and CoStar will seek monetary and equitable relief for such
breaches.  CoStar reserves all rights in connection herewith.

*Third*, in connection with the above-referenced lawsuit, we are sending this letter to
remind Apartment Hunters, and its affiliates, directors, officers, employees, and agents, of their
legal obligation to take immediate steps to preserve relevant documents and evidence in their
possession, custody, or control.  We are sending similar letters to Messrs. Kevin Shayan and
Steven Shayan.

In the context of this letter, "documents" should be construed in its broadest sense.  The
term therefore includes, without limitation:  (1) contracts, correspondence, memoranda,
spreadsheets and files; (2) information in notebooks, handwritten notes, post-its, telephone
messages and logs, date books, diaries and agendas; (3) information that is stored electronically,
such as e-mails, word processing documents, images (*i.e.*, .jpg and .gif files), spreadsheets,
PowerPoint presentations, calendars, instant messages, text or SMS messages, log and access
files, directory files, history files, cache and "cookie" files, databases or other applications,
including without limitation information stored on firm-hosted or third party-hosted servers,
company-issued or personal computers, company-issued or personal laptops, and company-
issued or personal smart phones or other portable handheld devices; and (4) information that is
stored in any other medium, including without limitation on USB drives, external hard drives,
DVDs, or tape.  The information and documents that must be retained include not only formal
documents and final versions, but also drafts.  The obligation to retain documents extends to all
existing documents as well as to documents created in the future.

The steps Apartment Hunters and its affiliates, directors, officers, employees, and agents
should take to preserve and maintain relevant documents should include without limitation the
following:

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 3

- issue a litigation hold memorandum to all Apartment Hunters affiliates, directors, officers, employees and agents that may have relevant documents in their possession, custody, or control;

- suspend any routine document-destruction policies and switch off any function that could result in the automatic deletion of relevant documents, including without limitation the automatic deletion of email or website content;

- taking appropriate steps to preserve any company-issued or personal computers, laptops, servers, drives, web-based email accounts, smart phones or other portable handheld devices that may contain relevant documents; and

- maintain all reasonably accessible back-up tapes and other disaster-recovery technology that could contain relevant documents and ensure that such back-up tapes are not overwritten.

Given the claims at issue in this particular case, we note in particular that Apartment Hunters is required to take steps to retain electronic data constituting the various websites that appear to be owned or controlled by Apartment Hunters and/or Messrs. Kevin Shayan and Steven Shayan, including without limitation: (a) ApartmentHunterz.com; (b) 4rentinla.com; (c) 4rentinnewyork.com; (d) wetakesection8.com; (e) ifindrentals.com; (f) featuredrentals.com; (g) leaseinsandiego.com; (h) rentinsanfrancisco.com; and (i) ineed2move.com (the "Apartment Hunters Websites"). The electronic data that must be preserved includes without limitation: web pages that are currently being displayed, web pages that have in the past been displayed and remain in existence, web pages that are being prepared for future display, log files, access files, and directory files. These data, which easily could be deleted or altered in the ordinary course of business, must be preserved. Accordingly, we ask that Apartment Hunters immediately take affirmative actions to preserve the entire content of the Apartment Hunters Websites as they exist today, to preserve any currently existing prior content, and to ensure that, going forward, all website content is preserved.

This letter is without prejudice to CoStar's rights, and shall in no way be construed to modify, limit, or restrict the requirement that any persons, including without limitation Apartment Hunters, comply with their legal obligation to preserve documents that relate to the pending lawsuit.

We appreciate your cooperation in this matter.

Sincerely,

Nicholas J. Boyle

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

NICHOLAS BOYLE
(202) 434-5343
nboyle@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

December 18, 2015

***Via Hand Delivery***

Kevin Shayan
Apartment Hunters, Inc.
201 North Robertson Boulevard
Suite 202
Beverly Hills, California 90211

> Re:   *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters,
> Inc., Kevin Shayan, and Steven Shayan*

Mr. Shayan:

I represent CoStar Realty Information, Inc. and Apartments, LLC (collectively,
"CoStar").  If Apartment Hunters is represented by outside counsel, please forward this
correspondence to your attorneys.

***First,*** it has come to our attention that you, along with Apartment Hunters, Inc.
("Apartment Hunters") and Steven Shayan, have been copying from apartments.com, then
publishing and publicly displaying without permission, CoStar-copyrighted photographs and
CoStar-verified listing information on Apartment Hunters' network of websites, including
ApartmentHunterz.com, thereby infringing upon CoStar's intellectual property, misappropriating
its time-sensitive proprietary information, and unfairly competing with CoStar's apartments.com
website.  To redress that infringement, misappropriation, and unfair competition, CoStar has
filed a complaint in the United States District Court for the Central District of California,
captioned *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc.,
Kevin Shayan, and Steven Shayan* (the "Complaint"), with which you have been personally
served.

***Second,*** as you should already be aware, your actions, as detailed above and in the
Complaint, also violate the binding Terms of Service which govern use of apartments.com (the
"Site").  For your convenience, we enclose a hard copy of the Terms of Service, which are also
available in their entirety at <http://corporate.apartments.com/disclaimers/terms-of-service/>.

As the Terms of Service provide, ***any user who visits, views, accesses or uses any version
of the Site, including through a bot or other automated means, is bound by the Terms of***

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 2

*Service*.  Moreover, ***any user who does not agree to the Terms of Service is prohibited from accessing the Site and must immediately discontinue use***.  Accordingly, you are hereby directed to **CEASE AND DESIST** any and all usage of apartments.com which violates the Terms of Service, including but not limited to:

- using the Site for competitive, commercial, or non-personal purposes;

- copying, reproducing, selling, licensing, publishing, distributing, modifying, displaying, performing, re-posting or otherwise using the photographs and information available on the Site; or

- using any robot, spider or other automatic device, or a manual process, to access, monitor or copy web pages or the Materials contained in the Site or for any other unauthorized purpose.

Continued impermissible usage of apartments.com constitutes willful and intentional breach of the binding Terms of Service, and CoStar will seek monetary and equitable relief for such breaches.  CoStar reserves all rights in connection herewith.

*Third*, in connection with the above-referenced lawsuit, we are sending this letter to remind you of your legal obligation to take immediate steps to preserve relevant documents and evidence in your possession, custody, or control.  We are sending similar letters to Apartment Hunters and Steven Shayan.

In the context of this letter, "documents" should be construed in its broadest sense.  The term therefore includes, without limitation:  (1) contracts, correspondence, memoranda, spreadsheets and files; (2) information in notebooks, handwritten notes, post-its, telephone messages and logs, date books, diaries and agendas; (3) information that is stored electronically, such as e-mails, word processing documents, images (*i.e.*, .jpg and .gif files), spreadsheets, PowerPoint presentations, calendars, instant messages, text or SMS messages, log and access files, directory files, history files, cache and "cookie" files, databases or other applications, including without limitation information stored on firm-hosted or third party-hosted servers, company-issued or personal computers, company-issued or personal laptops, and company-issued or personal smart phones or other portable handheld devices; and (4) information that is stored in any other medium, including without limitation on USB drives, external hard drives, DVDs, or tape.  The information and documents that must be retained include not only formal documents and final versions, but also drafts.  The obligation to retain documents extends to all existing documents as well as to documents created in the future.

The steps you should take to preserve and maintain relevant documents should include without limitation the following:

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 3

- suspend any routine document-destruction policies and switch off any function that could result in the automatic deletion of relevant documents, including without limitation the automatic deletion of email or website content;

- taking appropriate steps to preserve any company-issued or personal computers, laptops, servers, drives, web-based email accounts, smart phones or other portable handheld devices that may contain relevant documents; and

- maintain all reasonably accessible back-up tapes and other disaster-recovery technology that could contain relevant documents and ensure that such back-up tapes are not overwritten.

Given the claims at issue in this particular case, we note in particular that you and Apartment Hunters are required to take steps to retain electronic data constituting the various websites that appear to be owned or controlled by you, Steven Shayan, and/or Apartment Hunters, including without limitation: (a) ApartmentHunterz.com; (b) 4rentinla.com; (c) 4rentinnewyork.com; (d) wetakesection8.com; (e) ifindrentals.com; (f) featuredrentals.com; (g) leaseinsandiego.com; (h) rentinsanfrancisco.com; and (i) ineed2move.com (the "Apartment Hunters Websites"). The electronic data that must be preserved includes without limitation: web pages that are currently being displayed, web pages that have in the past been displayed and remain in existence, web pages that are being prepared for future display, log files, access files, and directory files. These data, which easily could be deleted or altered in the ordinary course of business, must be preserved. Accordingly, we ask that you immediately take affirmative actions to preserve the entire content of the Apartment Hunters Websites as they exist today, to preserve any currently existing prior content, and to ensure that, going forward, all website content is preserved.

This letter is without prejudice to CoStar's rights, and shall in no way be construed to modify, limit, or restrict the requirement that any persons, including without limitation you, comply with their legal obligation to preserve documents that relate to the pending lawsuit.

We appreciate your cooperation in this matter.

Sincerely,

Nicholas J. Boyle

Enclosures

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

NICHOLAS BOYLE
(202) 434-5343
nboyle@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

December 18, 2015

***Via Hand Delivery***

Steven Shayan
Apartment Hunters, Inc.
32565 Golden Lantern Street
Dana Point, California 92629

Re:   *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan*

Mr. Shayan:

I represent CoStar Realty Information, Inc. and Apartments, LLC (collectively, "CoStar"). If Apartment Hunters is represented by outside counsel, please forward this correspondence to your attorneys.

***First,*** it has come to our attention that you, along with Apartment Hunters, Inc. ("Apartment Hunters") and Kevin Shayan, have been copying from apartments.com, then publishing and publicly displaying without permission, CoStar-copyrighted photographs and CoStar-verified listing information on Apartment Hunters' network of websites, including ApartmentHunterz.com, thereby infringing upon CoStar's intellectual property, misappropriating its time-sensitive proprietary information, and unfairly competing with CoStar's apartments.com website. To redress that infringement, misappropriation, and unfair competition, CoStar has filed a complaint in the United States District Court for the Central District of California, captioned *CoStar Realty Information, Inc., and Apartments, LLC, v. Apartment Hunters, Inc., Kevin Shayan, and Steven Shayan* (the "Complaint"), with which you have been personally served.

***Second,*** as you should already be aware, your actions, as detailed above and in the Complaint, also violate the binding Terms of Service which govern use of apartments.com (the "Site"). For your convenience, we enclose a hard copy of the Terms of Service, which are also available in their entirety at <http://corporate.apartments.com/disclaimers/terms-of-service/>.

As the Terms of Service provide, ***any user who visits, views, accesses or uses any version of the Site, including through a bot or other automated means, is bound by the Terms of Service.*** Moreover, ***any user who does not agree to the Terms of Service is prohibited from***

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 2

*accessing the Site and must immediately discontinue use*.  Accordingly, you are hereby directed
to **CEASE AND DESIST** any and all usage of apartments.com which violates the Terms of
Service, including but not limited to:

- using the Site for competitive, commercial, or non-personal purposes;

- copying, reproducing, selling, licensing, publishing, distributing, modifying, displaying,
  performing, re-posting or otherwise using the photographs and information available on
  the Site; or

- using any robot, spider or other automatic device, or a manual process, to access,
  monitor or copy web pages or the Materials contained in the Site or for any other
  unauthorized purpose.

Continued impermissible usage of apartments.com constitutes willful and intentional breach of
the binding Terms of Service, and CoStar will seek monetary and equitable relief for such
breaches.  CoStar reserves all rights in connection herewith.

*Third*, in connection with the above-referenced lawsuit, we are sending this letter to
remind you of your legal obligation to take immediate steps to preserve relevant documents and
evidence in your possession, custody, or control.  We are sending similar letters to Apartment
Hunters and Kevin Shayan.

In the context of this letter, "documents" should be construed in its broadest sense.  The
term therefore includes, without limitation:  (1) contracts, correspondence,  memoranda,
spreadsheets and files; (2) information in notebooks, handwritten notes, post-its, telephone
messages and logs, date books, diaries and agendas; (3) information that is stored electronically,
such as e-mails, word processing documents, images (*i.e.*, .jpg and .gif files), spreadsheets,
PowerPoint presentations, calendars, instant messages, text or SMS messages, log and access
files, directory files, history files, cache and "cookie" files, databases or other applications,
including without limitation information stored on firm-hosted or third party-hosted servers,
company-issued or personal computers, company-issued or personal laptops, and company-
issued or personal smart phones or other portable handheld devices; and (4) information that is
stored in any other medium, including without limitation on USB drives, external hard drives,
DVDs, or tape.  The information and documents that must be retained include not only formal
documents and final versions, but also drafts.  The obligation to retain documents extends to all
existing documents as well as to documents created in the future.

The steps you should take to preserve and maintain relevant documents should include
without limitation the following:

WILLIAMS & CONNOLLY LLP

December 18, 2015
Page 3

- suspend any routine document-destruction policies and switch off any function that could result in the automatic deletion of relevant documents, including without limitation the automatic deletion of email or website content;

- taking appropriate steps to preserve any company-issued or personal computers, laptops, servers, drives, web-based email accounts, smart phones or other portable handheld devices that may contain relevant documents; and

- maintain all reasonably accessible back-up tapes and other disaster-recovery technology that could contain relevant documents and ensure that such back-up tapes are not overwritten.

Given the claims at issue in this particular case, we note in particular that you and Apartment Hunters are required to take steps to retain electronic data constituting the various websites that appear to be owned or controlled by you, Kevin Shayan, and/or Apartment Hunters, including without limitation: (a) ApartmentHunterz.com; (b) 4rentinla.com; (c) 4rentinnewyork.com; (d) wetakesection8.com; (e) ifindrentals.com; (f) featuredrentals.com; (g) leaseinsandiego.com; (h) rentinsanfrancisco.com; and (i) ineed2move.com (the "Apartment Hunters Websites").  The electronic data that must be preserved includes without limitation: web pages that are currently being displayed, web pages that have in the past been displayed and remain in existence, web pages that are being prepared for future display, log files, access files, and directory files.  These data, which easily could be deleted or altered in the ordinary course of business, must be preserved.  Accordingly, we ask that you immediately take affirmative actions to preserve the entire content of the Apartment Hunters Websites as they exist today, to preserve any currently existing prior content, and to ensure that, going forward, all website content is preserved.

This letter is without prejudice to CoStar's rights, and shall in no way be construed to modify, limit, or restrict the requirement that any persons, including without limitation you, comply with their legal obligation to preserve documents that relate to the pending lawsuit.

We appreciate your cooperation in this matter.

Sincerely,

Nicholas J. Boyle

Enclosures

Case 8:15-cv-02111-JLS-KES Document 4-4 Filed 12/02/16 Page 433 of 439 Page ID #:1857



Home › Disclaimers › Terms of Service

# Terms of Service

## Introduction and Agreement

These Terms of Service apply to the services offered by Apartments, LLC ("Apartments.com") in connection with the Apartments.com and ApartmentHomeLiving.com websites and related mobile applications, as well as any publicly available versions that may be offered through a distribution partner (collectively the "Site"). You may have arrived at a version of the Site from a distribution partner's website, in which case, that partner will be identified at the top of this page. Any individual who visits, views, accesses or uses any version of the Site, including through a bot or other automated means, ("You" or "User") is bound by these Terms of Service. By using the Site, You represent and warrant that You are at least eighteen (18) years of age and You hereby agree to be bound by all of the following provisions of these Terms of Service, which form a legally binding contract between You and Apartments.com.  You further represent and warrant that You are not a competitor of Apartments.com or any of its affiliates.  **If You do not agree to these Terms of Service, You are prohibited from accessing the Site and must immediately discontinue use.**

By accessing the Site, You consent to the collection and use of certain information, as specified in the Privacy Statement.

## Apartments.com is an Advertising and Information Service

The Site is an online advertising and information service for apartment hunters, dwellers, landlords, and property managers. Apartments.com does not broker, lease, or sublease apartments directly and is not a party to any transaction between landlords (including, as applicable, property management companies and/or property managers) and renters. As a result, Apartments.com does not (a) guarantee or ensure any apartment or any transaction between a renter and landlord, (b) collect or process payment or execute any lease or sublease documentation on behalf of renters or landlords, or (c) broker, lease, or sublease or offer to broker, lease or sublease, or own any apartments. You are strongly encouraged to personally inspect any apartment advertised for rent prior to: signing any lease documentation; providing personal information such as a social security number on a lease application; or wiring or otherwise sending money for any deposit, rent payment or application fee.  By using the Site, you acknowledge that published rents and availabilities are subject to change at the sole discretion of the property owner or manager at any time and without further notice.

## Site Materials

All information and content available on this Site (collectively, "Materials") is protected by copyright and other intellectual property laws. The Materials are owned by Apartments.com and its affiliates, and/or their respective licensors and suppliers (collectively, "Licensors"). The Materials are intended for personal and noncommercial use only. You may not copy, reproduce, sell, license, publish, distribute, modify, display, perform, re-post or otherwise use any portion of the Materials in any other way or for any other purpose without the prior written consent of Apartments.com.  Requests regarding use of the Materials for any purpose other than personal, noncommercial use should be directed to CoStar Realty Information, Inc., 1331 L Street, NW, Washington, DC 20005, attn.: General Counsel.

## Third-Party Sites

During the course of Your visit to the Site, You may be taken to third-party websites to fulfill certain site features and functionality (e.g., if You choose to view community information or check availability of a certain apartment unit). You agree that when visiting third-party websites (e.g., websites not

containing "Apartments.com" in the URL) You are subject to the privacy policy and terms of service, if any, of that third-party website, which may differ from those of Apartments.com. By selecting links to such third-party websites, You agree that You will be leaving the Site and that Apartments.com and its affiliates have no responsibility or liability whatsoever in connection with Your use or Your exchange of any information with such third-party websites. Apartments.com and its affiliates do not endorse, sponsor or guarantee these linked websites and are not responsible in any way for any advice, content, information, practices, products or services related to or made available through such linked websites.

## Copyrights and Copyright Agents

It is the policy of Apartments.com to respond to claims of intellectual property infringement. Apartments.com will promptly process and investigate notices of alleged infringement and take appropriate actions under the Digital Millennium Copyright Act, Title 17, United States Code, Section 512(c)(2) ("DMCA") and other applicable intellectual property laws. Pursuant to the DMCA, notifications of claimed copyright infringement should be sent to a Service Provider's Designated Agent. Notification must be submitted to the following Designated Agent for this Site:

CoStar Realty Information, Inc.
Attn: General Counsel
1331 L Street, NW
Washington, DC 20005
Phone: (202) 346-6500
Fax: (202) 346-6370
copyright@costar.com

To be effective, the notification must be a written communication that includes the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;

3. Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;

4. Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number and, if available, an electronic mail address at which the complaining party may be contacted;

5. A statement that the complaining party has a good-faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent or the law; and

6. A statement that the information in the notification is accurate and, under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

## Trademarks

You acknowledge that the Materials includes certain trademarks, service marks, and other indicia of source (together "Marks") that are owned by Apartments.com, its affiliates, Licensors and others. You agree not to copy, use, infringe or dilute the Marks. You further agree that You will not alter or remove any Mark, copyright notice or other notice from the Materials or any copy thereof. The "Apartments.com" name and logo are trademarks of Apartments.com. Other product and company names herein may be trademarks of their respective owners.

## Software

All software contained in this Site ("Software"), is owned by Apartments.com, its affiliates and/or Licensors and is protected by copyright and other intellectual property laws, as well as international treaty provisions.

Case 8:15-cv-02111-JLS-KES    Document 4-4    Filed 12/02/16    Page 435 of 439    Page ID #:1859

Any unauthorized access to, reproduction, redistribution, publication, display or other use of the Software is expressly prohibited by law and may result in severe civil and/or criminal penalties. Violators will be prosecuted to the maximum extent possible. Use of the MapPoint/Virtual Earth Service is also governed by the Microsoft Terms of Use and Privacy Statement located at http://go.microsoft.com/fwlink/?LinkId=21969 and http://go.microsoft.com/fwlink/?LinkId=21970.

## Linking

If You operate a website and wish to link to the Site, You must link to the Site's home page (www.apartments.com/) and/or You may also link to other pages found on the Site given that no manipulation to the canonical URL has occurred specifically, but not limited to, the addition or removal of any unique values, parameters or subfolders needed to render a page on the Site. Apartments.com reserves the right to disavow, reject or terminate any links to the Materials or the Site.

## User Content

By submitting listings, ads, photos, descriptions, data, or other content or materials ("Content") to the Site, You hereby grant to Apartments.com, its affiliates, and its parent and related companies a royalty-free, perpetual, irrevocable, nonexclusive, fully transferable, fully sublicenseable right and license to copy, modify, display, distribute, perform, create derivative works from, store, and otherwise use and exploit all such Content in any form, media, software or technology of any kind now existing or developed in the future. You further grant to Apartments.com, its affiliates, and its parent and related companies, a royalty-free right and license to use Your name, image and likeness in connection with the reproduction or distribution of the Content.

This Site may offer opportunities for Users 18 years of age and older to submit Content that express their opinions and share their ideas, for example in a consumer blogging format ("Opinion Content"). Apartments.com and its affiliates do not endorse the accuracy or reliability of any Opinion Content.  If You decide to submit Opinion Content, please use Your best judgment and be respectful of other individuals. By posting or submitting Opinion Content, You agree to abide by these Terms of Service. You may not use the Site to engage in any Prohibited Activities (as defined below). Uploading copyrighted or other proprietary material of any kind on the Site without the express permission of the owner of that material is prohibited and may result in civil and/or criminal liability.

## Apartments.com's Rights

Given the nature of the Site and the volume of messages and postings, except as otherwise provided in these Terms of Service or other applicable terms, Apartments.com cannot and does not monitor all of the Content posted or transmitted by You and other third-party information providers. Apartments.com reserves the right, in its sole discretion, to monitor, refuse to publish, remove, delete, move or edit any Content without notice, at any time for any reason. By using the Site, You expressly agree that Apartments.com (a) will not be liable for any claims, actions or judgments arising out of or related to any Content and (b) may monitor, refuse to publish, remove, delete, move or edit any Content without notice at any time for any reason, without liability and without providing a refund. You further expressly agree that You are solely responsible for any and all Content You submit to the Site.

## Unsolicited Content

Apartments.com does not accept unsolicited content or ideas for use or publication in its programming or in other digital, electronic or print media except in connection with the Forums, chat rooms and bulletin boards on the Site. Apartments.com and its affiliates shall not be responsible for the similarity of any of its content or programming in any media to Content or ideas transmitted to the Site.

## Representations/Indemnity

You hereby represent and warrant that (a) You have all necessary authority, rights and permissions to submit the Content to the Site, (b) the Content does not and will not infringe or misappropriate any copyright, trademark, trade secret, patent or other intellectual property right of any third party, including any rights of

privacy or publicity, (c) the Content and Your use of the Site does not and will not violate any applicable federal, state, or local law or regulation including, but not limited to, any fair housing laws or regulations or applicable real estate licensure or brokerage regulations, or cause injury to any person, and (d) the Content is truthful and accurate. You agree to release, defend, indemnify and hold Apartments.com, its affiliates, Licensors, and their respective officers, directors, employees, agents and contractors harmless from and against any and all claims, costs, demands or expenses, including attorneys' fees, arising from (i) any distribution, publication, refusal to publish, removal, deletion, movement, editing or other use of the Content You provide, (ii) Your use of the Site or any reliance on the Materials, (iii) Your breach of these Terms of Service or (iv) any actual, prospective or terminated sale, lease or other transaction between You and a third party.

## Prohibited Activities

You shall not:

- submit Content that is patently offensive to the online community, such as content that promotes racism, bigotry, hatred or physical harm of any kind against any group or individual;

- engage in activity or submit Content that could be harmful to minors;

- engage in activity or submit Content that harasses or advocates harassment of another person;

- engage in activity that involves the transmission of "junk mail" or unsolicited mass mailing or "spam" to others;

- engage in activity, submit Content, or promote information, that is fraudulent, false or misleading or promotes illegal activities or conduct that is abusive, threatening, obscene, defamatory or libelous;

- submit Content that contains restricted or password-only access pages, or hidden pages or images;

- submit Content that displays pornographic or sexually explicit material of any kind;

- submit Content that provides instructional information about illegal activities such as making or buying illegal weapons, violating someone's privacy, or providing or creating computer viruses;

- engage in activities or submit Content that solicit passwords or personally identifiable information for unlawful purposes from others;

- engage in commercial activities and/or sales without our prior written consent, such as contests, sweepstakes, barter, advertising and pyramid schemes;

- use the Site's lead forms and/or toll-free numbers to advertise or promote products and services to Apartments.com advertisers or to solicit Apartments.com advertisers in any manner;

- use any robot, spider or other automatic device, or a manual process, to access, monitor or copy web pages or the Materials contained in the Site or for any other unauthorized purpose;

- use any device, software or routine to interfere or attempt to interfere with the proper working of the Site;

- decompile, reverse engineer, disassemble or otherwise attempt to obtain the source code for the Software; or

- take any action that imposes an unreasonable or disproportionately large load on Apartments.com's hardware and software infrastructure.

## Compliance with Fair Housing Laws

All Content is subject to federal fair housing laws, which make it illegal to indicate in any advertisement any preference, limitation, or discrimination because of race, color, religion, sex, physical or mental disability, and/or familial status. Your state jurisdiction may also prohibit any preferences based on sexual orientation, marital status, ancestry, source of income, or other criteria. If You have any question about the fair housing laws and housing discrimination in general, please call Your local fair housing agency or the U.S. Department of Housing and Urban Development. For a list of all fair housing groups, go to the Housing Rights Center's website at www.hud.gov.

## Add a Listing Terms of Service

By listing an eligible property through the Site's "Add a Listing" service (the "Listing Service"), you acknowledge and agree to the Add a Listing Terms of Service, which are available http://corporate.apartments.com/ad-manager-terms-of-service :

## Warranty Disclaimer

YOU EXPRESSLY AGREE THAT USE OF THE SITE AND RELIANCE ON ITS CONTENT IS AT YOUR OWN RISK. APARTMENTS.COM, ITS AFFILIATES AND THEIR RESPECTIVE THIRD-PARTY LICENSORS DO NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND REGARDING THE SITE, THE SOFTWARE, THE CONTENT, THE MATERIALS, THE LISTING SERVICE OR THE RESULTS THAT MAY BE OBTAINED FROM USE OF ANY OF THE FOREGOING. THE SITE, THE SOFTWARE, THE CONTENT, THE MATERIALS AND THE LISTING SERVICE ARE PROVIDED ON AN "AS IS, AS AVAILABLE" BASIS, AND APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE THIRD-PARTY LICENSORS SPECIFICALLY DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF NONINFRINGEMENT. APARTMENTS.COM AND ITS AFFILIATES MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, TO ANY ACTUAL OR PROSPECTIVE RENTER OF ANY APARTMENT AS TO THE EXISTENCE, OWNERSHIP OR CONDITION OF THE APARTMENT; AS TO THE ADVERTISED AVAILBILITIES, RENT, LEASE TERMS, SECURITY DEPOSIT, OR APPLICATION FEES, IF ANY; OR AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION ABOUT AN APARTMENT APPEARING ON THE SITE. APARTMENTS.COM DOES NOT  WARRANT THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. APARTMENTS.COM RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO CORRECT ANY ERROR OR OMISSION ON THE SITE OR IN THE CONTENT. ALL APARTMENTS ARE SUBJECT TO PRIOR LEASE. ANY AND ALL CONCERNS, DIFFERENCES OR DISCREPANCIES REGARDING AN APARTMENT MUST BE ADDRESSED WITH THE LANDLORD AND/OR PROPERTY MANAGEMENT COMPANY PRIOR TO LEASING OF THE APARTMENT. APARTMENTS.COM DOES NOT MAKE AND EXPRESSLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES TO YOU REGARDING THE LISTING SERVICE INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES THAT YOU WILL LEASE YOUR APARTMENT, OBTAIN AN ACCEPTABLE RENT FOR YOUR APARTMENT, ONLY RECEIVE LEGITIMATE INQUIRIES OR SOLICITATIONS FROM QUALIFIED RENTERS, OR RECEIVE ANY INQUIRIES REGARDING YOUR APARTMENT FOR RENT. FOR PURPOSES OF THIS WARRANTY DISCLAIMER, "THIRD-PARTY LICENSOR" DOES NOT INCLUDE YOU. Some states do not allow the disclaimer of implied warranties, so the foregoing disclaimer may not apply to You.

## Limitation of Liability

APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE OWNERS, EMPLOYEES, AGENTS, CONTRACTORS AND THIRD-PARTY LICENSORS SHALL IN NO EVENT BE LIABLE FOR ANY DAMAGES OR LOSSES INCLUDING, WITHOUT LIMITATION, DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, RESULTING FROM OR CAUSED BY THE SITE, THE SOFTWARE, CONTENT, THE MATERIALS, THE LISTING SERVICE, THESE TERMS OF SERVICE OR OTHERWISE (THE "SERVICE"), INCLUDING, WITHOUT LIMITATION, DAMAGES RESULTING FROM NEGLIGENCE. IN NO EVENT WILL THE AGGREGATE MAXIMUM LIABILITY OF APARTMENTS.COM, ITS AFFILIATES, AND THEIR RESPECTIVE OWNERS, EMPLOYEES, AGENTS, CONTRACTORS AND THIRD-PARTY LICENSORS FOR ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF THE SERVICE EXCEED THE TOTAL AMOUNT OF FEES ACTUALLY PAID BY YOU TO APARTMENTS.COM. THE NEGATION OF DAMAGES SET FORTH ABOVE IS A FUNDAMENTAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN APARTMENTS.COM AND YOU.  THE SERVICE WOULD NOT BE PROVIDED TO YOU WITHOUT SUCH LIMITATIONS.  NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM APARTMENTS.COM CREATES ANY WARRANTY, REPRESENTATION AND/OR GUARANTEE NOT EXPRESSLY STATED IN THIS AGREEMENT.   FOR PURPOSES OF THIS LIMITATION OF LIABILITY, "THIRD-PARTY LICENSOR" DOES NOT INCLUDE YOU. Some states do not allow the exclusion or limitation of incidental or consequential damages of implied warranties, so the above exclusion or limitation may not apply to You.

## Termination of Service

You understand and agree that in Apartments.com's sole discretion, and without prior notice, Your access to this Site may be terminated or suspended, and Apartments.com may exercise any other remedy available and remove any Content, if it believes that Your use of the Site and/or any Content You provide (a) violate (i) these Terms of Service, (ii) the rights of Apartments.com, its affiliates, a Licensor, or another User, or (iii) any law or regulation, or are otherwise objectionable or inappropriate or (b) constitute fraudulent activity of any nature. You agree that monetary damages may not provide a sufficient remedy to Apartments.com for violations of these Terms of Service, and You consent to injunctive or other equitable relief for such violations without the requirement that Apartments.com post a bond. Apartments.com is not required to provide any refund to You if Your use is terminated as a result of Apartments.com determination, in its sole discretion, that You have violated these Terms of Service.

## Miscellaneous

These Terms of Service may be changed at any time and You will be notified of any such changes by an updated posting of the new Terms of Service on this page of the Site. Your continued use of the Site after the posting of any amended Terms of Service shall constitute Your agreement to be bound by any such changes. Apartments.com may modify, suspend, discontinue or restrict the use of any portion of the Site without notice or liability. These Terms of Service will be governed by and construed in accordance with the laws of the State of Illinois without regard to its conflicts of law provisions. You hereby agree that any cause of action You may have with respect to the Site must be exclusively filed in the federal or state courts located in Cook County, Illinois, within one (1) year after the cause of action arises or the cause is barred. You hereby consent to personal jurisdiction in the federal and state courts in Cook County, Illinois, and waive any objection based on forum non conveniens. As a condition of using this Site, You agree that all causes of action arising out of or connected with this Site shall be resolved individually, without resort to any form of class action. If for any reason a court of competent jurisdiction finds any provision of these Terms of Service, or portion thereof, to be unenforceable, that provision of these Terms of Service will be enforced to the maximum extent permissible so as to affect the intent of the parties, and the remainder of these Terms of Service will continue in full force and effect. Failure by Apartments.com to enforce any provision of this Terms of Service will not be deemed a waiver of future enforcement of that or any other provision of these Terms of Service. These Terms of Service and any other terms and conditions or policies applying to Your use of the Site, constitute the entire agreement between the parties regarding the subject matter hereof. Nothing contained herein shall be construed as creating a partnership, joint venture or agency relationship or granting a franchise between the parties. Notwithstanding anything to the contrary herein, if you and Apartments.com have entered into a separate written Apartments.com advertising contract, the terms and conditions of such contract shall control with respect to any term that is inconsistent with these Terms of Service.  IF YOU DO NOT AGREE TO THE TERMS STATED ABOVE OR TO ANY CHANGES TO THESE TERMS OF SERVICE, PLEASE EXIT THE SERVICE IMMEDIATELY.

©2015 Apartments, LLC, 1331 L Street, NW, Washington, DC 20005.
Last updated: March 30, 2015

Advertisers                                                                                    +

The Marketplace                                                                               +

Neighborhoods                                                                                 +

Top Cities                                                                                    +

About Us                                                                                      +



© 2015 CoStar Group, Inc.



⌂ Equal Housing Opportunity